## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARY P. STEVENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 3:09-cv-00498 (MPS) |
| | ) |
| LANDMARK PARTNERS, INC. | ) |
| | ) JANUARY 31, 2013 |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE PROFFERED TESTIMONY OF DR. G. WILLIAM KENNEDY

### INTRODUCTION

In 2004, Plaintiff Gary Stevens joined Defendant Landmark Partners, Inc. ("Landmark" or the "Firm") as a partner and head of its real estate group. To persuade Stevens to take the job, Landmark promised him that he would have a 10% participation in the economics of the Firm. It summarized this promise in a provision in the offer letter it sent to Stevens (the "2004 Offer Letter"):

| *Participation in the Economics of Landmark Partners, Inc.* | We are in the process of examining various options for key principals to benefit from their contributions to the growth of the firm. At this time, we have not determined what form that will take, i.e. ownership in the management company, options, profit sharing, or some combination thereof. You will have a meaningful participation (initially, 10%) in the program, once it is finalized. |
|---|---|

Ex. 1 at 2.

Between the 2004 Offer Letter and the date Landmark terminated Stevens, Landmark did not put in place any program at all, let alone a program that satisfied the promises made in the

economic participation provision.  In the fall of 2008 – more than four years after it signed the 2004 Offer Letter and Stevens began working at the Firm – Landmark sent Stevens a PowerPoint outline of a plan, which it called an "Equity Share Program."  Ex. 2 (the "2008 Equity Share Program").  The 2008 Equity Share Program described in the PowerPoint did not satisfy Landmark's obligations to Stevens under the 2004 Offer Letter, as Landmark itself quickly agreed.  The parties negotiated, attempting to compromise their disagreement over Landmark's obligations.  When Stevens rejected the Firm's final settlement offer, it terminated his employment.  Stevens then filed this lawsuit, alleging breach of contract and negligent misrepresentation claims related to Landmark's failure to provide the promised participation.

On December 27, 2012, Landmark filed its motion in limine to preclude the proffered testimony of Dr. G. William Kennedy.  Dr. Kennedy is Stevens's expert who will testify to the damages suffered by Stevens as a result of Landmark's breach of the economic participation provision of the 2004 Offer Letter and its negligent misrepresentations that induced Stevens to join Landmark.  Dr. Kennedy is prepared to testify to three different damage calculations, as reflected in his expert report dated Sept. 24, 2012:

    i.    The increase in the value of the Landmark economics that Stevens lost as a result of Landmark's breach is $30,180,000, which is the difference between the value of that interest as represented by Landmark in 2004, and the value in 2010 measured by the sale of a 55% interest in Landmark to Religare, an Indian investment management company;

    ii.    The increase in the value of Landmark economics that Stevens lost as a result of Landmark's breach is $16,288,676, which the difference in the value of that interest as represented by Landmark in 2004, and its value in 2008 when Landmark terminated Stevens established by Dr. Kennedy's independent valuation of the Firm; and

    iii.    The amount of profits that Stevens did not receive during the time he was at Landmark, measured as 10% of the distributions to shareholders during that time and is $3,963,570.

Ex. 3, Kennedy Report at 3.  The first and second opinions are alternatives; it is Dr. Kennedy's conclusion that Stevens suffered damages equal to the sum of numbers 1 and 3, or to the sum of 2 and 3.

Landmark's motion to preclude Dr. Kennedy from testifying to these opinions is based on its contention that they are precluded by prior rulings of this Court.  This contention is incorrect.

Throughout this case, Landmark has sought relentlessly to limit Stevens's claims, arguing that the 2004 Offer Letter bars him from seeking a 10% interest in the economics of the entire Firm, and that discovery into the value of Landmark was not proper because Landmark was not required to provide Stevens with "equity" in Landmark.  The Court has consistently rebuffed Landmark's efforts.  During discovery, Judge Dorsey twice rejected Landmark's attempts to withhold documents related to its value and profits, ruling that if Stevens prevailed on his claims, the "total value of Landmark's equity will be necessary to determine the monetary value of the 10% allegedly owed to Plaintiff."  Dkt. 80 at 2; *see also* Dkt. 108 at 9-10.   In denying Landmark's summary judgment motion, Judge Eginton ruled that Stevens had demonstrated that there is a genuine dispute as to whether Landmark was obligated to "provide him with a 10% participation in the economics of the entire Firm," and as to whether Landmark misrepresented that it would revise its economic participation program and provide him with a 10% participation in the Firm that would begin to build value for him in 2004, when he joined the Firm.  Dkt. 175 at 13, 18.  Judge Eginton also found that there was a genuine factual dispute over what was a reasonable time for performance within which Landmark had to perform its obligations under the economic participation provision. *Id.* at 14.

Notwithstanding these clear rulings by the Court, Landmark seeks to bar Dr. Kennedy's expert testimony because, according to Landmark, it values an interest in the "equity" of

Landmark.  This, Landmark contends, is inconsistent with and therefore barred by the Court's prior rulings that Stevens is precluded by the parol evidence rule from introducing extrinsic evidence that the *form* in which he was promised he would receive an economic participation in Landmark was share ownership.  As the rulings summarized above demonstrate and as more fully explained below, however, the parol evidence rule does not preclude Stevens from proving that the *substance* of the promise to provide him with "Participation in the Economics of Landmark Partners, Inc." was to provide him with at least a 10% interest in all the economics of Landmark – including both its value and its profits – beginning at the time of his employment or within a reasonable time thereafter.

