IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARY P. STEVENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 3:09-cv-00498 (MPS) |
| | ) |
| LANDMARK PARTNERS, INC. | ) |
| | ) MARCH 1, 2013 |
| Defendant. | ) |
| | ) |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
IN LIMINE, PURSUANT TO FED. R. EVID. 702, TO PRECLUDE
PROFFERED TESTIMONY OF DR. G. WILLIAM KENNEDY

INTRODUCTION

Landmark has now filed two separate motions seeking to exclude the proffered opinions of Gary Stevens's damages expert, Dr. G. William Kennedy. Neither motion presents a meritorious challenge to Dr. Kennedy's qualifications or to the reliability of his opinions, and both should be denied.

In his report, Dr. Kennedy expressed opinions about the value of a 10% economic interest in Landmark. Mot.[1] Ex. A. He calculated the value of the growth of the Firm between two time periods: 2004-2008 (the dates of Stevens's employment) and 2004-2010 (when Landmark sold a 55% interest in the Firm to Religare Enterprises). *Id.* at 2. For the 2004 value, he used the stock sales that actually placed a value on Landmark at that time, which Landmark had described to Stevens before he took the job. *Id.* at 6. For the 2008 value, he conducted independent

---

[1] "Mot." refers to Landmark's motion in limine to preclude Dr. Kennedy's proffered testimony on Rule 702 grounds. "Mem." refers to Landmark's memorandum in support of that motion.

1

valuations based on (1) the "income approach" (based on Landmark's cash flows and risk-adjusted rates of return); (2) the "market approach – guideline transaction method" (based on Landmark's sale of a 55% interest to Religare Enterprises in 2010); and (3) the "market approach – guideline public company method" (based on the value placed on publicly-traded companies in the industry or in a similar line of business). *Id.* at 8. For the 2010 value, Dr. Kennedy used the value that the Religare sale placed on Landmark in that year. *Id.* at 7. Dr. Kennedy also valued the amount of the profits Landmark paid out to its "key principals" in the form of shareholder distributions.[2] *Id.* at 17.

Neither of Landmark's motions challenges Dr. Kennedy's qualifications to testify as an expert on valuation and damages. Dr. Kennedy has a Ph.D. in finance, is accredited in business valuation by the American Institute of CPAs ("AICPA"), and is a member of the AICPA's Business Valuation Hall of Fame, an honor conferred on only 35 or so of the 360,000 CPAs who are members of the organization. Mot. Ex. A at 19; Ex. 1, Kennedy Dep. 70:1-71:1. Dr. Kennedy easily meets the standard to provide expert testimony under Rule 702 of the Federal Rules of Evidence. By contrast, Landmark's damages expert has no accreditation in valuation. Ex. 2, Glusman Dep. 17:9-17.

Unable to challenge Dr. Kennedy's qualifications, Landmark has filed two motions seeking other bases on which to preclude Dr. Kennedy's testimony. Neither motion has merit. In its first motion, Landmark sought to exclude all of Dr. Kennedy's opinions as irrelevant. That motion rested upon an incorrect reading of prior rulings by the Court. Stevens has already

---

[2] Landmark does not contend in either of its motions that this calculation is unreliable.

explained in full why that motion must fail. *See* Opp'n to Mot. to Preclude Test. of Dr. G. William Kennedy, Jan. 31, 2012 (Dkt. 200).

Landmark's second motion, which seeks to attack the reliability of Dr. Kennedy's opinions, also lacks merit. First, Landmark argues his opinions should be excluded in their entirety because he used a fair value standard, which calculates the value of a pro rata share of a business without discounting it for lack of marketability or minority status. However, a fair value standard is properly used when it is just or equitable to do so. Dr. Kennedy's use of that standard in these circumstances, where Landmark promised Stevens a 10% interest in the economics of the Firm and then entirely denied him a firm-wide economic participation, does not render his opinions unreliable.

Second, Landmark argues that Dr. Kennedy could not use the December 2010 Religare transaction in Landmark's stock in performing his "market approach – guideline transaction method." In his opposition to Landmark's first motion to exclude Dr. Kennedy's opinions, Stevens explained that Dr. Kennedy properly took this transaction into account, because (i) it measures what Stevens would have received as of the time of the sale had Landmark not breached its agreement, and (ii) a valuation expert would consider it as evidence of Landmark's value as of November 2008, when Stevens was terminated. Landmark does not even attempt to rebut this showing in its current motion. Landmark's other criticisms of Dr. Kennedy on the Religare issue are also groundless: Dr. Kennedy was not required to make a "control premium" adjustment to the sale, and he did take into account the changes in Landmark's business between 2008 and 2010.

