```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3

     GARY P. STEVENS,            )
 4                Plaintiff,  )         NO: 3:09CV498(MPS)
                                )
 5   vs.                        )
                                )         April 22, 2013
 6   LANDMARK PARTNERS, INC.,   )
                  Defendants. )
 7   _____         VOLUME I

 8                      450 Main Street
                      Hartford, Connecticut
 9
                   T R I A L   B Y   J U R Y
10

11   B E F O R E:
            THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

12

13   A P P E A R A N C E S:

     For the Plaintiff :        GRAEME W. BUSH, ESQUIRE
14                              JASON M. KNOTT, ESQUIRE
                                Zuckerman Spaeder LLP-DC
15                              1800 M Street, N.W., Suite 1000
                                Washington, DC 20036
16

17   For the Defendant:        H. ROBERT FIEBACH, ESQUIRE
                                ROBERT V. DELL'OSA, ESQUIRE
18                              Cozen & O'Connor - PA
                                The Atrium
19                              1900 Market Street
                                Third Floor
20                              Philadelphia, PA 19103

21                              JOHN F. DRONEY, JR., ESQUIRE
                                JEFFREY J. MIRMAN, ESQUIRE
22                              Hinckley, Allen & Snyder, LLP
                                20 Church Street, 18th Floor
23                              Hartford, CT 06103

24   Court Reporter:           Martha C. Marshall, RMR, CRR

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

 1          THE COURT:  Good morning everyone.  Please be

 2     seated.  I'm going to try to keep the train running on time

 3     so we'll try to bring the jury in at nine sharp.

 4          There were a couple of things I briefly wanted to go

 5     over with you.  First, Ms. Furst (ph), the juror who had a

 6     medical issue, I'm glad to report is with us today.  She was

 7     able to postpone her surgery until May 2nd.  So I expect that

 8     we will have her for the duration of the trial

 9          Secondly, I did want -- I did receive the parties

10     comments and objections on the limiting instruction that we

11     put together and I am going to make two minor edits to it

12     that I wanted to alert you to.  I'm going to simply because I

13     think for simplicity sake and because of with fidelity to the

14     words actually used in the agreement, I'm going to delete the

15     word equity and just refer to an ownership interest.

16          The second change is something I wanted to ask the

17     parties about.  And if you can't agree, I'll just do my best.

18     Mr. Knott's version had the words "funds managed by the firm"

19     and I had "funds of the firm."

20          Let me ask Mr. Fiebach as to whether it's more

21     accurate, in your view, to say "funds of the firm" or "funds

22     managed by the firm."  I'm referring, Mr. Fiebach, to the

23     reference in the limiting instruction to the sentence, says:

24     Instead, you may consider evidence about discussions of an

25     ownership interest only for the limited purpose of

1    determining whether Landmark promised to let Mr. Stevens

2    participate in the economics of the entire firm or just in

3    specific funds managed by the firm or of the firm?

4            MR. FIEBACH:  Managed by the firm.

5            THE COURT:  So we have agreement on that.  That's

6    what I thought.

7            Okay.  Then let me, in the limited time we have, let

8    me just raise an issue related to this.  We don't have to

9    resolve it now.  And I think the issue really is this, I do

10   want to be as clear and simple in the instructions as I can

11   be without in any way precluding any party from putting on

12   any claim or defense that they think is appropriate to put

13   on.  Here's what I'm getting at.  I don't know whether

14   there's going to be any evidence in this case or any claim in

15   this case that stock options were on the table, that

16   Mr. Stevens was ever promised stock options, or that the

17   defense will ever claim that they complied with the agreement

18   in whole or in part by offering stock options.

19           The reason I ask is that in light of my and Judge

20   Eginton's earlier rulings that essentially an ownership

21   interest is out, that I think if stock options were simply

22   not going to be part of the case, I could -- we could

23   simplify this by simply saying to the jury either in part in

24   the opening instruction -- excuse me -- not in the opening

25   instruction, in the limiting instruction, but also in the

```
 1    final instructions that essentially their job is to decide a
 2    case about profit sharing.  So, for example, in the limiting
 3    instruction, instead of saying promise to let Mr. Stevens
 4    participate in the economics of the entire firm or just in
 5    specific funds managed by the firm, I could say promised to
 6    let Mr. Stevens participate in the profits of the entire firm
 7    or just in profits of specific funds managed by the firm.  I
 8    see Mr. Fiebach nodding.  I do want to hear from the
 9    plaintiff as well on that, whether that would simplify
10    things, or is that something that will complicate things?
11         MR. BUSH:  I think I'd say two things about that,
12    your Honor.  Our case would have been, prior to the rulings,
13    that any of those different options, including stock options
14    ownership or profit sharing, could have been used to satisfy
15    the substance of the promise to give Mr. Stevens the value
16    that was really promised in the discussions and was applied
17    in the agreement.  So we would have argued that.
18         We, frankly, understood your ruling to be, though,
19    that we're limited to profit sharing because of all the
20    things that you've already said.  And I think it's also true
21    that there was no -- there won't be any evidence and there
22    wouldn't have been any evidence, any express conversation
23    about how do you do this with options, for example, or
24    something like that.  So I think there's an argument that we
25    would have made, absent these rulings, that options were one
```

1   way to satisfy the promise.  It would have enabled Landmark

2   to have profit sharing with options that would have satisfied

3   the promise, but I thought you had ruled that out.

4        THE COURT:  I think it's accurate to say that I did.

5   At least, let's put it this way.  Never mind understanding

6   that there was evidence, express evidence concerning options,

7   my understanding was that the debate was over whether it was

8   going to be ownership or profit sharing.  I may be wrong.  Go

9   ahead.

10       MR. BUSH:  I don't think we go quite that far.

11  There was in the discussions that you will hear about, there

12  were discussions between Mr. Haviland, Mr. Borges and

13  Mr. Stevens that included various ways to satisfy the deals.

14  But did they have a long conversation about how we could do

15  it with options?  No.

16       That was one of the options -- options is an

17  ambiguous word here because I'm using it two different ways.

18  That was one of the options.

19       THE COURT:  I tell you what, I think I'm going to

20  leave the limiting instruction with the word "economics" for

21  now.  If at the end of the case it's clear from the evidence

22  that it's appropriate to focus the jury on the word "profits"

23  then I'll do that, but I think I'm going to leave the

24  limiting instruction as is for now and see how things

25  develop.

 1          Mr. Fiebach, you want to be heard?

 2          MR. FIEBACH:  I just want to state for the record,

 3     your Honor, I think it's much clearer if your Honor would

 4     change it to profit sharing.  Those really were the only two

 5     issues in the discussions, and stock options was not part of

 6     any discussion, as Mr. Bush said.  So I think that it

 7     certainly would make it clear.  We think the whole issue is

 8     going to be confusing to a jury and I think that your

 9     suggested change would make it clear.

10          THE COURT:  I'm not going to make the change just

11     yet.  Again, I may deal with it in the closing instructions

12     after the evidence has come in.

13          Okay.  Let me just see if there's anything else.

14          Real quickly, just as a reminder.  This is our trial

15     day.  We go from 9:00 to 10:45.  We have a break from 10:45

16     to 11.  We go from 11 to 12:30.  12:30 we take our lunch.

17     We're back on the record from 1:15, and then we go to 3:00.

18           As I've indicated, we will attempt to deal with

19     matters to be discussed outside the presence of the jury

20     either before nine or after three, where possible, where

21     practical.

22          The other thing, let me just ask quickly.  Are

23     there -- do the parties intend to use demonstrative exhibits

24     and, if so, have they exchanged them?

25          MR. BUSH:  We have exchanged demonstrative exhibits,

 1    and that was one issue that I wanted to raise with the Court.

 2    We have gotten the defense's demonstrative exhibits and four

 3    of them were unreadable in the form that we got them

 4    electronically.  So we only got them in readable form this

 5    morning.  I think even without having been able to read them

 6    completely, and I should say the word partially legible, but

 7    one of the worksheets was not legible.  I think even without

 8    having been able to study them, we're going to be objecting

 9    to them.  But at the moment I don't actually really

10    understand them.  So I'm going to need to have some time to

11    maybe consult with Mr. Fiebach and understand what he's

12    really trying to do with these and where they come from, but

13    I did want to reserve on that.  But we have exchanged

14    demonstratives.

15              THE COURT:  I've been calling you Mr. Fiebach.

16              MR. FIEBACH:  Fiebach.

17              THE COURT:  Fiebach is correct?

18              MR. FIEBACH:  Yes, your Honor.

19              Your Honor, I have one issue that came up when I saw

20    the plaintiff's demonstratives.  They included in their

21    demonstratives, and for the first time since your Honor ruled

22    allowing them to put in a supplemental report, they included

23    in their demonstratives the chart with regard to the

24    distribution of shareholder distributions.  I had thought

25    that the Court's granting of the supplemental report was

 1     because the shareholder distributions was clearly not a

 2     profit sharing distribution or profit sharing determination.

 3     And that Mr. Bush argued that since it was admittedly not

 4     complete he wanted the opportunity to make a complete

 5     presentation, which he does.

 6          I would submit, your Honor, that any testimony at

 7     this point now by Dr. Kennedy with respect to shareholder

 8     distributions would be beyond the relevance of the case,

 9     because only shareholders get shareholder distributions.

10     They've made their alternative calculation with regard to

11     distributions of the net income of the company.  And that any

12     testimony with regard to shareholder distributions should be

13     out.  And I think that if he's allowed to testify with that,

14     given the testimony you're going to allow on the discussions

15     regarding equity and ownership, that the jury is really going

16     to be confused as to why they're getting a presentation on

17     shareholder distributions when he clearly -- when clearly

18     Mr. Stevens was never and could never be a shareholder.

19          THE COURT:  Is Dr. Kennedy going to go on today?

20          MR. BUSH:  Yes, I expect him to.

21          THE COURT:  What time do you expect him to go on

22     today?

23          MR. BUSH:  Probably last.

24          THE COURT:  1:30, something like that?  After lunch?

25          MR. BUSH:  After lunch.

1          THE COURT:  All right.  Why don't we take that up at

2   lunch or we'll try to do a little more during the break as

3   well.

4          Is there anything else to discuss before I bring the

5   jury out?

6          MR. BUSH:  No, I don't think so.

7          THE COURT:  Very well.

8          (Jury in at 9:01, a.m.)

9          THE COURT:  The parties stipulate that all the

10  jurors are present?

11         MR. BUSH:  Yes, your Honor.

12         MR. FIEBACH:  Yes.

13         THE COURT:  Ladies and gentlemen, you may be

14  seated.

15         Good morning.  As you were already sworn in as

16  jurors following your selection, we're going to launch right

17  into some opening instructions by the Court, by me, and then

18  the parties opening statements.  Before I get to that, I just

19  wanted to just remind you of our trial day.  I know that our

20  courtroom deputy has alerted you to this, but just as a

21  reminder, we'll try very hard to start every day at nine.

22  We'll go to 10:45, then we'll take a 15 minute break.  We'll

23  start up again at 11, and we'll go to 12:30.  At 12:30 we'll

24  take our lunch break and then we'll be back in the courtroom

25  at 1:15, and we'll finish up every day at 3:00.

1          To begin with, I'm going to give you some

2    preliminary instructions to guide you in your important

3    function as jurors.  What I say now will not be a substitute

4    for the instruction on the law that I will give to you at the

5    conclusion of the case.  This is simply designed to give you

6    an overview before you begin hearing the evidence in the

7    case.  It will be your duty to listen and consider the

8    evidence and to decide what the evidence shows.

9          You and you alone are the judges of the facts in

10   this case.  You will then have to apply those facts to the

11   law as I will give it to you at the end of the case.  You

12   must follow that law whether you agree with it or not.  You

13   must not take anything that I may do or say during the trial

14   as indicating what your verdict should be.  Don't be

15   influenced by my taking notes or not taking notes or anything

16   else I might do.  You will make your judgment based solely on

17   the evidence that you see or hear in this courtroom.

18         You may hear references during the trial to "the

19   Court."  When someone refers to "the Court," they generally

20   mean the Judge presiding in this case.  In this case, me.

21   You may also hear the words "instruct" or "instruction."

22   This is a direction or order from me that you must follow.

23         It is your duty to find the facts having considered

24   all the evidence in the case.  The evidence from which you

25   are to determine what the facts are consist of the following:

1          First, the sworn testimony of witnesses on both

2    direct and cross-examination, regardless of who called the

3    witness.

4          Second, any exhibits that are received into

5    evidence.

6          Third, any facts to which the attorneys have agreed

7    or stipulated.

8          Certain things are not evidence and must not be

9    treated as evidence by you.  I will list them for you now.

10         All statements, arguments, and questions by lawyers,

11   and any questions that I might ask are not evidence.

12   Obviously, answers to questions by witnesses are evidence.

13         Objections to questions are not evidence.  The

14   lawyers have an obligation to their clients to make an

15   objection when they believe evidence should not be admitted

16   under the Rules of Evidence.  You should not be influenced by

17   the objection or by the Court's ruling on it.  If an

18   objection is sustained, this means the objection is correct

19   and you must ignore the question that was asked and any

20   answer that may have been given.  If the objection is

21   overruled or I say the question is allowed, this means the

22   objection is not proper and that you should treat the answer

23   to the question just like any other answer.

24         If you are instructed by me that some item of

25   evidence is received for a limited purpose only, you must

follow that instruction and consider that evidence only for
the specified purpose.  If I rule that an answer is stricken,
that means that you must ignore the answer because it is not
evidence.

On occasion, when the lawyers object, I may ask you
to leave the courtroom so they can give me the reasons for
their objections out of your hearing.  We are all going to
work hard to try to keep your departures from the courtroom
to a minimum by taking up objections during your breaks, but
you should understand that some interruptions may be
necessary.

Testimony that I have excluded or told you to
disregard is not evidence and must not be considered.
Anything you may have seen or heard outside the courtroom is
not evidence and must be disregarded.  You are to decide this
case solely on the evidence presented here in the
courtroom.

Now, there are two kinds of evidence, direct and
circumstantial.  Direct evidence is direct proof of a fact,
such as the testimony of a witness about what that witness
saw or heard or did.  Circumstantial evidence is proof of
facts from which you may infer or conclude that other facts
exist, even though there was no direct proof of those other
facts.  The word infer or the expression to draw an
inference, means to find a fact exists even though it has not

1    been proven directly.  By way of example.  If a witness

2    testifies that he or she woke up in the morning and saw that

3    the street and sidewalks were wet, you may find that it

4    rained during the night, even if no one testified that he or

5    she saw the rain.  In other words, the fact of rain is an

6    inference that could be drawn from circumstantial evidence,

7    the testimony of the presence of water on the street and

8    sidewalk.  Direct evidence of rain, on the other hand, would

9    be someone testifying that she actually observed raindrops

10   coming down from the sky.

11          An inference may be drawn only if it is reasonable

12   and logical, and not if it is just speculative.  You are

13   allowed to draw logical inferences from facts that you find

14   to have been proven, but you may not go outside of the

15   evidence to find the facts, nor may you resort to guesswork

16   or conjecture.

17          To aid you in better understanding this, in the rain

18   example I used a moment ago, although you could infer from

19   evidence of the wet ground that it had rained, you could not

20   also infer that there had been a thunderstorm without

21   additional evidence.  In other words, you must avoid

22   resorting to speculation, conjecture, or guesswork to

23   determine critical facts in this case.

24          I will give you further instructions on these

25   matters at the end of the case, but keep in mind that you may

1    consider circumstantial evidence as well as direct evidence,

2    and it is for you to decide how much weight, if any, to give

3    to either.

4         The jury alone decides the credibility of witnesses

5    and the weight to be given to their testimony.  In

6    considering the weight and value of the testimony of any

7    witness, you may take into consideration the appearance,

8    attitude, and behavior of that witness; the interest of the

9    witness in the outcome of the case, if any; the inclination

10   of the witness to speak truthfully or not; the probability or

11   improbability of the witness' statements; and, all other

12   facts and circumstances in evidence.

13        You should test the evidence that the witnesses give

14   you by your own knowledge of human nature and of the motives

15   that influence and control human action.  In short, you are

16   to assess a witness' testimony using the same considerations

17   and the same sound judgments and common sense you apply to

18   the questions of truth and veracity that present themselves

19   in your own daily lives.  It will be up to you to decide

20   which witnesses to believe, which witnesses not to believe,

21   and how much of any witness' testimony to accept or reject.

22   I will give you further guidelines for determining the

23   credibility of witnesses at the end of the case.

24        Because this is a civil case, the plaintiff has the

25   burden of proving his claims by a preponderance of the

 1    credible evidence.  Those of you who may have sat on criminal

 2    cases will have heard of proof beyond a reasonable doubt.

 3    That requirement does not apply in this case and you should

 4    put it out of your mind.

 5           In civil cases the burden is different and it is

 6    called proof by the preponderance of the evidence.  That

 7    means that the plaintiff has to produce evidence that leads

 8    you to believe that the plaintiff's claims are more likely

 9    true than not.  For the plaintiff to prevail in a civil case

10    such as this one, the plaintiff must prove all the essential

11    elements of his claims by the greater weight of the evidence.

12    This does not mean that the party who calls the most

13    witnesses or offers the most exhibits prevails.  Rather, it

14    means that the party who offers the evidence that you find

15    most persuasive prevails.  It might be helpful to you to

16    visualize a pair of balanced scales.  Imagine that you put on

17    one scale the evidence you find credible, relevant and

18    supportive of the plaintiff on a particular issue, and place

19    on the other scale the evidence you find credible, relevant

20    and supportive of the defendant.  If the scales tip in favor

21    of the defendant on that issue, even a little bit, or if the

22    scales are evenly balanced, the plaintiff has not sustained

23    his burden of proof on the issue.  But if the scales tip in

24    favor of the plaintiff on that issue, even a little bit, then

25    on that issue he will have sustained his burden of proof.

1    Now, there's an exception to the burden of proof

2    requirement.  The defendant may argue what is called an

3    affirmative defense, a series of facts that, if proven, would

4    shield the defendant from liability.  The defendant has the

5    burden of proof with regard to affirmative defenses.

6    As I described for you during the jury selection,

7    there are two claims in this case, both arising from the same

8    facts.

9    Landmark, an investment firm, hired Mr. Stevens to

10   join it as the head of its real estate group.  When Landmark

11   decided to hire Mr. Stevens, the two parties discussed the

12   terms on which he would agree to join the firm.  The parties

13   each then signed a letter agreement dated May 20, 2004.  This

14   case is a dispute over the meaning of the parties agreement

15   and whether Landmark met its obligations under its agreement

16   with Mr. Stevens.

17   The first claim is for breach of contract.  And you

18   will decide whether Landmark breached its contract with

19   Mr. Stevens and, if so, what his economic damages are as a

20   result of that breach.

21   The second claim, negligent misrepresentation, will

22   call on you to decide whether Landmark negligently made any

23   misrepresentations to Mr. Stevens during the negotiations

24   that led to the contract, whether Mr. Stevens was injured

25   because he reasonably relied on a misrepresentation when

1   deciding to enter the agreement with Landmark and accept

2   employment with Landmark and, if so, what damages Mr. Stevens

3   suffered as a result.

4         After you were selected I outlined some of the

5   responsibilities that attend your being a juror in this case.

6   I will again layout the key requirements and instructions and

7   it is important that you obey these instructions.

8         First, do not communicate with each other about this

9   case or about anyone who has anything to do with it until the

10  end of the case when you go to the jury room to decide on

11  your verdict.  You may certainly talk among yourselves during

12  the breaks and the like, just be sure your conversations are

13  not about anything having to do with this case.

14        Second, do not communicate with anyone else about

15  this case or about anyone who has anything to do with it

16  until the trial has ended and you have been discharged as

17  jurors.  The phrase "anyone else" includes members of your

18  own family and your friends, among others.  You may tell them

19  that you are a juror in a case, but don't tell them anything

20  else about it until after you have been discharged by me.

21  Additionally, do not post any information about your service

22  as a juror or any information about this case on the

23  Internet, for example, on Facebook, My Space, Twitter, a

24  blog, or any other web based service.

25        Third, do not let anyone talk to you about the case

     1    or about anyone who has anything to do with it.  If someone

     2    should try to talk to you, please report it to me

     3    immediately.  While serving on this jury, please do not speak

     4    with any of the parties or their attorneys, or any witness or

     5    with me, either about the case or about any other subject.

     6    In no other way can all the parties be assured of the

     7    absolute impartiality they are entitled to expect from you as

     8    jurors.  If, however, you have a question to pose to me or

     9    any other message, please write out the question or message,

    10    give it to the clerk or to a court Security officer who will

    11    bring it to my attention.  I will try to respond promptly.

    12          Fourth, do not read any news stories or articles or

    13    listen to any radio or television reports about the case or

    14    about anyone who has anything to do with it.

    15          Fifth, do not do any research or any investigation

    16    about the case on your own.  Do not do any Internet research.

    17    Even running a simple search on Google or any other search

    18    engine about this case or anyone involved in this case would

    19    violate that duty.  All the information you should consider

    20    during the course of this case will be presented to you here

    21    in this courtroom.  Do not look anywhere else for other

    22    information.

    23          Finally, you may take notes during the course of the

    24    trial.  Even if you do, these notes must be left in the jury

    25    room during all recesses and should not be brought home at

1    night or at the conclusion of the case.  Any notes that you

2    take should be used only as memory aids.  Do not rely on your

3    notes if they conflict with your independent recollection of

4    the evidence.  If you do not take notes, you should rely on

5    your recollection of the proceedings and should not be unduly

6    influenced by the notes of other jurors.

7          The reason for these rules is fairly simple.  The

8    parties are entitled to have you personally render a verdict

9    in this case solely on the basis of your independent

10   evaluation of the evidence, the evidence presented here in

11   this courtroom, after your deliberations with other jurors.

12   Obviously, speaking to others, including your family and

13   friends outside of the deliberation process or exposing

14   yourself to evidence or information outside the courtroom

15   would compromise your service and fairness to the parties.

16         Finally, I just want to walk through the stages of

17   the trial for you.  After I finish, each party may, but does

18   not have to, make an opening statement.  An opening statement

19   is neither evidence nor argument.  It is simply an outline of

20   what that party intends to prove and it is offered to help

21   you follow the evidence.  Each side will have ten minutes to

22   give an opening statement to you.

23         Next, plaintiff will present witnesses and the

24   defendant may cross-examine them.  Then, if desired, the

25   defendant will present witnesses and plaintiff may

1  cross-examine them.  Possibly, I will permit plaintiff to

2  present additional witnesses to rebut the defendant's

3  evidence.  Then I will give you instructions on the law, and

4  after that the attorneys will make their closing arguments to

5  summarize and give you their interpretations of the evidence.

6  Like opening statements, the closing arguments are not

7  evidence.  After closings, I will give you some final

8  instructions and you will retire to deliberate on your

9  verdict.

10       Do not make up your mind about what the verdict

11  should be until after I have instructed you on the law at the

12  end of the case and you have gone to the jury room and you

13  and your fellow jurors have discussed the evidence.  Keep an

14  open mind until then.  All the parties observe -- excuse me.

15  All the parties deserve, and the law requires, that you give

16  them an opportunity to be heard fully.

17       So finally, ladies and gentlemen, the preliminary

18  instructions I've just given are simply intended to help

19  orient you to hear the evidence.  Later, before you begin

20  deliberations, I will instruct you again in greater detail.

21  I'm sure you will bear these principles in mind and that you

22  will keep an open mind until you have heard all the evidence

23  and my formal instructions.

24       At this point we're going to hear brief opening

25  statements from each attorney.  As I mentioned, what the

1    lawyers say in the openings is not evidence.  Rather, it is a

2    prediction or a road map of what the lawyer expects the

3    evidence will show in the case.  You should not decide

4    anything about this case on the basis of the opening

5    statements which, like these preliminary instructions, are

6    intended merely to give you an orientation.

7            Thank you.

8            Mr. Bush, whenever you're ready.

9            MR. BUSH:  May it please the Court.  Ladies and

10   gentlemen, good morning.  My name is Graeme Bush and I'm

11   counsel for the plaintiff in this case, Gary Stevens.

12   Mr. Stevens is sitting at counsel table.  I'll be assisted in

13   the trial by my partner, Jason Knott, who is sitting next to

14   Mr. Stevens.

15           Mr. Stevens made a deal with Landmark Partners, Inc.

16   in 2004 -- Landmark is the defendant in this case -- to join

17   as head of its Real Estate Department.  A key promise that

18   was made in that deal was that he would have a 10 percent

19   participation in the economics of Landmark Partners, Inc.

20   Landmark never lived up to that promise and never gave him

21   that 10 percent interest, and he was terminated in 2008

22   because he refused to accept that they wouldn't live up to

23   the agreement, and the suit was filed shortly thereafter.

24           Landmark is an asset manager.  It makes money and

25   its value comes from what it earns from fees that it earns on

1    the assets it has under management.  So it earns a certain

2    percentage of the assets under management in each year

3    whether the investments that it makes with those assets do

4    well for the client or not.  Mr. Stevens knew this and he

5    knew this is where the value was in the company.

6         He heard about the opportunity at Landmark from Tony

7    LoPinto who you will hear from as a witness in this case.

8    Mr. LoPinto was a headhunter who was retained by Landmark to

9    conduct the search to find somebody to be head of the Real

10   Estate Division.  When he heard about it he was at a private

11   equity firm called Carlyle Group which is a global, very

12   successful, private equity company that is located in the

13   Washington, D.C. area, and he was preparing to leave and look

14   and do something else.  He'd been there for eight years and

15   he founded the Real Estate Fund Investment Group and grown it

16   over the eight years that he was there.

17        He told Mr. LoPinto right from the beginning, as he

18   found out more about the opportunity, that a critical term

19   for him was that he have the opportunity -- at that point

20   they were discussing the opportunity to invest in the

21   fund -- excuse me, to invest in Landmark.  And he told

22   Mr. LoPinto it was critical for him in any deal that he might

23   reach to join Landmark that he have the opportunity to invest

24   in the entire company.  And Mr. LoPinto conveyed that back to

25   his client, Landmark, to Mr. Haviland and Mr. Borges, who are

1  the senior people at Landmark who owned a controlling

2  interest in it and, also, were the ones in charge of

3  conducting the search.  And he told them that it was

4  critically important to Mr. Stevens that he have the

5  opportunity to invest in the entire firm.  So they understood

6  that.

7          And they also knew, because he told them, that he

8  would not take the job if he didn't get that opportunity.

9  When Mr. LoPinto called Mr. Stevens, this is maybe three or

10  four months after he was first contacted and after there had

11  been a number of discussions and meetings between

12  Mr. Haviland and Mr. Borges from Landmark and Mr. Stevens,

13  Mr. LoPinto called Mr. Stevens and described the offer that

14  Landmark was making to him to join as head of the real estate

15  group.  And he described this term, he went through a whole

16  bunch of terms, but this term he described to Mr. Stevens as

17  ownership in Landmark Partners equity.  And Mr. LoPinto told

18  him that they were offering him ownership in Landmark Partner

19  equity, but that he needed to talk to Mr. Haviland to get the

20  details.

21          Mr. Stevens called Mr. Haviland a few days later,

22  and he will testify about the conversation he had with

23  Mr. Haviland on that day and a conversation he had with

24  Mr. Borges later in the day.  He took detailed

25  contemporaneous notes of those conversations.  In the call