Landmark's second objection to Dr. Kennedy's opinions is based on his use of the Religare sale in forming his opinions about the value of Landmark in 2008 and 2010.  Landmark does not contend that any accepted principles of valuation preclude Dr. Kennedy from using the Religare sale to value Landmark – indeed, it cannot, because Dr. Kennedy applied established valuation methodologies when he considered the December 2010 sale as part of his independent valuation of the Firm as of 2008.  Instead, Landmark argues that Judge Dorsey's discovery ruling that the December 2010 sale was "too far removed" from the date Stevens was terminated to be relevant for discovery purposes bars an expert from using the sale in forming his opinions.  Judge Dorsey did not, however, rule that expert testimony using the Religare sale did not satisfy the test for admissibility of expert testimony under Federal Rule of Evidence 702.  To extend Judge Dorsey's discovery ruling to bar Dr. Kennedy's expert opinions on value would be contrary to that rule.

Dr. Kennedy's opinion on damages based on the value of Landmark in December 2010 as established by the Religare sale is also justified.  If Stevens had remained at Landmark until

December 2010, he would necessarily have been allowed to share in the economics from the Religare sale.  Evidence developed during discovery demonstrates that Stevens would, but for Landmark's breach, have been at Landmark at the time of the sale and, therefore, would have benefited from the increase in value indicated by the Religare sale price.  Landmark's own expert recognized that it was reasonable to assume that Stevens would have remained at Landmark for that time period, because he used a settlement payment for his damage calculations that was contingent on Stevens remaining at the Firm until December 31, 2011.  It is thoroughly inconsistent for Landmark to ask its expert to assume that Stevens would have been employed for three more years and then to ask this Court to preclude Stevens's expert from expressing a damages opinion based on the same proposition.

## BACKGROUND

### A.    Landmark Commits to Provide Stevens with Economic Participation in the Firm

Landmark is an investment management firm that specializes in the secondary market for private equity and real estate limited partnership interests.  It forms investment funds, raises money from investors in those funds, makes purchases on behalf of the funds in the secondary market of private equity or real estate limited partnership interests, and manages those investments.  It is paid primarily through management fees that are based on a percentage of assets under management in each of the funds it has formed.

In 2004, Landmark needed to replace two members of its senior management who had served as the head and second-in-command of its real estate group, and who had recently left the Firm.  It hired a recruiter, Tony LoPinto of Equinox Partners, to help it find a new head for its real estate group.  The position specification that LoPinto created for the job, after speaking with

Landmark, stated that Landmark was looking for a "Senior Partner" who would be in a "leadership position on the Landmark team." As for compensation, it stated:

> An attractive and competitive compensation will be comprised of a base salary plus performance bonus and a significant equity component in the funds.

Ex. 4 at 4.

During the search process, LoPinto identified Stevens, who was previously a partner in the Carlyle Group, as a top candidate. In a memo discussing the compensation that would be required for Stevens to take the job, LoPinto wrote:

> We . . . spoke to Gary about his ability to invest in the firm. He understands that the plan is in formation now, and that he will participate in a meaningful way. *Participation at the firm level is critically important to him*; part of the attraction of the Landmark opportunity is the ability to be involved in a platform that extends beyond real estate investments. He indicated that if the participation plan involves his buying into the firm (as opposed to a direct equity grant), any income generated through the plan should not be factored into his compensation package.

Ex. 5 (emphasis added). Given that participation at the firm level was so important to Stevens, Barbara Beck, who worked with LoPinto on the Landmark search, concluded that Stevens would have rejected any offer from Landmark had it not included that opportunity. Ex. 6, Beck Dep. 113:19-114:2. Stevens made exactly that same point when Landmark showed him the outline of the Equity Share Program in September 2008 ("Material participation at the firm level . . . was of critical importance to me . . . and I would never have accepted employment at Landmark without it."). Ex. 7, Oct. 1, 2008 e-mail.

On May 3, 2004, after a series of interviews with Landmark, Stevens talked with LoPinto and the Firm's president, Tim Haviland, who extended an offer to Stevens to join Landmark as head of its real estate group. Haviland and Stevens discussed the subject of participation in the economics of the Firm. Haviland described Landmark's current program for firmwide economic participation, under which partners purchased shares in the Firm at an independent valuation.

6

Ex. 8, Haviland Dep. 274:24-280:5.  According to Haviland, the former head of the real estate group and his second-in-command – the people Stevens replaced – had owned 12.5% of the Firm.  Ex. 9, May 6, 2004 notes.  The current owners were Haviland; Frank Borges; and three partners in the Firm's private equity group, James McConnell, Robert Shanfield, and Tony Roscigno.  *Id.*; *see also* Ex. 8, Haviland Dep. 322:6-20; Ex. 10, Stevens Dep. 132:7-23.

However, Haviland told Stevens that the current program would change, because Landmark's shareholders were not comfortable with having new partners borrow in order to acquire stock.  Ex. 8, Haviland Dep. 276:2-4 ("[I] shared with [Stevens] that we have a plan in place that doesn't work.  We need to address working on a plan."); 319:24-320:3 ("We did have a conversation in that we were looking to change the plan because how people bought shares going in didn't work for us . . . ."); Ex. 10, Stevens Dep. 128:6-129:10.  Haviland explained that Landmark still wanted to figure out a way to also provide economic participation for people who, unlike Stevens, could not purchase stock on an all-cash basis, and that such participation would also be part of the new program.  Ex. 10, Stevens Dep. 129:11-131:5.  Landmark represented that it was trying to develop a new equity participation program for its current shareholders and new equity participants, which would include Stevens.  Ex. 8, Haviland Dep. 348:22-351:2; see also Ex. 11, Borges Dep. 99:12-100:19 (Landmark was going to put a plan together "to allow senior managers of the company to participate in the growth of the firm").  Haviland told Stevens that once Landmark had resolved the issue involving new participants who couldn't afford to purchase ownership, it would finalize the new program, which would govern equity participation for Stevens, the Firm's current shareholders, and others who the Firm decided to provide with firmwide participation.  Ex. 8, Haviland Dep. 348:22-351:2.