Third, Landmark attacks Dr. Kennedy's use of guideline public companies in his "market approach – guideline public company method." Landmark essentially argues that a valuation

3

expert may not conduct a market-based analysis unless the comparable companies are identical in size and sell an identical product. Landmark offers no authority for this position. Landmark also complains that Dr. Kennedy did not "consider how comparable the companies" were or make adjustments to the data. It is wrong; Dr. Kennedy did both.

Fourth, Landmark challenges Dr. Kennedy's "income approach," contending that he was required to use a "size premium" when assessing the percentage of risk a buyer would be willing to accept when purchasing Landmark. Dr. Kennedy's decision not to apply a "size premium" is a justified exercise of expert judgment, because there is debate in the valuation field as to whether such a premium actually exists. The only support for Landmark's argument that an expert must take its side of the debate and apply a "size premium" is the opinion of its own unaccredited expert. *See* Mem. 17.

Fifth, and finally, Landmark criticizes Dr. Kennedy's "use of averaging." Landmark's only authority for its criticism is an IRS revenue ruling, which it misconstrues. It points to no decision in which any court has ever excluded the same averaging methods Dr. Kennedy used. Nor does it show any reason why Dr. Kennedy was required to weight certain inputs unequally, rather than assigning them equal weight.

Landmark's second motion challenging Dr. Kennedy's ability to testify at trial and the scope of that testimony should be denied.

## ARGUMENT

### I. RULE 702 AND *DAUBERT* EMBODY A LIBERAL STANDARD FOR THE ADMISSIBILITY OF EXPERT OPINIONS.

Landmark premises its second motion to exclude Dr. Kennedy's opinions on Federal Rule of Evidence 702. That rule "embodies a liberal standard of admissibility for expert

4

opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Under it, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify as to "scientific, technical, or other specialized knowledge," if the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue" and "(1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citation and internal quotation marks omitted). These criteria are not exhaustive: as the Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the court may also consider, among other factors, "(1) whether a theory or technique has been or can be tested; (2) whether a theory or technique has been subjected to peer review and publication; . . . and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (citing *Daubert*, 509 U.S. at 593-94 (internal quotation marks omitted). The reliability inquiry is flexible, and these factors do not necessarily or exclusively apply in any case. *Williams*, 506 F.3d at 161.

"[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, 2000 amends. Only "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached [do] *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citation omitted). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* at 267. Instead, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her

5

conclusions." *Id.* (citation and internal quotation marks omitted). "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* Here, while Landmark has strained to rebut Dr. Kennedy's work by way of its own unaccredited expert's criticisms, it has failed to demonstrate that Dr. Kennedy's testimony should be excluded under any prong of Rule 702 or other factors that courts consider when assessing whether to permit an expert to testify.

## II. DR. KENNEDY'S OPINIONS ARE RELIABLE.

### A. The Use of a Fair Value Standard Does Not Render Dr. Kennedy's Opinions Unreliable.

The first issue Landmark raises with Dr. Kennedy's opinions is that he used a "fair value" standard, thereby calculating the *pro rata* value of a 10% economic interest based on 100% of the value of the Firm. Landmark contends that Dr. Kennedy should not have used "fair value," but instead should have used a "fair market value" standard. As Dr. Kennedy testified, the use of a "fair market value" standard is mandated in certain circumstances – namely, tax valuation proceedings, Ex. 1, Kennedy Dep. 81:10-15 – while "fair value" is mandated in others. *See* Conn. Gen. Stat. § 33-855 (shareholder appraisal cases).

A "fair market value" is the price "at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts." Ex. 3, AICPA Standards of Business Valuation 44. Under the "fair market value" standard, which Landmark's expert applied in his valuation report (Ex. 4), discounts may be applied to the *pro rata* value of minority shares in order to reflect the impact of a minority interest's lack of control over the company and

6

the fact that an interest in a closely-held company is not freely marketable. For example, after reaching a fair value for Landmark as a whole, Landmark's expert then multiplied that amount by 10% to account for Stevens's economic interest, reduced that figure by 20% for a lack of control, and then reduced it further by 25% for a lack of marketability. Ex. 4 at 19.