```
 1   with Mr. Haviland they covered all the terms that Mr. LoPinto
 2   had described to Mr. Stevens, and they spent a long time on
 3   the ownership of Landmark Partners equity term.  Mr. Haviland
 4   told Mr. Stevens what the existing plan to share in the
 5   economics of Landmark was, it was a share purchase agreement.
 6   He told him what the senior people who were at the same level
 7   that Mr. Stevens would be owned under the share purchase
 8   agreement, how much stock they owned in the company.  He told
 9   him what the valuation of that stock was.  And during the
10   conversation Mr. Stevens asked how much will I be able to
11   acquire, and he said at least 10 percent, but he had to talk
12   to Mr. Borges to figure out what exactly the percentage would
13   be.  Mr. Haviland also said that they had some problems with
14   the existing plan.  It didn't work for all the people who
15   were participants in it because they had to take out loans to
16   buy their shares in the company, and they didn't like having
17   to repay those loans out of current income.  A lot of those
18   loans were to private shareholders who had left the company
19   and they say I'm working for the guys who used to own the
20   company.  So they said they're going to restructure the plan
21   in order to make it work for all the people that they
22   intended to benefit under the plan.
23        Mr. Stevens said, that's not a problem for me,
24   because I have the assets to be able to buy the stock
25   outright so I'm not going to need to take a loan.
```

1    Mr. Haviland also told Mr. Stevens that he anticipated that

2    they would make the changes in the plan and put them in place

3    by the end of the year.  This conversation is happening in

4    May of 2004.  And that it would be effective for Mr. Stevens

5    as of the date he started.

6           That same day Mr. Stevens talked on the phone to

7    Mr. Borges.  He wanted to confirm that Mr. Borges, who was

8    the head of the firm, was on board with all of the terms that

9    had been described to him by Mr. LoPinto and Mr. Haviland.

10   As Mr. Stevens notes reflect, Mr. Borges told him on

11   ownership, I'm very committed to the concept.  He also told

12   Mr. Stevens that the new plan would be effective for him

13   as of the date he started.

14          So although there were things that needed to be

15   worked out to restructure the plan so it worked for other

16   people, it was clear that this agreement was that he would

17   get an interest in the entire company, Landmark Partners,

18   Inc., and that that interest would start as of the date that

19   he started.

20          Now, you'll not hear in the testimony about those

21   conversations that there was -- that Landmark expected to

22   have the flexibility to change that plan in such a way that

23   Mr. Stevens wouldn't get the equivalent value that was being

24   discussed in the others that he was replacing had under the

25   plan.  You've not going to hear that they told him or

1    suggested to him in any way in those conversations that he

2    would not get an interest in the entire company.  And you're

3    not going to hear that they told him, by the way, you only

4    get this interest when we get around to putting a plan in

5    place.  So if it takes us five years, you won't get anything

6    in the meantime.

7              Now, as it turned out, it did take them quite a long

8    time to do anything.  I'm sorry.  I got a little ahead of

9    myself.

10             Mr. Borges drafted an offer letter which was sent to

11   Mr. Stevens by Mr. LoPinto, and the offer letter contained a

12   term or a provision called Participation in the Economics of

13   Landmark Partners, Inc., and that came about eleven days

14   after these conversations.  And it went on and described some

15   of the things that Mr. Stevens and Mr. Haviland, Mr. Borges

16   had talked about, the need to change the plan.  And it said

17   that they were considering changes and the changes could be

18   in the form of ownership, options, profit sharing or some

19   combination.  Three days passed between receipt of that

20   draft, there were no conversations about the terms, nobody

21   called Mr. Stevens and said, by the way, this is different

22   than what we were talking to you about.  And then a final

23   version of the agreement came and Mr. Stevens signed it.

24             Landmark didn't do anything to implement a plan

25   under this term of the agreement for over four years.

1    Mr. Stevens asked about it from time to time every year in

2    his annual review.  They always assured him they're working

3    on it, they just were having trouble figuring out how to do

4    it.  Finally, as they're getting ready to put a new real

5    estate fund out in the market, Mr. Stevens insists in the

6    middle of 2008, look, you really have to live up to the terms

7    of the agreement.  It's disappointing that you haven't done

8    anything with it.  And in September they proposed --

9    Mr. Haviland sends him a PowerPoint outline called the 2008

10   Equity Share Program.  That Equity Share Program did not give

11   him interest -- it only gave him an interest in the next real

12   estate fund.  Didn't give him an interest in all of Landmark

13   Partners, Inc. and it didn't give him anything for the four

14   years of delay that they had taken to put something together

15   on this.

16           The parties talked about this over the next few

17   weeks and debated what the term of the agreement required.

18   Mr. Borges -- Mr. Haviland actually initially acknowledged

19   that, gee, we didn't really draft this with your contract in

20   mind.  Mr. Borges eventually agreed that, yes, you were

21   entitled to 10 percent.  Because they didn't even give him

22   10 percent of the program in this proposal.  At most he had

23   five percent in that program which wasn't satisfactory.  And

24   he also agreed that he was supposed to get an interest beyond

25   just his Real Estate Division.  He was supposed to get an

1    interest in all Landmark Partners, Inc.  But what they

2    proposed wasn't participation in the economics of Landmark

3    Partners, Inc. in any sense.

4           Now, you're going to hear, I think, the question

5    asked, look at the agreement, look at the written agreement,

6    it doesn't promise anything that Mr. Stevens says.  And if

7    Mr. Stevens really thought that was what the promise was,

8    he's an experienced guy, he was an attorney, he drafted a lot

9    of agreements, he would have insisted on a more detailed

10   agreement.  And so why didn't he do that?

11          And the answer to that -- there are several answers

12   to that question.  One is that Mr. Stevens had seen a lot of

13   contracts or offer letters in the investment manager business

14   to hire senior executives and they almost all were summaries

15   like this.  This agreement said, on its face, it is a summary

16   of terms.  It didn't say it was a long, detailed agreement.

17   So it didn't look odd to him that the agreement came in this

18   way.

19          He also read the provision in the context of the

20   conversations that he had with Mr. Borges and with

21   Mr. Haviland and with Mr. LoPinto, and it did describe that

22   they needed to make changes, the kind of changes that he

23   talked about that were necessary for other people.  And he

24   knew that they knew he wasn't going to come if he didn't get

25   an interest in all of Landmark Partners, Inc. and that that

1    was critically important to him, and they discussed all of

2    that stuff.  So he read it in that context.

3         And, finally, he really trusted them.  It didn't

4    really occur to him that they were going to talk to him about

5    an interest in the entire company from the day that he got

6    there, and then write an agreement that is called a summary

7    and that was so ambiguous that four years later they would

8    use it to try to get out what they committed to do.

9         Ultimately, when terms in a contract are ambiguous

10   what helps you interpret what that contract means, if terms

11   of the written contract are ambiguous, are the context in

12   which the agreement was reached, what the objectives of the

13   parties were, and what they said to each other.

14        Ultimately, the parties couldn't reach any agreement

15   on a program that would satisfy the terms of the economic

16   participation provision in the contract.  Mr. Stevens did not

17   want to continue working there unless they lived up to the

18   agreement and they terminated him on November 6, 2008.  The

19   suit was filed shortly after that.

20        You're going to hear all the evidence and you'll

21   hear the Judge's instructions on the legal principles, as he

22   he described to you, and that will guide your decision.  But

23   at the end of the day, you have to make a decision based on

24   the evidence that you've heard.

25        As the Judge is going to inform you for reasons that

1    aren't -- that you don't need to be concerned with, we are

2    not going to ask you in this case to find that Landmark

3    breached it's agreement with Mr. Stevens because they didn't

4    give him ownership of stock in Landmark Partners.  We are

5    going to ask you to find that Mr. Borges and Mr. Haviland

6    did, in fact, agree to give Mr. Stevens an interest in the

7    entire company, all of Landmark Partners, Inc.  And if they

8    chose to give him that interest in the form of profit

9    sharing, it had to be all of the profits of Landmark

10   Partners, not just a slice of a particular fund, or not just

11   a slice of the Real Estate Department.  And that they

12   promised to do that from the date that he joined the firm.

13   We think the evidence is going to show that's what the

14   agreement is.  But we're also going to ask you to find that

15   if the agreement is something else, if you conclude the

16   agreement is something less than that, that Mr. Haviland and

17   Mr. Borges, on behalf of Landmark, negligently misled

18   Mr. Stevens into believing that's what they were giving him,

19   that he relied on them to join the firm.  He wouldn't have

20   joined the firm if they had been straight with him.  And he

21   would have obtained different employment at another job -- he

22   was leaving Carlyle -- at the same level of compensation that

23   he had at Carlyle.

24           So that's what we believe the evidence is going to

25   show.  We look forward to presenting Mr. Stevens's case to

1     you.  I thank you for your attention over the next few days

2     and for your participation in the process.

3           THE COURT:  Thank you, Mr. Bush.

4           Mr. Fiebach.

5           MR. FIEBACH:  May it please the Court.  Good

6     morning, members of the jury.  My name is Robert Fiebach.  I

7     represent Landmark.  With me is Robert Dell'Osa and John

8     Droney.  And also Gail Rizzo (ph) will be assisting me with

9     the documents and helping you see the documents in the case

10    Technologically.

11          Present in the courtroom are Mr. Tim Haviland,

12    Mr. Frank Borges, the managing partners of Landmark, and

13    you'll be hearing testimony from them throughout this case as

14    well.

15          Now, in early 2004, landmark was looking to fill a

16    vacancy that it had for the head of its Real Estate

17    Department.  It engaged a search firm, Equinox Partners,

18    headed by Mr. LoPinto, as Mr. Bush told you, and

19    Mr. LoPinto's job was to try to find candidates to fill that

20    vacancy.  Ultimately, Mr. LoPinto submitted Mr. Stevens as a

21    person to fill that -- as a candidate to fill that vacancy,

22    and Landmark considered him, considered several other people

23    suggested by Mr. LoPinto.  Eventually, Landmark focused on

24    Mr. Stevens as the best candidate to fill the job.

25          In April and May of 2004, Landmark had discussions

1    with Mr. Stevens about his interest in the job.  Some of

2    these conversations were through Mr. LoPinto, and then some

3    of them eventually got to be directly between Mr. Stevens and

4    Mr. Borges and Mr. Haviland as they got to try to get to know

5    him a little better.  Ultimately, Landmark submitted an offer

6    to Mr. Stevens.  First, Mr. LoPinto discussed it orally with

7    Mr. Stevens.  As a result of those discussions some changes

8    were made, but contrary to what Mr. Bush told you, the

9    evidence will show that from the very beginning with regard

10   to this issue of interest in the economics of Landmark,

11   Mr. LoPinto told Mr. Stevens that is to be determined.  That

12   the decision has not been made by Landmark as to what form

13   that will be.

14         As a result of those discussions and, ultimately, as

15   Mr. Borges drafted an offer letter that spelled out the terms

16   and conditions of the offer.  After Mr. Stevens had the offer

17   for five days, plenty of time to look at it and review it, he

18   decided to sign it.  And he did sign it.  That agreement is

19   undisputed in this case and we have it as D-415.  We can put

20   that up.

21         The main issue in this case is what Mr. Stevens was

22   entitled to.  In that portion of the agreement as referred to

23   by the Participation in the Economics of Landmark Partners.

24   Do you have it on the screen?

25         515.  I'm sorry.  Can you focus in on that one

1    provision which talks about the interest and the economics of

2    Landmark Partners.

3           Before the agreement was entered into the parties

4    discussed many issues.  Mr. Stevens expressed through both

5    his own discussions with Landmark and through Mr. LoPinto the

6    things that he said were important to him, but the evidence

7    in this case will show that the only agreement that Landmark

8    made with respect to the contract are all included in this

9    writing.  Despite all of Mr. Stevens's contentions that he

10   sought additional terms that were not included in the letter

11   agreement, Mr. Borges and Mr. Haviland will tell you, and the

12   evidence will show, that none of those provisions that

13   Mr. Stevens discussed directly or through Mr. LoPinto were

14   ever agreed to.

15          You should also know that the evidence will show

16   that Mr. Stevens was a lawyer, an accomplished lawyer, a

17   transaction lawyer, and that in his career he has drafted or

18   consulted with thousands of contracts.  He certainly knew how

19   to draft contracts, to put something in that may have been

20   omitted by the other side.

21          Members of the jury, the evidence will show through

22   the testimony of Mr. Haviland and Mr. Borges that the reasons

23   why the additional terms that Mr. Stevens now claims are not

24   in this contract are because they simply did not agree to it.

25          Mr. Stevens, as an experienced businessman and

1    lawyer, with lots of experience in dealing with contracts,

2    certainly understood that when he signed the contract without

3    those additional items that he was not entitled to, and he

4    was not entitled to those because they were not in the

5    contract.  For example, you will hear testimony by

6    Mr. Stevens that he wanted to have a stock ownership plan for

7    his benefit.  However, as you can see from the contract, the

8    contract is clear, and the Court will instruct you in this

9    case that Landmark did not agree to give Mr. Stevens an

10   ownership interest, and that they had the right to formulate

11   a profit sharing plan.

12          Landmark was candid with Mr. Stevens when it said in

13   the contract provision that was -- it was in the process of

14   examining various options and that it had not determined what

15   form that will take, i.e., ownership in the management

16   company, options, profit sharing, or some combination

17   thereof.

18          Another example is a contention by Mr. Stevens that

19   if it's to be a profit sharing plan, he's entitled to

20   10 percent of all of the company's profits in each year.

21   Once again, if one looks at the contract, and you will hear

22   from Mr. Borges and Mr. Haviland, that that is simply not

23   what the agreement says.  What it says is that he will have a

24   participation in the program.  In the program.  In the

25   program that is ultimately adopted.  Not in the entire

1    company.  Very, very clear.

2          The evidence will show that Mr. Stevens received

3    right from the beginning -- Mr. Bush told you it took four

4    years to get a plan, this plan together, and that's true --

5    but right from the beginning Landmark paid what it was called

6    a profit participation bonus, and Mr. Stevens received

7    $150,000 per year for the first four years of his employment.

8    He received a total of $600,000 under that plan.

9          In September 2008, when Landmark put together the

10   plan that it had been talking about in the contract, in that

11   plan Mr. Stevens was offered a 10 percent profit

12   participation in the profit of the funds generated in the

13   Real Estate Division.  He took the position that that plan

14   did not satisfy his agreement because it did not give him an

15   interest in the profits in the private equity side of the

16   business.

17         The program that Landmark devised was to give its

18   key principles an interest in the gross profit margins of the

19   funds generated under their areas of primary responsibility.

20   And Mr. Stevens' area of primary responsibility was the Real

21   Estate Investment Program as called for in the contract.

22         The evidence will show that there was never any

23   agreement made with Mr. Stevens that he would have any

24   interest in the profits of the areas of the business that he

25   had nothing to do with and to which his contributions did not

1    contribute to the growth of the firm.

2         Finally, Mr. Stevens maintains that Landmark had

3    agreed to make any program that they initiated retroactive

4    back to the date of the start of his employment.  The

5    evidence will actually show that if this plan had been made

6    retroactive back to the start of his employment, that he

7    would have received less under that program than he received

8    under the $150,000 profit participation bonus that he

9    received each year.  However, Mr. Haviland and Mr. Borges

10   will tell you that it never undertook or agreed with

11   Mr. Stevens that the plan would be made retroactive.  And you

12   can see in there that there was nothing in there, in the

13   agreement, that has such a provision.

14        The parties, as Mr. Bush told you, tried over a

15   period that ran from the end of September until November 2008

16   to try to resolve their differences.  However, the parties

17   could not reach agreement on the terms that Mr. Stevens

18   considered to be acceptable.

19        Accordingly, on November 6, 2008, Landmark

20   terminated Mr. Stevens' employment, and six days later

21   Mr. Stevens brought this case.  At no time, members of the

22   jury, the evidence will show, did Landmark ever misrepresent

23   in any way its intentions to Mr. Stevens.  Nothing could be

24   plainer than the language with regard to participation in the

25   economics of Landmark Partners, Inc. that is contained in

1    this contract.  We are in the process of examining various

2    options for key principals to benefit from their

3    contributions, from their contributions, to the growth of the

4    firm.  At this time we have not determined what form that

5    will take, i.e., ownership of the management company,

6    options, profit sharing, or some combination thereof.  You

7    will have a meaningful participation, initially 10 percent,

8    in the program once it is finalized.  That is what the

9    promise was to Mr. Stevens.

10          Landmark, through Mr. Borges and Mr. Haviland, will

11   tell you that that was absolutely correct, they had not yet

12   made that determination, and it took some time to make the

13   determination as to what they wanted to do.  There was never

14   any misrepresentation about that and no promise made to

15   Mr. Stevens about any aspect of the plan or what the plan

16   would or would not contain.

17          Landmark will also present evidence to you that if

18   you do not agree with the evidence from Landmark that it

19   fully lived up to its contractual obligations, that any

20   damages suffered by Mr. Stevens as a result are far less than

21   what he is asking you to consider.  But Landmark is confident

22   that, after hearing all the evidence in this case, you will

23   conclude that there has been no breach of contract by

24   Landmark, that there has been no misrepresentation by

25   Landmark, and that Mr. Stevens is not entitled to recover any

1    damages.

2            As an experienced lawyer in contract matters,

3    Mr. Stevens should not have accepted the offer letter that

4    Landmark submitted to him if he thought it did not reflect

5    the agreement.

6            In closing, members of the jury, I want to ask you

7    to keep an open mind in this case until you have heard all

8    the evidence in the case.  As the Court told you, the way the

9    court system works is the plaintiff goes first, the plaintiff

10   gets a chance to put on their evidence to you for you to

11   consider, I get an opportunity to cross-examine, but the

12   defendants don't get an opportunity to put on their case

13   until after the plaintiff has rested his case.

14           Please keep an open mind until you have heard the

15   full presentation of evidence from Landmark, from Mr. Borges

16   and from Mr. Haviland, until you've heard their testimony and

17   reviewed their evidence.

18           Thank you very much, members of the jury, for your

19   patience.

20           Thank you.

21           THE COURT:  Thank you, Mr. Fiebach.

22           All right, Mr. Bush.

23           MR. KNOTT:  Your Honor, the plaintiff calls Anthony

24   LoPinto.

25                   A N T H O N Y   L O P I N T O,

1    called as a witness by the Plaintiff, having been duly sworn

2    by the Clerk, was examined and testified on his oath as

3    follows:

4            THE CLERK:  State your name, city and state, and

5    spell your last name for the record.

6            THE WITNESS:  My name is Anthony J. LoPinto.  I live

7    at 525 East 72nd Street in New York City.  Last named is

8    spelled L O P I N T O.

9                         DIRECT EXAMINATION

10   BY MR. KNOTT:

11       Q.   Good morning, Mr. LoPinto.

12       A.   Good morning.

13           MR. KNOTT:  Ms. Johnson, can you turn on our

14   monitor?

15           Thank you.

16       Q.   Mr. LoPinto, please tell the jury about your

17   education since high school.

18       A.   I received a bachelor's of art education from

19   Loyola University in 1972.

20       Q.   And where do you work now, sir?

21       A.   I'm Managing Director of the global real estate

22   practice of Korn/Ferry International.  We are the largest

23   real estate executive search firm.

24       Q.   And where is your office located?

25       A.   200 Park Avenue, New York City.

1    Q.    How many employees does Korn/Ferry have as a
2    company?
3    A.    Approximately 2,000.
4    Q.    How long have you been at Korn/Ferry?
5    A.    About three and a quarter years.
6    Q.    Where did you work before Korn/Ferry?
7    A.    I had my own firm, name of it was Equinox
8    Partners.
9    Q.    What did you do at Equinox Partners?
10   A.    I was the CEO.  It was a retained executive search
11   firm that focused exclusively on real estate.
12   Q.    Were you working at Equinox Partners in late
13   2003?
14   A.    Yes.
15   Q.    Do you recall speaking with Frank Borges at that
16   time?
17   A.    I do.
18   Q.    Who is Frank Borges?
19   A.    The CEO of Landmark Partners.
20   Q.    What did you talk with Mr. Borges about?
21   A.    Mr. Borges contacted me about performing an
22   executive search for the head of their real estate funds.
23   Q.    Did Mr. Borges hire Equinox to perform the
24   search?
25   A.    Yes, he did.

1    Q.    Did you prepare an engagement letter related to

2    that?

3    A.    We did.

4         MR. KNOTT:  Jake, can you please call up Plaintiff's

5    Exhibit 3.

6    Q.    Mr. LoPinto, do you see that document on your

7    screen?

8    A.    I do.

9    Q.    Do you recognize it?

10   A.    Yes.  It's our retainer agreement for the search we

11   performed for Landmark Partners.

12        MR. KNOTT:  Your Honor, I move Plaintiff's Exhibit 3

13   into evidence.

14        MR. FIEBACH:  No objection, your Honor.

15        THE COURT:  It will be admitted full.

16   Q.    Mr. LoPinto, you see in the top line of that letter

17   it says:  We are pleased to accept your assignment to

18   identify and present candidates for the position of senior

19   partner.  Do you see that?

20   A.    Yes, I do.

21   Q.    When Equinox was hired to perform a search, who did

22   it represent?

23   A.    We represent the client.  In this case, it was

24   Landmark Partners.

25   Q.    Do you represent the candidates who might be

1   interested in the job?

2       A.    No, we do not.

3       Q.    When you make representations during a search, who

4   do you make them on behalf of?

5       A.    On behalf of Landmark Partners, the client.

6       Q.    After you were engaged, did you further discuss the

7   search with Mr. Borges?

8       A.    Yes, regularly.

9       Q.    Did you also discuss the search with Tim

10  Haviland?

11      A.    I did.

12      Q.    Who is Mr. Haviland?

13      A.    I believe his title was Chief Operating Officer.

14      Q.    During the search, did Mr. Borges and Mr. Haviland

15  tell you about any concerns they had related to the state of

16  the real estate group at Landmark?

17      A.    There were --

18           MR. FIEBACH:  Objection, relevancy.

19           THE COURT:  Overruled.  You can answer the

20  question.

21      A.    They outlined for us really two concerns that

22  existed.  One was the head of the real estate fund, I believe

23  his last name was Main, M A I N, had left the firm, and it

24  was not long after they had raised considerable amount of

25  money from investors.  And because of the situation, they

1    were in a position where they had to refund those investment

2    dollars which in the investment world was a critical issue.

3    There also was some other litigation, I forget what the

4    particulars of it were, some issues associated with the State

5    of Connecticut.

6            MR. FIEBACH:  Objection, your Honor.

7            THE COURT:  Sir, why don't you end your answer

8    there.  Attorney Knott, why don't you ask your next question.

9            MR. KNOTT:  Yes, your Honor.

10           Jake, can you please show us Plaintiff's Exhibit

11   4.

12   Q.    And do you recognize this document, Mr. LoPinto?

13   A.    Yes.  It's a position specification that we

14   developed in connection with the search.

15           MR. KNOTT:  I move the admission of Plaintiff's

16   Exhibit 4.

17           MR. FIEBACH:  Lack of foundation, your Honor.

18           THE COURT:  Why don't we ask a little more, a few

19   foundation questions, Mr. Knot.  The objection's sustained at

20   the moment.

21   Q.    Mr. LoPinto, did you prepare this document?

22   A.    We prepared a draft and then presented it to the

23   client.  The client and ourselves went back and forth and

24   finalized it.

25   Q.    Do you recognize this as the finalized position

1    specification?

2         A.    Typically, we have a watermark that says draft.

3    The fact that this does not include that, I assume it's the

4    final.

5              MR. KNOTT:  Your Honor, I move Plaintiff's Exhibit 4

6    at this time.

7              MR. FIEBACH:  No objection.

8              THE COURT:  It will be admitted full.

9         Q.    Mr. LoPinto, did you prepare this document based on

10   your discussions with Mr. Borges and Mr. Haviland?

11        A.    Yes.

12        Q.    In the paragraph titled Position Summary, it states

13   that you'd been retained by Landmark Partners to recruit and

14   hire a senior partner.  Do you see that?

15        A.    Yes, I do.

16        Q.    Is that based on what Mr. Borges and Mr. Haviland

17   told you?

18        A.    Yes.

19        Q.    In also states that this individual would be in a

20   leadership position on the Landmark team.  Do you see that?

21        A.    I do.

22        Q.    Is that also based on what Mr. Borges and

23   Mr. Haviland told you?

24        A.    Yes.

25        Q.    It states that this individual will have primary

1   responsibility for leading the firm's real estate investment

2   strategy.  Do you see that?

3        A.    Yes, I do.

4        Q.    Was that also information that came from Mr. Borges

5   and Mr. Haviland?

6        A.    Yes, it did.

7             MR. KNOTT:  Jake, can you please call out the client

8   summary section.

9        Q.    In this client summary it describes Landmark as a

10  private equity and real estate investment company

11  specializing in secondary funds.  Do you see that?

12       A.    Yes.

13       Q.    Is this information that came from Mr. Borges and

14  Mr. Haviland?

15       A.    Yes.

16            MR. KNOTT:  Jake, can you go to page two of the

17  document, please.

18       Q.    Can you call out the section entitled Position

19  Responsibilities?

20            And it states that the successful candidate was to

21  direct the real estate program.  Do you see that?

22       A.    I do.

23       Q.    And to lead, direct, manage and significantly

24  expand Landmark's secondary investment program in real

25  estate.  Do you see that?

1      A.    Yes, I do.

2            MR. KNOTT:  Jake, can you call out the section

3      entitled Candidate Profile.

4      Q.    It says Landmark was looking for a seasoned

5      investment professional, is that right?

6            MR. FIEBACH:  Objection to the form of the question.

7      He's just reading the document.

8            THE COURT:  Sustained.  Why don't you rephrase.

9      Q.    Did Mr. Borges and Mr. Haviland tell you that they

10     were looking for a seasoned investment professional?

11     A.    Yes.

12     Q.    Did they tell you that they were looking for an

13     individual with experience in raising capital?

14           MR. FIEBACH:  Objection, leading.

15           THE COURT:  I'm going to overrule it.  You can

16     answer the question, sir.

17     A.    That was one of the elements of the role.

18     Q.    Look at the next page, Jake.  Actually, the fourth

19     page.

20           Did Mr. Borges and Mr. Haviland tell you that they

21     were planning to negotiate compensation to attract

22     exceptional candidates?

23     A.    Yes, they did.

24     Q.    There's a reference here in the last line to a

25     significant equity component in the funds.  What does that

1   mean?

2       A.    That would have referred to the real estate funds

3   that were raised and invested.

4       Q.    Did that mean participation in the management

5   company, Landmark Partners, Incorporated?

6           MR. FIEBACH:  Objection, your Honor.

7           THE COURT:  Sustained.

8           MR. KNOTT:  What's the grounds for the objection?

9           MR. FIEBACH:  Leading.

10          THE COURT:  The objection's sustained.

11      Q.    Did you discuss participation in the management

12  company, Landmark Partners, Inc. with Mr. Borges and

13  Mr. Haviland?

14          MR. FIEBACH:  Objection.  What time frame is he

15  talking about?

16          THE COURT:  Sustained.

17      Q.    During the search, did you discuss participation in

18  the management company Landmark Partners, Inc. with

19  Mr. Borges and Mr. Haviland?

20      A.    Yes.

21      Q.    What did you discuss on that subject?

22      A.    It came up in particular in our review of Gary

23  Stevens as a candidate, because they found him attractive

24  beyond just the real estate function.  At Carlyle he had

25  taken on a broader role, moved out of strictly real estate

1    and had been involved in other activities, again, outside of

2    real estate.  And one of the attractions of him as a

3    candidate was the fact that he would be able to add more

4    value than just within the real estate context.  So it became

5    part of the discussion that his role would be to participate