Stevens asked about the level of participation that he would have in the new plan. Haviland told him that assuming ten participants rather than the five in the existing program, Stevens would be "not on [the] low end" of the equity recipients: thus, he would receive "at least 10% in [the] firm." Ex. 9, May 6, 2004 notes at STE-00016. As for the timing of the changes to the program, Haviland said that Landmark expected to have a new program in place as of December 31, 2004, but that Stevens's participation would begin to build value starting in 2004 regardless of when the program was finalized. Ex. 10, Stevens Dep. 132:3-6; *see also id.* at 139:24-140:22 ("That was clear that [starting the program one or two years later] was not the deal. It's going to be, This will be effective as to you when you start.").

Haviland also described the value that Stevens could expect from his participation. He told Stevens that the Firm had been valued at $20 million when it acquired shares of its founder, Stan Alfeld, in early 2004; he also described the projected revenue of the Firm for 2004, which Stevens used to estimate the expected $20 million increase in the value of Landmark for that year. Ex. 9 at STE-00015. This growth in value was part of the economics of the Firm that Landmark promised Stevens he would receive.

Later on the 6th, Stevens spoke with Frank Borges, who stated that he was "v[ery] committed to [the] concept" that Stevens would participate in the ownership of the Firm. *Id.* at STE-00017; *see also* Ex. 11, Borges Dep. 126:23-25 ("My indicating to him . . . that I was fully committed to coming up with a plan for which he and other partners could benefit from ownership. Who could benefit, you know, from the growth of the firm . . . ."). Borges also promised Stevens that his participation would be valued as of his start date to allow Stevens to benefit from the gains in value subsequent to that date. *Id.* at 99:3-5 and 100:17-19.

After these discussions, Borges sent Stevens an offer letter, which stated that it was a "summary of the terms we have discussed." Ex. 1 at 1. The offer letter included the aforementioned provision for "Participation in the Economics of Landmark Partners, Inc." *Id.* at 2. Both the people who Stevens was to replace as head of the real estate group, as well as the five key people in the private equity group, were at the level of senior management – or, to use the terminology of the economic participation provision, "key principals" – of Landmark. Stevens joined Landmark as senior management and was led to believe that Landmark intended to treat him similarly to the other members of senior management who were his peers in the Firm.

**B.      Landmark Fails to Provide Stevens with the Required 10% Participation**

Contrary to its promises, Landmark did not change its economic participation program for key principals, and never gave Stevens participation in the economics of the Firm in the amount of 10%. Instead, it maintained and did not change the existing share ownership plan that it had described to Stevens. Ex. 8, Haviland Dep. 108:10-111:13. Under that plan, Landmark's other key principals received millions from the profits of the Firm in the form of shareholder distributions, and continued to benefit from the increased value of Landmark through their ownership of a substantial percentage of the outstanding shares in Landmark. *Id.* Stevens was never offered any of these benefits, let alone 10%.

The so-called "Equity Share Program" Landmark described to Stevens in September 2008 (Ex. 2) did not satisfy its obligations under the 2004 Offer Letter. Stevens would receive an interest in only part of the profit margin (which Landmark called the "Operating Margin") from only *one* new Landmark real estate fund. *Id.* Landmark would retain the sole discretion to set the Operating Margin at whatever amount it decided upon, and only proposed to give Stevens a "2-5%" interest. Ex. 2 at 4. At the time it gave Stevens the outline of the 2008 Equity Share

9

Program, Landmark had *twenty-six* active funds. *See* Ex. 11, Borges Dep. 45:4-18. As a Landmark shareholder conceded, a plan that "provide[d] a sharing of the profits from a specific either private equity or real estate fund to its participants . . . based on a very specific formula," was not "designed to afford participation in the economics of Landmark as a whole." Ex. 12, McConnell Dep. 19:20-21:19. One reason is because Landmark makes money not only from its new funds in the form of management fees, but also from its numerous other funds, which were continuing to generate fee revenue. *See* Ex. 13, Alfeld Dep. 61:14-62:3 (other funds aside from newly established funds continued to generate revenue for Landmark); Ex. 27 at 2 (2008 quarterly financial statement, reflecting revenue produced by all funds).

Ironically, in light of Landmark's insistence that it had no obligation to provide "equity" to Stevens, under the 2008 Equity Share Program, Stevens's "2-5%" interest in the one real estate fund would be converted to equity upon a capital event (i.e., a sale of all or a substantial percentage of the Firm), such that even under this deficient plan, Stevens would receive some equity-like benefit from a sale of Landmark. Ex. 2 at 6.

Stevens objected to the 2008 Equity Share Program, because the outlined plan did not comply with the agreement Landmark had made with him in 2004. Ex. 14, Sept. 28, 2008 memo. Landmark immediately conceded that it did not satisfy the 2004 Offer Letter. Haviland admitted that the outline of the 2008 Equity Share Program was not drafted with the 2004 agreement in mind. *See id.* Borges responded that, in light of the terms of Stevens's agreement, Landmark would need to adjust Stevens's participation to 10%; he also stated that "[i]mportantly," the outlined program would give him "equity-like treatment in the event of a Landmark Partners Inc. liquidity event." Ex. 15, Sept. 29, 2008 e-mail. Stevens, however, correctly noted that the 2008 Equity Share Program, if implemented, would not actually provide

participation in the entire Firm, but only in a small sliver of the Firm, such that "the magnitude of the value proposed [wa]s not commensurate with the value of what was implicitly offered in the original agreement." Ex. 7, Oct. 1, 2008 e-mail.