A "fair value" standard, by contrast, does not include those discounts. The purpose of a "fair value" measurement is to account for situations in which a claimant is not "in the position of a willing seller." *Conway v. Carpenter*, No. CV044005121S, 2007 WL 1600004, at *2 (Conn. Super. Ct. May 16, 2007) (citation and internal quotation marks omitted). In such circumstances, courts decline to apply the minority discount and lack of marketability discounts on the grounds that they deprive the claimant of the full proportionate value of his interest and give a windfall to those who control the corporation. *Id.*; *see also* Ex. 5, Ibbotson Associates, Stocks, Bonds, Bills and Inflation Valuation Edition 2005 Yearbook at 10 ("fair value" is the amount that will "compensate an owner involuntarily deprived of property").

In the "wide ground between [the] two areas" in which particular valuation standards are "specifically mandated or specified," it is proper for an expert to use a fair value standard based on the facts and circumstances of the case. Ex. 1, Kennedy Dep. 97:11-98:21. Here, those facts and circumstances permitted Dr. Kennedy to use a fair value standard, rather than one based on fair market value with discounts for lack of marketability and control. That is because Stevens was not in the position of a "willing seller" of a 10% economic interest in the Firm: Landmark deprived him of any firm-wide economic participation, and then terminated him after he insisted on receiving what he was promised. In these circumstances, the jury could fairly award Stevens the full *pro rata* value of his 10% economic interest and refuse to reduce that value by the hypothetical discounts that would give Landmark a windfall from its breach.

7

In addressing Dr. Kennedy's use of a fair value standard, Landmark's expert stated that "the Connecticut Appellate Courts have yet to finally determine whether value should be based on Fair Value or Fair Market Value," and that there is a "lack of direction from the Connecticut Courts on the issue." Ex. 6, Glusman Damages Report 10-11. Thus, Landmark contradicts its own expert's view when it argues that Connecticut law prohibits the use of a fair value standard unless expressly permitted by statute,. Moreover, the cases cited by Landmark do not support that proposition. *Brooks v. Brooks*, 997 A.2d 504 (Conn. App. Ct. 2010), was a marital dissolution case, not an action for breach of contract brought by an aggrieved party against a corporation. In that case, the appeals court reaffirmed that the trial court, as factfinder, had "considerable discretion" to select "an appropriate valuation method," but reversed the trial court's findings on the "fair market approach to valuation" because the trial court misapplied that approach. *Id.* at 509. Nothing in *Brooks* suggests that the court could not have used the fair value standard, had it done so correctly.[3] Meanwhile, *Johnson v. Johnson*, No. X07CV990060602S, 2001 WL 1042632 (Conn. Super. Ct. Aug. 15, 2001), was a shareholder dissolution action in which a Connecticut trial court – acting as factfinder – applied a fair value standard, not a fair market value standard.

In addition to relying on case law that its own expert has admitted is inconclusive, Landmark contends that the use of "fair value" is inconsistent with the facts, pointing to the shareholders' agreement it had in place at the time Stevens joined the Firm. According to the shareholders' agreement, when a shareholder's employment was terminated, his stock would be

---

[3] In similar dissolution actions, other Connecticut courts have declined to apply discounts for lack of marketability or minority. *See Voges v. Voges*, No. FA074011439S, 2008 WL 4378483 (Conn. Super. Ct. Sept. 9, 2008); *Fogel v. Fogel*, No. FA990171687S, 2002 WL 653318, at *9 (Conn. Super. Ct. Mar. 26, 2002).

8

repurchased based on a price determined by a valuation expert who would apply the methodology Comstock Valuation Advisors used when it valued Landmark as of 1999. Mot. Ex. F ¶ 3(d). Landmark contends that Dr. Kennedy "should have followed the designated Comstock methodology and used 'fair market value' to value Landmark." Mem. 12.