6    at some level in the management of Landmark Partners in

7    Executive Committee.  I don't, frankly, remember all the

8    particulars on that front.  And that he would be able to,

9    therefore, receive some incentive in the form of

10   participation in the top of the business, the management

11   company, or some other structure.

12       Q.   Were you familiar with Mr. Stevens at the time of

13   the search?

14       A.   Was I familiar with him?  Yes.

15       Q.   How did you know him?

16       A.   I had known Gary for a number of years.  I first

17   met him probably in 1990 or 1991.  I was Chief Financial

18   Officer of a company based in Washington, D.C. and our

19   company had some business dealings with his company, and I

20   met him in conjunction with those activities.

21       Q.   Did you identify Mr. Stevens as a candidate for

22   Landmark?

23       A.   We did, yes.

24       Q.   Did you discuss the position with Mr. Stevens

25   before you identified him?

1    A.    Yes, I would have contacted him and told him

2  generally about the opportunity and then, based on that, once

3  he indicated interest, we would provides him with the

4  position specification.

5    Q.    Based on what you were seeing in the marketplace at

6  that time, would there have been other opportunities that

7  would have been available to someone with Mr. Stevens's

8  experience?

9         MR. FIEBACH:  Objection.

10        THE COURT:  Grounds?

11        MR. FIEBACH:  Leading.

12        THE COURT:  I'm going to overrule the objection on

13  that ground.  Go ahead.  You can answer.

14    A.    It was an active time in the real estate markets.

15  There was quite a bit of activity, hiring activities.  Funds

16  were being invested.  So in that context the answer would be

17  yes.

18    Q.    After you identified Mr. Stevens as a candidate,

19  what happened next in the search?

20    A.    After we would have reviewed the opportunity in

21  more detail with him in connection with the specification, we

22  would then review his background.  We generally had weekly or

23  biweekly status reports with the client, reviewed candidates

24  who had surfaced who were interested.

25         Generally, we approach it from a very short list

1    point of view.  We don't present long lists of candidates.

2    We present individuals who we feel are highly qualified.  And

3    in this particular case, we probably presented about six, and

4    Gary would have been among them.  And we would have reviewed

5    his background and then had further discussion.  And based on

6    that, they indicated interest in meeting with him, and we

7    prepared before presentation a candidate profile that

8    includes their resume background as well as our own due

9    diligence and evaluation of the candidate.

10        Q.    Do you recall talking with Mr. Stevens in the

11   middle of February 2004 about the search?

12        A.    I don't remember exactly when I would have

13   contacted him about this.

14        Q.    Would it help you to look at a document to

15   remember?

16        A.    Sure.

17            MR. KNOTT:  Jake, can you call up Plaintiff's

18   Exhibit 7, please.  And once you've had a chance to look at

19   it, let us know.

20            MR. FIEBACH:  Your Honor, objection.

21            THE COURT:  Grounds?

22            MR. FIEBACH:  Hearsay.  As I understand it, these

23   are notes from Mr. Stevens.

24            THE COURT:  Mr. Fiebach, he hasn't offered the

25   document yet.  We'll deal with the objection when he offers

1    the document.

2           MR. FIEBACH:  Thank you.

3      A.    Okay.  I've reviewed it.

4      Q.    And is your memory refreshed about a conversation

5    that you had with Mr. Stevens during the search?

6      A.    Yeah.  I don't remember the precise call or

7    conversation, but the general substance of it I do recall.

8           MR. KNOTT:  Jake, can you take the document down,

9    please.

10     Q.    Can you tell us about that conversation?

11     A.    We would have provided background information in

12   terms of the status of the search, how many individuals would

13   have been presented.  I like to keep our candidates aware of

14   where they stand in the process in fairness to them.  These

15   are very senior people and take a high interest.  So we would

16   have reviewed how many other candidates there were, where we

17   viewed him to be positioned in that group and so forth.  And,

18   also, where the status was with the client vis-a-vis his

19   candidacy.

20          MR. KNOTT:  Jake, can you call up Plaintiff's

21   Exhibit 9, please.

22     Q.    Mr. LoPinto, do you recognize this document?

23     A.    Yes.

24     Q.    What is it?

25     A.    This is our candidate profile document.  It's

1   the -- it's our review of background information that we

2   believe to be relevant for him as a candidate.

3       Q.    Is this a document that you prepared?

4       A.    Yes.

5           MR. KNOTT:  I move to admit Plaintiff's Exhibit 9.

6           THE COURT:  I take it there's no objection?

7           MR. FIEBACH:  No objection.

8           THE COURT:  This will be full.

9       Q.    Mr. LoPinto, at some point during the search, did

10  you ask Mr. Stevens to describe his compensation while he was

11  at Carlyle to you?

12      A.    Yes.

13      Q.    Why did you do that?

14      A.    We always gather background information on

15  candidates' compensation, both in the form of cash

16  compensation as well as, in this particular case, for real

17  estate investors what their interests were in the funds that

18  they may have been granted an interest in and what the

19  approximate value was.

20      Q.    Did Mr. Stevens prepare a memoranda for you about

21  his compensation at Carlyle?

22      A.    I don't recall the memoranda, but I do know we did

23  get detailed information from him on his participation in the

24  funds.

25      Q.    Did you provide that information to Landmark after

1    you received it?

2        A.    Yes, yes.

3             MR. KNOTT:  Jake, can we look at Plaintiff's Exhibit

4    10, please.

5        Q.    Mr. LoPinto, do you recognize this document?

6        A.    I do.

7        Q.    What is it?

8        A.    It would have been a memorandum from Gary Stevens

9    to myself and my partner, Barbara Beck.

10       Q.    Did you receive this memorandum?

11       A.    Yes.

12       Q.    And did you provide it to Landmark?

13       A.    We did.

14            MR. KNOTT:  I move to admit Plaintiff's Exhibit

15   10.

16            MR. FIEBACH:  Objection, your Honor.

17            THE COURT:  Grounds?

18            MR. FIEBACH:  Your Honor, in part, it's hearsay.

19   With regard to matters related to Mr. Stevens' income, the

20   best evidence rule.  And I believe that portions of this are

21   not admissible based on some prior rulings your Honor has

22   made.

23            THE COURT:  Objection sustained.

24       Q.    Mr. LoPinto, you recall that Landmark -- did

25   Landmark conduct interviews in the search?

1      A.    Yes.

2            MR. KNOTT:  Jake, can you call up Plaintiff's

3      Exhibit 11, please.

4      Q.    Mr. LoPinto, do you recognize this document?

5      A.    Yes.  This would be the cover page of one of our

6      standard status reports.

7      Q.    Is this a document that you prepared?

8      A.    Yes.

9      Q.    Is this a document that you provided to Landmark?

10     A.    Yes.

11           MR. KNOTT:  I move to admit Plaintiff's Exhibit

12     11.

13           THE COURT:  Mr. Fiebach?

14           MR. FIEBACH:  Can I just look at it?

15           No objection, your Honor.

16           THE COURT:  It will be admitted full.

17           MR. KNOTT:  Jake, can we go to page three, please.

18     Q.    Now, the document says, current candidates who have

19     interviewed with client, Graham Bond, Patrick Sullivan,

20     Robert Gifford and Gary Stevens.  It says of March 8, 2004,

21     Mr. Stevens had interviewed with Landmark?

22     A.    Yes.

23           MR. KNOTT:  Jake, can we go to Plaintiff's Exhibit

24     12, please.

25     Q.    And, Mr. LoPinto, do you recognize this document?

1     A.    Yes.

2     Q.    And what is this document?

3     A.    Emails from Frank Borges to myself.  Actually, my

4     emails to Frank and then his response.

5          MR. KNOTT:  I move to admit Plaintiff's Exhibit 12.

6          MR. FIEBACH:  Objection, your Honor, on hearsay and

7     relevance.

8          THE COURT:  Overruled.  It will be admitted full.

9          MR. KNOTT:  Jake, can you call out the bottom email,

10    please.

11    Q.    And this is an email from you to Mr. Borges and

12    Mr. Haviland, is that correct?

13    A.    That's correct.

14    Q.    And you said:  Frank and Tim, Please contact me

15    ASAP tomorrow morning.  I need to debrief Rob Gifford's

16    comments about his meeting last week.  Is that right?

17    A.    That's correct.

18    Q.    And then in the email above that, Mr. Borges

19    writes:  Sounds like these guys may inadvertently cool the

20    enthusiasm and the compelling nature of the opportunity in

21    their discussion with Gifford.  We will follow-up prior to

22    Stevens meeting.  Need to be in the sell mode.

23          Do you see that?

24    A.    Yes, I do.

25    Q.    What did you take that last comment to mean, need

1    to be in the sell mode?

2        A.    It likely referred back to the issues that I

3    mentioned earlier.  There were issues with the institutional

4    investors of terms of their view of the company.  And in

5    order to provide a framework for these candidates to have a

6    continuing interest, needed to sell the broader opportunity

7    which we worked hard at, as did Frank.

8            MR. KNOTT:  Jake, can we look at Plaintiff's Exhibit

9    16, please.

10       Q.    Mr. LoPinto, do you recognize this document?

11       A.    I have to be honest with you, it's awful fuzzy.

12           MR. KNOTT:  Jake, can you call out the text, please.

13       A.    It's an email from myself to Frank announcing that

14   we had brought on a new partner to the firm.

15           MR. KNOTT:  And, Jake, can you also call out the

16   text of the above email for Mr. LoPinto.

17           I move the admission of Plaintiff's Exhibit 16.

18           MR. FIEBACH:  No objection, your Honor.

19           THE COURT:  May be admitted full.

20       Q.    So this email is dated April 25, 2004, and the top

21   email is from Mr. Borges to you, is that correct?

22       A.    That's correct.

23       Q.    And Mr. Borges writes:  Please get back to me and

24   Tim with a proposed offer to Gary we can chew on early next

25   week.  Do you see that?

1    A.    Yes, I do.

2          MR. FIEBACH:  Objection, he just misread it.

3          THE COURT:  I can't hear you.

4          MR. FIEBACH:  Objection, he just misread the

5    document.  He said we can chew on early week.

6          THE COURT:  Thank you.

7    Q.    Gary, did that mean Gary Stevens?

8    A.    Yes.

9    Q.    Did you prepare a proposed offer to Mr. Stevens?

10   A.    I don't recall preparing an offer.  I would have

11   called Frank and Tim and reviewed parameters of an offer.

12   Q.    Do you recall drafting a memorandum about an offer

13   for Mr. Stevens?

14   A.    I had sent a memorandum that summarized the

15   situation, you know, Gary's compensation, certain

16   considerations, what was motivating him so that they would

17   have, you know, the information they need to create an offer

18   package.

19         MR. KNOTT:  Jake, can we look at Plaintiff's Exhibit

20   17, please.

21   Q.    Mr. LoPinto, do you recognize this document?

22   A.    Yes, that's an email from me to Frank and Tim.

23   Q.    And was this a document that you created as part of

24   your work on the Landmark engagement?

25   A.    That's correct.

1          MR. KNOTT:  Move to admit Plaintiff's Exhibit 17.

2          MR. FIEBACH:  May I have a moment to read it, your

3    Honor?

4          THE COURT:  Sure.

5          MR. FIEBACH:  Your Honor, for the record, I object

6    to the document as being inconsistent with your earlier

7    ruling.

8          THE COURT:  Ladies and gentlemen, the document's

9    admitted as a full exhibit.

10         Ladies and gentlemen, during the course of the

11   trial, and this is one instance, you may see or you may hear

12   evidence that the parties at some times discussed giving

13   Mr. Stevens an ownership interest.  I instruct you that the

14   contract did not require Landmark to give Mr. Stevens's an

15   ownership interest and that you may, therefore, not consider

16   this evidence as proof either that Landmark breached the

17   contract or that it is liable for any negligent

18   misrepresentation simply because it failed to give

19   Mr. Stevens an ownership interest.

20         The Court has already ruled that Landmark was not

21   required to do that and you are not to speculate as to why

22   the Court has made that ruling.  Instead, you may consider

23   this evidence and, other evidence of discussions of an

24   ownership interest, only for the limited purpose of

25   determining whether Landmark promised to let Mr. Stevens

1    participate in the economics of the entire firm or just in

2    specific funds managed by the firm.  In other words, you may

3    consider this evidence only in deciding what the parties

4    agreed to and whether Landmark is liable for any negligent

5    misrepresentations about the scope of the program referred to

6    in the May 20, 2004 agreement.

7              All right, Mr. Knott.

8              MR. KNOTT:  Jake, can you call out the top

9    paragraph, please.

10        Q.    And you write here that Mr. Stevens was pleased to

11   hear that he is your top candidate.  Is that information that

12   Mr. Borges and Mr. Haviland had told you?

13        A.    Yes, they would have.

14             MR. KNOTT:  Jake, can you call out paragraph 4,

15   please.

16        Q.    It says:  We spoke, reviewed with Gary the

17   structure of the potential package, and explored his thoughts

18   about current cash as well as equity participation in the

19   fund.  On the subject of equity participation in the fund,

20   what did you talk about with Mr. Stevens?

21        A.    It would have been the parameters that Frank and

22   Tim gave us authorization to frame for him, and it would have

23   been relative to the real estate funds.

24             MR. KNOTT:  Jake, can we go to page two, please.

25   Can you call out the top paragraph.

1    Q.    It says we also spoke to Gary about his ability to

2    invest in the firm.  He understands that the plan is in

3    formation now and that he will participate in a meaningful

4    way.  What did you tell Mr. Stevens about that subject?

5    A.    Again, it would have been based on discussions I

6    had with Frank and Tim about the fact that he was a candidate

7    that would have a broader context for the firm and that he

8    would participate in certain level of management activities,

9    as I recall, it was in connection with membership on an

10   executive committee or some other governing body, and that he

11   he would enjoy certain participation in the equity of the

12   firm.  They were in -- they had explained to me in one

13   meeting that I recall specifically that there were a variety

14   of issues that they were managing through in restructuring

15   the firm.  So that they were not able at that point in time

16   to conclude an agreement, but that it was in process and that

17   it would get resolved, you know, in the coming months, but

18   not in time for them to conclude a current agreement with

19   him.

20   Q.    Did they tell you what the issues were with the

21   restructuring?

22   A.    I didn't get deep detail, but I recall there were

23   restructurings going on in the form of buying out the

24   original founder of the business, and there were other issues

25   involving some of the problems that the firm had run into.

1    So all of that occasion to restructure which was in process.

2    I didn't have deep details on that beyond that level.

3        Q.    Did you describe for Mr. Stevens the concept of

4    restructuring what they had in place?

5        A.    Well, I explained that there was a restructuring

6    going on, that they were in the process of dealing with that,

7    which would then be followed by developing an equity -- long

8    term incentive, equity participation program.

9        Q.    It says in this document, participation at the firm

10   level is critically important to him.  Part of the attraction

11   of the Landmark opportunity is the ability to be involved in

12   a platform that extends beyond real estate investments.  Is

13   that information that Mr. Stevens had told you?

14            MR. FIEBACH:  Objection, leading.

15            THE COURT:  Overruled.

16       A.    Yes, it would have been the reason he was

17   interested was because it made it a more interesting

18   opportunity but, also, there were the issues associated with

19   the recovery of the real estate program because of the

20   departure of the former head and the fact that they had to

21   turn back the funds.  So there was some risk associated with

22   the turnaround of the real estate component of the business.

23   You know, that on one level was that under-riding concern and

24   on the other level it represents an opportunity because

25   someone could go in and turn it around that was good.  But

1    clearly having a broader opportunity in the firm was

2    attractive to Gary for those two reasons.

3            MR. KNOTT:  Jake, can you call out the last

4    paragraph of this document, please.

5        Q.    In the paragraph at the top of the call out here

6    there's a discussion of compensation information from Gary.

7    Do you see that?

8        A.    I do.

9        Q.    And that was information that you provided to

10   Landmark in this memo?

11       A.    Yes.

12       Q.    You say:  After you've had an opportunity to digest

13   the above, let's line up a conference call.  Did you have a

14   conference call with Landmark after you sent them this

15   memo?

16       A.    I believe we did.

17       Q.    What did they -- what did you talk about in that

18   conference call?

19       A.    We would have reviewed the points that were made

20   and discussed approaches to the structure of an offer.  The

21   offer would have provided for three components:  One would be

22   a base salary; second would be a performance bonus, and the

23   third would be long term incentive which would be

24   participation in the funds.  So we would have reviewed, you

25   know, these facts and then developed a plan for the offer.

1     Q.    Did you develop a plan for the offer in your

2   conversation with Landmark?

3     A.    I don't recall all the particulars of that call.

4     Q.    Did Landmark authorize you to contact Mr. Stevens

5   about the terms of an offer?

6     A.    Once they had developed them and they gave me the

7   particulars, I did, I reviewed them, top line review.

8     Q.    Did you have a telephone conversation with

9   Mr. Stevens to discuss those terms?

10    A.    I probably did.  I don't believe we would have met

11  in person.

12    Q.    Do you recall, though, having a conversation with

13  Mr. Stevens to discuss the terms?

14    A.    Yes.

15    Q.    What did you tell Mr. Stevens in that

16  conversation?

17    A.    Generally, with those conversations I just report

18  the facts, I outline the terms and the parameters, the

19  amounts.  In this particular case, there was some concern on

20  the company's part, they wanted to keep the base salary in

21  check.  So we came up with a number that I reviewed with

22  Gary.  There was a performance bonus component.  And as I

23  recall, there was another performance bonus based on success

24  in raising real estate funds from institutional investors.

25  So there was a three-tier cash compensation plan and then

1  there was a participation in the Real Estate Funds that would

2  be raised.  I believe it was 15 percent of the promoted

3  interest in the funds.

4      Q.   Did you in that conversation tell Mr. Stevens

5  anything about participation in the economics of Landmark

6  Partners, Inc.?

7      A.   Would have discussed it just in very broad terms,

8  because I didn't have any facts.  And, you know, it was still

9  subject to that restructuring that we talked about before.

10  But, certainly, that was of keen interest to him and we would

11  have reviewed it, but I wouldn't have presented a specific

12  plan.

13      Q.   Did you tell him anything about Landmark offering

14  him equity in Landmark Partners?

15          MR. FIEBACH:  Objection, leading.

16          THE COURT:  Sustained.

17          MR. KNOTT:  Your Honor, a moment to consult?

18          THE COURT:  Sure.

19  BY MR. KNOTT:

20      Q.   What, if anything, did you tell Mr. Stevens about

21  Landmark's willingness to give him an interest in Landmark

22  Partners, Inc.?

23          MR. FIEBACH:  Objection, leading.

24          THE COURT:  Overruled.

25          THE WITNESS:  Repeat the question.

1      Q.   What, if anything, did you tell Mr. Stevens about

2  Landmark's willingness to give Mr. Stevens's an interest in

3  Landmark Partners, Inc.?

4      A.   I don't recall any specifics that were discussed.

5  I do recall that I indicated that there was a plan that they

6  would be providing him with in a long term interest in the

7  company.  But, again, the structure was not discussed and the

8  issues of the restructuring that was going on were really

9  conditions preceding to being able to formalize that.

10     Q.   After speaking with Mr. Stevens, did you have a

11  follow-up conversation with Mr. Haviland?

12     A.   I don't recall it specifically.  I probably did.

13  Generally, after I report to the candidate, I go back to the

14  client and brief them on that conversation.  And, also,

15  that's typically a point where, you know, my job is not to

16  continue to work through, you know, the more specific

17  details.  Generally, the client and the candidate generally

18  at that point will start to interact directly once I've sort

19  of screened the issues and screened their level of

20  interest.

21     Q.   Would it help to refresh your memory about

22  specifics of a conversation with Mr. Haviland to look at a

23  document?

24     A.   Sure.

25          MR. KNOTT:  Jake, can you call up Plaintiff's

1    Exhibit 22, please.

2        Q.    I'd ask you to just take a look at that and let us

3    know when you're done.

4        A.    Can you blow it up a little bit?

5            MR. KNOTT:  Jake, can you call up the top half of

6    the page, please.  And if you could scroll through it

7    slowly.

8        A.    Right, I recall.

9        Q.    What did you talk about in your follow-up

10   conversation with Mr. Haviland?

11           MR. FIEBACH:  Your Honor, lack of foundation.  He

12   hasn't identified this as being following the conversation

13   with Mr. Stevens as before the conversation --

14           THE COURT:  Why don't you prephrase the question.

15   Objection sustained.

16       Q.    Do you recall the specifics of your conversation

17   with Mr. Haviland?

18       A.    Would have covered Gary's level of interest and,

19   also, as the notes remind me, that Gary was actually in

20   conversations with another investor, an opportunity that

21   involved the development -- the acquisition and development

22   of environmentally challenged lands.  And it was at that time

23   pretty active space and Gary had been pursuing conversations

24   with that group for some time.  In fact, I think he was

25   already talking to them when we first approached him.  In

1    this conversation I would have reminded Tim that there was a

2    competitive situation that Gary was considering.

3         Q.    After that conversation, did you participate in any

4    more phone calls with Mr. Stevens about Landmark's offer?

5         A.    I don't recall any specifics.

6         Q.    At some point did you receive a draft offer letter

7    from Landmark?

8         A.    I did.

9              MR. KNOTT:  Jake, can we look at Plaintiff's Exhibit

10   23, please.

11        Q.    Mr. LoPinto, do you recognize this document?

12        A.    Yes.  It's an email from me to Gary Stevens with

13   carbon copies to Frank and Tim.

14             MR. KNOTT:  I move to admit Plaintiff's Exhibit 23.

15             MR. FIEBACH:  No objection.

16             THE COURT:  It may be admitted full.

17        Q.    You say here that you're pleased to submit the

18   attached offer letter that Frank and Tim have authorized me

19   to forward to you.  Do you see that?

20        A.    I do.

21        Q.    And you also say, if you have any questions or want

22   to discuss any aspect of the offer, please give me a call.

23   Do you see that?

24        A.    I do.

25        Q.    Do you recall any discussions after you sent this

1    to Mr. Stevens with him?

2        A.    Not specifically.  I'm sure we did have a

3    conversation.  Likely that we reviewed it.

4        Q.    Did you believe that this -- and, Jake, can you

5    just page through so we can see the attachment.

6              You don't need to call out.

7              Did you believe that this letter was consistent with

8    what you had described to Mr. Stevens on May 3rd?

9        A.    Yes.

10             MR. KNOTT:  Jake, can we go to page three, please.

11   And can you call out the section participation in the

12   economics of Landmark Partners, Inc.

13       Q.    Did you believe this provision was consistent with

14   what you had told Mr. Stevens the offer was?

15       A.    Yes.

16       Q.    Did you have a belief as to the intent of this

17   particular provision of the offer for Mr. Stevens?

18             MR. FIEBACH:  Your question?

19             THE WITNESS:  I didn't understand the question.

20             MR. FIEBACH:  Objection.

21             THE COURT:  Why don't you repeat the question, Mr.

22   Knott.

23       Q.    Did you have a belief as to the intent of this

24   particular provision of the offer for Mr. Stevens?

25             MR. FIEBACH:  Objection.

1          THE COURT:  Grounds?

2          MR. FIEBACH:  His understanding of intent is

3    irrelevant.

4          THE COURT:  Why don't you rephrase the question.  I

5    think you can get at this but slightly differently.

6      Q.    What was your understanding of what this provision

7    meant for Mr. Stevens?

8          MR. FIEBACH:  Objection.  His understanding is

9    irrelevant.

10          MR. KNOTT:  He's the agent whose communicating the

11    offer.

12          THE COURT:  I'm going to overrule the objection.

13          THE WITNESS:  Can you repeat the question?

14          MR. KNOTT:  Can you read it back?

15          (Whereupon, the court reporter read back the

16    requested question.)

17      A.    My interpretation was meant that they would, you

18    know, finalize the development of a plan after they resolved

19    the other issues that they had been grappling with and that

20    it would be concluded.  I would have expected it would have

21    been concluded at some few months after he got on board.

22    Obviously, it couldn't be concluded before he started,

23    however.

24      Q.    There's a reference here to participation in the

25    economics of Landmark Partners, Inc.  What did you take that

1    to mean?

2         MR. FIEBACH:  Your Honor, I think he's already asked

3    and answered.

4         THE COURT:  Overruled.

5    A.    Well, clearly, in the offer letter they framed it

6    rather broadly and I had no basis for, you know, judging it

7    any differently than the parameters that they outlined.  I

8    expected that it would be a material interest in the business

9    and that, as it indicates here, it would be approximately

10   10 percent of that interest or 10 percent of the business.

11   Q.    There's a reference here to key principals.  Do you

12   see that.  What was your understanding of that term?

13   A.    I would have taken that to be the group that I

14   referred to earlier, members of the executive committee.

15   There were, as I recall, Landmark Partners was broken into

16   various market sectors, real estate being one, and that Gary

17   would be heading that one up, would be among others that

18   headed up different industry segments in their business in

19   the form of an executive committee.

20   Q.    Did you forward this letter to Mr. Stevens -- yes,

21   you did.  It's in the email.  I'm sorry.

22        What happened after you forwarded the email to

23   Mr. Stevens?

24   A.    Well, I would have reviewed it with Gary

25   telephonically and at that point, you know, generally at this

1  juncture the client and the candidate interface on questions

2  that Gary might have that he would want to clarify.

3  Obviously, this point in particular would be the area that

4  was vague so that necessitated further conversation, but I

5  didn't participate in that conversation that he would have

6  had with them.

7      Q.   At some point did you find out that the offer

8  letter had been finalized?

9      A.   Yes.

10     Q.   Did Mr. Borges, Mr. Haviland, or anyone else at

11 Landmark ever tell you that they were not willing to provide

12 Mr. Stevens with an interest in the business, Landmark

13 Partners, Inc.?

14     A.   No.

15     Q.   Did they ever tell you that they thought they had

16 complete discretion over when to put a plan in place?

17          MR. FIEBACH:  Objection.

18          THE COURT:  Grounds?

19          MR. FIEBACH:  Leading, your Honor.

20          THE COURT:  I'm going to allow it.

21     A.   I never heard that they have complete discretion.

22 I would have expected that they -- this would have been

23 pursued in good faith.  They would have wrapped up whatever

24 had to get resolved and that they would put this plan in

25 place.  So I didn't expect it to be in a sole discretion

1    situation.

2              MR. KNOTT:  Pass the witness.

3              THE COURT:  I'm sorry, Attorney Knott, did you say

4    you completed your questioning?

5              MR. KNOTT:  Yes, I pass the witness.

6                   CROSS-EXAMINATION

7    BY MR. FIEBACH:

8        Q.    Good morning, Mr. LoPinto.  I'm Robert Fiebach.  We

9    haven't met before.  I represent Landmark.  I have a few

10   questions for you.

11             You identified a document, P-11.  It was a -- can we

12   get that up, P-11?

13             Do you have P-11 in front of you?

14       A.    No.

15             THE COURT:  Do we have the plaintiff's original

16   exhibit?

17             Go ahead, Mr. Fiebach.

18       Q.    So that document is called a status report?

19       A.    That's correct.

20       Q.    This particular one is dated March 8th?

21       A.    Correct.

22       Q.    And my question to you is is this an internal

23   document that Equinox used to track the status of a

24   particular search?

25       A.    No.  It's a document that we prepare for the

1    client.

2         Q.    You prepared the document for the client?

3         A.    Right.

4         Q.    And you would send this document to the client?

5         A.    Yes.

6         Q.    I would ask you if we could get up Plaintiff's

7    Exhibit -- I'm trying to deal with their exhibits rather than

8    our D numbers.  P-23.  P-23, can we put that up

9              Now, you testified that one of the things that

10   Mr. Stevens was interested in was to be involved beyond just

11   the Real Estate Division, correct?

12        A.    Correct.

13        Q.    Now, if you look at the second sentence -- do we

14   have that up?  You're having a problem?

15             THE COURT:  It's five minutes before our break.  In

16   light of the technical difficulties, why don't we take the

17   break now.

18             Ladies and gentlemen, we'll report back at five

19   minutes to 11, and so I'm going to ask you to stand and take

20   a break now.

21             Before you go, I just need to say one thing that

22   you're going to hear me say a lot.  Don't discuss the case

23   amongst yourselves or with anyone else while you're taking

24   your break, and don't let anyone discuss it with you.  So go

25   ahead and take your break now, file out, and we'll come back