Borges responded: "[Y]ou are absolutely right that the intent was to participate in LPI economics and the plan shared with you Monday did not do that, for which an adjustment is required and will be made.  Therefore, the plan for Gary Stevens will include participation in both private equity and real estate subject to their respect[ive] terms." Ex. 16, Oct. 2, 2008 e-mail.  Thus, Borges proposed that Stevens would be a "5% participant" in the private equity "plan" and a "10% participant" in the real estate "plan;" however, those "plans" would still begin with and include only the Firm's newest funds. *Id.*

Borges later conceded that he had also promised Stevens that his participation would begin to build value from the date he started at Landmark, although Borges attempted to limit this promise, and the 10% term in the 2004 Offer Letter, to a stock purchase for Stevens.  Ex. 17, Oct. 7, 2008 e-mail.  Borges thereby took the position that Landmark had promised Stevens 10% of the Firm if and only if he was permitted to acquire ownership of Landmark common stock, but that if he did not acquire ownership, the scope and timing of his participation in the Firm's economics were at Landmark's sole discretion.  He and Haviland repeated this position in their depositions. Ex. 11, Borges Dep. 338:21-24 (Q: "[I]f you did something else then the extent of his participation and the starting date for growth in value was in your discretion?" A: "Correct."); Ex. 8, Haviland Dep. 334:9-20 (Q: "[T]he deal was that we are planning to do it but if we don't do it, you get nothing?  A: That's correct."); 414:20-417:17 ("I didn't interpret that 2004 agreement to say that he was going to have 10 percent participation in any program that we came up with.").

In late October, after negotiations to resolve the dispute, Landmark made a final settlement offer that included $2 million to Stevens in the form of "special compensation." Stevens would not receive any of the $2 million unless he remained at Landmark at the end of 2009, more than five years after he joined; he had to remain at Landmark until December 31, 2011, in order to receive the total amount. Ex. 18.   The settlement offer also included two options: one was a 15% share of the net revenue from the new real estate fund, and the other was a 10% share of that revenue along with 3% of a to-be-developed private equity plan (which, again, would only apply to newly-created funds). *Id.* at §§ 6 and 6(alternate).   Stevens declined the final offer, in part because he did not want to release his claims in a situation in which Landmark could terminate him before he had received any of the benefits of the agreement, which it would retain the right to do.   Landmark then terminated his employment, and Stevens filed his complaint soon after.

### C.   This Court Consistently Rejects Landmark's Argument That Stevens Cannot Claim a Right to Participation in the Economics of the Entire Firm

After the District of Maryland transferred Stevens's action to this Court, Landmark moved to dismiss Stevens's complaint, arguing that the terms of the 2004 Offer Letter precluded Stevens from claiming an "equity interest" in Landmark that would have been retroactive to 2004.   Judge Dorsey ruled that because the 2004 Offer Letter left open the form that the economic participation program for key principals would take, Stevens could not enter parol evidence of a collateral oral agreement to provide him with ownership in the company.   Dkt. 57 at 5.   However, he also ruled that Stevens had clearly stated a claim for relief based on Landmark's failure to "offer him 10% participation in the growth of the firm," and further stated that it was not clear whether Landmark had offered a "proposal fitting with Plaintiff's broad

definition of equity," which could encompass ownership, options, profit sharing, or a combination thereof. *Id.* at 6.

During discovery, Stevens sought information about the economics of Landmark. Landmark contended that the Court should bar the requested discovery because "Plaintiff [was] not entitled to equity in the Company as a whole." Dkt. 76 at 8. Judge Dorsey disagreed, ruling that "should Plaintiff prevail, the value of the firm's equity as a whole will be relevant to determining damages," and "[t]he total value of Landmark's equity will be necessary to determine the monetary value of the 10% allegedly owed to Plaintiff." Dkt. 80 at 2. Judge Dorsey later reaffirmed this ruling, after Landmark continued to resist the discovery that he had ordered it to provide:

> [T]he Court held [in its ruling on Landmark's motion to dismiss] only that the form of Plaintiff's participation in Defendant's economics had not yet been determined at the time of the employment contract. . . . [A]n accurate valuation of Defendant . . . will be relevant to the issue of damages, should Plaintiff prevail.

Dkt. 108 at 9-10.[1]

After the close of discovery, Landmark moved for summary judgment, contending that the 2004 Offer Letter required it only to give Stevens 10% of a "program," the terms of which were entirely at its discretion even if that "program" only allowed Stevens to "share in the profits of funds in [his] respective product line[]," real estate, and even if its other key principals still had participation in the growth and profits of the Firm as a whole. Dkt. 133, Landmark Mem. in Supp. of Mot. for Summ. J. at 13-14; *see also* Dkt. 157, Reply in Supp. of Mot. for Summ. J. at 12 (arguing that "[Plaintiff] claims that Landmark's offer was deficient, because it 'did not afford him 10% participation in the Firm's equity," and "Stevens advances no other grounds for disputing that he was offered 10% of the program" (emphasis omitted)).