No document required Dr. Kennedy to use the fair market value approach, and in fact there were sound reasons not to. First, Landmark told Stevens at the time he accepted its offer that it was going to modify or replace the economic participation program for its key principals (which at the time would have been defined by the shareholders' agreement). Second, Stevens was never made a shareholder, so he was never a party to the shareholders' agreement. Third, a "methodology," which is what the shareholders' agreement discussed from Comstock, is different from a standard of value (fair market value versus fair value). Fourth, even if parties have entered into a shareholders' agreement requiring a particular standard of valuation, the standard does not have to be applied if it is "unjust or inequitable to do so in light of the facts and circumstances of the particular case," as Landmark's own authority notes. *Stone v. R.E.A.L. Health, P.C.*, No. CV98414972, 2000 WL 33158565 (Conn. Super. Ct. Nov. 15, 2000) (citation omitted). Fifth, Landmark itself did not follow ¶ 3(d) of the agreement, because it never retained a valuation expert to derive a price for the stock it repurchased from its employees in 2004. Ex. 7, Haviland Dep. 191:3-18. For all of these reasons, Dr. Kennedy properly performed an independent analysis using a fair value standard, and the shareholders' agreement did not require him to do something different.

Finally, to the extent that there is room for debate on the proper valuation standard, the jury will be able to decide, after hearing the examination and cross-examination of Landmark's expert, whether Stevens's damages should be discounted. Because Dr. Kennedy's opinion on

fair value is demonstrably reliable, the proper method for addressing any concerns with the standard he used is through competing testimony and cross-examination, not exclusion. *See Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 173 (D.N.J. 2008) (noting that even if a defendant's objections to an expert's damages model were "material and valid," the expert's testimony at most could be "critiqued by another expert, not stricken").

### B. Dr. Kennedy Appropriately Used The Religare Sale To Measure Landmark's Value As Of 2008 And 2010.

In December 2010, Landmark sold a 55% interest in the Firm to Religare Industries for $171.5 million. Dr. Kennedy used this fact in two ways. First, he offered an opinion as to what a 10% interest in the Firm would have been worth at the time of the sale based on the value that Religare paid. Mot. Ex. A at 7. Second, when the Religare sale was completed, the financial press reported valuation multiples for the sale (*i.e.*, (i) the ratio of the implied value of the firm, based on the price Religare paid for 55%, to Landmark's EBITDA and (ii) the ratio of the implied value to assets under management). Dr. Kennedy used these multiples to calculate the Firm's value as of 2008, based on its EBITDA and assets under management at that time. *Id.* at 12-13.

With regard to the 2008 valuation based on Religare, Landmark argues that "a valuation can be based only on information that is known or knowable as of the valuation date." Mot. 13. As Stevens showed in his opposition to Landmark's first motion to exclude Dr. Kennedy's opinions, however, commonly-accepted valuation methodology dictates that it is prudent to use subsequent sales of the same asset when valuing the asset as of a prior date, and the Tax Court regularly accepts valuations based on this kind of information. Dkt. 200 at 20-22. Landmark's second motion does not address Stevens's showing on this point, let alone rebut it.

Landmark's other criticisms of Dr. Kennedy's use of the sale are similarly unavailing. First, Landmark argues that the Religare transaction "involved the sale of a controlling interest in Landmark," and that Dr. Kennedy should have adjusted his valuation of a 10% interest in the Firm to reflect a "control premium." Mem. 14. Its only authority for this suggestion is its unaccredited expert. *Id.* Landmark's "control premium" argument, however, simply dresses its "fair market value" argument in different clothing. Landmark's expert has offered a valuation in which he calculated the fair value of Landmark (*i.e.*, the value of 100% of the Firm), measured 10% of that value, and then applied a discount for lack of control. Dr. Kennedy chose, given the circumstances of this case, not to apply that particular discount. Nothing about that decision renders his valuation unreliable.

Landmark also contends that "there might have been changes in numerous economic aspects of Landmark . . . [that] could have made Landmark a substantially different company in December 2010 than it was in November 2008," and that "Dr. Kennedy's report reflects no effort to determine whether any such changes occurred." Mem. 14. This argument fails for two reasons. First, Dr. Kennedy *did* consider whether Landmark's business grew or changed between 2008 and 2010. In valuing Landmark as of November 2008 based on the multiples indicated by the Religare sale, he used 2008 amounts for assets under management and EBIDTA, thereby adjusting for the growth in the Firm that had occurred between 2008 and 2010. Mot. Ex. A at 13. He also reviewed the extensive testimony that Landmark's managing partner gave in his deposition about changes in the business between 2008 and 2010. *See* Mot. Ex. A at 35; Ex. 7, Haviland Dep. 72-81, 392-402. Second, Landmark fails to identify any other "changes in . . . economic aspects of Landmark" that actually occurred and that would have affected the

reliability of Dr. Kennedy's calculation, had they been disclosed to him. Thus, Landmark's challenge to Dr. Kennedy's methodology on this ground must fail.