```
 1    at five minutes before 11.

 2              (Jury out at 10:41, a.m.)

 3              THE COURT:  Why don't we sort this out.

 4              MR. FIEBACH:  The problem is getting it up on the

 5    monitor here.  This one, but you have it on the others.

 6              THE CLERK:  I have it switched over.

 7              THE COURT:  I'm going to take a recess.  I'm going

 8    to let you sort this out.

 9              (Recess.)

10              THE COURT:  Please be seated.

11              Mr. Fiebach, have we straightened that out?

12              MR. FIEBACH:  I think we have it now.  Apparently,

13    when they're on it it turns off hers and when their's is on

14    it turns off hers.

15              THE COURT:  I take it the parties have been

16    instructed how to use it so that it's not actually displayed

17    to the jury until it's admitted full.  Does everybody

18    understand how to do that?

19              THE CLERK:  I'm doing it.

20              THE COURT:  You control it?  I thought they did it

21    from there.

22              THE CLERK:  No.

23              MR. FIEBACH:  I didn't know that.

24              THE COURT:  That's what I wanted to check on, too.

25              All right.  Are we ready?
```

1          MR. FIEBACH:  Yes, your Honor.

2          (Jury in at 10:55, a.m.)

3          THE COURT:  Thank you, ladies and gentlemen.  Please

4    be seated.

5          Whenever you're ready, Mr. Fiebach.

6    BY MR. FIEBACH:

7      Q.    Mr. LoPinto, I want to ask you to look at

8    Plaintiff's Trial Exhibit Number 23 which is in evidence in

9    the case.

10     A.    Yes.

11     Q.    I think you said this was your -- a copy of the

12   offer letter that Mr. Borges sent to you and that you then

13   sent on to Mr. Stevens?

14     A.    Yes.

15     Q.    And I want to just go over a few items on it.

16   Let's turn to the first page of the offer letter itself which

17   is dated May 17th, 2004.

18          The second sentence:  As discussed, we feel that

19   your experience and reputation would be an excellent addition

20   to our team and we look forward to your active involvement in

21   the growth of our existing business lines as well as the

22   opportunity to launch and grow additional products.

23          Is that sentence consistent with the discussions

24   that you had with Mr. Borges, Mr. Haviland, and Mr. Stevens

25   concerning his participation beyond just the Real Estate

 1   Department?

 2       A.    Yes, this reads very broadly.

 3       Q.    Excuse me?

 4       A.    This reads rather broadly, yes.

 5       Q.    And then if you look down on primary

 6   responsibilities, while the first one is with regard to the

 7   real estate program, the last one says:  As a member of

 8   Landmark's leadership team, actively participate in the

 9   management, strategic direction and investment strategy of

10   the firm.

11           Is that consistent with your discussions concerning

12   Mr. Stevens's broader participation in Landmark?

13       A.    Yes.

14       Q.    Turn to the next page, page I guess three of

15   the -- it says page three.  Base salary -- you talked about a

16   several multi-layer level of compensation.  Base salary is

17   set forth.  That was consistent with your discussions with

18   Mr. Stevens, $250,000 a year?

19       A.    Yes.

20       Q.    And then there's annual incentive compensation of

21   $250,000?

22       A.    That's correct.

23       Q.    And then you talked about the additional -- there

24   was an additional level of compensation, depending upon the

25   funding of Real Estate Fund V, and that's under the

1    additional incentive compensation?

2        A.    That's correct.

3        Q.    Now, you have or there is included in there carried

4    interest in real estate fund.  Can you tell me what that is?

5    Do you understand what that is?

6        A.    Yes.  That's a participation in what's typically

7    described as the funds, the company's fund promoted

8    interest.

9        Q.    Do you know how that works, how carried interest

10   works?

11       A.    It would be participation -- it would be a

12   participation in the management side of the investment

13   return, the company's investment return.

14       Q.    This gave Mr. Stevens a 15 percent interest in the

15   real estate fund that was then being contemplated, correct?

16       A.    Correct.

17       Q.    And then the next?

18       A.    Could you blow this up?  I can't read it.  Thank

19   you.

20       Q.    Let's go on to the next one, participation in

21   Landmark's private equity fund.  Let's talk a little bit

22   about that.  Landmark -- you understood that Landmark had two

23   primary areas of business, one was real estate and one was

24   private equity?

25       A.    Uh-huh.

1     Q.     Is that correct?

2     A.     Yes.

3     Q.     And private equities was the side that wasn't going

4  to be Mr. Stevens' primary responsibility?

5     A.     Right.

6     Q.     And just so the jury has some understanding, do you

7  have any understanding of what that means, private equities?

8  I think real estate is pretty obvious to people in some

9  sense, but what is private equities mean, or do you have an

10  understanding of what it meant?

11     A.     These are investment funds that are raised with

12  institutional investors and invested on behalf of those

13  institutional investors.

14     Q.     And these would be invested in non-marketable

15  securities?

16     A.     It depends.

17     Q.     You think it might be.  Okay.  And Mr. Stevens was

18  given, pursuant to this agreement, a participation of a

19  minimum of two percent in the private equity fund that was

20  scheduled to close on June 30th, 2004, correct?

21     A.     That's correct.

22     Q.     So this was giving him an interest in the non real

23  estate part of the company?

24     A.     That's correct.

25     Q.     And it says you will be subject to vesting

1    provisions, both real estate and private equity.  Do you have

2    any idea what was that at the time?  What's vesting -- what

3    does vesting mean?

4         A.    Vesting means while you receive the interest, it's

5    not yours until a certain period of time passes.  Normally,

6    three to five years with the interest vesting pro rata each

7    year.

8         Q.    And Mr. Stevens understood that in your discussions

9    with him, that the interest in the real estate fund and the

10   interest in the private equity fund would be subject to

11   vesting requirements?

12        A.    Yes.  I don't believe this includes the vesting

13   terms in here.

14        Q.    No, but he knew there would be vesting terms?

15        A.    Yes.

16        Q.    And with regard to participation in the economics

17   of Landmark Partners, Inc., I think it was your testimony on

18   direct that this was consistent with your discussions with

19   Mr. Stevens and with Mr. Borges and Mr. Haviland concerning

20   what they could say about it at that time?

21        A.    You're referring to the section --

22        Q.    Let's go down to participation in the economics of

23   Landmark Partners, Inc.

24        A.    That's consistent with what could be said at that

25   time.

1      Q.    And looking at the last sentence of that:  You will

2  be a meaningful participant at least initially at 10 percent

3  in the program once it is finalized.  Did you have any

4  understanding as to what the program was going to be?

5      A.    We did not get into any specific details in terms

6  of how it was going to be structured, no.

7      Q.    And Mr. Stevens understood that that whole issue

8  was going to be determined in the future, correct?

9      A.    It was understood that once they resolved the

10  issues it would be concluded.

11      Q.    But it was not anything that was -- strike that.

12  There was no specific program or plan that was promised to

13  him at that time?

14      A.    It was promised that he would be a participant in

15  the plan.

16      Q.    Yes.  But the plan itself or the program that would

17  be developed was not yet known, correct?

18      A.    As I recall, there were two things going on, one

19  was the restructuring buy out of the prior principal in the

20  firm and they were debating how they could best structure the

21  program, if you will.  So it was a current activity.  It

22  hadn't been concluded.

23      Q.    But the type of the program or the type of plan to

24  be -- to come out of this had not yet been determined,

25  correct?

1      A.      Correct.

2      Q.      And Mr. Stevens understood that based on your

3  discussions with him?

4      A.      All I was able to do was discuss the general

5  parameters in the offer letter.  At that point it was handed

6  off and Gary spoke at length with Tim and Frank about the

7  particulars.

8      Q.      In your discussions with Mr. Stevens, did he

9  understand that the plan had not yet been determined?

10     A.      Yes.

11     Q.      Now, I just wanted to ask you to look at

12 Plaintiff's Exhibit 9, which you identified in your direct

13 examination as a true and correct copy of a candidate profile

14 that you prepared.

15     A.      It's not up yet.

16     Q.      Can we put it up?  Can we get it up?

17             I want to actually hand you another copy of the

18 document.

19             Can we get P-9 up?

20             And P-9 has a front page and the next page, the

21 second page of the document says page three, and then the

22 next page is a curriculum vitae of Mr. Stevens.

23             Can we get to the next page of the exhibit, which

24 says page four?  I just want to hand this to you because I'm

25 a little puzzled.  It seems to be missing a page.

1          So I now would like to show you Defendant's Exhibit

2     503.  Can we put that up?

3          Now, Defendant's Exhibit 503 has a page 2.  So I'm

4     now going to ask you to take a look at Plaintiff's Exhibit 9,

5     the front page appears to be the same, correct, between the

6     two documents?

7     A.    Yes.

8     Q.    And then Defendant's Exhibit 503 has a second page,

9     correct?

10    A.    That's correct.

11    Q.    And that second page is not on Plaintiff's Trial

12    Exhibit 9, correct?

13    A.    Correct.

14    Q.    And then the rest of the document is exactly the

15    same, pages three and four?

16    A.    Uh-huh.

17    Q.    Now, my question to you, sir, is defendant's

18    Exhibit 503 the candidate profile that you prepared or was

19    Plaintiff's Exhibit 9 the candidate profile that you

20    prepared?

21    A.    It would be this 503 document.

22    Q.    Defendant's Exhibit 503.

23         MR. FIEBACK:  Your Honor, I move Defendant's 503

24    into evidence.

25         THE COURT:  Mr. Knott.

1           MR. KNOTT:  Just a moment, your Honor.

2           No objection.

3           THE COURT:  It will be admitted full.

4     Q.    Now, if we look at page two of Defendant's Exhibit

5  503, the missing page from Plaintiff's Exhibit 9, there's a

6  section at the bottom of the second page, reason to consider

7  a change.  And if we could focus on that.  And you say:  Gary

8  has announced his decision to leave Carlyle, while

9  maintaining excellent relationships, and will be concluding

10 his involvement with the firm in the next few months.  You

11 see that?

12    A.    Yes.

13    Q.    That wasn't exactly true, was it?

14    A.    Why do you say that?

15    Q.    Hadn't he already left Carlyle?

16    A.    He was winding down.

17    Q.    Hadn't he already left Carlyle?

18    A.    My recollection was that he was winding down his

19 affairs with the firm.

20    Q.    Let me show you Defendant's Exhibit 735.  That

21 document is dated a month earlier than Defendant's Exhibit

22 503, correct?  Sir, front page.  Front page.

23    A.    Yes.

24    Q.    And this is another status report that you were

25 doing on the search, correct?

84

1      A.    Right.

2      Q.    And I just want to see if this refreshes your

3  recollection now.  If you look at the last page of the

4  document, it says Gary Stevens.  And the first sentence says

5  recently left Carlyle Group where he held the position of

6  Managing Director.  You see that?

7      A.    Yes.

8      Q.    So now I come back to my question to you on

9  Defendant's 503.  It wasn't true, was it, that he had

10  announced his decision and will be concluding his involvement

11  as of February 28th when you sent that report to Landmark

12  Partners?

13      A.    Well, as I said, my recollection was that he was in

14  the midst of winding down certain affairs there.  I couldn't

15  tell you if he was not employed.  He was still, as I recall

16  the conversations, managing affairs, because it was a

17  transitional situation.

18      Q.    Are you saying that the statement in 735 dated a

19  month earlier that Gary Stevens recently left Carlyle Group

20  was not correct?

21      A.    You know, it may be -- the fact may be that he had

22  actually left the firm from an official employment point of

23  view, but he was winding down his affairs there, because he

24  had significant interests.  I don't remember the

25  conversations exactly, but I do recall that he had some

1    matters that he was finishing up at Carlyle.  I don't know

2    what the particulars were.

3        Q.    A candidate would be more attractive to potential

4    employers if they thought he was still in his other job,

5    isn't that right?

6        A.    Not necessarily.

7        Q.    If he left, wouldn't that raise questions about why

8    he left?

9        A.    Sure.

10       Q.    And was he doing a good job there?

11       A.    Sure.

12       Q.    And there would be more due diligence?

13       A.    Absolutely.

14       Q.    Now, also attached to both Plaintiff's Exhibit 9

15    and D-503 -- get D-503 back -- was a resume of Gary Stevens,

16    correct?

17       A.    I don't --

18       Q.    You've got D-503?

19       A.    You mean behind this?  On this one?

20       Q.    And let's just hone in on the first professional

21    experience, 1996 to present.

22             Now, did Mr. Stevens prepare this document or did

23    you prepare it from information that Mr. Stevens gave you?

24       A.    I don't recall whether he did or whether we had it

25    retyped.

1    Q.    And then this says that Mr. Stevens was employed at

2    Carlyle Group from 1996 to present, correct?

3    A.    Uh-huh.  Yes.

4    Q.    And present meant as of the time you were

5    submitting this candidate profile to Landmark, correct?

6    A.    Right.

7    Q.    So if he was already gone, that statement is also a

8    little misleading?

9    A.    I think it's all a matter of -- this was, as I

10   said, a transitional period.  And that's why there would be

11   the indicated confusion.

12   Q.    If we go back to 503, Defendant's 503, the first

13   page.  And -- first page of the document.  Look at the last

14   paragraph on that page.  Tony LoPinto worked closely with

15   Gary at the Artery Organization.  You testified that you had

16   first met Mr. Stevens in connection with some -- you were CFO

17   of a company and you had some dealings with Mr. Stevens.  Is

18   that what you're referring to here or was there something

19   else?

20   A.    No, that's what I was referring to.

21   Q.    So that was the first time that you had ever met

22   Mr. Stevens?

23   A.    Yes.

24   Q.    Did you stay in touch with him?

25   A.    Yes.  He left Artery Organization so we didn't have

1      any direct activities.  He joined another local company, JER

2      Partners.  And we got together for breakfast and lunch

3      occasionally.  So, yes, we did keep in touch.  And he moved

4      on from JER to Carlyle, and we kept in touch while he was at

5      Carlyle.

6          Q.    And I think you testified -- you remember your

7      deposition was taken in this case?

8          A.    Yes.

9          Q.    I think you testified that both he and you were

10     active in some matters involving Cornell University?

11         A.    Yes.  I worked with Cornell University on their

12     graduate program and Gary was an alumni of Cornell.  So I'd

13     see him occasionally at those meetings.

14         Q.    So you'd see him there.  You'd see him at

15     professional trade groups, correct?

16         A.    Yes.

17         Q.    Did you place him when he left Artery and joined

18     J.E. Robert?

19         A.    No.

20         Q.    Did you have anything to do with his placement at

21     Carlyle?

22         A.    No.

23         Q.    Now, with respect to Plaintiff's Exhibit 3 which

24     was the, I think, your engagement letter with Landmark, your

25     compensation for bringing a successful candidate to Landmark

1    was, in part, dependent on a percentage of the compensation

2    to be paid to the candidate, correct?

3         A.    Yes.

4         Q.    So the more money Landmark paid to Mr. Stevens, the

5    greater your compensation, correct?

6         A.    Correct.

7         Q.    And Landmark's interest would be to negotiate as

8    low a compensation package as Mr. Stevens would be willing to

9    accept, correct?

10        A.    Correct.  But you have to be clear, our

11   compensation is only on the cash portion.

12        Q.    I understand.  I understand.  But I just wanted to

13   point out that your interest at some point diverge from the

14   interest of Landmark economically in trying to land a

15   candidate for the job.  I'm not saying there's anything wrong

16   with that but I just --

17        A.    It's the standard practice.

18        Q.    I understand that.  But at some point, at some

19   point, your economic interest is different than Landmark's?

20        A.    I'm aligned with the client.

21        Q.    But at some point you're not aligned with the

22   client.  Economically you're aligned trying to get the most

23   money for the candidate, is that true?  I'm not saying

24   there's anything wrong with it.

25        A.    No, that's not our objective.

1      Q.   I'm not saying it's your objective.  But you get

2   compensated on based on -- you make more money if the

3   candidate makes more money?

4      A.   Yes.

5      Q.   It's true, is it not, Mr. LoPinto, that you had no

6   understanding as to what the effective date would be with

7   respect to any plan that would be put into place?

8      A.   My only -- my assumption was it was going to happen

9   at some point before the end of the year.

10          MR. FIEBACH:  Move to strike the assumption, your

11   Honor.

12          THE COURT:  I will instruct the jury just to

13   disregard that last answer.

14      Q.   I didn't ask your assumption.  My question, sir, is

15   did you form any understanding based on the negotiations as

16   to the effective date when any plan would be adopted?

17      A.   During my conversations with Frank and Tim there

18   was a fair amount of discussion around resolving the internal

19   issues that had to be put behind them before they could

20   proceed with putting a plan together.

21      Q.   It's true, is it not, that you have no recollection

22   of any conversation regarding the effective date of the

23   plan?

24      A.   Correct.

25          MR. FIEBACH:  May I just look at my notes, your

1    Honor, and confer with my colleagues?

2             THE COURT:  Sure.

3             MR. FIEBACH:  No further questions, your Honor.

4             THE COURT:  Thank you, Mr. Fiebach.

5             THE COURT:  Attorney Knott, do you have any

6    redirect?

7             MR. KNOTT:  I do, your Honor.

8                  REDIRECT EXAMINATION

9    BY MR. KNOTT:

10       Q.   Mr. LoPinto, Mr. Fiebach asked you some questions

11   about the structure of the program that Landmark was

12   discussing with Mr. Stevens.  Do you recall that?

13       A.   Yes.

14       Q.   Did you have an understanding from your discussions

15   about the substance of the program?

16       A.   No.

17       Q.   Did you believe that the program would apply to the

18   entire firm?

19       A.   I was only aware or focused on the fact that it

20   would be the leadership team.

21       Q.   Can we call up Plaintiff's Exhibit 81?

22            Mr. LoPinto, do you recognize this document?

23            MR. FIEBACH:  Your Honor, may I just get the

24   document?

25            THE COURT:  Do you have a copy, Mr. Fiebach?

1          MR. FIEBACH:  Yes, your Honor.

2          THE COURT:  Go ahead, Mr. Knott.

3     Q.    Mr. LoPinto, do you recognize this document?

4     A.    If you could blow it up a little bit.  It's fuzzy.

5 I believe it's a printout.  Yes, it's a printout from

6 our -- we had a program that managed search processes and

7 candidates, and this looks like a print out of Gary's

8 record.

9     Q.    Was that a record that was kept in the regular

10 course of Equinox's business?

11    A.    Yes.

12    Q.    Was it Equinox's practice to record matters related

13 to a person in this summary?

14    A.    Yes.

15          MR. KNOTT:  Your Honor, I would like to ask

16 Mr. LoPinto to read a portion of this document into the

17 record.

18          THE COURT:  Has it been offered yet?

19          MR. KNOTT:  I would prefer to have him read it into

20 the record instead of offering the entire document.

21          MR. FIEBACH:  I don't know what section he wants to

22 read in.

23          THE COURT:  I take it it's the part under notes?

24          MR. KNOTT:  It's the section titled Compensation.

25 Jake, if you see that.

1          MR. FIEBACH:  Compensation?  Your Honor, I object on

2     the grounds as beyond the scope of cross.

3          THE COURT:  I'm not going to allow the witness to

4     read from a document that's not in evidence.  So I'm going to

5     sustain the objection.

6          MR. KNOTT:  A moment to consult, your Honor?

7          THE COURT:  Yes.

8          MR. KNOTT:  Jake, can you call that back out,

9     please.

10     Q.   Mr. LoPinto, does this entry reflect information

11     that was conveyed to you about the offer from Landmark?

12          MR. FIEBACH:  Your Honor, I just can't find out

13     where he is.

14          MR. KNOTT:  On the first page in the compensation

15     section.

16          THE COURT:  Do you have that in front of you,

17     Mr. Fiebach?

18          MR. FIEBACH:  Yes, your Honor.

19          THE COURT:  Attorney Knott, go ahead and ask your

20     question.

21     Q.   Does this section of the document include

22     information that was conveyed to you by Landmark about the

23     offer to Mr. Stevens?

24     A.   Yes.

25          MR. KNOTT:  A moment to consult, your Honor?

1          THE COURT:  Yes.

2     Q.    Mr. LoPinto, can you describe the information that

3    was conveyed by Landmark about the offer?

4     A.    Would have summarized the cash components of the

5    offer as well as the additional incentive bonuses that he'd

6    receive in connection with raising additional capital.  It

7    also talks about his 15 percent equity in the fund and his

8    participation in all future Real Estate Funds.  It then goes

9    on, says he can buy participation in the company.  Those were

10   conversations that it was back and forth on that because

11   Gary, one thing I do recall, and, again, it's part of a

12   larger conversation, he had raised the question of whether he

13   should keep some liquidity from his investments because he

14   wanted to reserve some investment capital to acquire an

15   interest in Landmark should he be allowed to make those

16   investments.

17          MR. FIEBACH:  Your Honor, I object and ask a

18   limiting instruction be given to the jury.

19          THE COURT:  Let me just read what he said.

20          Ladies and gentlemen, again, the same limiting

21   instruction as before.  You've heard some evidence just now

22   that there may have been discussions about giving

23   Mr. Stevens' an ownership interest.  I instruct you that the

24   contract did not require Landmark to give Mr. Stevens an

25   ownership interest and that you may, therefore, not consider

1    this evidence as proof either that Landmark breached the

2    contract or that it is liable for any negligent

3    misrepresentation simply because it failed to give

4    Mr. Stevens' an ownership interest.  The Court's already

5    ruled that Landmark was not required to do that and you are

6    not to to speculate as to why the Court made that ruling.

7    Instead, you may consider this evidence, evidence about

8    discussions of an ownership interest, only for the limited

9    purpose of determining whether Landmark promised to let

10   Mr. Stevens participate in the economics of the entire firm

11   or just in specific funds managed by him.  In other words,

12   you may consider this evidence only in deciding what the

13   parties agreed to and whether Landmark is liable for any

14   negligent misrepresentations about the scope of the program

15   referred to in the May 20, 2004 agreement.

16          Go ahead, Mr. Knot.

17   BY MR. KNOTT:

18      Q.   Mr. LoPinto, what's the date of the information

19   that's recorded about the offer here?

20      A.   It's indicated to be --

21          MR. FIEBACK:  Objection, lack of foundation.

22          THE COURT:  I'll sustain the objection.

23      Q.   Mr. LoPinto, was this information that you related

24   to us information that related to the final offer from

25   Landmark?

1    A.    I believe so.

2    Q.    Mr. Fiebach asked you some questions about Equinox

3    Partners compensation for a search?

4    A.    Yes.

5    Q.    And you testified that the compensation was based

6    on base and bonus that were paid to a recruited candidate?

7    A.    Right.

8    Q.    Who would decide how much to pay in base and bonus

9    to the candidate?

10   A.    That was the client's decision.

11   Q.    Is it important to you to have clients who are

12   satisfied with the offer that they make to an employee?

13   A.    Absolutely.

14   Q.    Was your compensation based at all on carried

15   interest participation, in particular funds that was provided

16   to Mr. Stevens?

17   A.    No, none whatsoever.

18   Q.    Was it based at all on the provision for

19   Mr. Stevens' participation in the economics of Landmark

20   Partners, Incorporated?

21   A.    Not at all.

22        MR. KNOTT:  No further questions.

23        THE COURT:  Very well.

24        Mr. Bush, your next witness, please.

25        MR. KNOTT:  Your Honor, the plaintiff calls Tim

 1    Haviland.

 2                    T I M O T H Y   H A V I L A N D,

 3    called as a witness by the Plaintiff, having been duly sworn

 4    by the Clerk, was examined and testified on his oath as

 5    follows:

 6            THE CLERK:  State your name, city and state, and

 7    spell your last name for the record, please.

 8            THE WITNESS:  Timothy L. Haviland, Palm Beach

 9    Garden, Florida.  Last name is H A V I L A N D.

10                    DIRECT EXAMINATION

11    BY MR. KNOTT:

12        Q.    Good morning, Mr. Haviland.

13        A.    Good morning.

14        Q.    We haven't met before.  I'm Jason Knott.  I'm an

15    attorney for the plaintiff, Gary Stevens.

16            Mr. Haviland, you work at Landmark Partners,

17    Incorporated?

18        A.    Yes.

19        Q.    Landmark is the defendant in this case?

20        A.    Yes.

21        Q.    You are the President, Chief Operating Officer and

22    Managing Partner of Landmark?

23        A.    Yes, I am.

24        Q.    Landmark is a private equity and real estate

25    investment company?

1    A.    Yes, it is.

2    Q.    Landmark Partners, Incorporated is a corporation?

3    A.    Yes, it is.

4    Q.    Landmark Partners, Incorporated is a management

5    company?

6    A.    Yes, it is.

7    Q.    Landmark manages a number of funds?

8    A.    Landmark Partners is a management company and we

9    have subsidiaries that are actually the registered investment

10   advisors for the funds that we manage.

11   Q.    Do the Landmark Partners, Inc., employees work for

12   those advisory companies?

13   A.    The way our structure is the employees are employed

14   at the management company level and it's the registered

15   investment advisors -- the subsidiaries don't hold employees,

16   but that's where investment decisions are made for our

17   funds.

18   Q.    The advisory companies don't have any employees?

19   A.    That's correct.

20   Q.    So there are funds -- there are advisory companies

21   and then there are funds under the Landmark umbrella?

22   A.    The funds are not owned by the management company

23   or the advisors.  The advisory subsidiaries act as investment

24   advisors to the funds.

25   Q.    Employees of Landmark Partners develop the funds?

1    A.    Yes.

2    Q.    Investors contribute money to the funds?

3    A.    Yes.  Investors contribute to the underlying

4  Landmark private equity or real estate funds.

5    Q.    And the funds then invest the money from the

6  investors into assets that they purchase?

7    A.    The fund purchases the assets, yes.

8    Q.    Landmark Partners, Incorporated, the management

9  company, makes money mostly through advisory fees that the

10  funds pay?

11    A.    That's correct.  The funds pay an investment

12  advisory fee to the investment advisory subsidiaries which

13  then flows up to the management company.

14    Q.    And the advisory fees are different from carried

15  interest?

16    A.    Yes.

17    Q.    Landmark has a private equity team?

18    A.    Yes, we do.

19    Q.    And that team oversees the funds that make private

20  equity investments?

21    A.    Yes.

22    Q.    And Landmark has a real estate team?

23    A.    Yes, they do.

24    Q.    And that team oversees the funds that make real

25  estate investments?

1      A.    Yes.

2      Q.    In 2003, the head of Landmark's real estate team

3    was Richard Main, is that correct?

4      A.    That's correct.

5      Q.    And there was another gentleman, Robert Harvey, who

6    worked under Robert Main, is that right?

7      A.    He was a partner in the firm and worked, yes, with

8    Dick Main in real estate.

9      Q.    At the end of 2003, Mr. Main and Mr. Harvey left

10   Landmark, is that correct?

11     A.    That's correct.

12     Q.    Mr. Main left because he wanted to spin off the

13   real estate team into a separate firm, is that right?

14     A.    Yes.

15     Q.    And you didn't want him to do that?

16     A.    Mr. Main wanted to buy the real estate practice.

17   We thought the real estate practice had value, had future

18   value giving the growing market, so we were not interested in

19   selling.

20     Q.    At the time of Mr. Main's departure, Landmark was

21   engaged in investing a real estate fund, is that right?

22     A.    Yes, we were.

23     Q.    And that fund was Real Estate Fund IV?

24     A.    Yes.

25     Q.    You give your funds names based on the sequence in

1 which they're launched?

2  A. We do.  And the reason I hesitate on the answer was

3 our sequence got a little bit out of order.  So along the way

4 we had to change the sequence.  But effectively that was our

5 fourth real estate fund.

6  Q. Your earliest real estate funds weren't actually

7 named Landmark Real Estate Fund number, right?

8  A. Our first real estate fund was actually Landmark

9 Equity Fund VI, I believe, because it was a sixth fund that

10 we had raised under the Landmark umbrella.

11  Q. Eventually, though, you started naming the real

12 estate funds real estate fund, right?

13  A. That's correct.

14  Q. And Real Estate Fund IV was the fourth real estate

15 fund at Landmark?

16  A. That's correct.

17  Q. And in Real Estate Fund IV, at the time that Mr.

18 Main departed the company, Landmark had commitments for 300

19 million dollars to that fund from investors, is that right?

20  A. Yes, approximately 300 million.

21  Q. All of that money hadn't yet been paid into the

22 fund, though, right?

23  A. That's correct.  The way the funds work is the

24 investors commit to the fund a certain amount of capital and

25 then we, as we deploy the capital, make capital calls to the

1    investors and they fund their obligation.

2        Q.    And when Mr. Main and Mr. Harvey left, you couldn't

3    call in the rest of the investors money without having a vote

4    of the investors to go on, is that right?

5        A.    That's not technically correct.  When -- in our

6    funds, when a key individual leaves, we have key man

7    provisions that are triggered.  I don't recall -- actually I

8    don't believe they were triggered here, but typically if

9    they're triggered you have to go to the limited partners, as

10   you said, to get a vote to continue this strategy.  Here, we

11   elected not to continue the strategy.  We elected to

12   terminate their outstanding capital commitments and with the

13   idea being that we would come back to market with a new

14   fund.

15       Q.    You decided not to have a vote and to give up the

16   commitments?

17       A.    That's correct.  Again, I'm not sure if there was a

18   requirement to have a vote.  I don't recall the provisions,

19   but we determined, as a management team, that when two of the

20   senior people who are supposed to help deploy that capital

21   left, that the right thing to do was to terminate the

22   outstanding commitments and go back to the market with the

23   team -- with a new team.

24       Q.    You decided not to have a vote because the

25   investors who had committed to the funds were unhappy that

1    the top two people in charge had left, isn't that right?

2        A.    Again, I'm sure our investors were not happy that

3    they left, but, again, I'm not sure we needed to have a vote

4    as you keep referring to.

5        Q.    The first Landmark real estate fund that you talked

6    about, that raised about 210 million dollars from investors,

7    is that right?

8        A.    Our very first real estate fund?  No, it was larger

9    than that.

10       Q.    How much larger?

11       A.    I believe our first real estate fund was 278 to 300

12   million dollars.

13       Q.    Was that all in committed equity?

14       A.    It was in limited partners commitments to the

15   fund.

16       Q.    What form?  Was it all in money that they were

17   actually paying in?

18       A.    Yeah.  Similar, again, the way our funds are

19   formed, they're limited partnerships and the investors are

20   effective of the limited partners.  So they commit to the

21   fund and we draw capital as that fund makes investments.

22   That fund deployed capital -- most of that capital's deployed

23   in one transaction.

24       Q.    And how much did your second Real Estate Fund

25   raise?

1    A.    Boy, I wish I had checked on that.  Around 300

2    million dollars.

3    Q.    And then did you launch a third Real Estate Fund?

4    A.    We did a small -- I apologize for not knowing the

5    amounts.  We have 28 funds and different timings are closing,

6    different sizes.  But we did raise a third fund.  The third

7    fund was different from the first two in that it was an

8    opportunity to invest in two direct real estate type

9    transactions.  The fund size was 25 to 30 million dollars.

10   It was not very large at all.  It was different than, as I

11   mentioned, the first two funds.

12   Q.    And then your fourth fund, how much did you end up

13   after you gave up your commitments?

14   A.    I believe the fund -- the total capital that

15   ultimately resolved in upper management was about 130 million

16   dollars.

17   Q.    After you gave up the commitments to fund for your

18   plan four, your plan was to launch a new fund with a new

19   team, is that right?

20   A.    Yes.

21   Q.    And Landmark contacted Equinox Partners about

22   searching for a replacement for Mr. Main, is that right?

23   A.    That's correct.

24   Q.    And Mr. Equinox partners was Mr. LoPinto's firm?

25   A.    I don't know who owned it but, yes, that's right.

1    Q.    And before you hired Equinox, you had discussions

2    with Mr. LoPinto, is that right?

3    A.    My partner, Frank Borges, was the point person on

4    that, but both he and I did have conversations with

5    Mr. LoPinto.

6    Q.    You discussed the type of person you were looking

7    for to fill the position, is that correct?

8    A.    Yes, we did.

9    Q.    Landmark engaged Equinox, correct?

10   A.    Yes, we did.

11   Q.    And Tony LoPinto was to lead the search, correct?

12   A.    I believe that's correct, yes.

13   Q.    And he was assisted by Barbara Beck?

14   A.    Yes.

15   Q.    You personally worked with Equinox to come up with

16   a job description to use for the search, is that correct?

17   A.    Between Mr. LoPinto and Mr. Borges, Ms. Beck and

18   myself, we did come up with a job description.

19   Q.    And at some point you learned about Gary Stevens as

20   a candidate for the position, is that right?

21   A.    Yes.

22   Q.    Mr. Stevens went through an interview process at

23   Landmark, is that correct?

24   A.    Yes, he did.

25   Q.    He came to Simsbury to meet with you?

1    A.    Yes, he did.

2    Q.    And you traveled to DC to meet with him, is that

3 correct?

4    A.    I do not believe I did, no.

5    Q.    Mr. Borges did?

6    A.    I don't recall.

7    Q.    You talked with Mr. LoPinto about Mr. Stevens?

8    A.    Yes.

9    Q.    And Mr. LoPinto told you about Mr. Stevens's

10 background and responsibilities at Carlyle, is that

11 correct?

12    A.    Yes.  He had told us he was employed at Carlyle and

13 had responsibilities in the real estate practice.

14    Q.    And you knew that Mr. Stevens was winding down at

15 Carlyle, is that right?

16    A.    I believe not initially, but we knew he decided to

17 leave, was leaving Carlyle, decided to leave and move on to

18 do other things.  But we assumed at the time he was still

19 employed there.

20    Q.    And Mr. LoPinto told you about Mr. Stevens'

21 compensation at Carlyle, is that correct?

22    A.    Yes.

23    Q.    As the hiring process continued, you narrowed down

24 the number of candidates, right?

25    A.    Yes.

1      Q.    And you reached a list of three?

2      A.    At some point the list was six and certainly was

3  down to three at one point.  It might have even gone down to

4  two, yes.

5      Q.    And you decided that Mr. Stevens was the better

6  fit?

7      A.    Yes, we did.

8      Q.    You liked the idea that he had worked at Carlyle?

9      A.    We did.  One of the -- to your point before about

10  why he was a better fit, there were a variety of things.  The

11  fact that he was coming from Carlyle which is a

12  well-established, well-known firm, was a real plus for him.

13  The fact that he did not have a buyout from where he was was

14  also important to us.

15      Q.   And once Landmark had decided to hire Mr. Stevens,

16  you had conversations with Mr. LoPinto about what to offer

17  him?

18      A.    Yes.  We had back and forth conversations where

19  Mr. LoPinto told us the things Gary was interested in, and

20  we'd go back and forth with what we were prepared to offer.

21      Q.    You talked about salary?

22      A.    Yes.

23      Q.    You talked about bonus?

24      A.    Yes, sir.

25      Q.    And you talked about carried interest?

1      A.      We did.