---

[1] Despite Landmark's steadfast reliance on the "law of the case" doctrine, Mem. at 10, it fails to even mention these rulings in its motion to exclude Dr. Kennedy's testimony.

Judge Eginton rejected Landmark's arguments. Like Judge Dorsey, he ruled that Stevens could not offer evidence of a collateral oral agreement that he was entitled to ownership as the only permissible form for his economic participation. Dkt. 175 at 11-12 (citing Judge Dorsey's ruling on motion to dismiss). However, Judge Eginton also ruled that Stevens had "presented parol evidence which supports his claim that the Agreement obligates Landmark to provide him with a 10% participation in the economics of the entire Firm," and that nothing in the 2004 Offer Letter contradicted "the alleged misrepresentations Landmark made to Stevens that it planned to revise its economic participation program and provide him with a 10% economic participation in the Firm effective as of the date he started regardless of when Landmark adopted the new program." Dkt. 175 at 13, 18.

### D.    The Damages Opinions of Dr. Kennedy and Mr. Glusman

Dr. Kennedy, Plaintiff's damages expert, reached three major opinions on Stevens's damages from Landmark's breach of contract and negligent misrepresentations. In the first opinion, he valued a 10% interest in the growth of Landmark from May 2004 to December 2010, with the increase in value measured by Landmark's sale to Religare. In the second, he valued the same interest from May 2004 to November 2008, the date Stevens was terminated, with the increase in value measured by Dr. Kennedy's independent valuation of Landmark as of that date. In the third, he valued a 10% interest in the profits that Landmark paid to its other key principals in the form of shareholder distributions from 2004 to 2008.

Landmark's expert, David Glusman, produced two reports. One is a valuation report in which he calculated 10% of the growth in Landmark's value from 2004 to 2008, using a fair market value standard. Ex. 28. The other is a report on damages. Ex. 19. In that report, he compares Landmark's $2 million cash settlement offer made to Stevens in October 2008 with:

(i)     a 10% interest in the "Equity Share Plan" that Landmark adopted after Stevens

left the Firm (the "2009 Equity Share Plan"), which he hypothetically applies

retroactively to other funds during Stevens's employment; and

(ii)    the profit participation in particular funds that was also included in the October

2008 settlement offer.

*See id.* at 14.[2]

## ARGUMENT

## II.   THE ECONOMICS OF LANDMARK, INCLUDING ITS GROWTH IN VALUE AND PROFITS, ARE RELEVANT TO STEVENS'S DAMAGES.

### A.   The Court Has Already Rejected Landmark's Argument that the Language of the Offer Letter Renders the Economics of the Firm Irrelevant to Damages.

A critical factual dispute in this case is whether Landmark breached its obligations under

the economic participation provision of the 2004 Offer Letter. Landmark argues that it satisfied

those obligations by merely proposing that Stevens receive a 10% participation in a "program" of

its own choosing, even though (i) that "program" did not include all of the economics of the

Firm, but only a slice of Landmark's net revenue from one real estate fund; (ii) Landmark's other

"key principals" had received, and would continue to receive, a broader participation in all of the

economics of Landmark, including its growth in value and profits; and (iii) Stevens would not

begin to receive even the benefits from the limited "program" until the end of 2009, more than 5

years after he joined the Firm. As Judge Eginton found on summary judgment, however,

Stevens is entitled to put on proof at trial that Landmark was required to provide him with a 10%

interest in the economics of the entire Firm accruing value from May 2004, and that Landmark

---

[2] Neither the 2009 plan nor the October 2008 settlement offer complied with Landmark's obligations under the 2004 Offer Letter. Stevens intends to file a motion in limine to exclude this testimony on the ground that it is irrelevant, barred by Fed. R. Evid. 408, and inadmissible under Fed. R. Evid. 403.

did not satisfy its obligations.  Dkt. 175 at 13.  If Stevens can convince the jury that his position is correct, the jury will need information about the damages that resulted from Landmark's breach and/or its negligent misrepresentations surrounding the agreement.

Dr. Kennedy's testimony will provide that information, because he has valued 10% of the economics of Landmark, including its profits and growth.  He appropriately considered each of those elements as components of the "economics of Landmark Partners, Inc."  Indeed, during Stevens's employment as a key principal of Landmark, Landmark's other "key principals" – the shareholders who Haviland described to Stevens – shared in those economics through shareholder distributions made from the Firm's profits, and through the appreciation of their shares in the company.  Stevens never shared in the economics of the entire Firm, even though Landmark had told him that he would participate in them in the amount of 10%.  The value of the benefits that Landmark's other key principals actually received from their economic participation is a logical starting point for measuring the value that Stevens should have received.

Judge Eginton's ruling that Stevens cannot introduce collateral evidence of an agreement to provide him with ownership does not change this outcome.  Landmark wants that ruling to mean that the 2004 agreement was satisfied if it *only* gave Stevens 10% of the profits from a particular real estate fund that it placed at its discretion in a "program" – not participation in the economics of Landmark as a whole.  But that position itself contradicts the terms of the 2004 Offer Letter, which set forth the required participation ("in the economics of Landmark Partners, Inc."), the other participants ("key principals"), the forms of participation (which included "ownership, options, profit sharing, or a combination thereof"), and the scope of Stevens's participation ("meaningful (initially, 10%) in the program").