### C. Dr. Kennedy Properly Applied The Guideline Public Company Method.

Another of the methods that Dr. Kennedy used for his independent valuation of Landmark as of 2008 was the guideline public company method. The concept of the guideline company method is that "companies within an industry or . . . that conduct similar types of business activities will be subjected to similar opportunities and business risks and will be priced similarly." Mot. Ex. A at 10. "Although no two companies are identical," the guideline company method "is widely recognized as a valid method to value a business." *Id.* In applying the guideline company method, Dr. Kennedy "performed a search for guideline publicly traded companies in the same or similar industries as Landmark," and then used the median of the pricing multiples he obtained from reviewing the pricing of the 15 companies that he identified. *Id.* at 9-10.

Landmark's opposition to Dr. Kennedy's use of the guideline company method is puzzling: the method resulted in significantly *lower* values than the income approach, so had Dr. Kennedy chosen not to use it, his final valuation figure would have increased substantially. *See* Mot. Ex. A at 16 (showing that income approach resulted in value of $192 million, while the guideline company method resulted in value of $114 million). But since Landmark has made the challenge, it must be addressed.

Landmark initially argues that the 15 companies Dr. Kennedy selected "do not appear to be comparable," because the largest one he chose had higher revenues and more offices than Landmark, and because Landmark forms and manages "secondary" funds. Mem. 15 (emphasis in original). For use in a market comparison, however, the guideline public companies need only

12

be comparable, not identical. *See, e.g., Estate of Hall v. Comm'r*, 92 T.C. 312, 327 (1989) (approving of methodology used by taxpayer's expert, who selected 15 comparables to Hallmark, including McDonalds, Anheuser Busch, IBM, and Coca-Cola). And the only support for Landmark's argument that the 15 companies Dr. Kennedy used were not properly comparable comes from its own unaccredited expert. Mem. 15 n.4. Further demonstrating that Dr. Kennedy's selections fell well within the scope of accepted valuation methodologies, Comstock – the firm that Landmark hired to value it in 1999 – used one of the same companies when it performed its own guideline public company analysis. Ex. 8 at 35 (excerpt from Comstock Report) (using Amvescap (now known as Invesco), which had $275 billion in assets under management at the time, as a comparable to Landmark).[4]

Thus, Landmark does not and could not seek to exclude Dr. Kennedy's opinion on the sole ground that he used improper comparables. Instead, it argues that Dr. Kennedy's guideline company analysis is unreliable because he did not consider "how comparable the companies [we]re to Landmark or mak[e] adjustments to the data to account for the degree of comparability." Mem. 16. This is a baseless criticism. Although Landmark only submitted a small portion of Dr. Kennedy's deposition testimony on this subject to the Court, Mot. Ex. B, the full transcript, and his report, show that Dr. Kennedy evaluated whether the publicly-traded companies were "in the same or similar industries as Landmark," and decided that the asset management companies he used were sufficiently comparable for purposes of his analysis. Mot. Ex. A at 10; *see also* Ex. 1, Kennedy Dep. 133:3-138:6, 143:13-147:14. These kinds of

---

[4] Landmark implies that Dr. Kennedy should have excluded Franklin Resources, the largest comparable, because of its size. Mem. 15-16. This, too, is a puzzling complaint: the valuation multiple Dr. Kennedy derived from Franklin was *lower* than that derived from the *smaller* companies with annual revenue closer to Landmark's, so using Franklin in these circumstances actually lowered his valuation.

professional judgments are an "essential component" of estimating value. Ex. 3, AICPA Standards for Business Valuation ¶ 4. Further, contrary to Landmark's contentions, Dr. Kennedy's testimony and report show that he did adjust his data for differences between the 15 companies by selecting the median valuation multiple and applying it to Landmark's financial metrics. Mot. Ex. A at 11; Ex. 1, Kennedy Dep. 138:22-141:18. This is a well-accepted methodology in the valuation field. *Id.*