2      Q.      Meaning a participation in the investment return of

3  particular funds, is that what that means?

4      A.      Carried interest is participation in the gains

5  related to funds.

6      Q.      In the investment returns?

7      A.      In the investment returns.

8      Q.      You make an investment and it either appreciates or

9  it depreciates?

10      A.      Yes.  Our business is a little different than that.

11  We've not investing in companies or properties.  We're

12  investing in other funds.  So it's a function of our fund

13  buying an interest in another fund, and if that other fund

14  returns capital in excess of what we paid for it on a

15  cumulative basis, the excess would be the gain and the

16  carried interest would be a percentage of that gain that

17  flows to Landmark's team.

18      Q.      Carried interest comes from the increase of the

19  investments by the investors and by the fund?

20      A.      By the investments, not the investors.

21      Q.      And Landmark makes money from the funds in advisory

22  fees, is that right?

23      A.      The Landmark Management Company receives the

24  advisory fee through the investment advisor subsidiaries, and

25  it's those fees that they use to operate their business,

1    compensate their employees and cover other operating

2    expenses.

3         Q.    And the advisory fees don't depend on whether the

4    investments are increasing in value or decreasing in value,

5    right?

6         A.    Some of them do.

7         Q.    Some of them don't?

8         A.    Yes.  The way our fee structure is, and it's

9    different for almost every fund, but our advisory fee on a

10   fund in the initial period of time is a function of the

11   commitment to the fund, and then after a couple of years, and

12   most typically three years, it reverts to a percentage of the

13   value of the investments.  So as the investments perform,

14   grow in value, the fee grows, or as they liquidate and

15   therefore run off, our fee goes down.  And that's, quite

16   honestly, the fee really goes down over time because we're

17   assets that are -- we're buying into investment funds that

18   are three to six years old and they are in a harvest mode.

19   So as they harvest, they liquidate.  As they liquidate, the

20   value goes down.  As their value does down, our management

21   fee goes down.

22             We also have some funds where our management fee is

23   is a percentage of dollars invested.  So the management fee

24   is low if there isn't capital being deployed.  And then,

25   again, once it's deployed, it's a function of the value of

1    the asset we invested in -- the investment we invested in.

2        Q.    In the beginning you charge an advisory fee based

3    on the committed amounts, is that right?

4        A.    Again, it's different for each of the funds, but as

5    a general rule, yes.

6        Q.    You discussed with Mr. LoPinto and Ms. Beck an

7    opportunity for the ownership and participation in the

8    profits of the firm for Mr. Stevens, is that right?

9        A.    Yes.

10       Q.    And the firm, meaning Landmark Partners,

11   Incorporated, the management company?

12       A.    Yes.  Mr. Stevens, through Mr. LoPinto and

13   Mr. Stevens directly, had a number of things that he was

14   interested in, but --

15       Q.    And Mr. LoPinto --

16            MR. FIEBACH:  Your Honor, I'm not sure he was

17   finished with his answer.

18       A.    I was going to say we discussed a number of things,

19   whether it was salary, whether it was participation to carry,

20   whether it was participation in economics of Landmark, but

21   those are conversations and what we actually agreed to is

22   what we ultimately put in the offer.

23       Q.    Mr. LoPinto and Ms. Beck made clear to you that

24   Mr. Stevens was interested in having a participation in the

25   economics of Landmark Partners, Incorporated on a going

1    forward basis, isn't that right?

2        A.    Yes, they did say he was interested in having

3    that.

4        Q.    They told you he wanted to have an opportunity to

5    have an ownership in Landmark Partners, Incorporated?

6        A.    Yes.

7        Q.    And at some point Landmark asked Mr. LoPinto -- I'm

8    sorry -- Mr. LoPinto and Ms. Beck to prepare an offer for

9    Mr. Stevens, is that right?

10       A.    Could you repeat that?  I missed the front end of

11   that.

12       Q.    At some point Landmark asked Mr. LoPinto and

13   Ms. Beck to prepare an offer letter for Mr. Stevens, is that

14   correct?

15       A.    I don't believe we asked them to prepare an offer

16   letter.  I think we asked them to prepare -- to provide us a

17   summary to what they thought were appropriate and necessary

18   terms for an offer.

19       Q.    You asked them to propose an offer?

20       A.    Yes.

21       Q.    Can we call up Plaintiff's Exhibit 17, please.  And

22   this is the memo that Mr. LoPinto and Ms. Beck sent to you

23   outlining an offer strategy for Mr. Stevens, is that right?

24       A.    Yes, it is.

25       Q.    And if you look at paragraph four, they told you

1    that Mr. he Stevens understood that he wished to keep base

2    and bonus around $500,000.  Do you see that?

3         A.    I do.

4         Q.    And that was the amount that Mr. LoPinto's

5    compensation would be based on, is that right?

6         A.    The original thought -- the original ask from Gary

7    was that his compensation, salary and bonus, he was looking

8    for it be in the million to a million and a half dollar

9    range.  We had had conversations with Mr. LoPinto and said

10   that wouldn't work for us.  Our compensation range was more

11   in the $250,000, 200 to 250 salary, and the like amount for

12   bonus.  So this is Mr. LoPinto returning comments back to us

13   that Mr. Stevens understands our desire to keep that base and

14   bonus at a $500,000 level.

15        Q.    And Mr. LoPinto and Ms. Beck told you that because

16   of Mr. Stevens' current cash position, he didn't have much

17   concern about the base and bonus, isn't that right?

18        A.    Yes.

19        Q.    But he was more concerned about was his

20   participation in the carried interest and his participation

21   in the business Landmark Partners, isn't that right?

22        A.    This paragraph refers to his -- his recommendation

23   to make sure we had the fund participation be plus $500,000

24   which we did in our offer.

25        Q.    And that's the carried interest that we were

1    talking about, correct?

2        A.    That's correct.

3        Q.    And on the next page, Mr. LoPinto and Ms. Beck told

4    you that participation at the firm level was critically

5    important to Mr. Stevens, is that correct?

6        A.    Let me read it.  They did tell us it was very

7    important to Mr. Stevens.  I have to read this paragraph for

8    you.

9        Q.    And they said part of the atraction of the Landmark

10   opportunity was the ability to be involved in a platform that

11   extended beyond real estate, isn't that right?

12       A.    Yes.

13            MR. FIEBACH:  Your Honor, I think the witness said

14   he wanted to read the document.

15            THE COURT:  He's answered the question.

16            THE WITNESS:  I'm trying to do both actually.

17            THE COURT:  Why don't you give him a chance to read

18   the document.

19            MR. KNOTT:  Absolutely.

20            THE COURT:  Sir, why don't you let us know when

21   you're ready.

22            THE WITNESS:  I don't know if there's a question --

23            THE COURT:  You're ready, sir?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Attorney Knott, why don't you ask a

1    question.

2        Q.    Mr. LoPinto and Ms. Beck told you part of the

3    attraction of the Landmark opportunity for Mr. Stevens was

4    the ability to be involved in a platform that extended beyond

5    real estate investments, isn't that right?

6        A.    And that's what Landmark was, he had both private

7    equity and real estate.

8        Q.    Based on this memo, you decided on an offer for

9    Mr. Stevens, is that right?

10       A.    This memo and other conversations, yes.

11       Q.    And you told Mr. LoPinto that he could communicate

12   the terms of the offer verbally to Mr. Stevens, is that

13   right?

14       A.    Yes.

15       Q.    And your understanding is that Mr. LoPinto did

16   communicate the offer, correct?

17       A.    That's correct.

18       Q.    And he did that on behalf of Landmark, correct?

19       A.    Yes.

20       Q.    And at some point you had a conversation with

21   Mr. Stevens about the details of the offer that Landmark had

22   made, correct?

23       A.    Yes, I did.

24       Q.    Before you did that, you talked again with

25   Mr. LoPinto and Ms. Beck, correct?

1    A.    I don't recall the sequenceing, but we had a

2    conversation with Mr. LoPinto to authorize him to make an

3    offer, verbal.  We received feedback from Mr. LoPinto on that

4    and then ultimately moved forward into a written offer of the

5    things that we were prepared to -- that we had verbalized to

6    Mr. LoPinto.

7    Q.    You had a conversation where you authorized

8    Mr. LoPinto to call Mr. Stevens with the terms of the

9    offer?

10   A.    Yes.

11   Q.    And you had a follow-up for feedback from

12   Mr. LoPinto and Ms. Beck, is that right?

13   A.    Yes.

14   Q.    And in that conversation, Mr. LoPinto and Ms. Beck

15   told you that Mr. Stevens had received contacts from other

16   opportunities, is that correct?

17   A.    I don't recall if that was the same conversation,

18   but we did get feedback from Mr. LoPinto that he had one or

19   two other opportunities.  They were not as far along.  And

20   given that, we should move forward with our offer before

21   those others have more attraction.

22   Q.    Mr. LoPinto and Ms. Beck reviewed Mr. Stevens's

23   questions about the offer with you, is that right?

24   A.    Yes.

25   Q.    And you and Mr. LoPinto and Ms. Beck talked about a

1    percentage of the platform, real estate and beyond, isn't

2    that right?

3         A.    I don't recall that.  The offer that we put in

4    front of Mr. LoPinto to put in front of Mr. Stevens talked

5    about salary, talked about bonus, talked about incentives for

6    if the fund was being raised at certain milestones.  It

7    talked about carried interest in the Real Estate Funds.  It

8    also spoke about carried interest opportunity in the private

9    equity funds.  And with regards to participation in the

10   Landmark Partners, Inc. economics, it was very clear and we

11   had been -- it was very clear, and we had had multiple

12   conversations that the plan that we had in place, the

13   shareholder agreement that we had in place, did not work for

14   us going forward and that we were going to establish a new

15   program, and that what we put in the letter offer to

16   Mr. Stevens was that the new program was being worked on and

17   he would have a participation in that new program.

18        Q.    Because the share ownership program wasn't working

19   for you?

20        A.    In our view, Frank Borges and I's view, the

21   managing partners, the existing shareholder agreement did not

22   have the mechanics necessary for a long term.  The existing

23   shareholder agreement we had in place was when we were a

24   smaller firm.  It was really put in place to protect the

25   owner's estates upon death, disability.  It really didn't

1  have the proper mechanisms for people to come in and out of

2  the program easily.  The challenges we had with the program

3  going forward were how does one buy in, what valuation do you

4  use, how does one leave, how does one sell.  And what we

5  wanted to do was put a plan in place to incentivize people to

6  participate in the growth that they created and have more of

7  an incentive to stay versus an incentive to leave the company

8  at some point in time.

9      Q.    Going back to one of my earlier questions, you and

10  Mr. LoPinto and Ms. Beck talked about a percentage of the

11  platform real estate and beyond, isn't that right?

12      A.    I don't recall talking about a percentage.  I do

13  recall them telling us that Mr. Stevens would like to have

14  10 percent ownership or more.

15      Q.    Would it help you to refresh your recollection to

16  look at a document about that?

17      A.    Yes.

18          MR. KNOTT:  Jake, can we call up Plaintiff's Exhibit

19  22.  And can you call out the arrows portion there.

20          Let's give Mr. Haviland a chance to look at the

21  document.  There you go.

22      Q.    I direct your attention to the arrow portions.

23      A.    I'm sorry, where would you like me to look at the

24  document?

25      Q.    The portions with the arrows in the middle of the

1  page.

2     A.   These are my notes -- thank you, I can see it.

3  These are my notes from Mr. LoPinto and Ms. Beck.  So this is

4  what they're telling me.  They're telling me we have to be

5  more aggressive with the opportunity to start new businesses,

6  i.e., joint ventures and opportunities off of the platform,

7  real estate and beyond.

8     Q.   Is it your testimony that it says off, not

9  percentage?

10    A.   That says off of platform, OFF.

11    Q.   These are the notes that you took of your

12 conversation with Mr. LoPinto and Ms. Beck, though, is that

13 right?

14    A.   Yes, yes.  Again, this is them telling us we need

15 to be more aggressive with the opportunity to start new

16 businesses opportunities off of our platform.  One of the

17 things that they said was attractive to Gary Stevens was that

18 Landmark had a good reputation, a strong platform, and that

19 the opportunity to do other things other than just a

20 secondary fund investing was very attractive to him.  And so

21 what this means to me was the opportunity to do joint

22 ventures on real estate projects, opportunity do funds to

23 funds in the real estate space.  So, yes.

24    Q.   After your conversation with Mr. LoPinto and

25 Ms. Beck, you spoke with Mr. Stevens, is that right?

1     A.     Yes, we did.

2     Q.     You said he had received parameters with your

3  offer, correct?

4     A.     Yes.

5     Q.     And that he had a few questions about it?

6     A.     That's correct.

7            MR. KNOTT:  Jake, you can take this down.

8     Q.     And in that conversation you told Mr. Stevens he

9  would be the head of the real estate group?

10    A.     That's correct.

11    Q.     You had two primary business lines at Landmark, one

12  was private equity and one was real estate, correct?

13    A.     Correct.

14    Q.     And he was to be head of one of the primary lines

15  of real estate?

16    A.     That's correct.

17    Q.     You told him that Paul Mehlman and Bob Dombi, who

18  also worked in your real estate group, would report to him,

19  is that right?

20    A.     That's correct.

21    Q.     You talked about his participation in the economics

22  of Landmark Partners, Incorporated, is that right?

23    A.     We talked about that both before the offer was made

24  and after the offer was made.  And, again, there was a desire

25  on his part to have participation in Landmark Partners, Inc.

1    We told him that the plan was still being worked on and that

2    when it was completed we didn't know what form it would take,

3    ownership or profit sharing, when it was completed he would

4    participate in that plan.

5        Q.    This conversation that we're talking about, though,

6    this conversation with Mr. Stevens was after Mr. LoPinto had

7    communicated the terms of the offer, isn't that right?

8        A.    I believe so, yes.

9        Q.    And as part of the discussions about the economics

10   of Landmark Partners, Mr. Stevens asked you specifics about

11   the company, right?

12       A.    He did.  He did.

13       Q.    You estimated the company's revenue and earnings

14   for him, right?

15       A.    Mr. Stevens, after he received the offer letter,

16   wanted to understand the capital structure of Landmark.  So

17   he had a number of questions, who the shareholders were, what

18   the revenue of the company was, what the operating income of

19   the company was, what the estimated eventually valuation of

20   the company was, what our shareholder agreement is.  We were

21   very open about that.  I told him who all the shareholders

22   were.  I told him the terms of our existing shareholder

23   agreement.  And I told him why those terms and that

24   shareholder agreement did not work for us on a going forward

25   basis.

1      Q.    The existing agreement was the way that people

2   participated in the economics of Landmark Partners at the

3   time, isn't that right?

4      A.    I don't think that's correct, to be honest with

5   you.  That shareholder agreement dealt with how people had

6   ownership of the management company and how people -- the

7   ownership rights that went along with it.  You had the right

8   to buy it, you had the right to sell it.  Again, but it was

9   really driven at the time it was put in place because we were

10  small, we were closely held, and we needed to have some

11  mechanism which we used life insurance for, to be honest with

12  you, to protect the estates for some sort of value.  The way

13  people participated in the economics of the business was

14  through bonuses and was through a profits participation plan

15  during the 2004 and 2008 time frame.

16     Q.    The conversation that you had with Mr. Stevens that

17  we're talking about, was that before or after you sent the

18  draft letter to Mr. Stevens?

19     A.    We had conversations with Mr. Stevens about his

20  desire to have ownership in the firm both before and after.

21  Really, those were all before we sent the offer letter.

22  After we sent the offer letter, I then did get a phone call

23  from Gary Stevens to talk through the specifics of the offer.

24  He wanted confirmation of the participation, the carried

25  interest.  He wanted to walk through the calculations as to

1    what the value of those were.  He wanted to also understand

2    the ownership of the existing management company and how that

3    shareholder agreement worked, which I mentioned before.  And

4    we went through all of that.

5        Q.    It's your testimony that that conversation was

6    after the draft offer letter went to Mr. Stevens?

7        A.    It was either after the draft offer letter or,

8    certainly, after Mr. LoPinto made the offer to him.

9        Q.    But as to whether it was after the draft written

10   offer letter was sent, you're not sure?

11       A.    The conversation with Mr. Stevens about the detail

12   was on May 6th of 2004.  And I don't recall the date of the

13   draft letter that went out to him.  I know the final letter

14   was May 20th.

15            MR. KNOTT:  Can we call up Plaintiff's Exhibit 23,

16   please.  Can you blow up the email?

17       Q.    This email reflects that the draft offer letter was

18   sent on May 17th, isn't that right?

19       A.    Yes, it does.

20       Q.    So your discussion about the specifics of the offer

21   was before the draft offer letter was sent, correct?

22       A.    That's right.  So it was after Mr. LoPinto

23   made -- passed along the terms to Mr. Stevens, and then

24   Mr. Stevens subsequently called me to make sure he understood

25   them.

1     Q.    In your conversation with Mr. Stevens, he talked

2  about the existing ownership of the firm, right?

3     A.    Yes, he did.

4     Q.    You told him who the current owners were?

5     A.    Yes, I did.

6     Q.    You told him what percentages of the company they

7  owned, right?

8     A.    I think I gave him estimated percentages, yes.

9     Q.    You told him there were five, but soon to be four

10 owners, right?

11    A.    Yes.

12    Q.    You told him you and Mr. Borges together owned over

13 50 percent of Landmark Partners, Incorporated, right?

14    A.    Again.  These were questions he was asking me and

15 these were the answers I was giving him.

16    Q.    But you did tell him that you and Mr. Borges

17 together owned more than 50 percent of Landmark Partners,

18 Incorporated, right?

19    A.    Absolutely.

20    Q.    And you told him that Robert Shanfield and Jim

21 McConnell were also owners of the firm, right?

22    A.    Yes.

23    Q.    And Robert Shanfield and Jim McConnell are partners

24 in the private equity side, right?

25    A.    Yes, they are

1     Q.    And you told him that Richard Main, the real estate

2   group head who you were hiring Mr. Stevens to replace, had

3   been an owner of the firm, right?

4     A.    Yes.

5     Q.    And you told him that Richard Main and Robert

6   Harvey, the person who worked under Richard Main, had owned a

7   combined 12.5 percent of -- I'll repeat the question.

8           You told Mr. Stevens that Mr. Main and Mr. Harvey,

9   who worked under Mr. Main in the real estate group, had owned

10  a combined 12.5 percent of Landmark Partners, Incorporated

11  before they left the real estate team, isn't that right?

12    A.    Yes.

13    Q.    You told Mr. Stevens that the existing ownership

14  plan didn't work, right?

15    A.    That's correct.

16    Q.    And that you needed to address working on a plan,

17  right?

18    A.    Yes.  I told him we were going to put a new plan in

19  place.

20    Q.    And he asked you what was wrong with your current

21  plan, right?

22    A.    Yes.

23    Q.    And he asked you why you were changing it?

24    A.    That's correct.

25    Q.    And you answered those questions?

1    A.    Absolutely.

2    Q.    You told him that one reason the existing plan

3    didn't work was because the owners were personally loaning

4    money out to new owners to acquire their interest in the

5    company, correct?

6    A.    That was one of the reasons it didn't work, yes.

7    Q.    And you also told him that how you dealt with

8    people when they left under the ownership plan was a problem,

9    correct?

10    A.    We didn't feel it was attractive, because when

11    people left they got paid out over a ten year period of time

12    and that just, you know, in today's world or at that time was

13    not an attractive approach.

14    Q.    And you wanted to address that issue, right?

15    A.    Yes.

16    Q.    And you also told Mr. Stevens that you wanted to

17    expand your ownership, right?

18    A.    Right.  The biggest challenge we had with our

19    existing plan was we were looking forward.  We had other

20    partners in the firm who we wanted to have participation in

21    the profits of the firm going forward.  We anticipated some

22    coming, some going over the years, and our existing plan was

23    not user friendly with regards to that.

24    Q.    You told Mr. Stevens you were looking at a variety

25    of plans or programs, right?

1    A.    Yes.

2    Q.    At the time you talked with Mr. Stevens, Landmark

3 had paid capital call bonuses to its employees at the end of

4 the year, right?

5    A.    That's correct.

6    Q.    And when you talked to Mr. Stevens about the

7 program that you had that you didn't like, you weren't

8 talking about capital call bonuses, were you?

9    A.    No.  His questions were specific to stock

10 ownership, and my response to those were our shareholder

11 agreement relates to stock ownership is what we're looking to

12 replace.

13   Q.    And at this point you're talking with Mr. Stevens

14 about the participation that Landmark is willing to give him

15 in the company, isn't that right?

16   A.    In our offer letter we were talking about the

17 participation for key principals in the growth that they

18 contributed to in our company.

19   Q.    What I'm asking you about is your conversation with

20 Mr. Stevens.  When you were having your conversation with

21 Mr. Stevens where you were describing the program that you

22 didn't like and you thought it didn't work, you were talking

23 about the term for his participation in Landmark, correct?

24   A.    That's not correct.  When I was talking about our

25 plan, I was responding to his questions about what our

1   shareholder agreement was, what our current stock ownership

2   was, how that plan worked.  I was not negotiating with him as

3   to what percentage ownership he'd have in a company or

4   anything like that.  We knew he wanted to have participation

5   economics of Landmark.  But that's not what we offered in our

6   letter.

7       Q.    And you didn't say to him, all these details don't

8   matter because this is irrelevant to you, did you?

9       A.    I did not say that.

10      Q.    In your conversation with Mr. Stevens, you talked

11  about the possibility of having more people buy ownership in

12  the firm, right?

13      A.    I don't recall that.  Certainly there's a

14  possibility.

15      Q.    It's possible that you talked about that, but you

16  don't remember?

17      A.    The way I may have talked about that was one of the

18  challenges we had were each of our partners all came from a

19  different place.  Some had the ability to buy into the

20  program, some had issues with regards to valuation.  So that

21  might have been how that discussion went about ability to buy

22  in.

23      Q.    And Mr. Stevens told you that because of his cash

24  position he would be able to buy in, right?

25      A.    He didn't tell that to me, but we did receive that

1    information from Mr. LoPinto.

2         Q.   You talked about the possibility with Mr. Stevens

3    of issuing warrants or options, right?

4         A.   We didn't get into the details.  We told

5    Mr. Stevens that we needed to come up with a new program.

6    That program could be ownership, it could be options, it

7    could be profits participation, profits bonus.

8         Q.   And options would give you the right to buy into

9    Landmark at a fixed price at a certain period of time?

10        A.   Yes.  Options could be all over the map.  They

11   could be the right to buy into the stock ten years from now

12   at a price to be determined then, it could be the right to

13   exercise vesting in options, but we didn't get into details

14   in that at all.

15        Q.   During your discussion you recall -- withdrawn.

16             You told Mr. Stevens that Landmark was willing to

17   give him 10 percent of the company, didn't you?

18        A.   I did not.

19        Q.   Do you believe -- it's your belief that Mr. Stevens

20   told you that he would like to get 10 percent?

21        A.   Yes, he did.

22             MR. FIEBACH:  Your Honor, I ask for a limiting

23   instruction at this point.

24             THE COURT:  Ladies and gentlemen, I'm going to sound

25   like a broken record after a while.  You've heard reference

1     again that the parties discussed giving Mr. Stevens an

2     ownership interest.  I instruct you that the contract did not

3     require Landmark to give Mr. Stevens an ownership interest

4     and that you may, therefore, not consider this evidence as

5     proof either that Landmark breached the contract or that it

6     is liable for any negligent misrepresentation simply because

7     it failed to give Mr. Stevens an ownership interest.  The

8     Court has ruled that Landmark is not required to do that and

9     you're not to speculate as to why.  Instead, you may consider

10    evidence about discussions about an ownership interest only

11    for the limited purpose of determining whether Landmark

12    promised to let Mr. Stevens participate in the economics of

13    the entire firm or just in specific funds managed by the

14    firm.  In other words, you may consider this evidence only in

15    deciding what the parties agreed to and whether Landmark is

16    liable for any negligent misrepresentations about the scope

17    of the program referred to in the May 20, 2004 agreement.

18    BY MR. KNOTT:

19        Q.    It's your belief Mr. Stevens told you he'd like to

20    get 10 percent of the firm?

21        A.    Yes.

22        Q.    And you didn't tell him that Landmark wouldn't

23    agree to that in your conversation with him, did you?

24        A.    We told him that we had to develop a new program

25    and we told -- and we put in our offer to him that he would

1    be a 10 percent participant in that program.

2        Q.    You and Mr. Stevens talked about when the new

3    program you were talking about would be finalized, right?

4        A.    We did not talk about timing on that, no.

5        Q.    You didn't talk about the timing at all?

6        A.    I don't recall him -- I don't recall.  I know we

7    didn't commit to any time line because we didn't have any

8    ability -- we didn't know at that time what avenue we would

9    go with regards to developing the plan.  So I had no ability

10   to do a time line.

11       Q.    You did talk about your hopes for when you would

12   complete the program, though, didn't you?

13       A.    Mr. Stevens said to me do you think there's a

14   chance it would get done by year end, meaning December 2004.

15   I said that would be nice, but I have no idea if we can pull

16   that off.

17       Q.    And you took notes of your conversation with

18   Mr. Stevens also, is that right?

19       A.    Yes, I did.

20           MR. KNOTT:  Jake, can you call up Plaintiff's

21   Exhibit 22.

22       Q.    Are these your notes of your conversation with

23   Mr. LoPinto and Ms. Beck on May the 6th, 2004?

24       A.    Yes, they are.

25       Q.    And can we look at the next page, please.  Can you

1   blow up the top.  Actually, can I have a copy of this?

2       A.   Is it okay to use glasses?

3            THE COURT:  Yes.

4            THE WITNESS:  I just started using them, too, so.

5   Okay.

6            MR. KNOTT:  If I can use them, you can use them.

7            THE WITNESS:  I can see it here, but I can't see it

8   there.

9            THE COURT:  Have you had a chance to review the

10  document, sir?

11      Q.   I just asked you to page through the document and,

12  in particular, after the first page.

13      A.   Okay.

14      Q.   You recognize those as the notes you took of your

15  May 6th, 2004 conversation with Mr. Stevens?

16      A.    Page 2 and 3 are, yes.  Page 1 is Mr. LoPinto and

17  Ms. Beck.

18           MR. KNOTT:  Your Honor, I move to admit Plaintiff's

19  Exhibit 22 into evidence.

20           MR. FIEBACH:  Your Honor, maybe at lunch we can talk

21  about this.  I guess I have to make the objection for the

22  record.

23           THE COURT:  You can say the objection for the record

24  in a few words I think.

25           MR. FIEBACH:  Excuse me, your Honor?

1      THE COURT:  I think you can say the objection for

2  the record succinctly.  It depends on what the objection is.

3      MR. FIEBACH:  Based on the in limine rulings, your

4  Honor.

5      THE COURT:  I'm not going to allow the exhibit at

6  this time.  I think there needs to be more foundation.

7   Q.   Mr. Haviland, did you take these notes during your

8  conversation with Mr. Stevens?

9   A.   Yes, I did.

10  Q.   And did you take the notes on the first page during

11 your conversation with Mr. LoPinto and Ms. Beck?

12  A.   Yes, I did.

13     MR. KNOTT:  Again, your Honor, I'd move the

14 admission of Plaintiff's Exhibit 22.

15     THE COURT:  Mr. Fiebach, maybe you can tell me which

16 rule or what the grounds for the objection are.

17     MR. FIEBACH:  Following up the foundation, there's

18 been no foundation as to what the second and third page

19 represents.

20     THE COURT:  I think he just testified those were

21 notes he took during a call.

22     MR. FIEBACH:  It's not clear if he's talking about

23 what he was saying to Mr. Stevens or what.

24     THE COURT:  Is there a hearsay objection as to the

25 second and third page?

1          MR. FIEBACH:  No, I think it's foundation.  But

2    also, your Honor, with respect to the question of stock

3    ownership, I'm not asking for another limiting instruction,

4    but this is a different issue.  This is the issue relating to

5    the word "program" in the contract.

6          THE COURT:  Could you direct me to the page of the

7    exhibit I should look at to see what the basis for your

8    objection is on that score?

9          MR. FIEBACH:  We have D-515 is the contract.

10         THE COURT:  Tell you what, why don't we do this at

11   side-bar.

12         (Whereupon, the following conference was held at

13   side-bar.)

14         MR. FIEBACH:  I understand that under the rules with

15   respect to our motion in limine to exclude the evidence your

16   Honor's ruling is controlling, and we don't have to make an

17   objection, but there's a second objection thats alluded to in

18   my response and, that is, that we also believe that the

19   contract itself is clear, that the only interest that he's

20   entitled to is 10 percent in the program, not in the company,

21   which is a slightly different issue.  It's a more specific

22   issue than the more generalized one that was addressed in the

23   motion in limine.

24         THE COURT:  Right.  I think the summary judgment

25   ruling made clear that that is an issue for the jury.

1          MR. FIEBACH:  Your Honor, this is correct, but what

2     I'm trying to do is protect the record.  I don't want to have

3     to object every time, but it does --

4          THE COURT:  You can have a continuing objection on

5     that.  We're on the record now.

6          MR. FIEBACH:  Right.  I just wanted to make that

7     clear for the record.

8          THE COURT:  Those are your objections, correct?

9          MR. FIEBACH:  Yes, your Honor.

10          THE COURT:  I'm going to overrule the objection.

11          (Side-bar concluded.)

12          THE COURT:  The objections are overruled.  The

13     document can be admitted full.  This is Number 22, Mr. Knott?

14          MR. KNOTT:  Yes, your Honor.

15     BY MR. KNOTT:

16     Q.    Mr. Haviland, looking at your notes, your notes

17     reflect a discussion about Mr. Stevens being the head of real

18     estate, right?

19     A.    Yes.  These are notes that I took of things Gary

20     said to me.

21     Q.    And looking at the paragraph marked 5, you've

22     written LPI equity, and it says reviewed existing plan, which

23     you did in your conversation with Mr. Stevens, right?

24     A.    Yes, we did.

25     Q.    Current thoughts going forward, equity or income it

1    says there, right?

2        A.    Yes.  And -- yes.  We talked about equity.  We

3    talked about profits participation which is another form of

4    that is income partner.

5        Q.    And you talked about return on investment.  Do you

6    see that?

7        A.    Yes, yes.

8        Q.    And return on investment, meaning if you invest in

9    the company how much do you get back, right?

10       A.    Right.  Gary asked the question what is the return

11   on investment.  I didn't have an answer for that.  Gary did

12   have -- he said, well, if you put -- I don't remember the

13   number -- but if you put certain dollars in and you get

14   certain dollars back, that would be your return on

15   investment.  And I agreed with that concept.

16       Q.    And then he asked what percentage of the company do

17   you think I'll be offered the opportunity to acquire,

18   right?

19       A.    That's correct.  To which I told him I'll talk to

20   Frank.  And, also, at that time we reviewed the current

21   ownership.

22       Q.    And then it says below that, suggest 10 percent,

23   right?

24       A.    That is Mr. Stevens suggests 10 percent or more.

25       Q.    It's your testimony that that's Mr. Stevens'

1    suggestion?

2        A.    It is.  And the reason I know that is because I

3    have this quirky way of taking notes, and when I put a double

4    slash like that, that means that's somebody else talking.  So

5    I told him I'd talk to Frank.  I reviewed the current

6    ownership and he suggested 10 percent or greater.

7        Q.    Did you mention how many participants you thought

8    would be in the new program?

9        A.    We told him -- I told him it was going to be a

10   firm-wide program and for key principals, key individuals.

11   So I don't recall if I told him it was 8 or 10 or 12, but it

12   would be all the partners and principals.

13       Q.    But the numbers you were talking about were 10

14   instead of 5, right?

15       A.    Ten people instead of five?

16       Q.    Ten people instead of five?

17       A.    It was certainly not five, yes.  It was closer to

18   10.  I don't believe we spoke about direct number of

19   participants.

20       Q.    You didn't tell Mr. Stevens that if you did a

21   profit participation that the program for him would be

22   limited to one new real estate fund, is that right?

23       A.    At that time we hadn't determined what the program

24   would be so I'd have no reason to tell him that.

25       Q.    And you didn't tell him that you were only going to

1    give him a 10 percent interest of the fixed margin of one new

2    real estate fund, right?

3         A.    That's correct.

4         Q.    Because you had 28 other funds at Landmark,

5    right?

6         A.    I'm not sure those two are tied to each other.

7    We've had 28 funds we've raised since inception.  Not all of

8    them were active.  Not all of them were generating fees.

9         Q.    At the time you had a number of funds aside from

10   whatever new real estate fund might be raised, right?

11        A.    That's correct.

12        Q.    And Landmark was making money off of all those

13   other funds, right?

14        A.    Landmark, as a firm, was making money, yes.

15   Private equity was -- had a profitable operating margin.  The

16   real estate group, as a whole, was not profitable.

17        Q.    At the time you're talking with Mr. Stevens?

18        A.    That's correct.  And from all through -- from 2004

19   through 2008, the revenues associated with the real estate

20   funds, less the direct real estate expenses, would not

21   provide any operating margin for the overall company from

22   real estate.

23        Q.    Is it your testimony if the program was limited to

24   real estate then Mr. Stevens would get nothing out of it?

25        A.    That is not my testimony.  My testimony was that

 1   real estate -- your question was profits.  And I was making

 2   the point that the real estate group, taken individually,

 3   from 2004 to 2008, was not profitable; and the profit

 4   participation, profit bonus plan, or the plan or program that

 5   we were taking into consideration that we were developing

 6   would have to address that.

 7           THE COURT:  Mr. Knott, are you at a point where you

 8   can take a break?  I think this is our lunch break.

 9           MR. KNOTT:  Yes, your Honor.

10           THE COURT:  Very well.

11           Ladies and gentlemen, we're going to take our 45

12   minute lunch break.  We'll be back in our chairs at 1:15.

13   And so, again, this instruction will become repetitive, but I

14   do need to make it every time.

15           Do not discuss the case with anyone.  Do not let

16   anyone else discuss the case with you.

17           And we'll be back in our chairs by 1:15.

18           Thank you.