16

As Judge Eginton found, it also contradicts the parol evidence of the parties' contemporaneous discussions, which helps explain these terms and provides proof of the context in which the agreement was negotiated, and the intent of the provision that Stevens would participate in the "Economics of Landmark Partners, Inc." The intent was that Stevens would receive a "real participation at the level of 10 percent in the entity and in the fund beyond real estate," regardless of what specific form of participation Landmark chose to deliver this benefit. Ex. 20, LoPinto Dep. 108:12-25; *see also* Ex. 8, Haviland Dep. 274-280 (Haviland and Stevens discussed the Firm's current stock ownership program for economic participation in the Firm and how Landmark wanted to expand it); *id.* at 333 ("We told him that we understood he wanted an interest in the firm. We were working on a program or a plan and he would participate in it."); *id.* at 421 (Landmark designed the provision to "address [Stevens's] request for participation in the entire firm"). The intent was not for Landmark to create a second-class "program" for Stevens, limited only to profit-sharing in particular funds, and maintain economic participation in the growth and profits of the entire Firm for its other "key principals." *See* Ex. 20, LoPinto Dep. 108-09.

Moreover, Landmark's newly limited definition of the term "equity" to mean outright ownership of its common stock, with no other alternatives for providing an interest in the growing value in the Firm, contradicts how it has actually used that term in the past. When Landmark described the outline of a plan in the September 2008 PowerPoint, it called the plan an "Equity Share Program," even though the outlined plan would not provide outright stock ownership but instead "economic protection/participation in a capital event." Ex. 2.[3] As set

---

[3] Similarly, the 2009 plan that Landmark asked its expert, Glusman, to use in calculating damages was called an "Equity Share Plan," although it did not include outright ownership. Ex. 21. Further demonstrating that Landmark wants to avoid its own terminology and actions,

forth above, the outlined 2008 Equity Share Program was deficient for a number of reasons.  The point, however, is that Landmark itself does not define "equity" to mean outright ownership, as opposed to some other form by which it confers participation in growth in value and profits.

**B.      The Profits that Landmark Actually Paid to Its Key Principals During Stevens's Employment Are Relevant.**

In addition to its more generalized argument that Dr. Kennedy cannot testify about its firmwide value and profits, Landmark specifically argues that Dr. Kennedy cannot testify about the amount of shareholder distributions that Landmark made to its key principals from 2004-08. Its argument is a tautology: Stevens was not a shareholder; only shareholders received distributions; therefore Stevens cannot claim a right to distributions.

However, the shareholder distributions are a measure of the profits that Landmark actually paid out to its key principals during the 2004-08 time period, when Landmark was dragging its feet and unreasonably failing to offer Stevens economic participation in the Firm as a whole.  Those profits are part of a logical measure of Stevens's damages from Landmark's failure to implement his required participation.

Landmark's contention that shareholder distributions are irrelevant to Stevens's damages is particularly ironic given its own expert's methodology.  Mr. Glusman chose to value damages by way of the following complicated and hypothetical steps:

- First, he used the 2009 Equity Share Plan, which was not adopted until after Stevens left the Firm, as his starting point[4];

---

Glusman renamed the 2009 Equity Share Plan the "2009 Profit Participation Plan" in his report and valued only selected components of that plan.  Ex. 19.

[4] As noted above and *infra* at 24, Landmark withheld this document during discovery and produced it only after discovery was closed, once it decided to have its own expert rely on it. Stevens will file a motion in limine to prevent Glusman from relying on the 2009 Equity Share Plan for his expert opinion.

- He then assumed that the 2009 Equity Share Plan was implemented in the 2005-2006 period;

- He then retroactively applied Landmark's methodology for calculating the "profits" for particular funds that were part of the 2009 Equity Share Plan to other funds, which were never going to be subject to the plan that was actually adopted.

Ex. 19 at 7-9.   Dr. Kennedy's testimony, by contrast, relies on what actually happened at Landmark.   There is no reason to avoid using the distributions as a measure of the profits that the Firm was generating.   Dr. Kennedy should be permitted to testify about them.

## III.   DR. KENNEDY APPROPRIATELY CONSIDERED THE DECEMBER 2010 RELIGARE SALE WHEN FORMING HIS TWO OPINIONS AS TO THE VALUE OF LANDMARK.

### A.   Commonly Accepted Valuation Methodologies Supported the Use of the Religare Sale to Measure Landmark's Value as of November 2008.

In arriving at an independent valuation of Landmark as of November 2008 (the date Stevens was terminated), Dr. Kennedy used three different valuation methodologies: (1) the income approach, based on Landmark's cash flow; (2) a market approach based on guideline (*i.e.*, comparable) public companies; and (3) a market approach using guideline transactions, which included two sales of Landmark stock in 2004 and the sale of 55% of Landmark to Religare in December 2010.   *See* Ex. 3 at 8, 12.   Dr. Kennedy then assigned an equal weight to each of those three methodologies to arrive at his final valuation for November 2008.   *Id.* at 8. The Religare sale formed only a component of one of the three methods used by Dr. Kennedy in reaching that valuation.

Judge Dorsey denied discovery into the circumstances of the Religare sale on the ground that it occurred "more than two years after Plaintiff's termination, not weeks or months," which would have indicated that it was the "best evidence of market value" of Landmark in November

2008.  Dkt. 142 at 2-3.  Landmark contends that this ruling is "law of the case," and that as a result this Court may not permit Dr. Kennedy to take the Religare sale into account when measuring the value of the Firm as of November 2008.  Mem. at 12.