Landmark's only authority for its suggestion that Dr. Kennedy's methodology was somehow improper is *Lippe v. Bairnco Corp.*, 288 B.R. 678 (Bankr. S.D.N.Y. 2003). Contrary to Landmark's reading of that case, the problem with the expert testimony in *Lippi* was not the valuation methodology itself, but rather the particular expert's lack of understanding and haphazard application of that methodology. In *Lippe*, the plaintiff's valuation expert testified that he was unfamiliar with the literature on business valuation and made no effort to keep up with it. *Id.* at 690. He refused to use an income approach to value the businesses at issue, and could not explain why he failed to do so. *Id.* at 689-90. He then mechanically applied a "comparable companies analysis," but could not explain why he chose not to give certain comparable transactions any weight whatsoever, why he did not make adjustments to the multiples he obtained from the small number of comparables (one or two) that he did find, and why he chose to disregard other comparables. *Id.* at 693-94. Given his lack of familiarity with standard valuation practices, and his lack of understanding of his own work, the *Lippe* court exercised its gatekeeping function to exclude his testimony. Unlike the expert in that case, Dr. Kennedy understands and has rigorously applied well-accepted valuation techniques in his work in this case

**D.   A Valuation Expert Is Not Required To Use A Size Premium In Using The Income Approach To Value A Business.**

In his income approach, Dr. Kennedy used the capitalization of cash flows method. Under that method, he first evaluated Landmark's free cash flow (also referred to as adjusted net income). *See* Mot. Ex. A at 14-15. He then performed a "build-up method," determining the rate by which an investor would discount the cash flows based on risk. *Id.* at 15. To determine this rate, Dr. Kennedy summed the long-term risk-free rate of return (the rate of return for long-term government bonds), the equity risk premium (the rate of return for stock in publicly-traded companies), and the industry risk premium (the rate of return for stocks in Landmark's industry). *Id.* at 15.

Landmark contends that Dr. Kennedy should also have included a "size premium" to reflect "the additional risk associated with the size of the company being valued," and that the fact he did not use a size premium invalidates his income approach. Mem. 17. Its sole authority for this proposition is the opinion of its own unaccredited expert. *Id.* As Dr. Kennedy testified in his deposition, however, there is an ongoing debate in the valuation field as to whether a size premium exists and should be applied in valuing a business. Ex. 1, Kennedy Dep. 174:2-175:10 ("serious empirical work . . . says that the size premium differential that Ibbotson is observing is disappeared in today's market conditions and has probably been gone for at least 20 years, if not longer"); *see also* Ex. 9, James R. Hitchner, *Financial Valuation: Applications and Models* (2003) at 141-42 ("There is continuing debate over which size premia should be used. Some analysts even have argued against including a size premia adjustment for smaller companies altogether."). Thus, whether to use a size premium is a matter of disagreement between experts, and an expert's income approach is not invalid simply because he takes one side of the debate. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999) (under *Daubert*, expert testimony

should be admitted when it expresses a view within "the range where experts might reasonably differ"); *Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir. 2006) ("The mere fact that two experts disagree is not grounds for excluding one's testimony.").

### E.  Landmark's Challenge To Dr. Kennedy's "Use Of Averages" Lacks Merit.

Finally, Landmark raises a generalized objection to Dr. Kennedy's "use of averaging." For example, Landmark contends that Dr. Kennedy should not have equally weighted his three approaches to valuation. Mem. 18-19. However, equal weighting of different valuation approaches is proper and admissible:

> Under standard valuation practice, an expert will perform an analysis under each of the valuation methodologies discussed above [the income approach, market approach based on guideline transactions, and market approach based on publicly traded companies] and reach a conclusion by assigning an appropriate weight to each methodology. For example, an expert might weigh each of the methodologies equally with his or her conclusion based 1/3 on the [income approach], 1/3 on the precedent transaction or comparable transaction analysis and 1/3 on the publicly traded company or comparable company analysis.

*In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 371 (Bankr. D. Del. 2006); *see also In re Exide Techs.*, 303 B.R. 48, 65 (Bankr. D. Del. 2003) (when multiple valuation analyses are available, "each method should be weighed and then all methods should be considered together"); Ex. 3, AICPA Statement on Standards for Valuation Services ¶ 21(a) (a "valuation analyst expresses the results of the valuation as a conclusion of value; the conclusion may be either a single amount or a range.").