19           (Jury out at 12:30, p.m.)

20           THE COURT:  All right, sir.  You can step down.  You

21   can leave the exhibits there.

22           THE COURT:  Be seated.

23           All right.  Mr. Knott, can you give me an estimate

24   on how much longer you expect to be with Mr. Haviland, just

25   an estimate?

1        MR. KNOTT:  I would estimate perhaps another hour,

2   your Honor.

3        THE COURT:  All right.  And then I expect there will

4   be some cross-examination.

5        MR. FIEBACH:  Not so far, your Honor.  We just

6   reserve the right to call him in our case.

7        THE COURT:  So you don't expect to cross-examine at

8   all?

9        MR. FIEBACH:  Not so far.  If there's something I

10  need to clarify.

11        THE COURT:  Understood.

12        And then the witness, let's say we go to 2:15 and

13  assuming there is no need for cross, your next witness will

14  be Dr. Kennedy?

15        MR. KNOTT:  Yes, your Honor.

16        THE COURT:  Then we should take up the issue that

17  was raised this morning which I, frankly, didn't get my mind

18  around.  So can we -- why don't we take that up right now.

19        MR. FIEBACH:  If your Honor may recall, in

20  Dr. Kennedy's first report he had as one of his calculations

21  a calculation of the shareholder distributions and what

22  10 percent of that would be for Mr. Stevens.  And initially

23  you ruled that he could testify to that.

24        The plaintiff then filed a motion to permit them to

25  prepare a supplemental report, and in the argument to justify

1    that, Mr. Bush argued to you that shareholder distributions

2    were really not a profit participation plan and that he

3    wanted the opportunity to have Dr. Kennedy present a profit

4    participation plan.  And your Honor granted that, and

5    ultimately Dr. Kennedy submitted a supplemental report and

6    one of the calculations or one of the areas that you did

7    permit to go forward was his calculations with respect to

8    10 percent of the profits of the company.

9            MR. BUSH:  Your Honor, I'm standing because I might

10   be able to save some time on this.

11           THE COURT:  Go ahead, Attorney Bush, if you really

12   think you can save some time.

13           MR. BUSH:  I'm going to save some time.

14           Although I don't agree with any of the rationale, we

15   do not intend to put the shareholder participation profits

16   in.

17           THE COURT:  Is that it?  I appreciate you doing

18   that.

19           I don't think in light of the fact that Dr. Kennedy

20   I expect will be on for more than 45 minutes, I take it?

21           MR. KNOTT:  I don't expect him to, your Honor.

22           THE COURT:  With the cross, go to about three?

23           MR. FIEBACH:  If it's limited to that, I don't think

24   there's going to be a whole lot of cross.

25           THE COURT:  Fine.  Then who will be your witness

1    after Dr. Kennedy?

2         MR. BUSH:  Our witness after that would be

3    Mr. Stevens.  So I think we'll be pretty close to three.  I

4    will ask if we can start with him in the morning.

5         THE COURT:  We'll see.  Depends how close to three.

6    I'd like to use all the time we can.  If it's five of three

7    we'll break.

8         All right.  We'll stand in recess.

9         (Recess.)

10        THE COURT:  Please be seated.

11        Are we ready for the jury?

12        MR. KNOTT:  Yes, your Honor.

13        THE COURT:  All right.

14        MR. KNOTT:  Should Mr. Haviland retake the stand?

15        THE COURT:  Yes, please.  Mr. Haviland, if you would

16   retake the stand.

17        (Jury in at 1:20, p.m.)

18        THE COURT:  All right, folks, if you would be

19   seated.  Any time you're ready, Mr. Knott.

20   BY MR. KNOTT:

21   Q.   Mr. Haviland, before lunch we talked about the

22   third real estate fund that Landmark raised.  Do you remember

23   that?

24   A.   Yes, sir.

25   Q.   And you said that that fund raised about 20 million

1    dollars?

2        A.    It was between 25 and 40 million dollars.

3        Q.    The goal for the fund to raise for that fund was

4    250 million dollars, isn't that right?

5        A.    No, that's not correct.  The fund I'm referring to,

6    which ultimately was called Real Estate Fund III, was a kind

7    of a special purpose fund.  There were two investment

8    opportunities that we went -- that we ran across that were

9    direct type investments that didn't fit in our prior funds.

10   Strategy was different.  And so we got the opportunity to do

11   those two transactions and we went to a subset of our

12   investor group and raised capital around that deal.

13       Q.    It's your testimony that the goal for the fund

14   raised for Real Estate Fund III was not 250 million dollars?

15       A.    I don't recall that.

16       Q.    Going back to your conversation with Mr. Stevens on

17   May the 6th, you didn't tell Mr. Stevens he couldn't have

18   ownership of Landmark Partners, did you?

19       A.    I did not tell him he could not have ownership,

20   that's correct.

21       Q.    And you didn't tell him that you viewed his

22   participation in the economics of Landmark as something that

23   was in your sole discretion, did you?

24       A.    I did not tell him that.

25       Q.    You didn't tell him that you thought you could give

1    him whatever you wanted or nothing at all, correct?

2        A.    That's correct.  I don't know why I would make a

3    statement like that.  At that point in time we were -- what

4    we had said was we needed to create a new plan.  We did not

5    have a sense of what that plan was.  So I wouldn't have been

6    in a position to tell him what he could or couldn't have.

7        Q.    You didn't tell him he was not going to participate

8    at the top level of the company, right?

9        A.    That's correct.

10       Q.    After your discussion with Mr. Stevens, Mr. Borges

11   wrote an offer letter to send to Mr. Stevens, right?

12       A.    That's correct.

13       Q.    It was Landmark's practice when hiring not to draft

14   formal legal language for new hires, correct?

15       A.    Our view was that the letter agreement that we put

16   forth to the recruit was a summary -- was the

17   agreement -- the offer that we were to make.  So I'm not sure

18   I understand your question.

19       Q.    Landmark didn't draft more detailed employment

20   contracts, right?

21       A.    That's correct.  All the detail was in that

22   agreement, that letter.

23       Q.    It's your testimony that all the detail was in that

24   letter?

25       A.    Well, certainly not the name of the -- the fine

1    detail, for example, on insurance.  It said you will be

2    eligible for insurance, but it didn't get into what it was,

3    Blue Cross/Blue Shield, but all of the significant terms of

4    the agreement were in that letter.

5        Q.    You used employment letters to summarize and

6    document the arrangements that had been agreed upon, isn't

7    that right?

8        A.    We used the letter agreements to put forth all the

9    things that we had agreed to, put them in writing.

10       Q.    But there were things that you agreed to that

11   weren't in the letters, right?

12       A.    I would say no.  That's the whole point, there were

13   a lot of things we discussed and there were a lot of things

14   that were asked for, but at the end of the day what we put in

15   the agreement was the things we were prepared to offer.

16       Q.    There were details of the agreement relating to

17   each provision that weren't reflected in the document, isn't

18   that right?

19       A.    Yes.  Detail, yes.

20       Q.    And when you and Mr. Stevens talked on May the 6th,

21   you talked about the details, right?

22       A.    We talked about some of the details, for example,

23   vesting in the carried interest.  We talked about -- but we

24   did not talk about details like what day of the month salary

25   was paid and what day of the month bonuses were paid.

1      Q.    After the draft letter went to Mr. Stevens, you

2    didn't have any conversations with him about it, right?

3      A.    I don't recall after he received the written -- I

4    think there were five or so days of silence and we received a

5    signed letter agreement back, and I don't recall if it was

6    through Mr. LoPinto or directly, where he accepted the terms

7    of our agreement.

8      Q.    He didn't ask you to make changes that you then

9    rejected, right?

10     A.    That's correct.

11     Q.    Do you believe that the terms that were set forth

12   in the letter that Mr. Borges wrote were things that had

13   already been discussed and agreed between Landmark and

14   Mr. Stevens, isn't that right?

15     A.    The terms that were in the agreement that

16   Mr. Borges sent to Mr. Stevens were the terms that we,

17   Landmark, had agreed to offer to Mr. Stevens, that's

18   correct.

19     Q.    You believed that the terms laid out were things

20   that you had discussed and agreed to, right?

21     A.    Yes.

22     Q.    The agreement uses the word key principals,

23   right?

24     A.    Yes, it does.

25     Q.    It doesn't say who the key principals are?

1    A.    It does not.

2    Q.    As of the time Mr. Borges drafted the letter, you

3    would have been a key principal, right?

4    A.    Excuse me?

5    Q.    You would have been a key principal, correct?

6    A.    Yes.

7    Q.    And Mr. Borges would have been a key principal?

8    A.    Yes.

9    Q.    And Mr. McConnell?

10   A.    Yes.

11   Q.    Mr. Shanfield?

12   A.    Yes.

13   Q.    The shareholders who were participating in the

14   existing program that you didn't like were key principals,

15   right?

16   A.    That's correct.  Although, again, existing program

17   was a shareholder agreement for the existing owners.  It

18   wasn't the program we were looking to put in place going

19   forward for future participants.

20   Q.    You wanted to change the program?

21   A.    We wanted to put a new program in place.

22   Q.    You told Mr. Stevens you were going to change the

23   program, didn't you?

24   A.    Yes.  I don't recall, but change or put a new one

25   in place is to me the same thing.

1      Q.    You didn't change the existing program after

2   Mr. Stevens joined the firm, did you?

3      A.    We did not.

4      Q.    You didn't change it at any time before 2008?

5      A.    Again, it was a shareholder agreement that

6   didn't -- that the terms of which did not change, but there

7   was no additional issuance under it, there was no additional

8   activity related to that.

9      Q.    And that program was still in place when you

10  terminated Mr. Stevens's employment?

11     A.    Yes.

12     Q.    During the time Mr. Stevens was at Landmark, the

13  key principals we've talked about, you, Mr. Borges,

14  Mr. McConnell and Mr. Shanfield, received payments from the

15  profits of the firm, right?

16     A.    We received distributions as shareholders of the

17  firm.

18     Q.    And Mr. Stevens didn't receive any of those?

19     A.    Mr. Stevens received $150,000 a year as a

20  participant in the interim profits participation plan.

21     Q.    But my question to you, sir, was whether

22  Mr. Stevens received any payments as shareholder

23  distributions?

24     A.    He did not.

25     Q.    At the end of 2004, Landmark completed what it

1  called the Summer Wind acquisition, is that right?

2      A.    Yes.   That was a -- I don't want to say code name

3  like it was some secret, but oftentimes when we were buying a

4  portfolio from a seller, the seller would request to keep the

5  name confidential.  So we nicknamed that acquisition Summer

6  Wind.

7      Q.    And that acquisition was the largest single

8  investment Landmark had ever made, right?

9      A.    That was a private equity portfolio and it

10 was -- yes, it was the largest portfolio that we acquired on

11 behalf of our funds.  It was not a Landmark acquisition.  It

12 was into our funds that we managed.

13     Q.    The total acquisition was about 950 million

14 dollars, is that about right?

15     A.    That sounds correct.

16     Q.    And that was an extraordinary event for Landmark,

17 the company?

18     A.    It wasn't such an extraordinary event for the

19 company.  It was a significant acquisition for our funds,

20 absolutely.

21     Q.    Is it your testimony that it was not an

22 extraordinary event for the firm?

23     A.    I guess you could describe it that, yes.  That's

24 fine, yeah.

25     Q.    The Summer Wind acquisition allowed you to close on

1    your private equity fund 11, right?

2        A.    I don't recall exactly the timing of it.  Actually,

3    Fund May 11 have already closed.  But what that transaction

4    did, that transaction was of such size that we put a portion

5    of the transaction into Fund 11 and we raised a Fund 12, a

6    special purpose vehicle, for the other half of that or

7    portion of that acquisition.

8        Q.    You were quickly able to raise another private

9    equity fund, right?

10       A.    Yes.  Specific to that transaction.

11       Q.    And that transaction raised the assets under

12   management of the firm more quickly than you'd previously

13   expected, isn't that right?

14       A.    On the private equity side, yes.

15       Q.    And since Landmark's advisory fees are paid based

16   on assets under management, Landmark Partners, Incorporated

17   was getting more money as a result of that acquisition, isn't

18   that right?

19           MR. FIEBACH:  Objection, relevancy.

20           THE COURT:  Sustained.  I don't see it.

21           MR. KNOTT:  Your Honor, it goes to the income of the

22   firm.

23           THE COURT:  You can answer that question.  Go ahead.

24   You can answer that question.

25           THE WITNESS:  Could you repeat that?  Sorry.

1      Q.    Since Landmark's advisory fees are paid based on

2  assets under management, Landmark Partners, Incorporated, was

3  getting more money as a result of that acquisition, isn't

4  that right?

5      A.    Yes.  The fact that we had formed private equity

6  fund 12, a new fund related to that acquisition, was

7  incremental revenue to the firm.  And there were incremental

8  expenses with that but...

9      Q.    Stan Alfeld was the founder of Landmark Partners?

10     A.    He was one of the founders, yes.

11     Q.    He passed away in 2005?

12     A.    I believe it was -- I don't know the exact date,

13  but I believe it was 2005, yes.

14     Q.    He was about 60 years old at the time?

15     A.    Sounds about right.

16     Q.    Mr. Alfeld had previously retired from Landmark,

17  correct?

18     A.    Yes.

19     Q.    And when Mr. Alfeld retired, Landmark Partners

20  repurchased his shares, right?

21     A.    Yes.

22     Q.    And it still owed him money for that repurchase

23  when he passed, correct?

24     A.    Yes.

25     Q.    It still owed him money for deferred compensation

1    that it had agreed to pay to him?

2         A.    Yes.

3         Q.    When Mr. Alfeld worked at Landmark, the company had

4    taken out a term life insurance policy on him, correct?

5         A.    That's correct.

6         Q.    And Landmark, the company, was the beneficiary?

7         A.    We were the beneficiary on part of the policy,

8    yes.

9         Q.    It was an eight million dollar policy for Landmark,

10   right?

11        A.    That's not the exact number, but it's close.

12        Q.    8,000,070?

13        A.    I think it was actually -- yeah, that's close,

14   yes.

15        Q.    And Landmark received the proceeds of that policy,

16   correct?

17        A.    Yes, we did.

18        Q.    And that was income to the firm?

19        A.    It was deemed income for accounting purposes, GAP

20   income.  It's not operating income of the firm by any

21   means --

22        Q.    Whether it's --

23              MR. FIEBACH:  He cut him off.  Objection.

24              THE COURT:  Ground?

25              MR. FIEBACH:  He wasn't finished with his answer.

1          THE COURT:  Please finish your answer.

2     A.    What I was saying was GAP, which is generally

3   accepted accounting principals, which is another way to say

4   book income, it was recorded as book income, but it is not

5   what I would call operating income.  Operating income is you

6   have your assets under management which generate a fee, you

7   have your expenses related to that, and the net of that after

8   bonuses, et cetera, is your operating income.

9     Q.    And Landmark used the proceeds from the policy to

10  pay off the debts it owed to Mr. Alfeld, right?

11    A.    Yes.

12    Q.    You've mentioned during Mr. Stevens's time at

13  Landmark the company paid what it called profit participation

14  bonuses?

15    A.    That's correct.

16    Q.    And the shareholders that we talked about received

17  those as well, right?

18    A.    That's correct.  We put an interim plan in place

19  that took a portion of the management company's income and

20  paid it out in a profits participation bonus to key

21  individuals of the firm.

22    Q.    Some of the key individuals were getting the

23  shareholder distributions, too, that we've talked about too,

24  right?

25    A.    Yes.  The owners of the firm would also receive a

1  shareholder distribution.

2      Q.    Landmark used to call the profit participation

3  bonuses capital call bonuses, isn't that right?

4      A.    We had a capital call bonus program that ended in

5  2003, and in 2004 we started a profits participation bonus

6  program.

7      Q.    You stopped the capital call bonuses and you called

8  them profit participation bonuses, isn't that right?

9      A.    We stopped the capital call bonus program in 2003

10  and we started a new program in 2004 which we called the

11  profits participation bonus.

12      Q.    Is it your testimony that you did not stop the

13  capital call program and call it a profit participation

14  bonus?

15      A.    The capital call bonus program that we had in

16  place, we stopped it in 2003, and in 2004 we started with a

17  profits participation bonus.  That's what we called it.  The

18  amounts of the program were very similar.  I'm not sure I

19  understand your question.

20      Q.    It's basically the same thing as the capital call

21  bonus you had before, isn't that right?

22      A.    I don't -- I would have to say no.  I mean, the

23  capital call bonus program was somewhat formulaic.  The

24  profits participation bonus was less so in that we considered

25  the profits of the organization, we looked at the

1    individual's contributions, we looked at prior year levels,

2    and we looked at the profitability of the respective groups,

3    and from that came up with a profits participation bonus

4    allocation.  And each year it changed.  I mean, I'm not sure

5    it was the same amount every year.  I'm not sure --

6         Q.    The term capital calls comes from required payments

7    on investments in Landmark funds, right?

8         A.    Correct.

9         Q.    Landmark awards its employees investments in

10   Landmark's funds, right?

11        A.    That's not correct.  When we form a fund, for

12   example, Real Estate Fund V, if the fund were 300 million

13   dollar fund that means the limited partners, the outside

14   investors, would put 300 million dollars into the fund.  The

15   general partner group, which was made up of representatives

16   of Landmark, would be required to put up one percent of the

17   capital.  So if it's a 300 million dollar fund, one percent

18   is whatever that -- three million dollars.  I'm not sure if

19   I'm doing my math quick enough -- but three million dollars.

20   We would then take that three million dollars obligation and

21   we would allocate it to the individual participants at

22   Landmark.  So if you were a 15 percent participant in the

23   general partners requirement to put in the one percent, then

24   you had to put in 15 percent of three million dollars or

25   $450,000.  That's correct.

1     Q.    So the employee would receive that interest, but

2   they would have to pay for it?

3     A.    There was an obligation they had to the fund.  Had

4   nothing to do with the management company.

5     Q.    And if the employees didn't buy that investment

6   outright, they could take out what Landmark called a capital

7   call loan, correct?

8     A.    Right.  Because we, as a firm, our practice was to

9   try to allocate or spread that opportunity broadly.  Those

10  who didn't have the ability to fund it on their own, we

11  would, at the management company, make them a loan so they

12  could fund it directly.  And that saved them from having to

13  go to a bank and try to get a loan from a bank and have to

14  leverage their home or something like that.

15    Q.    And you allocated -- when you paid the capital call

16  bonuses before Mr. Stevens joined, you allocated them based

17  on the loans that you'd made to employees, right?

18    A.    Not directly.  Not exactly.  What we did was we

19  looked at the capital that was called during a particular

20  year which, you know, for example, an individual might have a

21  capital call loan balance of $600,000, but during that year

22  we may -- they may have had to fund or borrow $125,000 for

23  that particular year's capital calls.  And so our view was we

24  would look at the amount of capital called for that year and

25  the amount of capital called had some reflection as to the

1  amount of dollars that were invested in that year.  And the

2  amount of dollars that were invested had a relationship to

3  the revenue generated.  And the revenue generated had a

4  relationship to the profits that the firm was generating for

5  the year.  So that was our way of determining how to allocate

6  a capital call bonus plan.

7      Q.    And you did the profit participation bonuses the

8  same way, right?

9      A.    No.  We looked at the capital that was deployed,

10 but we also looked at contributions.  So it was a little bit

11 broader than that.  It was more general than that.  We

12 stopped the capital call bonus program because it had more

13 participants in it.  It was a growing number, growing account

14 that we wouldn't be able to maintain.  So we went into a

15 profits participation which allowed us to kind of cap the

16 amount or determine the amount with more discretion.

17     Q.    When you talked with Mr. Stevens about his

18 participation in the economics of Landmark Partners, you

19 weren't talking about participation on the level of the

20 capital call bonuses, were you?

21     A.    We were not.

22     Q.    You were talking about something much more

23 significant?

24     A.    We were talking to him about participation in the

25 economics of Landmark.  We did not speak directly about a

1    capital call bonus plan.  We did not speak about what

2    ultimately was the intern profits participation plan.  We

3    were talking about a plan -- a program that we planned to put

4    in place on a going forward basis.

5         Q.    And a profit participation bonuses were not that

6    plan?

7         A.    No, that was an intern plan.

8         Q.    In fact, there was no written document related to

9    the -- how you calculated profit participation bonuses,

10   correct?

11        A.    That's correct.  That was determined by the

12   compensation committee which was comprised of the managing

13   partner, Frank Borges and I.

14        Q.    And those bonuses were informal, the profit

15   participation bonuses?

16        A.    I don't know -- what do you mean by informal?  They

17   were paid.  They were real.  Mr. Stevens participated in the

18   interim program between 2004 and 2007, but there was no

19   formal agreement between the individual participants and the

20   company.

21        Q.    And the bonuses were discretionary, right?

22        A.    The bonuses were independent -- you're talking

23   about the profits participation bonus?  Yes.

24        Q.    So it really wasn't a program at all, was it?

25        A.    It was a profits participation bonus pool, an

1    interim program.  I don't know how you want to define the

2    word program, but it was -- I would define it as a program in

3    that it allowed for participation in the profits of the

4    firm.

5        Q.   You required your employees to use their profit

6    participation bonuses to pay their capital calls, isn't that

7    right?

8            MR. FIEBACH:  Your Honor, this has been asked and

9    answered several time.

10           THE COURT:  I don't think this one has.

11   Overruled.

12       A.   I don't believe we did that every year.  I could be

13   wrong about that.  But we had -- we encouraged our employees,

14   our recipients under that plan, that if they had an

15   outstanding balance in terms of their loans to the company,

16   that they should use some portion of that to pay down those

17   loans.  We were concerned about an employee, a key person,

18   whatever, having a growing outstanding loan balance that, you

19   know, might be viewed as insurmountable.

20       Q.   In some years you required your employees to use

21   their entire profits participation bonus to pay down their

22   capital calls, right?

23       A.   No.  I think in some years we required them to use

24   their after tax capital call bonus to pay down their capital

25   calls.  And then the profits participation bonus, we required

1    them to use their after tax to do that, yes.

2           MR. KNOTT:  A moment to consult, your Honor?

3           THE COURT:  Yes.

4      Q.    The financial statements of Landmark Partners,

5    Incorporated show shareholder distributions that were paid,

6    right?

7      A.    The audited statements, sure, yes.

8      Q.    And they show discretionary payments that Landmark

9    made, right?

10     A.    I'm not sure I understand that.

11     Q.    Discretionary compensation?

12     A.    Yes.  One of the line items on our income statement

13   is discretionary compensation which is another term for

14   bonuses, whether they're base bonuses paid to employees or

15   profit participation bonuses, they would both be captured in

16   that category.

17     Q.    And the financial statements of Landmark also show

18   the net income of the firm, right?

19     A.    Yes, they do.

20     Q.    Look at Plaintiff's Exhibit 31.

21           MR. KNOTT:  Can I have a hard copy of that?

22           MR. FIEBACH:  No objection, your Honor.

23           THE COURT:  All right.  It may be marked as full.

24     Q.    Mr. Haviland, you recognize Landmark Partners'

25   financial statement from 2004?

1      A.    Yes.  This says looks like a photocopy of the

2   audited statements prepared by Pricewaterhouse Coopers.

3           MR. KNOTT:  May I have Plaintiff's Exhibit 35,

4   please.

5           MR. FIEBACH:  No objection, your Honor.

6           THE COURT:  It will be full.  35 is full.

7      Q.    And, Mr. Haviland, this is the audited financial

8   statement for Landmark Partners, Incorporated for 2005, is

9   that right?

10     A.    Yes.  Looks like 2005 and 2004.

11     Q.    Plaintiff's Exhibit 41, please.

12          MR. KNOTT:  Your Honor, we did admit the previous

13  exhibit, correct?

14          THE COURT:  Yes.

15          MR. FIEBACH:  No objection to 41, your Honor.

16          THE COURT:  41 will be admitted as a full exhibit.

17     Q.    Mr. Haviland, this is the audited financial

18  statement for Landmark Partners, Incorporated for the years

19  2006 and 2005, is that correct?

20     A.    Yes, it is.

21          MR. KNOTT:  Plaintiff's Exhibit 54, please.

22          THE COURT:  Mr. Knott, if you have other financial

23  statements, do you want to do them as a group?

24          MR. KNOTT:  I have one more after this one and I can

25  certainly do that, your Honor.

1          MR. FIEBACH:  No objection, to 54, your Honor.

2          THE COURT:  54 and 80 will be full exhibits.

3     Q.    For the record, Mr. Haviland, Plaintiff's Exhibit

4     54 is the Landmark Partners financial statement for 2007?

5     A.    Yes.

6     Q.    And Plaintiff's Exhibit 80 is the audited financial

7     statement for Landmark Partners, Incorporated for 2008, is

8     that correct?

9     A.    Yes, it is.

10    Q.    Regarding 2008, Landmark didn't pay any profit

11    participation bonuses in that year, is that correct?

12    A.    That's correct.

13    Q.    Turning back to Mr. Stevens.  In 2008, he outlined

14    a proposal for you for combining with a real estate team from

15    Liquid Realty, is that correct?

16    A.    Yes, he did.

17    Q.    And as part of that proposal, you were discussing

18    how his participation in the economics of that new team might

19    work, right?

20    A.    I believe -- I believe, I shouldn't say that.  He

21    had proposed to us an outline of putting those two teams

22    together and he had suggested to us an economic

23    arrangement.

24    Q.    As part of that discussion, he told you that you

25    hadn't proposed any program to comply with his participation

1  in the economics of Landmark Partners, Inc., right?

2      A.    I don't recall that.

3      Q.    He had raised that issue with you before, that you

4  hadn't adopted what you promised in 2004, isn't that right?

5      A.    There were -- was more than one occasion over the

6  four year period of time, maybe one or two occasions, where

7  he had asked about the status of where that program that we

8  were supposed to be developing was, correct.

9      Q.    And you told him you were working on it?

10     A.    That's correct.

11     Q.    Let's look at Plaintiff's Exhibit 59.

12           And, Mr. Haviland, Plaintiff's Exhibit 59 is a memo

13  that Mr. Stevens sent to you and Mr. Borges on September 22,

14  2008, is that right?

15     A.    That's what the memo says, yes.

16           MR. KNOTT:  I move to admit Plaintiff's Exhibit 59.

17           MR. FIEBACH:  Your Honor, objection on the grounds

18  of hearsay.

19           THE COURT:  Sustained.

20           MR. KNOTT:  The memo is offered for its affect on

21  the listener.

22           THE COURT:  I'm going to sustain the objection.

23     Q.    You received a memo from Mr. Stevens on September

24  22, 2008, didn't you?

25     A.    Yes.  I don't recall receiving this, but the memo

1    is dated September 22nd addressed to me so I assume I did

2    receive it.

3        Q.    And at that time you were discussing with him the

4    fact that you hadn't adopted a program yet, right?

5        A.    At that time September -- I don't know.  I haven't

6    seen this memo since September 22, 2008.  If you want me to

7    read it, I will be happy to do that, but I don't recall at

8    the time.  I mean, in September 22nd we were trying to -- I'm

9    not sure if that was right around the time we had proposed a

10   plan, a program that we had come up to with to Mr. Stevens.

11   It was right around that same time frame.  If you're asking

12   me about this memo, I need to read it.  If you're asking me

13   about that program back then, I'd be happy to speak to

14   that.

15       Q.    On September 22nd, Mr. Stevens told you that he was

16   concerned that you hadn't complied with your agreement with

17   him, isn't that right?

18       A.    I don't recall that specific date.

19       Q.    On September 26th, 2008, you sent him a PowerPoint

20   outline.  Do you remember that?

21       A.    Yes.

22       Q.    And the PowerPoint outline was of an equity share

23   program, do you remember that?

24       A.    Yes.  That was an outline of the program that we

25   had come up with.

1      Q.    And that's what you called it in the PowerPoint,

2   was an equity share program?

3      A.    That's correct.

4      Q.    Look at Plaintiff's Exhibit 60, please.

5            And, Mr. Haviland, this is a September 26, 2008

6   email from you to Mr. Stevens, and attached to the email is a

7   PowerPoint presentation, is that right?

8      A.    Yes, it is.

9            MR. KNOTT:  I move to enter Plaintiff's Exhibit 60.

10           MR. FIEBACH:  No objection, your Honor.

11           THE COURT:  It will be moved as a full exhibit.

12     Q.    This says:  Gary, attached is the draft outline of

13  the Equity Share Plan we discussed with you.  Do you see

14  that?

15     A.    Yes, I do.

16     Q.    You'd already discussed verbally the PowerPoint

17  idea that you were going to present to him, right?

18     A.    Yes.

19     Q.    At that time in September 2008?

20     A.    Right around the 26th, I would assume, yes.

21     Q.    You didn't draft the outline of the equity share

22  program that's attached here with Mr. Stevens offer letter in

23  mind, right?

24     A.    This was a firm-wide plan program that we were

25  putting in place.  So it wasn't drafted specific to

1    Mr. Stevens, but we felt as though it addressed the

2    obligation we had under the agreement with Mr. Stevens.

3        Q.    But when you were writing this outline, you weren't

4    thinking to yourself how can I comply with the agreement I

5    made with Mr. Stevens in 2004, were you?

6        A.    Well, I knew that we had an obligation under that

7    agreement to put a program in place and this was that

8    program.  So I think I would say, yes, I was doing that with

9    this in mind.  I wasn't doing it specific for Mr. Stevens,

10   but I was doing it as our agreement said which was we were

11   going to put a firm-wide program in place.

12       Q.    You told Mr. Stevens, though, didn't you, that you

13   didn't draft this outline with his offer letter in mind?

14       A.    I don't recall that.  Again, it would be in mind.

15   I'm not trying to be cute with words here.  We drafted this

16   program for the whole firm and we felt that this program

17   spoke to the agreement we had with him in his letter offer.

18       Q.    You didn't have any other drafts from before this

19   of an outline for the equity share program, right?

20       A.    That's correct.  This is, I believe, the first

21   one.

22       Q.    You don't have any other drafts of a new program

23   that would be different from this, do you?

24       A.    Not that I'm aware of, no.

25       Q.    You don't have any emails or notes before this

1    reflecting discussions about how to come up with this new

2    program, do you?

3         A.    No.

4         Q.    The equity share program that you describe in this

5    outline didn't provide participation in the profits of

6    Landmark Partners, Incorporated, right?

7         A.    It did provide for participation in the profits in

8    that -- in that the participants, if you were in the -- the

9    way the program is set out is we would take the funds that we

10   had going forward, whether it was private equity or real

11   estate, we would determine a profit margin for those

12   respective funds and we would have individuals would

13   participate in that profit.  So it is sharing in the profits

14   of Landmark Partners.

15        Q.    Just one very small piece of it?

16        A.    The piece going forward, yes.  Again, the idea of

17   this program was to incentivize, compensate, whatever word

18   you'd like, for an individual's contribution to the profits.

19   And so this was a -- we thought a great program because it

20   took some of the ambiguity out of it in that if a participant

21   was a real estate individual and they knew the fund that was

22   being raised going forward was a 300 million dollar fund or

23   400 million dollar fund and a profit margin was predetermined

24   and they were a set participant, then they knew every year

25   all they had to do is look at the revenue that was generated

1    from that fund, times the margin that was already

2    established, times their piece, and they had a predetermined

3    set amount as long as they stayed employed at Landmark.

4    That's what we thought was so good about this.  And there was

5    no cost to entry.

6        Q.    It was not participation in all the profits of

7    Landmark Partners, Incorporated, was it?

8        A.    It is.  I mean, this -- the funds generate the

9    revenue.  We assigned a profit margin.  A portion of that

10   revenue is profits.  And this was their way to participate in

11   those profits.

12       Q.    From one new fund?

13       A.    The way this was designed was from any fund formed

14   going forward from January 1, 2009.  So it could be

15   the -- the plan was over a ten year period of time it would

16   be multiple funds.  And more and more of the profits, as

17   older funds ran off, they would be less of the profits and

18   newer funds would be more of the profits.

19       Q.    You had a number of other real estate funds at the

20   time, didn't you?

21       A.    We had at that time real estate -- we had four real

22   estate funds.  I think at that point in time all four were

23   active.  Two of them may have had significant liquidation so

24   that there were not a whole lot of fees coming from those

25   funds.

1    Q.    Some of the previous funds were still paying

2    advisory fees, though, right?

3    A.    They were paying advisory fees but, as I mentioned

4    earlier today, from 2004 through 2008 those fees never

5    covered the direct expenses of real estate to begin with.

6    Q.    You had a number of other funds that were also

7    paying advisory fees to Landmark, right?

8    A.    We had a number of other private equity funds,

9    yes.

10   Q.    And this outline that you wrote up didn't provide

11   any participation in that?

12   A.    That's correct.

13   Q.    Let's look at page five.

14         And this says the program would apply to partners

15   and principals in their respective product lines, right?

16   A.    On page four, yeah.  My draft it says page four.

17         THE COURT:  Mine, too.

18         MR. KNOTT:  I'm sorry.  It's page five of the

19   document, but page four of the slide.

20   A.    I've got the same as on the screen, yes.

21   Q.    So it's applicable to partners and principals and

22   their respective product lines.  Meaning, if you were in real

23   estate, you only got real estate?

24   A.    That's correct.

25   Q.    And if you were in private equity, you only got

1    private equity?

2        A.    That's correct.  Let me make one exception, though.

3    If you were involved with the private equity, you got private

4    equity.  If you were involved -- I'm not saying this well.

5    If you were an individual that had involvement with both

6    private equity and real estate then you'd have participation

7    in both.  But the most part, the real estate team had

8    participation in the real estate program, part of the

9    program, and the private equity team had participation in the

10   private equity part of the program.  And my point being there

11   were some individuals who bridged both.

12       Q.    Range of participation you described for partners

13   is 2.5 percent to 5 percent.  Do you see that?

14       A.    Yes.

15       Q.    And so for somebody who was in real estate and

16   participated in the program as to that product line, the most

17   you were suggesting was 5 percent, right?

18       A.    5 percent and the margin, yes.

19       Q.    Five percent and the margin?