The Court should reject Landmark's argument.  First, Judge Dorsey did not address the issue presented here – the admissibility of expert testimony based on the Religare sale.  Federal Rule of Evidence 702 governs the admission of expert testimony.  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)."  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).  Under Rule 702, an expert may testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; *see also In re Xerox Corp. Securities Litig.*, 746 F. Supp. 2d 402, 407 (D. Conn. 2010) (Rule 702 requires a "reliable basis in the knowledge and experience of the relevant discipline") (internal citation and quotation marks omitted)).[5]

Second, Dr. Kennedy's use of the Religare sale easily meets the standard for admissibility under Rule 702 – it is entirely appropriate and consistent with accepted valuation methodology.  *See* Ex. 22, Kennedy Dep. 51 ("Clearly I believe that [the Religare sale] was a direct indication of pricing for that company and was relevant for me to consider as a valuation

---

[5] Under Rule 702, expert testimony no longer has to be "'generally accepted' as reliable in the relevant scientific community" in order to be admitted.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 584 (1993).  However, if an expert's methodology is not only valid, but "generally accepted," as Dr. Kennedy's methodology is, that only strengthens the case for its admissibility. *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) (affirming admission of expert testimony after district court concluded that expert's opinions were "generally accepted within the relevant community"); *see also Daubert*, 509 U.S. at 590 n. 9.

expert."). The use of post-valuation date transactions in the company's own stock as information that is relevant to the prior value of the company – even transactions that are two years after the valuation date – is supported by the valuation literature and case law. Shannon Pratt's <u>Valuing A Business</u> is an authoritative treatise on business valuation, as Landmark's own expert, Mr. Glusman, acknowledges. Ex. 23, Glusman Dep. 207:15-16 (Dr. Pratt "may be the original dean of the valuation profession"), 237:17-238:17. Dr. Pratt states:

> [I]f a subsequent sale has occurred, most analysts now agree that it would be prudent to reconcile the valuation date value concluded by other approaches with the subsequent event transaction price.

Ex. 24, Shannon Pratt and Alina Niculita, <u>Valuing A Business: The Analysis and Appraisal of Closely Held Companies</u> (5th ed. 2008) at 669.

In the same section of his treatise, Dr. Pratt summarizes numerous decisions of the Tax Court – which frequently addresses the valuation of businesses – that have repeatedly ruled that subsequent sales are relevant to the value of the enterprise at an earlier date, even if the sales post-dated the valuation date by two years or more. *See id.* (citing *Estate of Scanlan v. Comm'r*, T.C. Memo 1996-331 (Jul. 25, 1996) (Tax Court relied on sale consummated in January 1994 to establish value as of date of death in July 1991); *Estate of Cidulka v. Comm'r*, T.C. Memo 1996-149 (Mar. 26, 1996) (Tax Court relied primarily on sale four years following valuation date to establish value); *Estate of Jung v. Comm'r*, 101 T.C. 412, 431-32 (1993) (analyst's valuation on date of death had to be reconcilable with subsequent sale price two years later)).[6] The Second Circuit, like the Tax Court, has also consistently held that information about subsequent sales should be admitted as evidence of value. *Schonfeld v. Hilliard*, 218 F. 3d 164, 178-79 (2d Cir.

---

[6] In *Estate of Kaplin v. Commissioner*, 748 F.2d 1109 (6th Cir. 1984), the Sixth Circuit held that the Tax Court erred in assessing the value of donated property because it failed to consider a sale of the property that occurred two years after the donation, stating that the sale was "highly relevant" because "little evidence could be more probative than the direct sale of the property in question." *Id.* at 1111.

2000) ("recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value," finding it an abuse of discretion to exclude such evidence); *see also Boyce v. Soundview Technology Group, Inc.*, 464 F. 3d 376, 386 (2d Cir. 2006).

Under these authorities, there is no basis for excluding Dr. Kennedy's proposed testimony using the Religare sale as evidence of Landmark's 2008 value: it is based on reliable principles and methods applied to facts (the Religare sale) that are typically taken into account by valuation professionals in valuing a company such as Landmark. *See Xerox Corp.*, 746 F. Supp. 2d at 411 (admitting opinions where experts used an "accepted methodology" based on "reliable principles and methods"). Dr. Kennedy's opinions would not have been excluded even before *Daubert* and Rule 702 expanded the scope of permissible expert testimony. *See United States v. Jacobetz*, 955 F.2d 786, 799-800 (2d Cir. 1992) (techniques that were commonly used by experts in the field satisfied *Frye* standard because they were generally accepted).

Third, ignoring the Religare sale would risk misleading the jury as to Landmark's true value. In his own valuation report, Mr. Glusman opines that in 2008, an arms-length buyer would have paid merely $37 million to purchase Landmark. Ex. 28 at 15 (measuring fair value of Landmark before applying discounts for lack of marketability and minority). However, two years later, an independent, arms-length buyer paid nearly *five* times that amount for just over *half* the Firm, where the evidence does not reveal any dramatic changes in Landmark's performance or structure in the meantime. Mr. Glusman chose to ignore that purchase entirely, despite the authoritative treatise and case law describing a different approach. The Religare sale is plainly relevant to the jury's decision whether to give more weight to Dr. Kennedy's valuation. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999) (where there is a dispute within

the scientific community about a theory, *Daubert* supports admission of testimony expressing a view within "the range where experts might reasonably differ").