Although Landmark cites IRS Revenue Ruling 59-60, that ruling is not authority for Landmark's argument that a valuation report is unreliable when it uses averages. The particular section of the ruling that Landmark cites (Section 7) merely discourages valuation experts from

16

averaging factors internal to the business ("book value, capitalized earnings, and capitalized dividends") and basing the valuation on the result without exercising any reasoned judgment. Dr. Kennedy, however, did not take that approach. Instead, he applied standard valuation approaches, concluded that the approaches were equally valid, and then weighed them equally as a result.[5]

Without basis for its claim that Kennedy's equal weighting of the valuation methods is improper, Landmark complains that he "made no attempt in his report to explain" his decision to weight the difference approaches equally. Mem. 18-19. To the extent Landmark felt that Dr. Kennedy's use of averages needed more explanation, however, it had the opportunity to ask him about it in his deposition. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 739 (3d Cir. 1994) (expert depositions permit the opposing party to "develop strong critiques and defenses of their expert's methodologies," and give "the side trying to defend the admissibility of evidence . . . an adequate chance to do so") (citation omitted).

In fact, it did so, though Landmark ignores Dr. Kennedy's testimony on the subject. Dr. Kennedy explained why he used averages, why he did not assign unequal weight to some factors over other, and why his methods were consistent with commonly-accepted valuation techniques. For example, Dr. Kennedy testified: "I think it's obvious from what's presented in the report and on this table that it is my judgment that there was no reason to assign a heavier weight to one than the other. [A]nd that's very common practice to do that." Ex. 1, Kennedy Dep. 123:1-5. And with regard to his equal weighting of his two guideline transactions results based on different multiples (price to EBITDA and price to assets under management), he stated: "[E]qual

---

[5] Even if the Court were to decide to exclude one of Dr. Kennedy's approaches (which it should not), his other approaches would remain valid and admissible.

weighting is the default weighting in these kinds of calculations. If you move off of that default, if you will, assumption that they should be equally weighted, you're imposing additional judgments of . . . why one should be weighted more than the other." *Id.* 155:23-156:3.[6] He also fully explained why and how he selected the median of the multiples that he identified as a result of the guideline company method. *Id.* 139:3-141:18.

In short, Dr. Kennedy has explained his opinions and his methodology, and Landmark should not be able to preclude him from testifying because they disagree with, or choose to ignore, those explanations.

## CONCLUSION

Landmark's motions in limine seeking to exclude the proffered opinions of Dr. G. William Kennedy should be denied.

Dated: March 1, 2013

Respectfully submitted,

Graeme W. Bush (*admitted pro hac vice*)
gbush@zuckerman.com
Jason M. Knott (Fed. Bar No. phv03741)
jknott@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800
Fax: (202) 822-8106

---

[6] After reviewing Dr. Kennedy's report, Landmark's proffered expert did not have any opinion as to what weighting of these different approaches would be proper. Ex. 2, Glusman Dep. 228:1-7.

Kathryn Emmett (Ct Bar No. 05605)
EMMETT AND GLANDER
45 Franklin Street
Stamford, CT 06901
Telephone: (203) 324-7744
Fax: (203) 969-1319

*Counsel for Plaintiff Gary P. Stevens*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2013, a copy of the foregoing Opposition to Defendant's Motion in Limine, Pursuant to Fed. R. Evid. 702, to Preclude Proffered Testimony of Dr. G. William Kennedy was served on counsel of record as follows:

BY E-MAIL & U.S. MAIL

John F. Droney, Jr.
Jeffrey R. Mirman
HINCKLEY, ALLEN & SNYDER, LLP
20 Church Street, 18th Floor
Hartford, CT 06103
jdroney@haslaw.com
jmirman@haslaw.com

BY E-MAIL

Robert Fiebach
Robert Dell'Osa
COZEN & O'CONNOR
The Atrium
1900 Market Street
Philadelphia, PA 19103
rfiebach@cozen.com
rdellosa@cozen.com

Jason M. Knott (Fed. Bar No. phv03741)
jknott@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800
Fax: (202) 822-8106
*Counsel for Plaintiff Gary P. Stevens*