20       A.    Yes, five percent of the profits margin.

21       Q.    And the profits margin was a fixed number that

22   Landmark would decide upon, right?

23       A.    Yes.

24       Q.    It wasn't whatever the margin actually was, it was

25   a number that you would actually set?

1      A.    That's correct.  It did, however, bear some

2  relationship to the firm's profit margin.  Having said that,

3  you know, the firm was profitable, but as I mentioned

4  earlier, the private equity was much more profitable.  Real

5  estate was not profitable.  So if we had used a margin in

6  this plan for real estate, it would have been zero or

7  negative.  We chose not to do that.

8      Q.    In 2004, real estate wasn't profitable, right?

9      A.    In 2004, real estate was not profitable.

10      Q.    And Mr. Stevens wanted an interest in the

11  economics of the entire firm rather than just the

12  unprofitable line of business, right?

13      A.    That's what he wanted, but that's not what we put

14  in the letter agreement to him.

15      Q.    After you sent this document to Mr. Stevens, you had

16  a phone call with him, right?

17      A.    That's correct.

18      Q.    And he told you that what you were describing here

19  didn't comply with his offer letter, right?

20      A.    I believe that's correct.  Either it was a phone

21  conversation or he sent an email, but he -- that's correct.

22      Q.    And you told him, didn't you, that the intent of

23  your agreement with him was that he would participate in the

24  economics of the entire firm?

25      A.    I didn't tell him that.  What I told him was what

1    was written in the agreement was that he would have a

2    10 percent participation in the program.  And this was the

3    program.

4           And I would go further and say, in error, we

5    offered him five percent, and it should have been 10 percent.

6    And when that was brought to our attention we changed it.

7    Q.    You offered him 10 percent of the program applying

8    to new real estate funds that were launched in 2009 and

9    later, right?

10   A.    That's correct.

11   Q.    Under which he would get a percentage based on a

12   fixed margin that you decided?

13   A.    That's correct.  Not just me, but the compensation

14   committee which was comprised of the managing partners which

15   is Frank Borges and I.

16   Q.    Let's look at Plaintiff's Exhibit 73.  And this is

17   an October 2, 2008 email from you to Frank Borges, is that

18   right, in the email below that?

19   A.    Yes.

20           MR. KNOTT:  I move to admit Plaintiff's Exhibit

21   73.

22           MR. FIEBACH:  Objection, your Honor.

23           THE COURT:  Why don't we discuss this at side-bar.

24           (Whereupon, the following conference was held at

25   side-bar.)

1          THE COURT:  Okay.

2          MR. FIEBACH:  We feel this document's part of the

3    settlement discussions and should not come in, consistent

4    with your Honor's earlier ruling on their motion in limine.

5          MR. KNOTT:  Your Honor, this is still at the point

6    where the parties are discussing what their interpretation of

7    the agreement is, trying to clarify understanding.

8          THE COURT:  How much more do you have?

9          MR. KNOTT:  Not much.

10          THE COURT:  I just need a minute to read it.

11          MR. FIEBACH:  Your Honor --

12          THE COURT:  Let me just read it.

13          Simply communications between Mr. Haviland and

14    Mr. Borges, right?  In other words, I take it they're getting

15    ready to send something to Mr. Stevens, but they haven't yet

16    sent it to him.

17          MR. FIEBACH:  That's true.  But if they're in the

18    process of formulating a position on their settlement

19    proposal, I think there's an earlier document that makes it

20    pretty clear, that has similar language, that they agreed on

21    that, they relied on later, that talked about the gulf

22    between them.

23          THE COURT:  That's earlier or later?

24          MR. FIEBACH:  I think that's earlier.

25          THE COURT:  I think that's October 7.

1          MR. FIEBACH:  I think there's one on October 1.

2          THE COURT:  Can you find that for me?

3          I'm going to give the jury a short break.

4          (Side-bar concluded.)

5          THE COURT:  Ladies and gentlemen, I'm going to give

6    you a short break that way we can do this in the courtroom on

7    the record so I can discuss it with the lawyers.

8          Let me ask you to go into the jury room.  Don't

9    discuss the case and we'll call you back out when we're

10   ready.  Sorry for the interruption.

11         (Jury out at 2:10, p.m.)

12         THE COURT:  Mr. Fiebach, will you give me the

13   earlier document?

14         MR. FIEBACH:  Yes, your Honor.  Actually, I think

15   Plaintiff's Exhibit 73 is an attempt by Messrs. Haviland and

16   Borges to respond to the Stevens memo the day before.  It

17   starts with Mr. Borges' 9-30-08 email to Mr. Stevens where

18   they say maybe we should go a whole different direction and

19   Mr. Stevens says we have a significant misunderstanding.

20         THE COURT:  Can you give me the exhibit number for

21   that?

22         MR. FIEBACH:  I think that's where it starts.

23         THE COURT:  So, Mr. Haviland -- excuse me.

24   Mr. Fiebach, you've handed me Defendant's 542 which I've

25   read.  I didn't see a reference in that document to the gulf

1   between our positions.

2           MR. FIEBACH:  It's Mr. Stevens' statement because we

3   have a significant misunderstanding.  Meaning, what we agreed

4   on.

5           THE COURT:  Okay.  So the offer right now is

6   Plaintiff's Trial Exhibit 73, Mr. Knott?

7           MR. KNOTT:  Yes, your Honor.

8           THE COURT:  Are you planning to offer anything else

9   that's similar to this?

10          MR. KNOTT:  Not subsequent to this, your Honor.

11          THE COURT:  So we only have to do this once then?

12          MR. KNOTT:  Yes.

13          THE COURT:  The document I'm looking at has a

14  Plaintiff's Exhibit sticker 73 and also what looks like a

15  Deposition Exhibit 111.  Is that what I should be looking at?

16  Is that's what's being offered?

17          MR. KNOTT:  Yes.  73 is the one I'm offering.  As to

18  whether we might offer earlier documents, we might.

19          MR. BUSH:  Your Honor --

20          THE COURT:  I'm going to overrule the objection to

21  73.  I don't think they're quite there yet.  I acknowledge

22  that they're getting close, but I don't think they're quite

23  at the point that they were when we saw I think it was the

24  October 7th document that was the beginning in the series

25  that was the subject of a plaintiff's motion.

1          MR. BUSH:  I think that's right, your Honor.

2          THE COURT:  I'm going to overrule the objection to

3    73.

4          What else do you have?

5          MR. BUSH:  I guess we're not really going to get

6    into this, but Mr. Fiebach brought up what is our Exhibit 69,

7    but I think it's your Exhibit 542, and was pointing to going

8    down an alternative path as an indication of settlement

9    discussions.  I don't want to leave that completely

10   unanswered, because I just don't think that's an accurate

11   characterization of what was going on there.  And it's also

12   disputed that that's even true.

13         THE COURT:  What you're going to tell me is this

14   alternative path referred to some proposal with the real

15   estate team, right?

16         MR. BUSH:  Yes.  That had to do with Liquid Realty

17   stuff.  That's not a settlement.  Has nothing to do with that

18   at all.

19         THE COURT:  Right now all that's being offered is

20   73, is that correct?

21         MR. BUSH:  That's correct.

22         I know you're worried about sending them back out in

23   five minutes.  I don't think that's going to come up.

24         THE COURT:  The objection's overruled.  The document

25   can be admitted as full.

1              Let's get the jury back.

2              MR. FIEBACH:  Your Honor, may I have our D-542 back?

3              (Hands.)

4              (Jury in at 2:18, p.m.)

5              THE COURT:  All right, folks, you can be seated.

6              Exhibit 73 has been admitted as a full exhibit.  So

7    that will come up on your screens shortly.

8    BY MR. KNOTT:

9        Q.    Mr. Haviland, how we have this broken out is that

10   there is an email from Mr. Borges at the bottom and then your

11   email at the top responding to him, correct?

12       A.    That's correct.

13       Q.    And Mr. Borges, at the bottom, is sending you a

14   draft email to send to Mr. Stevens, correct?

15       A.    That's correct.

16       Q.    In the second sentence of Mr. Borges' email he

17   writes:  You were absolutely right that the plan took time,

18   to wit, I accept responsibility for that.  As indicated, it

19   was not for lack of effort or desire to string this along and

20   not honor commitment.

21              And your suggestion to Mr. Borges was that he should

22   remove the words "and not honor commitment," is that right?

23       A.    That's correct.

24       Q.    And then in the paragraph in Mr. Borges' email,

25   starting to be clear, he writes:  To be clear, there was and

1    is a commitment to a plan but not to the form of the plan.

2    The 10 percent was if the plan took the form of a stock

3    purchase which I assured you verbally that if that were the

4    case we would use valuation as of your start date.

5         Do you see that?

6    A.    Yes, I do.

7    Q.    And in your suggested revision to that you wrote:

8    To be clear, there was and is a commitment to have a plan,

9    but there has never been a commitment to the form of the

10   plan.  More specifically, we did not commit it to a stock

11   purchase plan.  Having said that, I did verbally assure you

12   that if the plan was a stock purchase plan we would use a

13   valuation determined as of your start date.

14        So you took out the reference to 10 percent, is that

15   right?

16   A.    That's correct.

17   Q.    And then in the next sentence of his email

18   Mr. Borges wrote:  Also, to be clear, you are absolutely

19   right that the intent was to participate in LPI economics,

20   and the plan shared with you Monday did not do that for which

21   an adjustment is required and will be made.  Do you see

22   that?

23   A.    Yes, I do.

24   Q.    And in your suggested revision to Mr. Borges'

25   email, you didn't change that sentence, is that right?

1      A.    That's correct.

2      Q.    And so in his next sentence, Mr. Borges wrote:

3  Therefore, the plan for Gary Stevens will be different from

4  other participants and that your participation will be at the

5  highest partner level in the private equity pool and real

6  estate.  Do you see that?

7      A.    Yes, I do.

8      Q.    And in your email you wrote:  We have concluded

9  that a profit participation plan is the best option.

10  Therefore, the plan for Gary Stevens will include

11  participation in both private equity and real estate.  Do you

12  see that?

13      A.    Yes, I do.

14      Q.    You took out a reference to the highest partner

15  level, is that right?

16      A.    That's correct.

17      Q.    So Landmark proposed to include Mr. Stevens in the

18  private equity plan, is that right?

19      A.    After discussions, that's what we ultimately did,

20  yes.

21      Q.    And you were going to give him five percent of

22  that, right?

23      A.    That's correct.

24      Q.    You still had a dispute, correct?

25      A.    At that time, that's correct.

1     Q.    And eventually you terminated Mr. Stevens because

2     of it, right?

3     A.    We had a number of discussions to try to resolve

4     the dispute.

5     Q.    And Mr. Stevens was terminated?

6     A.    And never reached agreement, and then was

7     ultimately terminated.

8     Q.    It is now your position that you weren't obligated

9     to give Mr. Stevens participation in anything more than a

10    plan that only included a real estate fund launched in 2009

11    and future real estate funds, right?

12    A.    My view was what we put in the letter agreement was

13    that we committed to a 10 percent participation in the

14    program that was going to be established.  We ultimately

15    established a program.  That program was to share in a profit

16    margin for funds being formed on a going forward basis.  And

17    in the interim period, from 2004 through 2007, we had an

18    interim profits participation plan which Mr. Stevens

19    participated in to the tune of $150,000 per year.

20    Q.    It's your position, though, that you weren't

21    obligated to give Mr. Stevens participation in anything more

22    than a plan that only included a real estate fund launched in

23    2009 and future funds in real estate, isn't that right?

24    A.    I believe we honored the agreement by giving him a

25    10 percent participation in a program that we said would be

1    developed.  So I guess the answer to your question is yes.

2         Q.    And it's now your position that you only agreed to

3    give Mr. Stevens participation in a program if and when it

4    was put in place?

5         A.    I think it was more when it was put in place.

6         Q.    And it's your position that if you never put a

7    program in place then he would never have been entitled to

8    participation, right?

9         A.    That's correct.

10        Q.    You believe that the deal was that you were

11   planning to put in a program, but if you didn't, Mr. Stevens

12   would get nothing?

13        A.    I think you're putting words in my mouth here.  We

14   agreed to put a program in place and told him the plan had to

15   be developed.  And so the intent was to put a program in

16   place.  It was not to never put a program in place and to

17   circumvent the whole obligation.  And while we were working

18   on that plan, we put an interim plan in place that allowed

19   him to participate in a meaningful way in profits of the

20   firm, even though real estate or even though the profits of

21   the firm he had not been involved in the development

22   thereof.

23        Q.    But what you believe currently as to your agreement

24   with him was that you're planning to do a program but, if you

25   didn't do it, he wouldn't get anything?

1    A.    If we never did a program, that's correct.

2    Q.    And you never told Mr. Stevens that, did you?

3    A.    We did not.

4         MR. KNOTT:  No further questions.

5         THE COURT:  All right.

6         MR. FIEBACH:  Your Honor, I have just a couple.

7         THE COURT:  Mr. Fiebach, a few questions?

8         MR. FIEBACH:  Yes.  And then I'll reserve to recall

9    in our case.

10              CROSS-EXAMINATION

11   BY MR. FIEBACH:

12   Q.    Mr. Haviland, just to finish up that last line, was

13   it always your intention and the intention of Mr. Borges to

14   come up with a plan?

15   A.    Absolutely.

16   Q.    And did you ever consider not having a plan?

17   A.    We did not.  We had multiple individuals in the

18   firm who were anxious to participate in a program.

19   Q.    Now, there's been -- you were asked a little bit

20   about the carried interest, and I'm not sure that the jury

21   can really understand from the little bits and pieces.  I'm

22   going to ask you to explain how this carried interest worked.

23        Mr. Knott asked you some questions and you used an

24   example of a 300 million dollar fund.  Do you remember that

25   testimony?

1      A.    Yes.

2      Q.    And you said the investors would put in 300 million

3    dollars?

4      A.    That's correct.

5      Q.    And then it would be the obligation of the general

6    partner to put in one percent of the amount put in by the

7    investors?

8      A.    Right.

9      Q.    And I think it's pretty clear how that got paid

10   for, how that one percent got paid for.  But then I want to

11   focus on how did the carried interest kick in.  How did the

12   general partners, in this case would be Landmark, and the

13   people at Landmark who participated in the carried interest,

14   when would they be entitled to anything?

15     A.    Two things.  One is when the individuals that made

16   up the general partner, you know, myself, Mr. Stevens in the

17   case of Fund V and Fund XI and Fund XII and Fund XIII, I

18   think, we would put our -- participate in the one percent

19   that I mentioned before.  And the idea behind it was that our

20   one percent was going in alongside the investors' capital so

21   our interests aligned with the limited partner.  So the

22   return that the limited partner got on their invested capital

23   was the same return that we, as individual general partners,

24   would get on our capital.  Anything that was above and beyond

25   the return of that capital, the 300 million in my example, or

1    the 303 million in my example, to be exact, 300 million from

2    the limited partners, 3 million from the general partner

3    group, any dollar above the 303 million dollars that were

4    returned would be deemed gain.  And our agreement was that we

5    would get 10 percent of the gains, and that 10 percent is

6    what is commonly referred to as carried interest.

7         Q.    So just to summarize, the investors put in 300

8    million dollars, correct?

9         A.    Correct.

10        Q.    Hypothetical fund?

11        A.    Yes.

12        Q.    And then the people at Landmark who were

13   participating would put in one percent of that or 3 million

14   dollars?

15        A.    Correct.

16        Q.    In the 2004, 2008 time frame, what would be a

17   typical rate of return that would be given to the

18   investors?

19        A.    Well, when we marketed the fund, our return

20   projections or profile would be 16 to 20 percent in turn of

21   rate of return, which is not as meaningful as to where you're

22   going with your question, I don't believe.  But more to the

23   point, we would return one and a half times capital to our

24   investors.  So if the limited partner group put in 300

25   million dollars and our fund was successful, it would have

1  returned 450 million dollars to the limited partner -- there

2  would be 150 million dollars of gain or 450 million dollars

3  of total proceeds.  You would take that 150 million dollars

4  of gain times 10 percent and you would come up with a 15

5  million dollar carried interest pool.

6      Q.   Would you take the -- I got lost in the numbers.

7  Let me just back up.  I don't want to confuse the jury more.

8  You said there would be a one and a half times capital.  What

9  would the investors get back before you got any percentage of

10  the gain?

11     A.   It's going to make it a little more confusing as

12  well.

13     Q.   I want to make it accurate.

14     A.   The investors had to get back their 300 million

15  dollars before the carried interest would kick in.  And the

16  part that would make it a little more complicated, we also

17  had a provision that said the limited partners had to get

18  their 300 million dollars at a minimum rate of return on that

19  300 million dollars before we could get into the carried

20  interest.

21     Q.   That's where I was going.  What was the tip -- what

22  was in Fund V?  Do you remember what the minimum rate of

23  return was?

24     A.   It was somewhere, I believe, between six and eight

25  percent return.

1    Q.    So before you got 10 percent of any gains, the

2    people who put up the 300 million would have to get their 300

3    million dollars back, correct?

4    A.    Correct.

5    Q.    And they'd have to get whatever this guaranteed

6    interest return was on their investment, six or eight

7    percent?

8    A.    Correct.

9    Q.    And that would be per year?

10   A.    That would be on the balance of their capital that

11   was outstanding.

12   Q.    So if their 300 million was outstanding for five

13   years, how much interest?

14   A.    It would be 300 million times six percent.

15   Q.    A million eight?

16   A.    A million eight for every single year.  Times five,

17   it would be nine million dollars.

18   Q.    So if the fund didn't perform to that level, in

19   other words, if you didn't get enough to get both the

20   original capital back and the rate of return back, there

21   would be no carry for anybody?

22   A.    That's correct.  That preferred return, that

23   interest rate, was a way to protect the investors from not

24   getting the capital back quick enough.  You could return 600

25   million dollars on a 300 million dollar investment for the

1    limited partners, but if it took 30 years, that preferred

2    return would gobble up that carried interest that otherwise

3    would have been paid.

4        Q.    And that's when the contract -- the agreement

5    between you and Mr. Stevens gave him 15 percent in the first

6    fund, the carried interest on the real estate fund.  The

7    carried interest wouldn't kick in until everybody got back

8    their investment and their rate of return?

9        A.    That's correct.

10       Q.    And that would be true also of the private equity

11   money?

12       A.    That's correct.

13           MR. FIEBACH:  Thank you.  Your Honor, we reserve the

14   right to recall him.

15           THE COURT:  Yes.

16                   REDIRECT EXAMINATION

17   BY MR. KNOTT:

18       Q.    Mr. Haviland, the carried interest that Mr. Fiebach

19   is asking you about is different from the advisory fee

20   revenue to Landmark Partners, right?

21       A.    Yes, it is.

22       Q.    And the rate of return doesn't affect the advisory

23   fee revenue, at least at some points, right?

24       A.    The internal rate of return that the fund

25   ultimately generates does not have a direct relationship to

1  the fees that ultimately flow to the management company.

2  Although if the internal rate of return is low, that's an

3  indication -- it's not an indication, it's a fact, that the

4  value of the assets, the investments that were made, didn't

5  do well and, therefore, the carrying investments by the fund

6  would be lower and, therefore, lower asset value at the fund

7  level would mean lower management fees to the management

8  company because at some point the management fees are a

9  function of the value of the fund.

10     Q.    But the management fees paid to Landmark Partners,

11  Incorporated are different from the carried interest that Mr.

12  Fiebach went through?

13     A.    Yes, they are.

14          MR. KNOTT:  No further questions.

15          THE COURT:  You can step down, sir.

16          Why don't I see Mr. Bush and Mr. Fiebach at side-bar

17  just briefly.

18           (Whereupon, the following conference was held at

19  side-bar.)

20          THE COURT:  I understand that you are feeling ill

21  and would like to go early today.  You want to try to put him

22  on?

23          MR. BUSH:  I'd like to put the expert on.  I just

24  didn't want to put Mr. Stevens on.

25              (Side-bar concluded.)

 1            THE COURT:  So if the plaintiff would call its next

 2    witness, please.

 3            MR. KNOTT:  Your Honor, the plaintiff calls Dr. G.

 4    William Kennedy.

 5            G    W I L L I A M    K E N N E D Y,

 6    called as a witness by the Plaintiff, having been duly sworn

 7    by the Clerk, was examined and testified on his oath as

 8    follows:

 9            THE CLERK:  State your name, city and state, and

10    spell your last name for the record.

11            THE WITNESS:  I'm sorry, ma'am, name and?

12            THE CLERK:  State and city.

13            THE WITNESS:  It's G. William Kennedy, and I reside

14    at Walpole, Massachusetts.

15                     DIRECT EXAMINATION

16    BY MR. KNOTT:

17       Q.    Dr. Kennedy, where do you work?

18       A.    I work at Berkley Research Group in their Boston

19    office.

20       Q.    What kind of company is Berkeley Research?

21       A.    It's a consulting firm.

22       Q.    What is your job title at Berkeley?

23       A.    I'm a Director at Berkeley Research.

24       Q.    What services do you perform in your work at

25    Berkeley?

1      A.     My area of expertise broadly is accounting; more

2  specifically, in valuation and forensic accounting matters.

3  I give either opinions of value of privately owned businesses

4  or opinions and testimony regarding issues such as lost

5  profits, valuation of business, accounting issues.

6      Q.     Do you have any professional certifications or

7  designations?

8      A.     Yes, I do.

9      Q.     What are those?

10     A.     I'm a Certified Public Accountant, and I also hold

11  the Accredited and Business Valuation or ABV designation

12  that's earned from the American Institute of Certified Public

13  Accountants of which I'm a member.

14     Q.     How do you get a CPA designation?

15     A.     You have to pass the uniform CPA exam that's

16  administered by the American Institute of Certified Public

17  Accountants.  It's a rigorous multi-day written examination

18  that accountants need to take and pass in order to have a CPA

19  designation.

20     Q.     And how do you get the ABV designation?

21     A.     It's also administered by the American Institute of

22  Certified Public Accountants, and there's a day-long written

23  examination that you need to pass.  And in order to sit for

24  the written examination you have to have certain amounts of

25  experience and training in the specific field.

1      Q.    Is it important to understand the finances of a

2   business in order to receive those designations?

3      A.    Yes.  A very important element of the curriculum

4   for having that both the CPA designation, obviously, and as

5   well as the Accredited and Business Valuation Designation is

6   understanding of financial statement, financial statement

7   analysis.

8      Q.    Please describe for the jury your education after

9   high school.

10     A.    I have a bachelor's degree in accounting from the

11  University of Illinois.  I also have master's degree in

12  accounting from the University of Illinois.  And I have a PhD

13  in finance from the St. Louis University.

14     Q.    What did you have to do to receive your PhD?

15     A.    Multiple steps in the program.  I had to take

16  graduate level course work for two, two and a half years,

17  three years.  Had to then pass a comprehensive oral

18  examination on the major and minor fields in my study.  That

19  admitted me to what's called a dissertation phase, and then

20  for the next year researching and writing on original work to

21  create a dissertation.  And then at the end of the

22  dissertation phase when the document was written, and it was

23  multiple factors, five, seven chapters, if I recall, I had to

24  pass and go before a dissertation committee and pass, again,

25  a dissertation test, oral exam.  Having concluded all of

1   those steps, the dissertation committee said it was okay and

2   the university granted the Ph.D.

3        Q.    Have you presented on the issue of financial

4   analysis?

5        A.    Yes, many times.  I do a lot of teaching of CPA's

6   for the American Institute of Certified Public Accountants,

7   and every year I'm a speaker at their national conference.

8        Q.    Have you been hired to analyze the finances of

9   businesses?

10       A.    In my 35 plus years it has been the focus either as

11   an auditor in the first decade of my career or, in the last

12   decade, decade and a half, doing financial analysis of

13   companies financial statements.

14       Q.    Do you have expertise in calculating the profits of

15   a business?

16       A.    Yes.

17       Q.    What is that expertise?

18       A.    Well, it goes all the way back to the beginning of

19   my career.  I was an auditor for ten years with two of the

20   international CPA firms, Ernst & Young and KPMG, where I

21   analyzed the books and records in the internal controls of

22   companies, and then step after that analyzing the financial

23   statements and the presentation of those financial statements

24   to determine if they were presented in accordance WITH

25   generally accepted accounting principles or GAP.  In the last

1    decade and a half of my career then using those financial

2    statements for purposes of analyzing the performances of

3    business in my consulting career.

4         Q.    Have you ever been qualified as an expert to

5    testify in court about the profits of a business?

6         A.    Yes.

7         Q.    You were engaged by the plaintiff, Gary Stevens, in

8    this matter, is that correct?

9         A.    Yes, that's correct.

10        Q.    Is Berkeley receiving a fee for your work?

11        A.    Yes, they are.

12        Q.    What's the hourly rate that Berkeley is charging

13   for your work?

14        A.    My firm is billing $575 an hour for the time I

15   spend on the matter.

16        Q.    Does the outcome of the case affect the rate that

17   Berkeley's paid?

18        A.    No, it's strictly a financial arrangement.

19             MR. KNOTT:  Your Honor, at this time I tender

20   Dr. Kennedy as an expert in the area of finance and economic

21   damages.

22             MR. FIEBACH:  No objection, your Honor.

23             THE COURT:  All right.

24        Q.    Dr. Kennedy, what was your assignment in this case

25   as it pertains to your testimony today?

1    A.    I was asked to calculate what the 10 percent of the

2    profits of Landmark over the period 2004 to 2008.

3    Q.    What kind of business is Landmark?

4    A.    They're an investment advisory firm.

5    Q.    How does Landmark generate profits?

6    A.    I think we've heard a lot of testimony about that

7    already, at least what I've heard today, but the advisory

8    fees that it generates for money under management is the

9    principal revenue source, and then the cost that it incurs,

10   labor costs, occupancy costs, those other categories.

11   Q.    What materials did you review in order to form an

12   opinion on the profits of Landmark?

13   A.    The audited financial statements for the company

14   over the -- for each of the years 2004 through 2008.  They're

15   audited financial statements in the footnotes thereto.

16   Q.    What years of profits were you able to measure?

17   A.    2004, 5, 6, 7 and 8.

18   Q.    Why didn't you look at later years?

19   A.    Those were the only financial statements that were

20   made available to me.

21   Q.    On the audited financial statements that you looked

22   at, does it show profits of Landmark Partners,

23   Incorporated?

24   A.    Yes, it does.

25   Q.    And what -- how does it show that?

1        A.    On the income statement.  The standard income

2   statement presentation, the revenues, various categories of

3   expenses, and net income is the bottom line.

4        Q.    Did you calculate 10 percent of Landmark's profits

5   using the net income measure?

6        A.    Yes, I did.  Using the net income as reported on

7   the audited financial statements.

8        Q.    And can you tell us what you did to calculate

9   that?

10       A.    Yes.  I was aware that Mr. Stevens joined Landmark

11  in May of 2004.  So for the year 2004, I prorated the total

12  2004 net income for only the seven months that he was

13  employed there.  I did note that at the end or toward the end

14  of 2004, the company added another fund which increased its

15  money under management.  So although I took a straight

16  average of seven months, it was probably accelerating some of

17  its revenue toward the latter half of the year, but I didn't

18  make an adjustment for that.  And then for the whole years of

19  2005, 6, 7 and 8, I referenced the income statement that was

20  part of the audited financial statements, took those five

21  numbers, the prorated 04 and then the full years for 5, 6, 7

22  and 8, added them up, and then multiplied by 10 percent to

23  calculate 10 percent of those profits.

24       Q.    Did you prorate for the time in 2008 when

25  Mr. Stevens was not working at Landmark?

1      A.    No, I did not.

2      Q.    And what's your understanding of what that time

3   period was?

4      A.    I understood that he left the firm in November, and

5   I didn't make a proration for the last month with the thought

6   that, you know, but for whatever is the claims at issue in

7   this case, he would have still been employed then.

8           MR. FIEBACH:  Your Honor, I move to strike.  That's

9   not in his report.

10          THE COURT:  Overruled.

11     Q.    And do you have a slide with you that shows the

12  jury the results of your calculation electronically?

13     A.    I don't know.  I guess we do.

14          MR. KNOTT:  Plaintiff's Exhibit 101, please.

15          MR. KNOTT:  May we publish that to the jury, your

16  Honor?

17          THE COURT:  This is the demonstrative?

18          MR. KNOTT:  Yes.

19          THE COURT:  Is there an objection, Mr. Fiebach?

20          MR. FIEBACH:  I just want to get it out and look at

21  it.  I think I know what it is.

22          No objection, your Honor.

23          THE COURT:  You may publish it to the jury.

24     Q.    Dr. Kennedy, can you tell the jury what this slide

25  shows?

1      A.     Yes.   What the slide shows is for the years 2005,

2  6, 7 and 8, those values represent the net income reported by

3  Landmark on their audited financial statements, on the income

4  statement that was contained within their audited financial

5  statements.

6           For the year 2004, their reported net income was

7  just above seven million dollars.  And doing the proration

8  for seven months from the May 20 start date, May 2004 start

9  date until the end of the calendar year.  So prorating for

10  seven months, $4,114,862.  And that represents the proration

11  of the full year 2004 net income for only those seven months.

12  And then what I simply did was added up the individual years

13  to total the aggregate net income earned over that period of

14  2004, 2008 by Landmark of $53,300,741.  And then took 10

15  percent of that, which is $5,330,074.

16      Q.     So using the net income profit measure 10 percent

17  of the profits of Landmark during the 2004 - 2008 time period

18  you measured was $5,330,074, is that correct?

19      A.     Yes.

20           MR. KNOTT:  No further questions.

21                       CROSS-EXAMINATION

22  BY MR. FIEBACH:

23      Q.     Good afternoon, Dr. Kennedy.  How are you?

24      A.     Good afternoon.  Very well, thank you.

25      Q.     I wanted to ask you first about this calculation

1    for the year 2008.  You're aware that Mr. Stevens was not

2    employed for the full year of 2008?

3        A.    Yes.  It's my understanding he left sometime in

4    November of that year.

5        Q.    For 2004, he wasn't employed for the full year and

6    you prorated it?

7        A.    He hadn't started with the firm until May 20, 2004,

8    I believe.

9        Q.    So you calculated this net income and prorated it

10   based on a period of time in 2004 that he was employed?

11       A.    Starting with approximately his employment date,

12   yes, that's correct.

13       Q.    But for 2008, you carried it through beyond the

14   time when he was employed?

15       A.    Through the full year 2008, that's correct.

16       Q.    Do you have a calculation as to what, if you had

17   prorated, what that would reduce your calculation by?

18       A.    I don't.

19       Q.    Can you do it?

20       A.    In my head, likely not.

21       Q.    November 6th was the date.

22       A.    I'm sorry, what am I to be doing now?

23       Q.    Calculate, if you prorated for 2008, what would it

24   reduce your 5,330,000 number to?

25       A.    I'm also going to have to resort to glasses up

1    here.

2         Q.    Okay.

3         A.    I'm sorry.  What was the -- approximately the 1st

4    of November?

5         Q.    6th of November, sir.

6         A.    I'm not sure how this calculator works.

7               May I turn -- I'm not getting this to work for me.

8    May I turn on my iPhone?  I've got a calculator on there I

9    know how to use.

10              THE COURT:  Sure.  Take your time, sir.

11        A.    I apologize for this, your Honor.

12              Just using two months out of the twelve months, I'm

13   getting about 1.2 million.  For some reason it doesn't look

14   right to me.  Let me do that again.

15        Q.    Would it be 120,000?

16        A.    There you go.  Slipped a digit.

17        Q.    So you would reduce the 5,330,000 to 5,210,000?

18        A.    That would be the math of that.

19        Q.    Now, I want to ask you some questions.  You said

20   you're presently employed by Berkeley.  How long have you

21   been involved in this case?

22        A.    Quite a while.  From fairly early on in the case.

23   I changed employers at the beginning of this year.

24        Q.    What was your prior employer?

25        A.    I was with FTI Consulting.

1      Q.    And what did they charge per hour for your

2  services?

3      A.    The same rate, I believe.

4      Q.    535 an hour?

5      A.    575.

6      Q.    And how much did you -- did FTI incur in expenses

7  for your services and any backup services in connection with

8  this case, the fees that they billed?

9      A.    I have no idea.

10     Q.    You have no idea?

11     A.    Correct.

12     Q.    And what were the fees that Berkeley has billed in

13 this case?

14     A.    Same answer.  I'm not even sure if Berkeley

15 submitted an invoice.

16     Q.    And how much has been incurred?

17     A.    That, I don't know.

18     Q.    How much of your time was incurred while you were

19 employed by FTI?

20     A.    It wasn't something I looked up.  I don't have any

21 idea as I'm sitting here right now.

22     Q.    How many times have you testified in court,

23 Dr. Kennedy?

24     A.    Several dozen.

25     Q.    Haven't you always been asked that question, what

1    your fees were?

2        A.    I can't recall I have, no.

3        Q.    Never asked that question before?

4        A.    Not in open court, I can't recall that I have.

5        Q.    Been asked in depositionss?

6        A.    I have occasionally in depositions.

7        Q.    And you didn't think it was appropriate to check

8    before you came in here as to what total amounts were -- have

9    been billed on your behalf for your services by your present

10   and your past employer?

11       A.    No, sir, I didn't.

12       Q.    As I understand it, you were asked to calculate

13   10 percent of the net income of Landmark?

14       A.    That was what I was asked to do, that's correct.

15       Q.    Who asked you to do that?

16       A.    Counsel for Mr. Stevens.

17       Q.    Plaintiff's Exhibit 31, for example, has the

18   statement of operations for Landmark Partners.  Can we put

19   that up?  It would be P-31, page three of the document.

20             And so what you would do there --

21             Let's focus in on the bottom number, 7,054,049.

22   You took that number, you prorated it, and that was your

23   4,114,862?

24       A.    Yes.

25       Q.    And you did that, and then without prorating, you