Finally, even if Judge Dorsey had expressly (or by implication) precluded Dr. Kennedy from considering the Religare sale in forming his opinions, the Court is not bound to follow his decision under the "law of the case" doctrine, as Landmark contends. At the trial level, the "law of the case" is simply a "management practice." *Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co.*, 736 F. Supp. 1226, 1228 (D. Conn. 1990). Even if the Court has previously ruled on an issue, it retains the ability to exercise its discretion, further reflect, and "make a better informed ruling in accordance with its conscience." *Id.* The Court may revisit its prior legal rulings "where new evidence has surfaced or a more complete record has developed," or to "to correct a clear error of law or to prevent manifest injustice." *Casey v. United States*, 161 F. Supp. 2d 86, 92-93 (D. Conn. 2001) (citations and internal quotation marks omitted). If the Court believes that Judge Dorsey's discovery ruling would, if left undisturbed, compel the exclusion of Dr. Kennedy's opinion insofar as he relies on the Religare sale as one data point considered in calculating the value of Landmark, it should reconsider that ruling and find that it will not govern the separate question whether the use of post-valuation-date transactions in a company's own stock may properly be considered by a valuation expert in reaching an independent opinion on valuation.

**B.     Landmark's Value as of December 2010 Is Relevant for the Added Reason that Stevens Would Have Received the Benefit of the Religare Sale if Landmark Had Not Failed to Satisfy Its Obligations.**

Dr. Kennedy should also be permitted to testify as to his calculation of Landmark's value as of December 2010 using the Religare sale. Although Judge Dorsey wrote in his February 11, 2010 discovery ruling that "Plaintiff cannot claim interest in the company outside the time period of his employment," Dkt. 80 at 3, as discussed above, the Court is not rigidly bound by the law

of the case doctrine to follow Judge Dorsey's discovery ruling on relevance in ruling on the substantive question whether to admit expert testimony based on the Religare sale, where the record is further developed and circumstances suggest a different ruling.  The evidence shows that Stevens would have remained at Landmark but for Landmark's breach.  *See* Ex. 8, Haviland Dep. at 437:23-25 (Landmark "genuinely wanted to keep" Stevens); Ex. 11, Borges Dep. 165:2-9 (Borges was trying to work out an agreement by which Stevens would remain at Landmark). Therefore, it was reasonably certain that Stevens would have enjoyed the benefit of the Religare sale had Landmark complied with its agreement in the first place.  *See Gianetti v. Norwalk Hosp.*, 304 Conn. 754, 777-81 (2012) (plaintiff put forth sufficient evidence to prove lost profits for four years after breach arising from non-renewal of physician privileges).

Allowing Stevens to claim damages based on a post-termination transaction is also supported by Landmark's own reversal of course on the relevance of the "Equity Share Plan" implemented in 2009 *after* Stevens's departure and by the recent opinion proffered by Landmark's own expert.   Landmark previously opposed discovery into post-2008 events, claiming that they were irrelevant. Dkt. 78 at 14.  It has now elected to produce, well after the close of fact discovery, a copy of the 2009 Equity Share Plan. Ex. 21.  Landmark intentionally withheld this document during discovery and instructed its witnesses not to answer questions about the 2009 Equity Share Plan.  *See, e.g.*, Ex. 25, Mehlman Dep. 16:19-17:10; Ex. 26, Giovacchini Dep. 93:1-18.  It produced a copy of the document only when it asked Mr. Glusman to rely upon it.  Landmark cannot fairly seek to preclude Stevens from introducing his own post-termination evidence where its own expert relies on post-termination evidence it withheld in discovery.

Finally, Landmark also asked Mr. Glusman to assume that Stevens would have remained at Landmark until December 2011. At Landmark's request, Mr. Glusman used its $2 million settlement offer of "special compensation" as part of his damages calculation. Ex. 19 at 5-6. That $2 million, however, would have been paid to Stevens over the course of three years. Although this opinion is inadmissible for many other reasons (which will be addressed in a motion in limine to exclude Mr. Glusman's testimony on this point), it demonstrates that Landmark itself is willing to calculate damages suffered by Stevens based on the proposition that Stevens  would have remained at Landmark past December 2010 when the Religare sale was announced. Stevens is entitled to ask his own expert to calculate damages based on that same proposition.

## CONCLUSION

Landmark's motion in limine seeking to exclude the testimony of Dr. G. William Kennedy should be denied. Dr. Kennedy's proposed testimony is plainly relevant to measuring Stevens's damages, and it uses methodologies that are commonly accepted in the field in which he practices.

Dated:  January 31, 2013

Respectfully submitted,

Kathryn Emmett (Ct Bar No. 05605)
EMMETT AND GLANDER
45 Franklin Street
Stamford, CT  06901
Telephone: (203) 324-7744
Fax: (203) 969-1319

Graeme W. Bush (*admitted pro hac vice*)
gbush@zuckerman.com

Jason M. Knott (Fed. Bar No. phv03741)
jknott@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Suite 1000
Washington, D.C.  20036
Telephone: (202) 778-1800
Fax: (202) 822-8106

*Counsel for Plaintiff Gary P. Stevens*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2013, a copy of the foregoing Opposition to Defendant's Motion in Limine to Preclude Proffered Testimony of Dr. G. William Kennedy was served on counsel of record as follows:

BY E-MAIL & U.S. MAIL

John F. Droney, Jr.
Jeffrey R. Mirman
HINCKLEY, ALLEN & SNYDER, LLP
20 Church Street, 18th Floor
Hartford, CT 06103
jdroney@haslaw.com
jmirman@haslaw.com


BY E-MAIL

Robert Fiebach
Robert Dell'Osa
COZEN & O'CONNOR
The Atrium
1900 Market Street
Philadelphia, PA 19103
rfiebach@cozen.com
rdellosa@cozen.com


Kathryn Emmett (Ct Bar No. 05605)
EMMETT AND GLANDER
45 Franklin Street
Stamford, CT  06901
Telephone: (203) 324-7744
Fax: (203) 969-1319

*Counsel for Plaintiff Gary P. Stevens*