```
1    just looked at the financial statements, took the remaining

2    years, 2005 through 2008, copied the net income number on to

3    your chart, added it up and divided by 10?

4         A.    Yes, or multiplied by 10 percent.  Yes.

5         Q.    Now, I want to ask you to focus on the line on this

6    document that says income from operations before

7    non-operating income.

8              THE COURT:  Excuse me, Mr. Fiebach, we did promise

9    the ladies and gentlemen of the jury that we'd break at

10   three.

11             MR. FIEBACH:  Trying hard to finish the witness.

12             THE COURT:  I appreciate that and, I'm sure he does,

13   too, but it sounds like you have a little bit ways to go.

14             So we're going to break for the day, ladies and

15   gentlemen, and I will just remind you again not to

16   communicate with anyone else about the case or about anyone

17   who has anything to do with the case when you go until the

18   trial has ended and you've been discharged.  Again, that

19   includes even members of your family.  You certainly may tell

20   them you're serving on a jury, but don't tell them anything

21   else about it until you've been discharged.  Again, don't

22   check on the Internet, don't do any investigation about the

23   case.  Don't look anything up about anything or anyone you've

24   seen or heard here today.

25             With that, if you could stand and and I'll let you
```

1    go and see you tomorrow morning at 9:00.

2          (Jury out at 3:00, p.m.)

3          THE COURT:  You can step down, sir.  Thank you.

4          All right.  Be seated, please.

5          Let's talk a little bit about what's on tap for

6    tomorrow.

7          Mr. Fiebach, what's your estimate for how much

8    longer you have with Dr. Kennedy?

9          MR. FIEBACH:  About a half an hour, your Honor.

10          THE COURT:  That's what I figured.  And then we'll

11   begin after that with Mr. Stevens, is that right?

12          MR. BUSH:  That's correct, your Honor.

13          THE COURT:  And will the plaintiff be calling any

14   other witnesses tomorrow?

15          MR. BUSH:  I don't think so.

16          THE COURT:  At that point you'll rest?

17          MR. BUSH:  I think so.  I would like to have the

18   opportunity to review what's happened today and see if we may

19   want to call Mr. Borges, but that's not my current intent.

20          THE COURT:  What I would request or I would order is

21   that you notify defendant's counsel if you do intend to this

22   evening, if you do intend to call Mr. Borges.

23          MR. BUSH:  We'll absolutely do that.

24          THE COURT:  Let's have that understanding throughout

25   the trial, that counsel will notify opposing counsel of

1    witnesses they intend to call the following day.

2          MR. FIEBACH:  Your Honor, we have that

3    understanding.  And if he does not call Mr. Borges,

4    Mr. Borges will be our first witness, assuming the survival

5    of a motion at the end of the plaintiff's case.

6          THE COURT:  And being ambitious, maybe we'll even

7    get past Mr. Borges today.  If we do, who will be next?

8          MR. FIEBACH:  Haviland.

9          THE COURT:  That's helpful.  I have read the parties

10    submissions regarding Mr. Glusman.  I want to think on it a

11    little more.  We'll probably have time to take that up.

12    Actually, why don't we take that up tomorrow morning.  Why

13    don't we take that up at 8:30 tomorrow morning.

14          And I'm just trying to remember if there was

15    anything else like that that was outstanding.  I can't think

16    of anything.

17          MR. BUSH:  The only thing I can think of is the

18    lingering issue about settlement documents which I think may

19    come up.

20          THE COURT:  We had one of those today.

21          MR. BUSH:  I think they may come up more tomorrow.

22          THE COURT:  I'll take a look at the others.

23          In that case, we stand in recess.

24          MR. BUSH:  I'm sorry, there is one other thing.  We

25    got some demonstratives which I think I mentioned earlier in

1  the day, but I'm sorry if I didn't, and they were not

2  legible.  We just got hard copies of them and I still haven't

3  really been able to sort through them because we've been in

4  trial all day.  I think those may be related to the objection

5  we have to Mr. Glusman's supplemental testimony, but I need

6  to get some clarity from defense counsel what they really say

7  because they have some fairly detailed calculations behind

8  them and, to use your Honor's terms, they don't look very

9  straightforward to me.  So far I haven't been able to

10  understand them.  I think we will have an objection to those,

11  but I would like to at least hear what they're supposed to be

12  saying.

13          THE COURT:  Well, I propose that we try to take that

14  up after we have our initial discussion at 8:30, if we have

15  time, otherwise, we'll have to do it at the first break.

16          THE COURT:  Okay.  We'll stand in recess.

17          (Court adjourned.)

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3         I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    of my original stenotype notes taken in the matter of Stevens

6    v. Landmark Partners, which was held before the Honorable

7    Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,

8    Connecticut, on April 22, 2013.

9

10

11

12                          _____
                            Martha C. Marshall, RMR,CRR
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                          I   N   D   E   X

 3
      PLAINTIFF'S WITNESSES:
 4
      ANTHONY LOPINTO
 5    Direct Examination              39, 90
      Cross-Examination               72
 6
      TIMOTHY L. HAVILAND
 7    Direct Examination              96, 185
      Cross-Examination               180
 8
      G. WILLIAM KENNEDY
 9    Direct Examination              187
      Cross-Examination               195
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```