```
 1    UNITED STATES DISTRICT COURT

 2    DISTRICT OF CONNECTICUT

 3
      GARY P. STEVENS,            )
 4              Plaintiff,   )           NO: 3:09CV498(MPS)
                                 )
 5    vs.                        )
                                 )           April 23, 2013
 6    LANDMARK PARTNERS, INC.,    )
                Defendants. )
 7    _____           VOLUME II

 8                        450 Main Street
                        Hartford, Connecticut
 9
                  T R I A L   B Y   J U R Y
10
      B E F O R E:
11          THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

12
      A P P E A R A N C E S:
13
      For the Plaintiff :        GRAEME W. BUSH, ESQUIRE
14                               JASON M. KNOTT, ESQUIRE
                                 Zuckerman Spaeder LLP-DC
15                               1800 M Street, N.W., Suite 1000
                                 Washington, DC 20036
16

17    For the Defendant:        H. ROBERT FIEBACH, ESQUIRE
                                 ROBERT V. DELL'OSA, ESQUIRE
18                               Cozen & O'Connor - PA
                                 The Atrium
19                               1900 Market Street
                                 Third Floor
20                               Philadelphia, PA 19103

21                               JOHN F. DRONEY, JR., ESQUIRE
                                 JEFFREY J. MIRMAN, ESQUIRE
22                               Hinckley, Allen & Snyder, LLP
                                 20 Church Street, 18th Floor
23                               Hartford, CT 06103

24    Court Reporter:           Martha C. Marshall, RMR, CRR

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

1          THE COURT:  Good morning.

2          A couple of things to do this morning so I think

3  we'll just get right into it.  I have a ruling on the Motion

4  to Preclude In Part the Supplemental Opinions of Defendant's

5  Expert Mr. Glusman.

6          Plaintiff asked the Court to exclude three separate

7  opinions.  First, Mr. Glusman's supplemental report includes

8  the opinion that "There is no definitive basis on which to

9  opine that Mr. Stevens was entitled to a 10 percent interest

10  in the total earnings of Landmark."  I agree with the

11  plaintiff that this opinion must be excluded.  Whether

12  Mr. Stevens was entitled to 10 percent interest in the total

13  earnings is a question for the jury.  In allowing

14  Mr. Glusman, in effect, to opine about the meaning of the

15  contract would invade the province of the jury to determine

16  what Landmark's obligations were under the 2004 agreement.

17  An expert may not offer legal opinions as to the meaning of

18  the contractual terms at issue.  For example, see the *Marx*

19  case 55 -- I think it's 550 F.2d at 509.

20          Similar principles apply with respect to the second

21  opinion that plaintiff challenges.  Mr. Glusman's opinion

22  that if the jury determines that Mr. Stevens' is entitled to

23  10 percent of Landmark's profits then he would opine "It

24  should be based on income from operations."  In my view, this

25  opinion, again, usurps the jury's role to determine the

1  meaning of the contract and tells the jurors how they should

2  interpret the term "profit sharing" in the May 20th, 2004

3  agreement.  To be clear, however, I am not entirely

4  foreclosing Mr. Glusman from testifying as to operating

5  income.  First, Mr. Glusman may calculate for the jury

6  10 percent of operating income and he can show the jury what

7  the constituents of operating income are.  Mr. Haviland's

8  testimony from yesterday has already introduced the concept

9  to the jury and supplies a basis for the defendants asking

10  Mr. Glusman to provide this alternative profit calculation to

11  the jury.  Thus, Mr. Glusman can be asked, for example, to

12  assume that the parties intended, by using the term profit

13  sharing, that Mr. Stevens would share in operating profit

14  rather than net income, but he cannot offer expert testimony

15  to support that proposition because that is a question of the

16  parties' intent.  Further, I have heard no evidence up to

17  now, at least, suggesting that the term profit sharing in the

18  parties agreement was a technical term or that there was a

19  custom or usage in the industry of which both sides were

20  aware associated with that term in an employment agreement.

21  While I do not exclude the possibility that such evidence

22  might be offered and that a foundation for these opinions

23  might be laid, I have not heard any such evidence as of yet.

24  I, therefore, grant plaintiff's motion with respect to this

25  continue as currently phrased.

1          Third, Mr. Glusman opines that "To the extent the

2   jury concludes that these profit participation bonuses

3   constituted the program referred to in the employment letter,

4   Mr. Stevens would have been paid $1,044,132."  I deny

5   plaintiff's motion as to this opinion.  Mr. Glusman is

6   explicit that his valuation only applies if the jury makes a

7   specific finding as to the meaning of program in the 2004

8   agreement.  And in the interest of fairness, having allowed

9   Dr. Kennedy to file a late supplemental opinion, I will not

10  bar this opinion as going beyond the scope of Dr. Kennedy's

11  supplemental opinion.

12          So plaintiff's motion is granted in part and denied

13  in part.

14          I want to discuss another issue which we began

15  discussing the other day and that has to do with the, I guess

16  what I'll call for lack of a better phrase, the election of

17  remedies issue between the two claims.

18          I think the issue is going to come up both in the

19  instructions and in the crafting of the verdict form which

20  we've been working on.  I'd be interested in the parties

21  views -- well, before I get to that.  My current thinking is

22  that with regard to prejudgment interest, which obviously

23  relates to the issue that, number one, I was incorrect the

24  other day, I did check the law, and in Connecticut the jury

25  does make the predicate findings for a determination of

1    prejudgment interest when an award of prejudgment interest is

2    appropriate.  So, for example, the jury instructions I've

3    seen in this district in several cases, including a Judge

4    Underhill case called *Retepromaca* and Judge Kravitz's case

5    called *Crane (ph)*.

6           In those cases, the Judge Underhill case commented

7    that the issue should have been presented to the jury.  And

8    in Judge Kravitz's case, the issue of the predicate findings

9    of wrongful withholding and the date of the wrongful

10   withholding were presented to the jury.  But it appears that

11   the Court actually selects the interest rate to be applied.

12   So it's sort of a mixed law, a set of law in equitable

13   findings.

14          My inclination also at this time is to allow

15   prejudgment interest or to have those findings made only with

16   respect to the breach of contract claim and not with respect

17   to the tort claim.  So that leaves us, I think, in the

18   following situation.

19          I think that leaves us in a situation where assuming

20   the plaintiff prevails on both counts, number one, we're not

21   going to have a final number from the jury because of the

22   point I made about the Court selecting the interest rate and,

23   number two, we're going to have to face the question of how

24   to choose and who chooses between two damages amounts.  And

25   so I would be interested in the parties views on those

1  issues.

2          MR. BUSH:  Good morning, your Honor.

3          THE COURT:  Good morning.

4          MR. BUSH:  I think this is one of those occasions

5  where we may actually agree with what I believe was one of

6  the alternative proposals that the defense has made which

7  would be that once the jury has rendered a verdict, including

8  a verdict on whether or not prejudgment interest is awarded

9  or is available to be awarded, I guess your Honor would award

10  the amount on Count One, that we would then make an election

11  which one to go forward on, I guess is the way I would put

12  it, to have judgment entered on.

13          When we were uncertain what your Honor was going to

14  do with respect to the award of prejudgment interest, we were

15  going to suggest that we get that ruling after the verdict,

16  whether or not prejudgment interest was going to be awarded

17  on both counts and then make the election, but you've already

18  done that.  So I think that makes the most sense rather than

19  having the jury select simply the largest number.

20          THE COURT:  Mr. Fiebach.

21          MR. FIEBACH:  Good morning, your Honor.

22          THE COURT:  Good morning.

23          MR. FIEBACH:  Of course, I'm confident that we're

24  talking about a moot point here.  But, your Honor, we never

25  got a chance to express to the Court our view and you never

1    heard us on why we think prejudgment interest is

2    inappropriate here because you had initially said that that

3    would be something that you would later make a decision on.

4    And we think that -- and we would object to -- we do object

5    to any instruction to the jury that allows them to return a

6    verdict that would include prejudgment interest because of

7    the unusual history of this case.

8         At no time, your Honor, until just very recently,

9    did the plaintiff seek damages that are in the realm of what

10   we're now talking about in this case.  Before that their

11   damage calculation, based on their belief that they had a

12   right to own the company, was in the range of 21 to 33

13   million dollars.  And I think -- and the jury's not going to

14   know that, and the jury therefore doesn't have a basis for

15   determining the equitable basis for the withholding.

16        I think within the context of this case, your Honor,

17   to award -- to allow the jury to make findings with respect

18   to prejudgment interest given the fact that at no time was

19   there ever even a demand in this case in the five million

20   dollar range until we got to the eve of trial, that it would

21   be inappropriate even if the jury awards the full 5.3 that

22   Dr. Kennedy testified to, it would be improper to award

23   prejudgment interest.

24        If, however, the Court does decide to submit it to

25   the jury, we think the election of remedies should be made

1    before the case goes to the jury, but in the event the

2    Court -- and I don't want to reargue what we argued about

3    that the last time, but in the event that the Court disagrees

4    with us, then I do agree with Mr. Bush's agreement with me

5    that the election should be made by the plaintiff and not by

6    the jury.

7              THE COURT:  Let me make sure, a couple things,

8    Mr. Fiebach by way of follow-up.

9              So first you make the point that, as I understand

10   it, because up until a month or two ago the claimed amount of

11   damages was based on a valuation of an ownership interest in

12   Landmark and that number was many times higher than the

13   numbers that are being talked about now, that even if that

14   sum was liquidated or clear, Landmark cannot be found, and I

15   shouldn't even submit to the jury the question of whether

16   some smaller amount was wrongfully withheld because there was

17   never a question of withholding a smaller amount.

18             MR. FIEBACH:  That's correct, your Honor.  If we had

19   tendered a check to the plaintiff for 5.3 million dollars and

20   asked for a release we wouldn't have gotten it.  And so there

21   was no way we could have paid that amount and had this

22   dispute go away.  So we were not unlawfully withholding 5.3

23   million.  We weren't asked for 5.3 million, we were asked for

24   30 million.

25             THE COURT:  Mr. Bush, do you want to be heard?

1          MR. BUSH:  I sure do.

2          Your Honor, I'm really quite mystified by this

3   argument.  Prejudgment interest was demanded in the

4   complaint, all of the versions of the complaint, and it

5   is -- while it is true that we have asked for elements of

6   damages that have added up to a larger amount, we've also had

7   in Mr. Kennedy's -- Dr. Kennedy's first report, one

8   computation of damages that was based on shareholder

9   distributions.  That is money that would have been paid out

10  in each year, at the end of each year, to people who were

11  shareholders.  So that was an amount that's actually slightly

12  less than what the current amount is that Mr. Kennedy has

13  spoken about.

14         We never got an offer of judgment.  They've known

15  all along if you were talking about what they could have

16  done, they could have made an offer of judgment.  And if that

17  could have somehow cut off interest, then they should have

18  done it, but they didn't do it.  They've been on notice that

19  we're going to claim as one element of damages distributions

20  either that went to shareholders or that were profits of the

21  company, that's always been in the case.  There's been

22  litigation and discovery on it.  There's been expert opinion

23  on it.  It's now slightly different version of it, but it's

24  not something new.

25         I do think that there is an issue that maybe we get

1    to now or maybe we get to when we do the verdict form about

2    exactly how you ask the jury to determine the date, because

3    it's kind of complicated.  The profits are at the end of each

4    year.  And while you can say that to the jury, trying to get

5    really get them do that on a verdict form, we have struggled

6    with that little bit ourselves, how to ask for that date.

7           THE COURT:  Because it's multiple years.

8           MR. BUSH:  It's multiple years.  There is actually a

9    case -- I don't remember the name of the case --

10          THE COURT:  I'd be interested in the name of the

11   case.

12          MR. BUSH:  I'll get it.  Where it was a Connecticut

13   state court case, and it seems to be fairly similar in that

14   there were periodic payments that needed to be made.  And it

15   was a situation somewhat like this.  And the Judge in that

16   case made the decision on the dates.

17          Now, I don't know whether that was because of the

18   agreement of the parties or what, but I'm pretty sure that

19   the Judge made the decision in that case.  And we may

20   ultimately, I don't know if the defense would agree to this,

21   we may ultimately think that's the better way to go.

22          THE COURT:  On the first issue, I think what

23   Mr. Fiebach will tell me in response is, well, that initial

24   Kennedy report did not treat shareholder distributions as a

25   separate distinct category of damages.  What it did is it

1   said here's two different valuations of the company, and to

2   get the final damages you add the shareholder distributions

3   to A or B, and that's the final damages.

4           MR. BUSH:  I think he probably will say that.

5   Saying it doesn't make it exactly right.  We have in there

6   different calculations of damages.  It wasn't clear what the

7   Court was going to allow us to put in, and it wasn't clear

8   what the jury would accept.  So that was always an element

9   that could stand on its own two feet.  It wasn't something

10  that was necessarily part of the other two things.

11          THE COURT:  Right.  I guess it what I would --

12          MR. FIEBACH:  Your Honor, may I be heard on that,

13  because I think that is a misrepresentation.

14          THE COURT:  Go ahead, Mr. Fiebach.

15          MR. FIEBACH:  Dr. Kennedy testified in his

16  deposition just what you said, he did not say it was a free

17  standing calculation.  He testified that you take the

18  shareholder distributions and you add it to one of the two

19  values, depending upon which value you use, to get the total

20  damages.  And Mr. Bush is just wrong when he says it was a

21  free-standing one.  In the report itself we were surprised

22  when he testified that in his deposition, because when you

23  look at his report you can't tell that.  He doesn't say it in

24  his report, but he clearly said it in his deposition and we

25  can supply the Court with it certainly before this decision

1    has to be made, we can supply the Court with the

2    deposition.

3           THE COURT:  Actually, what I'd be at least as

4    interested in being supplied with is case law on the question

5    of whether the Court or the jury may award prejudgment

6    interest or has awarded prejudgment interest in situations

7    where either the damage theory changed or the amount that was

8    found to be withheld was smaller or considerably smaller than

9    what was demanded.  Because it strikes me that's where we

10   are.  And I'm not aware whether there are such cases.  I

11   don't foreclose there being such cases.  There may well be.

12   But it would be helpful to me in making this determination if

13   the parties could assist.

14          MR. FIEBACH:  We'll see if we can find it, but I

15   think what the case law does say it's an equitable issue.  So

16   that the jury's supposed to look at the equities.  In this

17   case, the jury -- there's a very important equity that the

18   jury's not going to know.

19          MR. BUSH:  I think this is a little bit of a

20   misleading presentation of how this case has evolved.  This

21   case has been in litigation since the end of 2004.  It's

22   always had a prejudgment interest claim in it.  The expert

23   opinion didn't -- wasn't even rendered until, what was it, I

24   think sometime last year.  So in terms of what exactly the

25   calculation was, there wasn't anything on the table just

1    because of the way the court -- the way the litigation went

2    and the motions practice went.  So to somehow say that

3    they've been lulled for all these many years into not making

4    an offer of judgment or not doing something.  Frankly, I'm

5    not really quite sure what the argument here is, that because

6    the damage theory changed that that somehow affects whether

7    prejudgment interest should be awarded.  I'd be interested to

8    see any case that articulates that that's, A, true and, B,

9    what the principal is, because I've never heard it before.

10           THE COURT:  I think what you'll find, if I recall

11   correctly, is that the cases on prejudgment interest,

12   unfortunately, there are no bright line rules.  And the

13   prototypical case that one thinks of under 3783 is a

14   collection case, there's a sum certain, it's withheld, boom,

15   they award prejudgment interest.  Those aren't the only

16   cases, though.  But I would be interested in learning about

17   cases that sort of approximate the facts of this case if

18   there are any.  So that's point one.

19           In the remaining time, though, so what I hear the

20   parties saying on the first question I raised is that should

21   the Court decide to submit the question of prejudgment

22   interest to the jury and not require an election before the

23   case goes to the jury, that the parties are in agreement that

24   the way to proceed is to have the jury make findings on both

25   claims, and then for the plaintiff to elect between the

1   negligent misrepresentation claim essentially and the breach

2   of contract claim.  Is that what both parties agree to in

3   that situation?

4           MR. FIEBACH:  Yes.  Assuming the Court doesn't agree

5   that the election should be made before it goes to the jury.

6           THE COURT:  Well, that's food for thought.  I'm

7   glad we got that out.

8           MR. BUSH:  I think, your Honor, that I should just

9   state for the record that we do object to the ruling that

10  that prejudgment interest would not be awarded on the

11  negligent misrepresentation.

12          THE COURT:  I understand.

13          MR. FIEBACH:  Your Honor, one housekeeping before

14  the jury comes in.  I didn't want you to be surprised.

15  Mr. Bush already knows this.  We're not going to have any

16  further questions for Dr. Kennedy.  We'll put that on the

17  record.

18          THE COURT:  Great.  So that means that our first

19  witness this morning, Mr. Bush, will be Mr. Stevens?

20          MR. BUSH:  That's correct, your Honor.

21          THE COURT:  Excellent.

22          I think it would be appropriate for me just to

23  inform the jury that we're done with Dr. Kennedy since we

24  left off in a way yesterday that did not suggest that we were

25  done.

1          MR. FIEBACH:  I can just say no further questions.

2          THE COURT:  That's fine.  Is Dr. Kennedy here?

3     Well, why don't we have you do that.  Sorry, sir, to have you

4     come up for that minor role.

5          MR. FIEBACH:  Your Honor, it's like that story if I

6     have more time I could write a shorter story.

7          (Jury in at 8:58.)

8          THE COURT:  Good morning, ladies and gentlemen.

9     Please be seated.

10         MR. FIEBACH:  Good morning, your Honor.

11         THE COURT:  Good morning.

12         MR. FIEBACH:  Your Honor, after having some time to

13    think about it overnight, we've decided we have no further

14    questions for Dr. Kennedy.

15         THE COURT:  All right.  Dr. Kennedy, you may step

16    down.  Thank you.

17         Mr. Bush, you may call your next witness.

18         MR. BUSH:  Plaintiff calls Gary Stevens.

19              G A R Y   S T E V E N S,

20    the Plaintiff in the case, having been duly sworn by the

21    Clerk, was examined and testified on his oath as follows:

22         THE CLERK:  State your name, city and state, and

23    spell your last name for the record.

24         THE WITNESS:  My name is Gary P. Stevens, S T E V E

25    N S.  I'm from Chevy Chase, Maryland.

```
 1                    DIRECT EXAMINATION

 2   BY MR. BUSH:

 3        Q.    Good morning, Mr. Stevens.

 4        A.    Good morning.

 5        Q.    Where were you born?

 6        A.    I was born in Madison, Wisconsin.

 7        Q.    What's your birth year?

 8        A.    1949.

 9        Q.    Did you go to college?

10        A.    I did.

11        Q.    Where did you go?

12        A.    I went to Cornell University.

13        Q.    And did you graduate?

14        A.    I did.

15        Q.    When did you graduate?

16        A.    1973.

17        Q.    Did you do any post-graduate work?

18        A.    I did.  I went to law school at Cornell as well.

19        Q.    And you graduated?

20        A.    In '76, yes.

21        Q.    Are you married?

22        A.    I am.

23        Q.    How long have you been married?

24        A.    I've been married for 40 years to the same

25   person.
```

1    Q.    How many children?

2    A.    Three.  I have three sons.

3    Q.    What did you do after law school?

4    A.    I went to work for a law firm in Washington, D.C.

5    Q.    What was the name of that firm?

6    A.    Melrod, Redman & Gartlan.

7    Q.    How long were you there?

8    A.    I was only thereabout six months.

9    Q.    What did you do after you left Melrod?

10   A.    Well, I worked at another law firm called Aronoff,

11   A R O N O F F, David, which split off from another firm.

12   Q.    What kind of legal work did Aronoff and David do?

13   A.    Real estate transactional work primarily.

14   Q.    What kind of work did you do at the firm?

15   A.    The same.

16   Q.    Were you a partner in that firm?

17   A.    Yes.

18   Q.    And how long were you at the firm?

19   A.    From early 1977 through the end of 1984.

20   Q.    What did you do after you left Aronoff and David?

21   A.    I went to work for my largest client at the time.

22   Q.    What was the client?

23   A.    Called the Artery Organization.

24   Q.    What is the Artery Organization?  What was it?

25   A.    At the time it was one of the larger real estate

1    development construction management firms in the Washington,

2    D.C. area single family, multi-family, office buildings,

3    retail, hotel, everything across the gamut.

4         Q.    How many employees did it have?

5         A.    I think at the time we had about 400 maybe.

6         Q.    What was your position?

7         A.    I had several positions.  I came in as senior

8    vice-president and general counsel.  I did many different

9    jobs.  I ended up being a partner in that firm.

10        Q.    How long were you at Artery?

11        A.    From the start of 1985 until about the middle of

12   1991.

13        Q.    What did you do after you left?

14        A.    I went to work for a firm that had also been a

15   client of mine called the J.E. Robert Company.

16        Q.    How did you come to join J.E. Robert?

17        A.    J.E. Robert at the time was solely owned by a man

18   named Joe Robert.  I'd been close with Joe and his personal

19   attorney in my law practice, and in 1984 the last thing I did

20   for him was a contract with the FSLIC, that means the Federal

21   Savings and Loan Insurance Corporation.  And in 1984, the

22   FSLIC had taken over an S&L, Savings and Loan Association,

23   that had gone bankrupt in the Chicago area and it was a start

24   of a series of closures where the government closed down

25   S&L's.  I had done the first deal with FSLIC to have a

1    private company manage the mess that was inherited when the

2    government had to close this S&L.

3            In the five years or so that I was at Artery, the

4    FSLIC had gone bankrupt along with the S&L's and there was a

5    new organization called the RTC, the Resolution Trust

6    Corporation, that had taken -- the government had set up to

7    take over for the FSLIC and manage this huge real estate mess

8    that we had in the late '80's and early '90's.

9            Joe had become the largest contractor for the RTC,

10   essentially using the contract I had done in 1984.  So I knew

11   a lot about that business.  Joe called me up and said, look,

12   you're kind of the guy I need here and the government has

13   just made a decision that instead of hiring firms like mine

14   to manage these assets and sell them off one by one, they're

15   going to do a new aggressive program called bulk sales and

16   they're going to try to sell hundreds, maybe even thousands

17   of assets at the same time in a single transaction to people

18   out there who want to buy them, and I need somebody who's

19   been -- who understands the RTC, who understands what the

20   problems are with these S&L's, and who can help us get

21   capital from Wall Street to buy these big portfolios for

22   price tags that are going to be very, very large.

23   Q.    What was the position you had when you joined J.E.

24   Robert?

25   A.    I had several different positions.  I came in as a

1    managing director.  We were actually partners with the

2    Blackstone Group initially.  So I had an office at

3    Blackstone, an office at J.E. Robert, and I was managing

4    director of the Blackstone Robert Group, as well as I think a

5    senior executive vice-president of J.E. Robert at the start.

6        Q.   And what role did you play at the firm after you

7    joined it?

8        A.    I was one of the really three senior people who

9    were figuring out how to manage this process of getting

10   capital out of Wall Street and taking -- hiring people from

11   around the country in various offices of J.E. Robert and

12   figuring out exactly what do you do when you have to buy a

13   portfolio with a thousand assets in it and you've got to do

14   due diligence in two months and pay 400 million dollars sixty

15   days later.  How do you do that?  That's pretty complicated.

16   We need lawyers, we need lots of underwriters.  It's a very,

17   very complicated process.  So my job initially was leading

18   the firm's efforts to figure out how to do that.

19       Q.   And did the job change?

20       A.    Yes, it did.  After we got that business pretty

21   stable and it was very successful, we turned out to be the

22   largest buyer of assets from the RTC.  We bought about ten

23   billion dollars worth of assets in five years.  Joe made me

24   the Chief Operating Officer of the company which meant that I

25   was also responsible for managing offices around the country

1    that were doing government work here in Connecticut,

2    including I was down in Milford, offices in Los Angeles,

3    Dallas, Houston, Ft. Lauderdale.  I was traveling a lot.

4        Q.    Was that the last position you held at J.E. Robert

5    before you left the company?

6        A.    I don't actually recall.  I recall that we then

7    started to think about ways to raise capital for ourselves,

8    raise private equity funds within J.E. Robert.  We had been

9    partnering with -- Goldman Sachs was our partner.  The

10   partnership at Blackstone had sort of fizzled for internal

11   problems.  We switched to Goldman.  Most of our money came

12   from there, although I set up another division that partnered

13   with some other Wall Street firms.  And we finally said we

14   should try to raise this capital on our own.

15       Q.    Did you have involvement in that?

16       A.    I did a little bit initially, and that was about in

17   1996 or so.  I don't actually remember my title at the very

18   end, but essentially -- I was less involved in some of the

19   operations of the business and more focused on how are we

20   going to raise this capital, how do we do that.

21       Q.    Did there come a time when you left J.E. Robert?

22       A.    Yes.

23       Q.    And when was that?

24       A.    It was in the first third or so of 1996.

25       Q.    What did you do?

1      A.    I joined the Carlyle Group.

2      Q.    What is the Carlyle group?

3      A.    The Carlyle Group is currently one of the largest

4   private equity firms in the world.  There's kind of two --

5   depends on whose closed the most recent funds, Blackstone or

6   Carlyle.  So a chance to go to Carlyle was pretty

7   interesting.  It's a global firm.  At the time it had a goal

8   of being global.  It only had corporate buyout funds, but it

9   said we want to get into the real estate fund business and we

10  want you to come here and start that up.

11     Q.    What was the position you had when you first joined

12  Carlyle?

13     A.    Managing Director.

14     Q.    What were your responsibilities?

15     A.    Well, my responsibility was to lead and manage the

16  Real Estate Fund Group.  So that meant --

17     Q.    What did you do?

18     A.    Raise money from institutional investors.  Got

19  commitments like the ones I think you heard a little bit

20  about yesterday.

21     Q.    How much money did you raise while you were at

22  Carlyle Group?

23     A.    About 1.5 billion in equity.  But just apples to

24  apples, in real estate when you hear Landmark's numbers, they

25  count debt in the amount invested.  They're not exactly

1    comparable.  If you count debt, it was about five billion

2    dollars in real estate in the time I was at Carlyle.

3         Q.    Did you have responsibilities for any of the

4    functions of the Real Estate Group at Carlyle?

5         A.    Yeah, I was responsible for all of it.  So I had to

6    get the capital, figure out how to invest the capital,

7    communicate with the investors, handling the lawyers and

8    manage it.  When I first started I think we had four other

9    people in real estate, that was it.

10        Q.    How many did you have two or three years later?

11        A.    35.

12        Q.    How big was the Real Estate Fund Group at Carlyle

13   when you came there?

14        A.    In terms of people, I was the fifth investment

15   professional.  In terms of money, I think they'd done a few

16   small deals.  Maybe they'd invested maybe a hundred million

17   dollars.

18        Q.    How much did Carlyle, the whole firm, have in

19   assets under management when you joined it?

20        A.    When I joined it, I'm not really sure of the

21   answer, but the order of magnitude was 400, 500 million

22   dollars.  They had either one or two buyout funds at the

23   time.

24        Q.    How much did it have in assets under management at

25   the time you left?

1       A.     Almost 20 billion dollars.

2       Q.     Let me shift gears here for just a second and we'll

3   come back to Carlyle.  Did you have any positions in industry

4   groups while you were at Carlyle?

5       A.     I did, yes.

6       Q.     Can you just tell the jury what some of the

7   positions were?

8       A.     I guess the one that people knew me for was that I

9   was the Chairman of the Tax Policy Committee with something

10  called the Real Estate Round Table.

11      Q.     What is that?

12      A.     Real estate Round Table is an organization in

13  Washington that attempts to get all of the different

14  professional groups related to real estate, the realtors, the

15  mortgage finance guys, the securitization guys, the property

16  owners, it attempts to get all of them in the room to

17  communicate to Congress and the White House with one voice, a

18  view on how proposed legislation affects the real estate

19  industry.

20      Q.     We heard some talk yesterday about Cornell, and you

21  testified that you graduated from both Cornell and Cornell

22  Law School.  Do you have any involvement with Cornell?

23      A.     Yes.

24      Q.     What's that involvement?

25      A.     I've been on the Advisory Board for the Cornell

1   Program in Real Estate since the inception of the program.

2   Do you want -- I could explain that.

3       Q.    Have you played any other role at the school in

4   that program?

5       A.    Yeah.  Basically the purpose of that group has been

6   to design a two-year master's degree program in real estate

7   that's distinguishable from all of the other undergraduate

8   and post-graduate educational programs that are out there for

9   real estate, because a lot of us thought that there were

10  areas that were important for real estate professionals to

11  know that weren't being addressed in the business schools or

12  in the other programs that were out there.  So we designed a

13  program.  I remain on the Advisory Board.  I'm a frequent

14  speaker there.  I guest lecture there.  I'm very involved in

15  that program, meet multiple times a year.

16      Q.    If we could go back to Carlyle for a minute.  Did

17  your responsibilities change or evolve over time at

18  Carlyle?

19      A.    Yes, they did.

20      Q.    And again, briefly, how did they evolve?

21      A.    Well, when I first started I was trying to do

22  everything that, as we grew, that became completely

23  impossible.  So I went to the founders of the firm and said,

24  look, we need another Managing Director in real estate.  This

25  is just too much.  And we were fortunate to attract a really

1    capable operational guy named Rob Stuckey who said I'll only

2    come if I can manage the group.  I was fine with that.  And

3    he really took over the operations part.  In other words, I

4    drifted more into capital raising and looking at new areas of

5    real estate investment.  David Rubenstein, the head of the

6    firm, asked me to look at some non-real estate areas as well.

7    But I basically drifted away from real estate operations.

8         Q.    And did there come a time when you decided to leave

9    Carlyle?

10        A.    I did.

11        Q.    About when was that?

12        A.    It was roughly a year before I joined Landmark.  So

13   it would have been 2003.

14        Q.    And why did you decide to leave Carlyle?

15        A.    There were several reasons.  I was interested in

16   starting some new kinds of real estate funds at Carlyle and

17   there was some disagreement within the firm about that.

18   David Rubenstein liked the idea a lot.  Specifically, I

19   helped get off the ground with real estate operation that was

20   just dedicated to Europe.  I took the first guy that I'd

21   hired in '96 and moved him to Asia.  He was a Korean American

22   and we moved him to Asia and started a Real Estate Asian

23   Group.  And then I had some other ideas for expanding new

24   fund operations under the Carlyle umbrella but there was

25   disagreement with that.  Rob Stuckey, my partner, really

1  didn't like the idea of having a separate team in Europe,

2  separate team in Asia.  Really didn't like the idea of having

3  additional teams in the United States doing different things.

4  It was an honest disagreement about what to do and David said

5  to me, look, don't get hung up on whether you're at Carlyle

6  or not --

7          MR. FIEBACH:  Excuse me, your Honor.  Objection to

8  hearsay, what David said to him.

9          THE COURT:  Sustained.

10          MR. BUSH:  Your Honor, it's not being introduced for

11  the truth of it.  He's describing --

12          THE COURT:  It's also not necessary.  Why don't we

13  move on.

14          THE WITNESS:  I got the impression from the founders

15  at Carlyle that they would give me the money to do whatever I

16  wanted to do whether I was in Carlyle or not.  So I decided

17  that pursuing one of those ideas was a better option than

18  staying.  And they said to me, look, you can keep all your

19  Carlyle investments.  You'll continue to vest.  You'll

20  continue to invest in our new deals, the same basis that the

21  employees now invest.  So why not.

22      Q.    Did you reach any kind of an agreement with Carlyle

23  with respect to your departure?

24      A.    I did.

25      Q.    And, in general, what was the agreement?

1       A.      The agreement -- we reached the agreement in sort

2    of I guess it was probably the fall of 2003, and the deal was

3    I was working on a specific transaction where I hoped to

4    acquire a controlling interest in a specific company.  And

5    the deal was I was going to work on that.  I could keep my

6    office at Carlyle, keep my email, keep my investments, stay

7    there, and ultimately they said how long.  I said, look, I

8    think this deal is going to be done at the end of the year.

9    How about the end of February.  So they said, okay, the end

10   of February 2004 I will go off of the payroll at Carlyle and

11   be doing something else.

12       Q.      Did you have the option before you made that

13   agreement with Carlyle to stay at Carlyle?

14       A.      Yes.

15       Q.      And, again, I don't need it to be a really long

16   answer but, in general, what would you have done if you had

17   stayed at Carlyle?

18           MR. FIEBACH:  Objection, that's hypothetical.

19           THE COURT:  Why don't you rephrase the question.

20       Q.      You said you had reason to believe that you could

21   have stayed there.  What was the basis for your reason to

22   believe you could have stayed there?

23       A.      David Rubenstein, the founder of the firm, told me

24   that.

25       Q.      Did you have any understanding of what kinds of

1   things you could have done if you had stayed there?

2      A.    David said, look, do whatever you want.

3   Specifically, you want to just join the fund raising team.

4   You know, he had showed me a list that said the top earners

5   in the firm were on the fund raising team.  So, yeah, okay,

6   you can just do fund raising not just for real estate, but

7   for everything.  You can come over to the corporate side, the

8   buyout funds, and start a new business group there in

9   possible retail.  You know a lot about retail real estate.

10  Why don't you consider doing that.  We've got this guy Dave

11  Cummings in the corporate group who is working on putting

12  someting together, that's involved in real estate.  Maybe you

13  can work with that.  There were lots of options.

14     Q.    You mentioned you were working on a particular deal

15  or interest in a particular deal while you were still at

16  Carlyle.  Can you explain to the jury what that deal was?

17  First of all, what was the company that was involved?

18     A.    It's called Brownfields Capital.

19     Q.    What business is that?

20     A.    It's in the business of financing environmentally

21  contaminated properties so that they can be cleaned up and be

22  developed in productive use.

23     Q.    What was your interest in that?

24     A.    My interest in the area?

25     Q.    In the company.  What was the name of the

1   company?

2       A.      Brownfields Capital.

3       Q.      Were you in negotiations with them or what were you

4   interested in with Brownfields?

5       A.      I initially started working with Brownfields trying

6   to see if there was an investment or investment area for

7   Carlyle in the business and, for a variety of reasons, that

8   wasn't going to work.  And so David had said to me -- I

9   introduced the owner to David.  He said this is a great idea.

10  I like this woman a lot.  I like what she's come up with.

11  She had some patents on the process, very interesting, very,

12  very creative.  And he said, why don't you pursue it on your

13  own.  I'll help you buy it.

14          So I worked with them on their first project which

15  was a contaminated cite in Richmond, Virginia.  We got the

16  approvals from the city government and we're ready to go and

17  I gave them a proposal to acquire a majority interest in the

18  firm.

19      Q.      And did that proposal ever realize into an actual

20  deal?

21      A.      No.

22      Q.      At some point did you learn that it wasn't going to

23  happen?

24      A.      Yes.

25      Q.      About when did you learn that?

1      A.      I had made the proposal in kind of mid December of

2   2003, didn't hear anything back.  I was nervous about it by

3   the end of the year.  And I learned sometime in January that

4   it really wasn't going to happen.

5      Q.      Did you look into any other opportunities that you

6   might pursue after you left Carlyle?

7      A.      When?

8      Q.      Let's start around the time that we're talking

9   about, before you left.

10     A.      No.  What happened was when it became clear that

11  that deal was not going to happen, I sort of took a breadth,

12  said, well, I don't need to do something right away.  I can

13  take my time, explore some options.  So this is January of

14  2004.  So I hadn't done anything when I first heard about the

15  Landmark opportunity.

16     Q.      Let's go to the Landmark opportunity.  How did

17  Landmark come to your attention?

18     A.      Tony LoPinto, who we met yesterday, called me up

19  sometime in late January, I think, of 2004.

20     Q.      Were you still at Carlyle?

21     A.      Yes.  Yeah, I was sitting in my office at Carlyle

22  when he called.

23     Q.      What did he tell you about Landmark?

24     A.      He said they're in the private equity secondary

25  business.  They're looking for someone to restart their real

1    estate operations.  They've had some problems, but they want

2    to restart it.  I think you're really well suited for this

3    position.

4        Q.    Had you heard of Landmark prior to talking to

5    Mr. LoPinto?

6        A.    I didn't recall having heard of Landmark.   In

7    retrospect, I had.  Yes, I had.

8        Q.    How had you heard of them?

9              MR. FIEBACH:  Objection, your Honor.

10             THE COURT:  Overruled.  How had he heard of them?

11   He can speak to that.

12             MR. FIEBACH:  There are certain items your Honor has

13   excluded.

14             THE COURT:  Why don't we come to side-bar briefly.

15   I'm not sure what you're referring to.

16       Q.    My question I think is how had you heard of

17   Landmark?

18             I said I couldn't recall -- that I didn't recall --

19       Q.    Exactly.

20       A.    Landmark had acquired interest in some of the funds

21   I'd raised and from, I think, J.P. Morgan Chase, one of the

22   investors in the funds I raised, and they acquired those

23   interests on a secondary basis.  In other words, they were

24   the second owner.  And I had approved that.  So I had seen it

25   and I'd said at the time who are these guys, Landmark,

1    they're in the secondary business.  I said, oh.  I didn't

2    recall that when Tony called me.  But later I realized, when

3    I started talking to Landmark I said, wait a minute, we own

4    some of your funds.

5          Q.    There's been other testimony, and you mentioned it,

6    about the word secondary.  What does the secondary market

7    mean?

8          A.    It means you're the second owner.  In other words,

9    the bank was the first owner.  They gave us the original

10   capital commitment.  We're in the fund.  We commit 10 or 20

11   million dollars, whatever it was.  And then it was Chase

12   Capital Partners.  Chase was acquired by J.P. Morgan.  J.P.

13   Morgan said we don't want these, we already have some, why

14   don't you sell it.  Landmark had acquired it on a secondary

15   basis.  They were the second owner of that privately traded

16   security.

17         Q.    Had you heard of Tim Haviland at this point?

18         A.    No.

19         Q.    Had you heard of Frank Borges at this point?

20         A.    No.

21         Q.    Had you heard what the size of Landmark was

22   compared to Carlyle?

23         A.    Yes.

24         Q.    What was it?  What was the comparison?

25         A.    Again, they count debt so it's a little bit hard to

1   go apples to apples.  I think in real estate Tony's

2   description said they'd raised -- I think he might have said

3   they raised a billion in real estate, and I think they were

4   maybe three and a half billion total at the time, something

5   like that.  In real estate and plus private equity, about

6   three and a half billion as far as I can remember.

7        Q.   And that compared to?

8        A.   About 20 billion in Carlyle.  But, I mean, the

9   context is in real estate alone I'd raised five billion in

10  total capitalization, and the firm at Landmark had raised

11  three and a half billion.  So for their business they were

12  pretty active, but it was a much smaller business.

13       Q.   Take a look at what's been marked and I think is in

14  evidence as Exhibit 4.  Plaintiff's Exhibit 4.

15       A.   Is that here?

16            MR. BUSH:  I'm sorry.

17            THE COURT:  It's a full exhibit.

18       Q.   Did Mr. LoPinto send you a copy of this?

19       A.   Yes.

20       Q.   Did he send that to you shortly after your first

21  conversation with him?

22       A.   Yeah.  Typically he gets a read on whether somebody

23  has any level of interest.  If not, he doesn't send this.  I

24  said, yeah, I'd be interested in seeing the position

25  description.

1      Q.     Did you review it?

2      A.     Yes.

3      Q.     Is there anything in particular that you focused on

4    when reviewing it?

5      A.     Yeah.  I mean, a little about Landmark first.

6    Second, the responsibilities, the key responsibilities of the

7    position on the second page.

8            MR. BUSH:  Can you pull up the key responsibilities

9    part on the second page.

10     Q.     Is that the section you're focused on?

11     A.     Yes.

12     Q.     And what did you focus on in that section?

13     A.     Really, each point.  I thought that I had good

14   experience to perform each of those responsibilities.

15     Q.     The third bullet point down, did you know any of

16   the institutional investors that Landmark dealt with?

17     A.     Yeah.  First of all, it refers to these consulting

18   firms.  I knew all of them very well.  And Tony had listed

19   for me Landmark's primary investors in real estate and I knew

20   probably eight of ten of them, some of them really well and

21   I'd gotten commitments from some of them.  So I thought

22   that's a pretty good fit.

23     Q.     In the second bullet point it refers to leadership

24   role in raising institutional capital.  Do you see that?

25     A.     Yes.

1      Q.    Did you think that was a good fit for you?

2      A.    I did.

3      Q.    Why?

4      A.    Well, as I indicated, I'd raised more institutional

5  capital just for real estate at Carlyle than Landmark had

6  raised for the whole firm.

7      Q.    And the last two bullet points, were those -- did

8  you think you were particularly suited to help in those?

9      A.    I did.  I thought I was pretty well recognized

10 across the country.  I spoke at conferences a lot.  And I was

11 very interested in participating in the management of the

12 whole firm.

13     Q.    Now, did you ultimately take a job at Landmark

14 Partners?

15     A.    Yes.

16     Q.    When did you do that?

17     A.    We reached an agreement in May of 2004, and I

18 started June 1, 2004, I believe.

19     Q.    So what did you do between -- in general -- we'll

20 talk about things in more detail but, in general, would you

21 tell the jury what you did between the time you first heard

22 about this opportunity, gotten the position description, and

23 when you made the agreement to join Landmark in order to

24 explore the opportunity?

25     A.    So we're talking about, roughly, February, March,

1    April.  For the first, roughly, month, I didn't really do

2    much.  I was still licking my wounds from my deal not falling

3    through and thinking about what I wanted to do next and

4    finishing up a bunch of stuff I had been working in at

5    Carlyle.  I had people coming in my office every day, hey,

6    before you leave, I need to know whatever.  So I did that for

7    about a month.

8            Tony and his partner Barbara Beck called me back and

9    said, Are you interested?  We really think this fits well.

10   Then I started to call some people, asked if they knew

11   Landmark, walked up and down the halls at Carlyle asking a

12   bunch of my partners if they knew Landmark, what they knew

13   about them.  Made some phone calls.  I did whatever research

14   I could about them and eventually I said to Tony I'm

15   interested enough to come up and meet these guys.

16   Q.    Did you have any conversations -- right now let's

17   just focus on the whole period but not get into the detail,

18   because we'll come back to that.  But did you have

19   conversations with Mr. LoPinto and Barbara Beck during the

20   period from when you first heard about it until you made the

21   agreement to come with Landmark?

22   A.    Yes, they checked in.  After maybe three weeks or

23   something like that went by before they called back.  So now

24   it's mid or probably late February.  And then they started

25   calling on a weekly or biweekly basis, if not more

1    frequently.

2        Q.    Did they give you any information about Landmark

3    and what it was looking for, what the problems were, if there

4    were any problems that Landmark was confronting?

5        A.    Yes.

6        Q.    What did they tell you about both of those

7    subjects?

8        A.    They said, look, this is a restart.  They had two

9    partners, owners in real estate and they left.  And that

10   meant that they triggered what was known as a key man clause

11   and that meant that they had to discontinue their investment

12   commitments and shut down the fund.  So this is a restart.

13   They've got some guys there.  They do not consider the people

14   who are still there as candidates for the lead position.

15   They need somebody to raise the capital, restore investor

16   conference, manage the group, and there's nobody here.  The

17   overhead's running and they don't have any money.

18       Q.    You said you did meet with some people at

19   Landmark?

20       A.    Yes.

21       Q.    Do you recall when you first met with anybody at

22   Landmark?

23       A.    I think it was probably in early March, but I'm not

24   sure of the precise date.

25       Q.    Did you have more than one meeting with people at

1    Landmark?

2         A.    Yes.

3         Q.    Were those meetings in Simsbury or were they in

4    various places?

5         A.    Mostly it was in Simsbury and there was a dinner

6    meeting we had that was elsewhere in -- I think it was in

7    Bloomfield, but mostly in Simsbury.  I think right at the end

8    we did have a dinner down in Washington with Frank and Tim,

9    but mostly in Simsbury.

10        Q.    And what were the nature of the discussions that

11   you had with the people at Landmark when you met with them?

12        A.    Well, it was getting to know you, do you like these

13   guys, do you trust these guys, are these guys you want to be

14   partners with.  I think that was going on both ways.

15        Q.    Were you finding anything out about the business

16   itself?

17        A.    Yeah.  I think I was asking them more about the

18   business and their history.  They were asking me for about my

19   experience and so forth.  That was the purpose, continuing

20   exploration, see if this was a good fit or not.

21        Q.    During that process, did you get copies of any of

22   their offering materials?

23        A.    Yeah, I did.  I said -- offering materials, these

24   are books that are printed up called PPM's or private

25   placement memoranda that typically are given to investors.

1   They're required under the securities laws.  And they are the

2   legal document that describes the securities offering.  So I

3   said, yeah, show me the PPM's for your real estate funds and

4   show me one of your private equity funds and let me look at

5   it, see what it says.  There tend to be disclosures in those

6   things that you might not mention in casual conversation.

7       Q.    How many real estate funds had Landmark raised

8   prior to the time you got there?

9       A.    It's hard to figure out, but I think the answer was

10  four.  The reason it was hard to figure out, Tim described

11  yesterday they used one kind of convention for all their

12  funds so that they ended up with Real Estate Fund I, it was

13  like Landmark Fund VI, and it confused people.  Ultimately

14  renumbered them and there were four before I started.

15      Q.    Were all of them secondary funds?

16      A.    No.

17      Q.    So what was the other one?

18      A.    The other one was a direct investment fund.  It was

19  very similar to what I had raised at Carlyle so I was

20  interested in that.

21      Q.    And what fund was that?

22      A.    I think ultimately we called it Real Estate Fund

23  III.  I'm not sure what the original convention was.

24      Q.    What amount of money had Landmark tried to raise?

25      A.    The cover said 250 million dollars.

1      Q.     How much had it raised?

2      A.     I asked them about it and at the time they said

3  about 25 million dollars.

4      Q.     Did you have discussions during these meetings

5  about the departure of Mr. Main?

6      A.     Yes.

7      Q.     And who is Mr. Main?

8      A.     Dick Main had been the senior partner in charge of

9  real estate, the primary person I understood myself to be

10  replacing before I got there.

11      Q.     And what were you told during these meetings about

12  his departure?

13      A.     Well, I was told several things.  One of them was

14  he wanted to go off on his own and he really wanted his own

15  operation, separate from Landmark.  And, I mean, I guess that

16  was the primary message.

17      Q.     Were there -- did you discuss whether there were

18  any consequences of his departure?

19      A.     Yeah.  I asked about the key man.  They said, yeah,

20  we had to discontinue the fund.  It's kind of complicated.

21  We actually had two parallel funds, one of them had a clear

22  key man, the other one didn't.  We thought about keeping one

23  going and closing the other one, but some people got really

24  upset about that and it was really clear that enough

25  investors were very upset that they weren't going to vote to

1    continue the fund.  So we didn't bother to go through with

2    the process of having a vote because we knew the embarrassing

3    outcome of that.

4        Q.    During any of these conversations that you had

5    before you got an offer to join Landmark, did you have any

6    discussion with the people at Landmark in these meetings

7    about compensation?

8        A.    Before I got an offer, no.

9        Q.    Before you got an offer?

10       A.    No.

11       Q.    Or about the terms on which you would come in?

12       A.    I don't recall any.  Well, I don't recall any

13   specifically, because there were two sets of communications

14   going on.  There was communication between me and Tony

15   LoPinto and Barbara Beck, the search firm, and communications

16   between Landmark and me.  The communications between Landmark

17   and me were primarily focused on let's get to know each

18   other, see if we want to work together, are these the kind of

19   people you want to work with.

20            The conversations between the search firm and me

21   were, okay, here's what I need to consider this position and,

22   you know, then more details around that.

23       Q.    So you had discussions with Mr. LoPinto and Barbara

24   Beck about if you were interested what you would need?

25       A.    Yes.

1      Q.    What did you tell them -- actually, let's do this a
2  little differently.  Let me ask you to turn to what's been
3  marked, but I believe is not in evidence, as Plaintiff's
4  Exhibit 10.  So I'm not sure that's up there.  Is that a
5  document that you prepared?
6      A.    Yes.
7            MR. FIEBACH:  Your Honor sustained our objection to
8  this document yesterday.
9            THE COURT:  Right.  He hasn't offered it yet.
10     Q.    Is that a document that you prepared?
11     A.    Yes.
12     Q.    Why did you prepare it?
13     A.    Either Tony or Barbara had said, look, we need to
14 tell Landmark what your current comp is.  Can you write
15 something up and give it to us.  This is what I produced.
16     Q.    How did you produce this, the information in this
17 document?
18     A.    I ended up just looking at my tax returns and
19 recording numbers and putting them on this document.
20     Q.    And what was your understanding that Mr. LoPinto
21 and Barbara Beck were going to do with the information that
22 you conveyed to them?
23     A.    Pass it on to Landmark.
24     Q.    And why were they going to do that?
25     A.    To give Landmark an idea of the level of

1    compensation, recent compensation I had had at

2    Landmark -- excuse me, at Carlyle.

3              MR. BUSH:  Move its admission, your Honor.

4              MR. FIEBACH:  Objection.

5              THE COURT:  Grounds?

6              MR. FIEBACH:  Best evidence rule, your Honor, with

7    respect to the compensation issues which are more than just

8    the background because of the damages issues.

9              THE COURT:  I'm going to overrule the objection on

10   that ground.

11             MR. FIEBACH:  May I -- parol evidence, your Honor.

12             THE COURT:  I'm going to overrule the objection on

13   that ground too.

14             MR. BUSH:  Is it in?

15             THE COURT:  Any other objections, Mr. Fiebach?

16             MR. FIEBACH:  Obviously, you're thinking of one I

17   can't think of, your Honor.

18             THE COURT:  The exhibit will be admitted as full.

19   BY MR. BUSH:

20        Q.    Mr. Stevens, would you look at the box that is

21   highlighted on the screen?

22        A.    Sure.

23        Q.    Is that a summary of your compensation at Carlyle

24   for the years 2000 to 2003?

25        A.    It's not a summary of my entire compensation, but

 1    it's a summary of the part of the compensation that was

 2    reported on my tax returns for those years.

 3        Q.    And what is your W-2 reported income?

 4        A.    In this particular column, that reflects the

 5    amounts that Carlyle reported I received in salary and

 6    bonuses for the years indicated.

 7        Q.    And what's in the column that's headed carried

 8    interest paid?

 9        A.    Except for the number for 2003 which says estimate,

10    because I hadn't received the K-1's at the time, that

11    reflects amounts I'd actually reported for the years

12    indicated as having received it on carried

13    interests -- having actually received the carried interests

14    payments for that year.

15        Q.    At the bottom you have a line that's called

16    average.  You see that?

17        A.    Yes.

18        Q.    What have you done there?

19        A.    I'd added up the four years above and divided by

20    four.

21        Q.    Why did you compute an average?

22        A.    Well, because the numbers are not consistent for a

23    whole variety of reasons about when carried interests are

24    paid and when they're reported.  It's a little bit misleading

25    to look at -- you can't really look at a pattern.  Whether

1    something comes in on December 31 or January 2 is not always

2    within your control.  Sometimes it is, sometimes it isn't.

3         Q.    So when you say they're not consistent, you mean

4    they're not consistent why or how?

5         A.    The amounts go up and down, and what really matters

6    is the total that you end up getting.

7         Q.    The carried interests column is called carried

8    interests paid.  What did you mean to indicate when you used

9    the word paid?

10        A.    Paid, received, reported for income tax purposes.

11   Lots of people when they talk about carried interests do

12   projected numbers.  Maybe there's no other way to do it, but

13   it's sort of like this is going to be a great deal because in

14   the future you're going to get all these great benefits so

15   I'm going to tell you about it now and you write down a big

16   number.  People do that.  You can buy it or not buy it, but

17   what you actually get is what you actually got.  Can't argue

18   with that.  At least most people can't.

19        MR. BUSH:  You can take that down, Jake.

20        Q.    What other subjects did you discuss with

21   Mr. LoPinto and Barbara Beck concerning your compensation?

22        A.    Well, the big one from the start was, look, I just

23   tried to buy majority interest in a new platform to finance

24   Brownfields.  I'm only interested in an opportunity anywhere

25   if I'm a major owner, if I'm a major economic participant.

1    So if that works for these guys, fine.  If it doesn't, I

2    understand.  But that's number one.  And we discussed that

3    early on and repeatedly.

4         MR. FIEBACH:  Your Honor, request a limiting

5    instruction.

6         THE COURT:  I'll give that now.

7         Ladies and gentlemen, you just heard Mr. Stevens

8    testify about discussions about an ownership interest.  You

9    may hear further testimony about that today.  Again, just to

10   repeat what I told you yesterday as a reminder, I instruct

11   that you the contract did not require Landmark to give

12   Mr. Stevens an ownership interest and that you may,

13   therefore, not consider this evidence as proof either that

14   Landmark breached the contract or that it is liable for any

15   negligent misrepresentation simply because it failed to give

16   Mr. Stevens an ownership interest.  The Court's already ruled

17   that Landmark was not required to do that.  You're not to

18   speculate as to why.  Instead, you may consider this evidence

19   about discussions of an ownership interest and any other such

20   interest you hear today or for the rest of the trial only for

21   the limited purpose of determining whether Landmark promised

22   to let Mr. Stevens participate in the economics of the entire

23   firm or just in specific funds managed by the firm.  In other

24   words, you may consider this evidence only in deciding what

25   the parties agreed to and whether Landmark is liable for any

1    negligent misrepresentations about the scope of the program

2    referred to in the May 20, 2004 agreement.

3         Go ahead.

4         MR. BUSH:  Thank you, your Honor.

5    Q.   Did you have a discussion with Mr. LoPinto about

6    the subject you were just testifying about that was specific

7    to Landmark?

8    A.   Yes.

9    Q.   And can you relate what that discussion was?

10   A.   I'll try, respecting the spirit of what Judge Shea

11   just told us.

12   Q.   You can testify to what you said.  Judge Shea will

13   take care of instructing the jury.

14        THE COURT:  Right.

15   A.   Yes, I'll try to answer your question.  The problem

16   is the meaning of ownership.  At the time a private equity

17   guy and a lawyer for 35 years, the context, having known Tony

18   for 15 years, having talked to him about dozens and dozens of

19   different position descriptions, the way he used the

20   ownership, the word ownership, and I used it were different,

21   with due respect, from the way I believe your Honor

22   understands it.  So there's a big semantic confusion here

23   that confuses me quite honestly.  I apologize, it may confuse

24   you.  So I'm not sure exactly what you want me to answer.

25        MR. FIEBACH:  I move to strike his last statement.

1          THE COURT:  I just gave the limiting instruction.

2     I'm going to deny that motion.

3          Q.    What I want you to answer is when you talked about

4     the ownership point that you've already made in general, what

5     did you talk about that -- what did you say to Mr. LoPinto

6     about that point with respect to Landmark?

7          A.    I told him that I was only interested in

8     considering a position at Landmark if I got some kind of

9     ownership.

10         Q.    Did you tell him why insofar as Landmark is

11    concerned you were particularly interested in that?

12         A.    Yeah.  First of all, it was obvious through my due

13    diligence and by Landmark's own admissions that the Real

14    Estate Group was in trouble.  They had tried to raise a 250

15    million dollar fund and bombed.  They got about 10 percent of

16    that which is really embarrassing.  They had to close down

17    all operations in real estate when their key man left and

18    this was a total restart but they still had the overhead.  So

19    it was a huge challenge.  And it was obvious to me that it

20    was going to be a problem no matter what.

21         Secondly, the big problem that people in the

22    industry were talking about in secondaries was there will be

23    a good market for real estate secondaries, but whether it's

24    in 2004 or 2006 or 2008, we really don't know.

25         Q.    Why is that?

1     A.    Well, it was because the Real estate primary

2  market, in other words, those initial funds, weren't nearly

3  as big as the overall private equity, that industry was, and

4  the size of the secondary opportunity is really a function of

5  the size of the primary opportunity.  Because if there are

6  billions and billions of investors out there, some of them

7  may want to sell, and that's what you buy when you're a

8  secondary firm.  So because the real estate secondary

9  industry was really small, it was completely unclear how

10  quickly that was going to develop.  So it was clear that,

11  wait a minute, I'm not going to go from making what I've been

12  making and commute to Hartford in order to hope that this

13  business starts now instead of five years from now.  I have

14  no idea.  So, therefore, I'm only going to do it if you give

15  me an interest in the whole firm.

16     Q.    Did there come a time when you received an offer?

17     A.    Yes.

18     Q.    To join Landmark?

19     A.    Yes.

20     Q.    Who made that offer?

21     A.    Tony LoPinto.

22     Q.    And when did he do it?

23     A.    I'm pretty sure I can recall a date.  I think it

24  was early May of 2004, I think the 3rd.

25     Q.    Did you take notes of the -- first of all, was this

1   a phone call or a meeting?

2        A.     He called me up.

3        Q.     Did you take notes of the phone call?

4        A.     Yes.

5             MR. BUSH:  I'd like to show the witness what's been

6   marked as Exhibit 21.

7        Q.     Directing your attention, Mr. Stevens, to the first

8   two pages of Exhibit 21.

9        A.     Yes.

10        Q.     What are those?

11        A.     Those are the notes I took during the conversation

12   with Tony on May 3rd, 2004.

13        Q.     And what did the notes reflect?

14        A.     They reflect my notes point by point of the terms

15   he offered.  He said I've been authorized to -

16        Q.     Did they reflect what he said to you?  Did they

17   reflect anything other than what he said to you?

18        A.     Almost all of them are word for word what I wrote

19   down is he said to me.

20        Q.     All right.  And you took these notes when?

21        A.     Generally during the call.  There were points in

22   this conversation and in others where I couldn't write fast

23   enough to get everything down, so in some cases I went back

24   through the notes promptly afterwards and completed words or

25   sentences or maybe made one or two other notes, but they were

1    contemporaneous notes.

2           MR. BUSH:  Your Honor, I'd move the first two pages

3    of this into evidence at this point.  We'll get to the rest

4    of it when we get to the next phone calls.

5           MR. FIEBACH:  Objection, your Honor.  Hearsay.

6           THE COURT:  I think we need a little bit more

7    foundation in light of he used the word almost and also we

8    see, as we've discussed earlier, some different types of ink

9    on this page.  So if we let the two pages in there's going to

10   be a problem right now.

11          MR. BUSH:  Maybe what I'll do is lay the foundation

12   for all of the phone calls.

13          THE COURT:  That probably would make sense.

14   Q.    This document, as Judge Shea just mentioned, does

15   have some blue ink and some black ink on it?

16   A.    Yes.

17   Q.    What's the significance of the blue ink?

18   A.    Well, the blue ink reflects the notes that I took

19   during my conversation with Tim Haviland three days later.

20   Q.    Turn to page three of the document.

21   A.    Yes.

22   Q.    And from page three, four, five, six, and the top

23   of seven, what does -- what's reflected there?

24   A.    It's blue ink, and that reflects notes I took

25   during my conversation with Tim Haviland.  And, again, or

1    immediately thereafter.

2         Q.    When you say immediately thereafter, what does that

3    mean?

4         A.    Promptly thereafter.

5         Q.    After you got off the phone call?

6         A.    Yes.

7         Q.    And what is reflected in your notes of the call

8    with Mr. Haviland, what he said?

9         A.    Yes.

10        Q.    Is there anything in those notes that reflects

11   something other than what he said?

12        A.    We're now talking about the blue ink parts?

13        Q.    Right.  The conversation with Mr. Haviland.

14        A.    In substance, no.  There may be a case or two where

15   I went back and completed what I was thinking based on what

16   he said.  So if your question is did he say every single word

17   that I wrote down, the answer's probably not quite, but Every

18   single word that I wrote down was the impression I had of

19   what he was saying to me.

20        Q.    During the phone call?

21        A.    Yes.

22        Q.    And going back to the first page of Mr. LoPinto,

23   there's some blue ink.  I say of Mr. LoPinto, of the phone

24   call of Mr. LoPinto.  What is the blue ink on those two pages

25   reflect?

1      A.      It's the same answer as I just gave you for page

2    three.  So what I was doing was using my notes of the offer

3    from Tony point by point going through and confirming the

4    points with Tim.  So to the extent that I could just say yes

5    or confirm it, I did that on the same page in a different

6    color ink so I could tell which conversation it was.  And

7    then to the extent that I couldn't fit that in or the answer

8    was longer, I would go to wherever I was in my notes and make

9    it a longer entry.

10     Q.      And then, finally, on the last page of the

11   document, at the bottom of the page, there's another set of

12   notes that's in dark ink?

13     A.      Right.

14     Q.      What does that reflect?

15     A.      That reflects notes that I took during my telephone

16   conversation on May 6th with Frank Borges and that's in

17   black.

18     Q.      And you took them during the phone call?

19     A.      During that phone call, yes.

20     Q.      And what do they reflect?

21     A.      They reflect my understanding of what he was saying

22   to me.

23          MR. BUSH:  With that foundation, I offer it.

24          THE COURT:  Do you want to voir dire, Mr. Fiebach,

25   the witness' testimony about impressions?  That to me is the

1    only issue at this point.  The witness mentioned that there

2    were some impressions.  To me the only issue at this point is

3    that.  If you want to voir dire, you may.

4              MR. FIEBACH:  Yes, Your Honor.

5    VOIR DIRE BY MR. FIEBACH:

6        Q.    Mr. Stevens, where on this document are your

7    impressions?  What pages are your impressions?

8        A.    I would have to look at it pretty closely to do

9    that, because I think it's a pretty fine distinction.

10             THE COURT:  Why don't you take your time and do

11   that.

12       A.    You're asking me about the entire document?

13       Q.    Tell me what pages your impressions are on.

14       A.    Okay.  I believe the only ones are on page five

15       Q.    Let me ask you a question.  Looking at page one.

16   You have something written about five lines from the bottom

17   and then after that you have dash TBD with a new program?

18       A.    Yes.

19       Q.    Now, before that you wrote down ownership of

20   Landmark Partners equity and then TBD with a new program --

21       A.    Yes.

22       Q.    -- did Mr. LoPinto used the words ownership or

23   were you writing ownership and basically putting down that he

24   said any program is going to be determined?

25       A.    I was writing down his exact words.

1             MR. FIEBACH:  I renew my objection, your Honor.

2             THE COURT:  I'm sorry?

3             MR. FIEBACH:  I renew my objection.

4             THE COURT:  Well, I think he said that, from what I

5     heard, the impressions were on page five.  We could redact

6     all but that and let it in on that basis, Mr. Bush.  I'm

7     going to overrule the objection as to the other pages except

8     as to which the witness testified they were impressions.

9             Do you want to do this at a break and redact and put

10    it in?  What do you want to do?

11            MR. BUSH:  Actually, I think I can clear up the

12    impressions.  I don't think there's a reason to eliminate the

13    impressions.

14            THE COURT:  Go ahead.

15     Q.    On page five, can you describe which

16    entry -- which of the entries there are your impressions?

17     A.    Well, okay.  Yes.  I think there are a couple.  The

18    first one where it says 2.0 million dollars, there's a

19    parenthetical.  And the parenthetical is my impression of

20    what he was telling me which is basically simple math derived

21    from the other things he told me.

22     Q.    All right.  And is there another place where

23    there's an impression?

24     A.    Similarly, we get down to the 2004 analysis,

25    instead of 2 million, it's 4.1 million projected earnings,

1    and which he said, and the 10 X is -- the last two lines --

2    let me make sure -- the last two lines are the math that's

3    obvious from the rest of what he told me.

4        Q.    Is there any other place on this document, on that

5    page, excuse me, that reflects your impressions?

6        A.    You mean as opposed to writing down what was being

7    said?

8        Q.    Exactly.

9        A.    No.

10            MR. BUSH:  I move the admission of the document.

11            MR. FIEBACH:  Certainly not as to those last two

12   lines on page five, your Honor, which are his impressions.

13            THE COURT:  They're math.  I'm going to overrule the

14   objection.  The document comes in.

15            MR. FIEBACH:  They're more than math, your Honor.

16   They really are more than math.

17            THE COURT:  I don't see it, Mr. Fiebach.  I'm going

18   to overrule the objection.  The document's in full.

19       Q.    Let's go to page one.  First of all, let's just

20   orient the jury.  What is going on page one?  What are you

21   writing down?

22       A.    Okay.  So Tony calls me up and he says I've been

23   authorized to give you an employment offer from Landmark

24   Partners.  This is -- you're going to love it.  It's what

25   we've been talking about.  And then he went through point by

1    point and mostly I just wrote.

2        Q.    And before we go through what he told you, what ink

3    reflects what he told you?

4        A.    It's the black.

5        Q.    And we've already heard a little testimony about

6    the blue ink.  Blue ink reflects what?

7        A.    Blue ink reflects my review of the same offer, the

8    same points, point by point, but during my conversation with

9    Tim.

10       Q.    Let's stick with the black ink for the moment.

11   Jake, why don't you highlight this down to plus plus.

12   Perfect.

13          If you could quickly tell the jury what Mr. LoPinto

14   told you the terms of the offer were that's reflected in his

15   part of the notes.

16       A.    So, first of all, he said you'll be viewed as a

17   partner in the firm.  You'll participate outside just the

18   real estate group.  The goal is to leverage the real estate

19   program with some of the great ideas you've been talking

20   about.  You'll be called partner in charge of real estate, in

21   charge of capital and investments.  You'll be in the

22   management of the whole firm as well.  You'll report to Frank

23   who is the Chairman.  Here's your base.  Here's your

24   incentive.  And there are two special bonuses to incentivize

25   you to get the new real estate fund which is going to be Real

1      Estate V, get that closed and exceed the goal.  Our goal will

2      be 250.  If you exceed 250, we'll give you a bonus.  If you

3      exceed 350, we'll give you another bonus.

4            MR. BUSH:  Jake, let's go down to the carried

5      interest section.

6            Q.    What is this section that's been highlighted

7      reflect?

8            A.    It says you're going to get 15 percent in Fund V

9      and future funds, a minimum two percent in the private equity

10     fund that we're currently raising which we think is going to

11     close in June, and and in the future PE funds, private equity

12     funds.

13           Q.    And the 15 percent related to what kind of funds?

14           A.    Real estate.

15           Q.    And then let's go down to -- Mr. Fiebach, already

16     asked you about the ownership of Landmark Partners' equity

17     term.  What does that actual language reflect?

18           A.    Tony said to me that one of the terms of the offer

19     you're getting from Landmark is ownership of Landmark

20     Partners' equity to be determined by a new program.

21           Q.    And did he say anything in addition in those words

22     about that particular term?

23           A.    During this call?

24           Q.    Right.

25           A.    Not that I recall.  Excuse me.  Yeah, he did.  He

1    said, either at this point in time or later in the

2    conversation, he said you need to call Tim for details about

3    that and the rest of the offer.

4         Q.    When he used the term ownership of Landmark

5    Partners' equity, what did you understand him to be referring

6    to?

7              MR. FIEBACH:  Objection, your Honor.

8              THE COURT:  Grounds?

9              MR. FIEBACH:  Asking him what somebody else meant.

10   Mr. LoPinto was here and he testified.

11             THE COURT:  I'm going to overrule the objection.  I

12   think the question was phrased as what he understood him to

13   mean.

14             MR. BUSH:  That was exactly the question.

15             THE COURT:  Objection's overruled.

16        A.    Landmark was giving me ownership, which meant a

17   right I would have that would be documented somehow of

18   equity, meaning equity -- I'll come back to that -- in the

19   whole enterprise.  Equity is the value of something after the

20   debts have been paid.  So like the equity in your house is

21   the value of your house minus your mortgage.

22        Q.    And did this particular term relate to anything

23   that you'd already been talking to Mr. LoPinto about?

24        A.    It related to the most important thing I'd talked

25   about over and over and over with Mr. LoPinto.

1     Q.    Did he tell you anything about why the program

2  needed to be determined?

3     A.    Yes.  Well, he had previously said to me, look,

4  they're restructuring the ownership of the firm.  The

5  founder's leaving.  They've got other guys leaving.  They've

6  got new guys coming it.  There are lots of issues they need

7  to resolve and they're working on it, but there's no way they

8  can resolve all of them now.  So he was clear, he said, you

9  know, they might not offer you direct outright stock

10  ownership, but there are lots of ways of giving you what you

11  want and they're promising you that you will get ownership of

12  Landmark Partners' equity.

13          MR. FIEBACH:  Your Honor, I move to strike that.

14  That's hearsay and it's certainly not consistent with what

15  Mr. LoPinto testified yesterday.

16          THE COURT:  Overruled.

17     Q.    Quickly, what are the other two items on this

18  particular part of the notes?

19     A.    One refers to a monthly housing allowance.  I was

20  going to be commuting between my house in Chevy Chase and

21  Hartford, Simsbury.  They would pay for that, cover the cost

22  of my commute and apartment in addition to my cash

23  compensation.  And I'd get kind of normal company benefits

24  for senior executives pursuant to the programs that they had

25  in place.

1      Q.     Can we turn to the next page and, Jake, can you

2    call up everything before the line.  Again, quickly, what are

3    the terms that are referred to here?

4      A.     The first one is sort of a protection.  Look, if

5    they decide they don't like you they can dismiss you without

6    cause but, you know, here's what we'll pay you in that case.

7            The next one is they think that the goal's going to

8    be to raise a 250 million dollar real estate fund.  They

9    think the value of the carry is going to be, you know, 1.8 to

10   2.8 million dollars.  Assume it's going to take three years

11   to invest and pays out later.  One of the main things they're

12   looking for you to do is lever the platform.  In other words,

13   come up with these great Ideas that you have for real estate

14   investing and bring them to Landmark.  And then, finally, the

15   PE fund they expect you to close in June.  It's going to be

16   north of a 400 million dollar fund.  You're going to get a

17   two percent carried interest.  We think that's worth over a

18   million dollars to you.

19     Q.     Were there any other terms of the offer that he

20   conveyed to you?

21     A.     I don't think so.  I certainly don't recall.

22     Q.     Can we call up the part just below the line on that

23   page.

24            What are those notes reflect, the notes in black?

25     A.     Those are also notes during the call with Tony sort

1    of after he'd completed his description of the terms of the

2    offer.

3        Q.    And it reflects there on the bottom, what, call Tim

4    for detail?

5        A.    Yes.

6        Q.    Is that something Mr. LoPinto told you?

7        A.    He did.

8        Q.    And did you call Mr. LoPinto -- excuse me.  Did you

9    call Mr. Haviland?

10       A.    I did.

11       Q.    When did you call him?

12       A.    I don't remember when I placed the call.  I finally

13   reached him three days later on May 6th.

14       Q.    Let me go back to the first page.  What was the

15   date of the phone call with Mr. LoPinto?

16       A.    May 3rd, 2004.

17       Q.    So let's turn to page three.  Why don't you

18   describe for the jury what happened when you got on the phone

19   call with Mr. Haviland to go over the terms of the offer?

20       A.    Okay.  I said Tim, I'm excited, and Tony told me to

21   call you up for more detail around the terms that he

22   described.  So what I want to do is go through point by point

23   with you to confirm that that's what you intend and to get

24   more detail on the points that require more detail.

25       Q.    And so how did you lead that conversation?

1    A.    Well, I had my blue pen out so I didn't confuse my

2    notes, and I turned back to page one of this document and

3    just went point by point through the same points with Tim.

4    Q.    And did you do it in the same order?

5    A.    Yes.

6    Q.    Well, why don't you explain what the first point

7    was that you discussed with Mr. Haviland and what he told

8    you?

9    A.    Well, I went back to the top of my list.  I said,

10   all right, so Tony tells me you're going to view me as a

11   partner in the firm.  Tim said right.

12   Q.    We're on page one?

13   A.    Yeah.  I started off hoping I could number the

14   points and lost.  That didn't work.  Number one on page

15   one.

16   Q.    Why don't you call that out.

17         Do you have notes of what Mr. Haviland told you on

18   point one?

19   A.    Yes.

20   Q.    What's your note?

21   A.    Right.  You got it.

22   Q.    Okay.  And what happened next or what subject did

23   you cover next?

24   A.    You want to leverage the real estate program.  By

25   that point both of us knew what that meant.  We spent a lot

1   of time talking about what Landmark thought they could expand

2   the platform, what I thought we could do, a lot of back and

3   forth and interesting ideas.

4       Q.   There are notes on the same page over to the right

5   in blue.  What does that reflect?

6       A.   The third major point, you'll be the partner in

7   charge of real estate.  And I said what does that mean.  Tell

8   me again all the people that work there.  I met some of them.

9   What does that mean?  Who is the group that I'm going to be

10  in charge of?  And so I wrote down the names and sometimes

11  the positions of those people and brief notes on what they

12  did.

13      Q.   And did you -- can we go, Jake, up to the very top

14  of that page over on the right, there's some blue.

15           What does that reflect?

16      A.   At one point we discussed administrative

17  assistants.  There were sometimes some asides and we

18  elaborated and those were my attempt to spell the names of

19  the two administrative assistants who I would be working

20  with.  Did pretty badly in retrospect.

21      Q.   Now, what's reflected in the notes prior to the

22  word 15 percent carry?

23           You can highlight that, Jake.

24      A.   That's an elaboration on the discussion I was just

25  describing.  Tell me more about the real estate group, tell

1    me about the culture.  Tell me about the assistants.  What

2    are the expectations?  What kind of stuff did they do?  Those

3    are just notes that I made on what Tim told me.

4         Q.    And then below that it starts 15 percent carry and

5    there's a chart.  What are you discussing there?

6         A.    Well, if you go back to the first page, then I went

7    point by point.  So I'd gone through salary and comp and I

8    was down to the point that said carried interest.  So I said,

9    well, okay, let's talk about carried interest for the

10   secondary project because I think it's a little different

11   from the primary products that I'd been used to.

12        Q.    Does it reflect what he told you?

13        A.    Yes.  This reflects the way in which Tim described

14   it to me.

15        Q.    And are the numbers in the chart numbers that

16   Mr. Haviland gave to you?

17        A.    Yes.

18        Q.    And what do those numbers reflect?

19        A.    They reflect a projection about -- this is a

20   matrix.  So they reflect a projection under two sets of

21   changing assumptions, one that goes across the top and one

22   that goes across the bottom.

23        Q.    What's the one across the top?

24        A.    Fund size.

25        Q.    And the one across the bottom?

1    A.    Down the bottom is the assumed equity multiple.  I

2    think you heard Tim describe that yesterday.  How much you

3    return as a result of how much you invested.  1.5 means one

4    and a half times.  Two means twice.

5    Q.    And this was for what -- what was this for, which

6    fund?

7    A.    This was describing a 15 percent carry in the

8    current real estate and future real estate funds which is

9    what they were offering me.

10    Q.    Had this fund already been raised?

11    A.    No.

12    Q.    So this is not a reflection of what's actually

13    happened?

14    A.    No.  This is a reflection of what we hoped might

15    happen when we went back out to the market for the first one

16    I would be raising which was Real Estate V.

17    Q.    All right.  Then let's look at the bottom of the

18    page real quickly.  What is the subject of this entry?

19    A.    It's the same subject we've just been discussing.

20    Q.    Let's turn over to page four.  Is everything before

21    the line -- highlight that -- does that all relate to the

22    carry?

23    A.    Yes.

24    Q.    Now, let's go to the bottom of that page, Jake,

25    below the line.

1          What's the subject that you're talking about with

2     Mr. Haviland that's reflected in this part of the document?

3          A.    The meaning of the next term in the sequence after

4     carried interest, the term that Tony had described as

5     ownership of Landmark Partners' equity.

6          Q.    So would you explain to the jury how you get to

7     this point.  Do I understand you're going through the --

8          A.    Right.  So I'm back on page one and we've talked

9     about carried interest.  So the next point in black which is

10    my checklist.

11         Q.    Where it says ownership?

12         A.    Right.  So we've ticked all the points above that.

13    We've already discussed and I've taken notes on what the

14    detail was.  I've gone back to page one and what's next.

15    Tony says Landmark is offering you ownership of Landmark

16    Partners' equity to be determined by a new program.  So I

17    say, Tim, this is what I really need some detail on.

18         So the question you asked me over on page four, then

19    below that line, that's the start of the notes I took during

20    that part of my conversation with Tim on May 6th.

21         Q.    Can you explain to the jury what Mr. Haviland said

22    to you is reflected in the -- after the term current equity

23    plan?

24         A.    He just --

25         Q.    First of all, how did that subject come up?

1      A.      So I had been hearing for some time there was some

2  restructure of ownership going on as Tony had described, and

3  Tony had said it's to be determined with a new plan, you got

4  to talk to Tim for the details.  So in my conversation with

5  Tim I said, okay, tell me again why you can't do this right

6  now and he said, okay.  And one of the ways was doing that

7  was having him describe what the current plan was.  So you're

8  going to have a new plan, but you haven't decided what you're

9  going to do.  So how do I get an understanding of this?  And

10  so I asked, and I assumed he agreed with me, one good way to

11  understand what that meant would be to talk about the

12  existing plan and then talk about why they had to change it

13  and ask him questions about what he knew or what he thought

14  about what they were going to do and how they were going to

15  change it.

16      Q.      So the part that follows current equity plan, what

17  is he telling you there?

18      A.      He's describing the way the existing plan or

19  program for economic participation in the firm, how that

20  worked.

21      Q.      And what did he tell you?

22      A.      He said, well, right now we have a stock ownership

23  plan and the way that works is -- SH is for shareholders --

24  buy into the company at an independent valuation and then he

25  further described it.

1    Q.    Okay.  And there's a term that talks about payment,

2    I guess.  Is that what PMT means?

3    A.    Yes, it does.

4    Q.    What did he tell you about that?

5    A.    I have two notes here that are on two lines that

6    begin PMT.  First, he said they pay for the stock by --

7    Q.    Who's the they?

8    A.    Anybody buying stock right now.  Anybody buying

9    economic interest in the firm right now pays 20 percent in

10   cash, DM, down, and they pay the balance over a ten

11   year -- on a ten year note with interest.  That's the first

12   thing he said.  And then he modified that slightly.  He said

13   the payment in is either buy in with cash or with a note.  He

14   was describing -- there's background on this part of the

15   conversation that led to his saying with cash or note.

16        MR. FIEBACH:  Objection, your Honor.  I don't know

17   whether he's testifying to what was said in this conversation

18   or some other conversation.

19        THE COURT:  Why don't you rephrase the question,

20   Mr. Bush.  Let's take it step by step.

21   Q.    Is the background that you're talking about

22   something that was related to you in this conversation?

23   A.    Oh, yes.  I'm sorry.  I'm sorry.  I apologize.  All

24   of this pertains to this particular conversation.  The

25   context for this point in the conversation is Tim was

1    basically saying we've got problems with the current plan, it

2    doesn't work for us, and we're going to have to change it.  I

3    said, okay, tell me about the plan and tell me about the

4    problems.

5         Q.   And what did he tell you the problems were?

6         A.   He said this financing mechanism doesn't work for

7    us and the reason is that basically every seller of stock

8    gets notes from every buyer.  So let's just say you had three

9    sellers and three buyers, but their stock amounts didn't add

10   up.  You would end up with notes from each -- the seller

11   would receive notes from each of the sellers and the buyer

12   would give notes to each of the sellers, and you'd have you

13   all of these promissory notes and then there are rules from

14   when they get paid out of the income.  And it's really

15   complicated, but the big problem is this, the guys who own

16   the stock don't get the current profit from the firm, because

17   this financing mechanism means that they work during the year

18   to create the profit for the company, but the money actually

19   goes to the old owners, not the current owners.  Because the

20   form of the current plan is that we have these promissory

21   notes attached to the purchase.  So it's all messed up.  And

22   everybody's like these guys or that guys and it's just a

23   mess, we have to change it.  So I said, look, none of this is

24   a problem for me.  I'm a lucky guy.  I've made a lot of

25   money.  I'll pay you cash for the stock.

1      Q.      Now, below the section -- there's a number of names

2   here.  What were those names?  What is he indicating to you

3   in the names?

4      A.      Now we're going through history, because the

5   history of how it got so tangled up was part of the

6   explanation.  So he's describing Stan Alfeld, the founder,

7   John, I believe that's Griner (ph) who I think was a

8   co-founder, and Tim, I don't know if Tim was a foudner, but

9   he'd been there a long, long time.  And he was describing a

10  time which they were the soul shareholders so it was before

11  Frank had joined the firm.

12     Q.      There's an entry at the very bottom.  It says

13  current plan will change?

14     A.      Yes.

15     Q.      And it says consider.  What does it say, consider

16  what?

17     A.      He said -- he had explained to me that he didn't

18  know what they were going to do, but he said we're seriously

19  considering having a couple of options we're seriously

20  considering.  One is we could have current equity partners

21  and current income partners.  So if you stayed with the stock

22  plan, you would have presumably some people actually owning

23  stock right now, and then maybe income partners with an

24  option or warrant or something like that because they

25  couldn't afford to pay it.  Or we might give people an option

1   to buy that might be exercised at a later time when they've

2   got the money or maybe right at the time of the capital

3   transaction so you would participate in all the equity, or we

4   might give you a warrant.  A warrant is basically it's like

5   an option, but it's a right to buy stock at a time in the

6   future that typically isn't tied -- is not restricted in the

7   same way some of the options are.

8        Q.   It says at the bottom, what does it say at the last

9   entry?

10       A.   It says effective as of now.

11       Q.   What did Mr. Haviland tell you that's reflected in

12   that note?

13       A.    Well, he's talking about these changes.  I said,

14   okay, I got it, got it, got it.  I know you don't know what

15   you're going to do.  You're not going to beat a dead horse

16   here.  You explained to me you don't know how to resolve

17   those things.  That doesn't matter.  What matters is whatever

18   you do how does it affect me.  He said whatever we do is

19   effective as of now.  Meaning not May 6th, but the time you

20   join the firm.

21       Q.   Meaning what, I'm sorry?

22       A.   Meaning effective for you.  The economic benefit

23   for you, Gary Stevens, is when you join the firm.

24       Q.   Can you look at page five, please.  And can you put

25   up the, I guess, the top of page five down to 2003, Jake.

1    Perfect.

2             Now, what's the subject that Mr. Haviland is talking

3    to you about as reflected in here?

4        A.    Further elaboration on the same set of points

5    because this was the key issue to me.  I don't -- this is a

6    continuation of the same discussion and it's a description of

7    the current shareholders, and then it gets into the value of

8    the enterprise.

9        Q.    Let's talk about that.  What is the subject of

10   the -- of what he's telling you that's reflected in the notes

11   that begin today?

12       A.    So, again, it's how is the plan going to change.

13   He said, well, today there are five shareholders in the

14   company, and told me who they were.  Said one of them, this

15   guy Tony Roscigno is going to be leaving and we're replacing

16   him.  He said together Frank and Tim owned more than 50

17   percent.  I had an impression it was like 75 percent, but

18   it's more than 50.

19            MR. FIEBACH:  Move to strike that, your Honor.

20            THE COURT:  The jury will disregard the part about

21   the impression.

22            Go ahead, Mr. Bush.

23       Q.    What's the part of the conversation that comes

24   after the word today?

25       A.    That's a list of who the five stockholders were.

1      Q.     I'm sorry?

2      A.     The other today?

3      Q.     The one that's down in the middle of the page.

4      A.     Okay.  So he said today the aggregate value of the

5   enterprise, it's the stock plan, so it's stock, the aggregate

6   stock value is 20 million dollars.  About 20 million as of

7   January 1, 2004.  And the parenthetical Stan means that he

8   described that that was a valuation that had been done in

9   connection with the departure of the guy who formed the firm,

10   Stan Alfeld.  And so they had needed a valuation to buy out

11   Stan's stock.

12      Q.     It says enterprise value outside group that

13   considered.  Do you see that?

14      A.     Yes.

15      Q.     What did he tell you about that subject?

16      A.     He described it -- he described it as the value of

17   the enterprise, the Landmark enterprise.  So, in other words,

18   what he's saying is all of the economics of the Landmark

19   enterprise, the business, the picture, are currently -- that

20   that means the same as the value of the stock, because all of

21   the economics now are flowing through to the owners, the

22   beneficiaries, in the form of stock.  So they meant the same

23   thing.  He said the enterprise value of Landmark, the thing

24   that we're talking about that you're going to get ownership

25   in, the enterprise value is 20 million and it's based on an

1    outside group that consulted and considered a bunch of

2    stuff.

3        Q.    And the last entry that's up on the screen here, it

4    says for 2004 cash return is 15 percent on EBITD basis.  What

5    did he tell you about?

6        A.    That EBITD sounds like you're a strange person.

7    It's earning before income tax depreciation.  I'm just going

8    to say earnings instead of EBITD.  For 2004, he says the cash

9    return to the guys who own the enterprise is about 15 percent

10   on an earnings basis.

11       Q.    Jake, can you call up the bottom part of the page.

12             And is this part of the same subject or are you

13   moving on to a different subject?

14       A.    No, no.  This is more detail.  This is the most

15   important point.  A lot of detail here.  We spent -- the call

16   lasted well more than an hour.  I think probably half of it

17   was on this.

18       Q.    And what is -- what's reflected on the bottom half

19   of the page here, the notes that are up on the screen?

20       A.    It's the continuation of the same discussion.

21       Q.    Is this information that Mr. Haviland gave to

22   you?

23       A.    Yes.  With the caveats we previously discussed.

24       Q.    What is the information that he gave to you?

25       A.    He said, okay, he told me specifically what the

1   numbers were for 2000 and projected numbers for 2003 and the

2   projections for 2004.  And the reason I was asking about that

3   is because I want to say, okay, what's this enterprise really

4   worth.  I had not asked any questions like that before this

5   point in the process.  So I wanted a lot of detail.

6       Q.    So what is the actual information that he gave you

7   here and what do your notes reflect that he told you?

8       A.    He said here's what it looked like for 2003.  We

9   had 22.8 million dollars of revenue.  After expenses, we had

10  14.4 million dollars of prebonus income.  We paid out bonuses

11  of 10.6 million, meaning that was one way they were paying

12  out the value -- the economic return to the guys who

13  benefited.  And then there's an aside there that says and we

14  have these capital call bonuses that we give and he gave me

15  an example.  He said bottom line is 3.8 million of earnings

16  except that we had a buy out Dick Main and Bob Harvey, and he

17  said there may be some other stuff in there.  But the bottom

18  line is 2 million dollars of earnings for 2003.

19      Q.    All right.  And then below that there's some

20  similar information it appears.  What is that information for

21  2004?

22      A.    Tim then said for 2004 we're growing really

23  quickly, it's going to be a good year.  So he said here's

24  what we project, the revenue's actually gone down but the

25  value has gone way up.

1      Q.     And why is that?

2      A.     Well, if you run through the numbers, you go

3   through the same exercise.  He's indicating they're going to

4   pay bonuses that are less and I'm thinking, well, guys left

5   so that kind of makes sense.  I don't need to understand why.

6   But the bottom line, instead of 2 million dollars, they're

7   going to make 4.1 million dollars he thinks in 2004.

8      Q.     And you've already testified a little bit about the

9   parenthetical.  Going back up to the top half of the page.

10  There's a parenthetical 10X equals 20 million.  Is that what

11  it says?

12     A.     Right.

13     Q.     What's that parenthetical?

14     A.     That's the math.  You told me the enterprise is

15  worth 20 million dollars and the earnings are 2 million

16  dollars.  That's not difficult math.  That's 10 times

17  earnings.  So he's telling me the value of the enterprise is

18  10 times earnings.

19     Q.     And then down at the bottom of the page you have

20  another parenthetical that said 10X equals 41 million?

21     A.     Right.

22     Q.     What's that?

23     A.     Well, after 2004, he's saying that -- or I

24  am -- the math I am deriving from what he said is 10 times

25  earnings is going to be not 20 million, but 41 million, and

1    that's a 21 million dollar growth in the value of the

2    enterprise from the end of 2003 to the end of 2004.  Again,

3    this part of the note is after the conversation.  So at this

4    point in the conversation he hadn't said 10 percent but

5    immediately after he had, and I said 10 percent of that is

6    2.1 million value growth between the end of 2003 and the end

7    of 2004.

8         Q.    Let's turn to the next page, please, the top of

9    that page.

10        A.    Yes.

11        Q.    Now, how did the subject of -- that's at the very

12   top of the page, GPS ownership come up?

13        A.    This is a continuation of the same topic.  So we're

14   still talking about -- we're still at the point on the first

15   pages, all right, you guys gave me an offer that used the

16   words ownership of Landmark Partners' equity to be determined

17   with a new program.  What does that mean?  So this is still

18   the same topic.  So I said, okay, ownership's your word, not

19   my word.  What does that mean?  What's my ownership?  What

20   does that mean?

21        Q.    And what did Mr. Haviland tell you about that

22   subject?

23        A.    He said you should assume that we'll get back up to

24   about ten shareholders and I'd not be on the low end.  So I

25   was doing math real quick and I said, well, if you guys

1    have -- then he said so that means at least 10 percent.  You

2    can do the math in a way if two people have a whole lot, you

3    can be above average and still be below that but I guess --

4    but, anyway, saying at least 10 percent.

5         Q.    That reflect -- does that reflect what Mr. Haviland

6    told you?

7         A.    He did.  He hedged a little bit, though.  He said I

8    need to confirm that with Frank.  I think he said something

9    like that's my recommendation.  He hedged with words that

10   made it clear he needed to talk to Frank about that.

11        Q.    Then it says goal.  Hold on a second.  Would you

12   read that and tell the jury what Mr. Haviland told you on

13   that subject?

14        A.    He said our goal is to have the new equity plan in

15   place by December -- by 12-31-04.

16        Q.    Was that something different than what he'd said to

17   you earlier when he told you it would be effective for you as

18   of your start date?

19        A.    No.  Because the diversion on this call was, look,

20   we've got to decide what to do and then we have to document

21   it.  And that means a legal documentation process.  I've been

22   through that many, many times.  It also takes longer than you

23   think, you know.  So he said that's our goal.  He was clear.

24   That's our goal.  I am not promiseing you that we're going to

25   get everything resolved and get all the documents done by

1    12-31 because both of us know that in the real world that

2    doesn't always happen.

3        Q.    And how -- but that's not different than it being

4    effective for you as of the start date?

5        A.    No, it's a different point.

6            MR. FIEBACH:  Objection, leading.

7            THE COURT:  Why don't you rephrase, Mr. Bush.

8        Q.    Did you consider when he told you that the plan

9    would be in place by 12-31-04 whether he was changing what

10   he'd told you earlier when he said that it would be effective

11   for you as of your start date?

12       A.    No, because it was really a slightly different

13   point.  This point is when is the documentation of the plan

14   going to be in place so it's operational.  That's a different

15   point from when do you get the economic benefit of whatever

16   we do.

17       Q.    Now, below that there's a section that says old and

18   has a bunch of names and other information there.  Can you

19   explain to the jury what Mr. Haviland told you on that

20   subject, what is that information?

21       A.    It's a continuation of the same subject.  The

22   reason I kept going back and asking for more details on it

23   because I was thinking quickly in my head.  Exactly what

24   happened here, I'm not understanding.  You're telling me

25   you've got this problem with the notes.  Run through who

 1   owned what when and this is a description of some of the

 2   historical ownership.  So one of the things I wanted to know,

 3   wait a second, I'm replacing Main and, in effect, I'm

 4   replacing Harvey, too, because you're only hiring one partner

 5   to do whatever those two guys are and you're going to raise a

 6   bigger fund.  You know, I wanted more detail on what did the

 7   guys I'm replacing get.

 8        Q.   And what does it say on that subject?

 9        A.   Maine had 7.5 percent and the other four, which I

10   understood to include Harvey, had another five percent.  So

11   the two of them together had 12.5 percent of the ownership of

12   the Landmark enterprise, the economics in the firm, of the

13   business, as you heard Tony describe it before.  They had

14   12.5 percent.  They were offering me 10 percent.

15        Q.   Let's take a look at the bottom of the page, Jake.

16             What are the subjects that are being discussed

17   there?

18        A.   We quickly covered their travel policies, how they

19   worked it, and then we got into the topic of how we expand

20   the fund, the business.

21        Q.   And then let's go on to top of page seven.  What's

22   the subject that's covered at the top of page seven?

23        A.   This is a matrix similar to the one we talked about

24   before relating to just real estate funds.  And this one

25   relates to a -- the value of a two percent carried interest

1    in the private equity fund they were raising in future

2    funds.

3         Q.   Let me ask you to go back to page one for a second.

4              Jake, call up the ownership section there, right

5    down at the bottom.

6              There's a blue note their right after the ownership

7    line.

8         A.   Yes.

9         Q.   What's that?

10        A.   It's a note I made at some point during my

11   conversation with Tim.

12        Q.   What does it reflect?

13        A.   It reflects the discussion that the benefit -- that

14   the program was going to get done by December of '04.  That

15   that was the goal.  That was the expectation.

16        Q.   Let's go back to page seven.  Did you -- was there

17   anything else that you recall that happened on that phone

18   call or have you covered it?

19        A.   Those are certainly the main points.

20        Q.   At the bottom of page seven there seem to be some

21   other notes in black.  What are reflected there?

22        A.   Those are notes I took during my conversation with

23   Frank.

24        Q.   So you had a conversation with Mr. Borges?

25        A.   Yes.

```
 1      Q.     When did you have a conversation?

 2      A.     Later in the day on May 6th.

 3      Q.     What was the purpose for having that conversation

 4    with Mr. Borges?

 5      A.     Well, Tim had hedged a little bit on the 10 percent

 6    and said, you know, I suggest at least a minimum of

 7    10 percent.  But he was clear, he said I got to talk to my

 8    partner about this, I got to talk to Frank.  I said, fine, I

 9    want to talk to Frank.

10      Q.     What did you do on the call with Mr. Borges?

11      A.     I looked back over my notes and I said  -- the one

12    I really want to hear from you directly on this thing is

13    ownership of Landmark Partners equities.  I first said you

14    understand the offer, that Tony said you authorized it.  I

15    discussed it with Tony.  I went through exactly the same

16    points in even more detail with Tim.  You're familiar with

17    the offer, right?  Right, totally familiar with it.  Fine.  I

18    said, look, the only thing I care about is to confirm

19    ownership, you're offering me ownership of Landmark Partners'

20    equity.  I understand you don't know the form, but we're

21    talking about the whole firm and we're talking about some

22    kind of ownership, right?  That's what we're talking about.

23    I want to hear you on that subject.  And he said, I am very

24    committed to that concept.

25      Q.     Did you have any discussion with Mr -- actually,
```

1    let me back up a second.  Are those his actual words?

2        A.    Yes.

3        Q.    Did you have any discussion with Mr. Borges about

4    the timing of the plan?

5        A.    I did.

6        Q.    And this would be the time it would --

7              THE COURT:  One at a time.

8        Q.    What did he tell you about the time that it would

9    take to put the plan in place?

10             MR. FIEBACH:  Your Honor, I want to renew my

11   objection with regard to this document, because if this is

12   supposed to be a present view of what was said, he's now gone

13   into a subject matter that's not covered by this note.

14             THE COURT:  Was the question pertaining to the May

15   6th, 2004 conversation?

16             MR. BUSH:  Yes.

17             THE COURT:  All right.  Well, whether it's covered

18   in a note is something you can cross-examine on, that was my

19   understanding of the question.

20             MR. BUSH:  Right.

21             THE COURT:  Why don't you rephrase the question

22   again or ask the question again.  Excuse me.

23       Q.    The question is, did Mr. Borges say anything to you

24   about the time it would take to put the new plan in place?

25       A.    Yes.

1      Q.    And what did he say?

2      A.    Promptly after he said I'm very committed to the

3 concept, I said, okay, and let me understand this.  You're

4 working out a plan, you're working through issues.  Documents

5 take some time.  But I want to know from you it's effective

6 as of when I start.  And he said yes.  The exact words he

7 used were whatever we do, it will relate back to the time you

8 start.

9      Q.    Did you have on that same subject any discussion

10 about the alternative of stock purchase?

11     A.    Yes.

12     Q.    Can you describe for the jury what that discussion

13 was?

14     A.    Yeah.  So I said, all right, let me be crystal

15 clear.  That means -- I said something like, look, the

16 value's going up really fast.  Not only is it important to

17 know that the general benefit relates back to when I start,

18 but the date of the stock valuation matters because if it

19 doubles during the year then exactly which date you use to

20 value that stock matters a whole lot.  We discussed, yeah,

21 that's right, we'd have to come up with a valuation as of

22 your start date.

23     Q.    What is the second numbered point refer to, is that

24 part of your discussion with Mr. Borges?

25     A.    Yes.

1      Q.     What did he say?

2      A.     We talked about follow-up.  It was a very cordial

3    discussion.  This is exiting.  I'm excited, you're excited.

4    Glad you're on board.  We're giving you what you want.

5    Here's what we're going to follow up on Monday.

6      Q.     What were you going to do on Monday?

7      A.     I want you to come up, have lunch with the

8    partners.  It turns out I've got a meeting in Washington at

9    the IFC.  We're using Stan's plane.  You can fly back with

10   me.  My meeting's at four.  We can get dinner afterwards.

11     Q.     Did that all happen?

12     A.     I think so.  I had dinner in Washington about then

13   with both Tim and Frank and I think that was the same

14   evening.  I could be wrong about that.

15     Q.     Can you take a look at Plaintiff's Exhibit 23.

16            Mr. Stevens, did there come a time when you

17   received a draft of the -- of an offer letter from Landmark?

18     A.     Yes.

19     Q.     And who sent it to you?

20     A.     Tony.

21     Q.     And there is -- is Exhibit 23, which I've put in

22   front of you, the way he sent that to you?

23     A.     Yes.

24     Q.     What's the date of that email?

25     A.     May 17th, 2004.

1    Q.    Between your conversations on May 6th and May 17th,

2    2004, did you have any conversations with anybody at Landmark

3    about the terms that you had been offered and that you

4    discussed on the 6th?

5    A.    I don't think so.  Not that I recall.

6    Q.    Did you have any discussions during that period of

7    time that's between May 6th and May 17th with Tony LoPinto or

8    Barbara Beck about the terms that had been offered?

9    A.    Yes.

10   Q.    And what discussions did you have?

11   A.    I ran into Tony at the Urban Land Institute

12   conference which that year was down in New Orleans and I

13   didn't have detailed discussions about the terms, but

14   basically it was, you know, I'm happy, I got you what you

15   wanted.  You're happy.  It's a great opportunity.  This is

16   going to be really exciting, you know.  I'm glad Landmark was

17   able to offer what you wanted.

18   Q.    Now, when you received -- I believe Exhibit 23 is

19   in evidence?

20         THE COURT:  It is.

21         MR. BUSH:  Thank you.

22   Q.    When you received the email from Mr. LoPinto, did

23   you review the draft?

24   A.    Yes.

25   Q.    Did anything about the draft cause you any

1   concerns?

2       A.    No.

3           MR. FIEBACH:  I think I don't have the whole

4   document.

5           MR. BUSH:  Hold on a second.

6           MR. FIEBACH:  You had a separate number for the

7   draft, P-24.

8           THE COURT:  Why don't we take our morning break at

9   this time.

10          Ladies and gentlemen, we're going to take our

11  morning break.  We'll come back and be in our chairs at ten

12  to 11.  Again, I'll caution you not to speak to anyone about

13  the case and in the courtroom or seen.  And don't let anyone

14  speak to you.  Thank you for your attention this morning and

15  we'll come back at 11:00.

16          (Jury out at 10:45.)

17          THE COURT:  Mr. Stevens, you can step down, stretch

18  your legs.  We'll come back on the record.

19          Before we go off the record, is there anything we

20  need to discuss before eleven?  I don't think so either.

21          We're in recess until 11.

22          (Recess.)

23          THE COURT:  Please be seated.  Are we ready for the

24  jury?

25          MR. BUSH:  We're ready.

1          (Jury in at 11:02, a.m.)

2          THE COURT:  All right, ladies and gentlemen.  Please

3    take your seats.  We'll continue with Mr. Stevens' testimony.

4    Whenever you're ready, Mr. Bush.

5          MR. BUSH:  Thank you, your Honor.

6    BY MR. BUSH:

7     Q.    Mr. Stevens, I'd like to go back a bit before we

8    continue with the draft.  I had asked you about whether you

9    had any contact with respect to the agreement with either

10   Mr. LoPinto or somebody at Landmark, but this question is did

11   you have -- did you discuss the opportunity at Landmark with

12   anybody else between the time that you had your conversations

13   on May 6th with Mr. Haviland and Mr. Borges and the time you

14   received the draft on May 17th?

15    A.    Yes.

16    Q.    And what -- with whom did you discuss it?

17    A.    In addition to my discussion with Tony that I

18   described, at the same conference was a good friend of mine

19   named David Gilbert.

20    Q.    Who is he?

21    A.    David -- at the time David was a senior real estate

22   manager at J.P. Morgan Chase.  He was a good friend.  I used

23   to see him regularly at your Urban Land Institute or ULI

24   conferences.

25    Q.    Did you see him at this conference?

1      A.    Yes.

2      Q.    Did the subject of Landmark come up?

3      A.    Yes, it --

4            MR. FIEBACH:  Objection to beyond yes.

5            THE COURT:  Why don't you let him formulate the next

6   question.

7      Q.    How did the topic come up?

8            MR. FIEBACH:  Objection, hearsay.

9            MR. BUSH:  I don't know how that's hearsay.

10           THE COURT:  He can testify as to how the topic came

11   up.

12     A.    I asked David if he ever heard of Landmark.

13     Q.    And had he?

14     A.    Yes.

15     Q.    And did you tell him that you were -- what did you

16   tell him about Landmark?

17     A.    I told --

18           MR. FIEBACH:  Objection, hearsay.

19           MR. BUSH:  What Mr. Stevens told Mr. Gilbert about

20   Landmark, I don't think that's hearsay.

21           THE COURT:  For what purpose is the testimony being

22   offered?

23           MR. BUSH:  It's part of the context of how he

24   decided to take the offer.

25           THE COURT:  I'm going to overrule the objection.

1          MR. BUSH:  Actually, can you read the question back?

2          (Whereupon, the pending questions was read back by

3     the court reporter.)

4     A.    I told him I received an employment offer from

5     Landmark.

6     Q.    And did you have a discussion about Landmark?

7     A.    Yes.

8     Q.    And what did he say to you and what did you say to

9     him?

10         MR. FIEBACH:  Objection.

11         THE COURT:  I'm going to sustain that because I

12    don't understand what the purpose of the testimony is other

13    than the truth right now.

14         MR. BUSH:  Can we approach the bench?

15         THE COURT:  Sure.

16         (Whereupon, the following conference was held at

17    side-bar.)

18         MR. BUSH:  It's not really being introduced for the

19    truth of the matter.  It's being introduced to show what Gary

20    Stevens' state of mind was when he decided to take the offer.

21    So on Mr. Gilbert says is really not whether it's true or not

22    is not important.

23         THE COURT:  What is he going to testify that

24    Mr. Gilbert said?

25         MR. BUSH:  He's going to say that Gilbert apparently

1   was one of the people who was considered.  That he decided he

2   wasn't interested in the job.  That he wondered why Gary

3   would want to do it because he said real estate was

4   uncertain, didn't know how quickly it was going to grow, and

5   they had issues at Landmark.  And Gary's conclusion was,

6   well, yes, but, yeah, I got something beyond real estate.

7          THE COURT:  Is he going to testify about what the

8   issues they had at Landmark were?

9          MR. BUSH:  No, he's not going to say anything about

10  the SEC thing.

11         THE COURT:  I think it does go to his state of mind,

12  what he was thinking about in terms of whether to accept the

13  offer.

14         MR. FIEBACH:  Your Honor, I think it's being offered

15  for the truth of what Gilbert said.  It raises a whole other

16  issue of was the job offered to Gilbert, did he turn it down.

17  It's a whole separate subplot here and it's not -- I think

18  there's a relevance issue, but in addition to that it's got

19  to be offered for the truth of what Gilbert is saying.

20         THE COURT:  I'm going to overrule the objection.  I

21  think as long as it's framed in terms of what Mr. Stevens is

22  thinking in going over the offer.  I will cut him off if he

23  gets into substance of what Mr. Gilbert says what the issues

24  at Landmark were.

25         MR. BUSH:  Just to be clear, he will say that

1    there's an issue about -- that they have had some issues.  I

2    mean, that's already in evidence.

3            THE COURT:  That's in evidence.

4            MR. BUSH:  But he's not going to go into the issues.

5    This is not a way to try and sneak in the SEC stuff.

6            THE COURT:  Let's take it question by question.

7            (Side-bar concluded.)

8            THE COURT:  So the objection to the last question is

9    overruled.

10           Mr. Bush, if you would be so kind to ask the

11   question again.

12           MR. BUSH:  I figured you might want me to do that.

13   Q.    I think my question was, what did he say to you and

14   what did you say to him?

15   A.    He said, yeah, I know about Landmark, I interviewed

16   for that job.

17   Q.    And did he say anything else about your opportunity

18   there?

19   A.    Yeah.  I asked him what he thought.

20   Q.    And what did he say?

21   A.    He said I turned them down for -- for several

22   reasons.

23   Q.    And what were those reasons?

24   A.    First of all, nobody knows how quickly this real

25   estate secondaries opportunity is going to develop and,

1   naturally, it will be there, but I'm not leaving J.P. Morgan

2   on the hope that this happens quickly because nobody knows is

3   the truth.  That's reason number one.  Secondly, if you're

4   going to do it, why would you do it with these guys.  They're

5   in the penalty box.

6           MR. FIEBACH:  Objection, your Honor, move to strike.

7           THE COURT:  The jury will disregard the statement

8   that they're in the penalty box.

9           You can continue.

10           MR. FIEBACH:  Your Honor.  He was --

11           May I approach side-bar, your Honor?

12           THE COURT:  Yes.

13           MR. FIEBACH:  I move for a mistrial.  He said

14   specifically he wasn't going to get into that.

15           I move for a mistrial.  He was told that he would

16   not get into that, that's what Mr. Bush said, and to get into

17   this idea that they're in the penalty box is much different

18   than issues, and certainly raises an issue now about the

19   character of Landmark and something that Mr. Bush said was

20   not going to be gone into.

21           MR. BUSH:  First of all, he hasn't said anything

22   about the SEC.  You seem to think that that reference is to

23   the SEC.  It's not.  If I can get him to explain.

24           THE COURT:  I think we're going to move on.  I'm

25   going to deny the motion for a mistrial.  I think the

 1    statement is vague enough that it's not yet enough of a

 2    problem to warrant a mistrial, but I am concerned about where

 3    the witness is going next, very concerned.  And so I think

 4    the jury's heard enough at this point about what Mr. Gilbert

 5    said.  Unless he's going to say something about that would go

 6    to state of mind that would not touch on the issues affecting

 7    at Landmark, I'm not going to allow the testimony.

 8         MR. BUSH:  I'll go to what was his conclusion after

 9    the conversation.

10         THE COURT:  That's fine.

11    Q.   Mr. Stevens, what conclusion did you reach after

12    listening to or having your conversation with Mr. Gilbert

13    about your own interest in the position?

14    A.   I was interested in the position, because the

15    reasons he didn't like it didn't apply to me based on the

16    offer I'd gotten from Landmark.

17    Q.   And was there any particular part of the offer that

18    you were focused on when you reached that conclusion?

19    A.   Yeah.  They were offering me ownership of

20    enterprise economics of equity in the whole firm.  So the

21    fact that the real estate part was going to take a long time

22    wasn't that big of a detriment as long as I was participating

23    in everything else.

24    Q.   Let's go back to Exhibit 23.  When you received

25    this draft -- hold on, excuse me one second.  Did anything

1   about the draft cause you any concern?

2       A.      Graeme, 23 is the LoPinto.

3       Q.      The draft that was sent to you by Mr. LoPinto.

4       A.      Did anything cause me concern?  No.

5       Q.      Did you consider or did you review it to consider

6   whether it was inconsistent with the discussions that you've

7   testified you had with Mr. Haviland and Mr. Borges and

8   Mr. LoPinto?

9       A.      Yes.

10      Q.      And what did you conclude?

11      A.      I concluded that it was a reasonable summary of the

12  terms we had discussed.

13      Q.      You mentioned the word summary.  Let me direct your

14  attention to the first page, first paragraph of the draft

15  itself.  Actually, why don't you highlight the line.  That's

16  good.  That's fine.

17              Can you highlight the word summary?

18              Did you note that it was -- you mentioned the word

19  summary.  Did you note that it was a summary when you

20  reviewed it?

21      A.      Yes.

22      Q.      And what was your reaction to the use of that word

23  in the offer or the draft?

24      A.      In my experience, it was typical.

25      Q.      And you say in your experience, what was your

 1   experience?

 2       A.    Well, at every job I'd ever had, my law firm, the

 3   Artery Organization, J.E. Robert, Carlyle, we'd used similar

 4   kinds of letters when extending an employment offer.  So I'd

 5   seen hundreds of these things.

 6       Q.    And while you were at any of those organizations,

 7   did you have any responsibility for preparing or reviewing

 8   such letters for others who were hired by whatever

 9   organization you were at?

10       A.    Yes.

11       Q.    And which organization?

12       A.    My law firm, I was the hiring partner so I had it

13   there.  At the Artery Organization, I was an owner of the

14   firm so I had it there with respect to people I hired which

15   were numerous.  And at Carlyle, early on I had to send out

16   the letters and later on they had an HR Department that took

17   care of those for us.

18       Q.    And in your experience, did any of these

19   organizations use more detailed employment agreements?

20       A.    Not that I'm aware of.  I suspect that Carlyle with

21   some of the high -- with more high powered people at Carlyle,

22   I suspect that they had more detailed agreements, but for the

23   kind of hiring I was familiar with, they were totally

24   common.

25       Q.    Did you ask Mr. Borges or Mr. Haviland to prepare a

 1   more detailed agreement?

 2        A.    No.

 3        Q.    Did you ever -- while you were at Landmark, I'm

 4   going to jump ahead out of order here a little bit, did you

 5   ever have a circumstance where you were involved in an offer

 6   letter being extended to somebody who was going to join

 7   Landmark?

 8        A.    Yes.

 9        Q.    And who was that person?

10        A.    It was multiple people.  Jamie Sunday, couple of

11   analysts, the guy we hired in London.

12        Q.    With respect to the guy in London, what's his

13   name?

14        A.    Paul Parker.

15        Q.    Was there a circumstance where he sought a more

16   detailed contract?

17        A.    The exception, and I hedged at Carlyle a little

18   bit.  When you hire people overseas sometimes there are

19   different understandings of the process from the

20   understandings we have in the United States.  So there are

21   practices in London that are very different from practices in

22   the United States.  And so we sent out one of these letters

23   to Paul and he had some questions about it.  So that was

24   actually the only one I ever saw that was complicated like

25   that.

1    Q.    Were you the point person?

2    A.    Yes.

3    Q.    And do you recall what Landmark's response was to

4    his request?

5    A.    Yeah.  I worked directly with Tim on that.  So I

6    talked to Tim immediately about it.

7    Q.    Was a detailed agreement prepared?

8    A.    No.

9    Q.    So what was used?

10   A.    I'm sorry?

11   Q.    What was used?

12   A.    We used the brief -- the summary form of letter and

13   then Tim -- Tim did some emails that were further

14   explanation.  Sitting here right now, I don't recall whether

15   or to what degree those additional details that were

16   important to Paul were incorporated in the letter.  I don't

17   know.  I think we pretty much used the form and there was

18   just the details in this case were provided through some

19   emails, I think.  I'm not a hundred percent positive on

20   that.

21   Q.    All right.  When you received the draft, did

22   Mr. Borges call you and say anything to the effect that they

23   had changed any of the terms of the offer that they had

24   discussed with you?

25   A.    No.

1      Q.    Did Mr. Haviland?

2      A.    No.

3      Q.    Mr. LoPinto sent it to you?

4      A.    Yes.

5      Q.    Mr. LoPinto sent it to you.  Did he tell you that

6  any of the terms had been changed?

7      A.    No, he said the opposite.  He said I'm happy to

8  give you the offer that we talked about, to confirm the offer

9  we talked about.

10      Q.    Let me ask you to turn to page -- to Exhibit 25.

11  Actually, I'll have to give that to you.  Do you recognize

12  Exhibit 25?

13      A.    Yes.

14      Q.    What is it?

15      A.    It's a copy of the signed final agreement on

16  Landmark letterhead that Landmark asked me to sign.

17          MR. BUSH:  I move that into evidence, your Honor.

18          MR. FIEBACH:  No objection, your Honor.

19          THE COURT:  It will be marked as a full exhibit.

20  25, right?

21          MR. BUSH:  Yes, your Honor.

22          Can you highlight the date.

23      Q.    What's the date of the letter?

24      A.    May 20, 2004.

25      Q.    Between May 17th and May 20th, did you have any

1    discussions with anybody about the terms that were in the

2    draft or that were going to be in the final version?

3        A.    No.  I might have had a conversation with Tony just

4    to say did you get the letter, are you happy with the letter.

5    But not about terms, no.

6        Q.    And when you got this final version, did you review

7    it?

8        A.    Yes.

9        Q.    And was it -- were there any significant changes

10   between the draft you received on the 17th and this final

11   version?

12       A.    I didn't -- there were some changes, but I did not

13   think they were significant.

14           THE COURT:  Go ahead Mr. Bush.  Why don't you ask

15   the question again.

16           MR. BUSH:  I'm not sure I had a pending question,

17   but let me just move on.

18       Q.    Mr. Stevens, did you execute this agreement?

19       A.    Yes.

20       Q.    Is that your signature on the third page?

21       A.    Yes.

22       Q.    What's the date of your signature?

23       A.    May 20th, 2004.

24       Q.    Do you know when you returned the executed copy to

25   Mr. Borges?

1      A.     Either the 20th or the following day.

2      Q.     And did you receive it, this final version, Exhibit

3  25, on or about May 30th?

4      A.     I believe so.

5      Q.     Let me ask you to turn to the term on page two.  If

6  you could highlight participation in the economics of

7  Landmark Partners, Inc.

8           Is this the provision that related to what you

9  discussed with Mr. LoPinto and Mr. Haviland and Mr. Borges

10  about ownership in Landmark Partners' equity?

11      A.     Yes.

12      Q.     Can you explain why you thought this provision was

13  consistent with what you had been told?

14      A.     Because it was a summary of a lot of discussions

15  and there are lots of different words used to describe this

16  stuff.  An interest in the economics of the firm.  An

17  interest in the business, as you heard Tony describe it

18  yesterday.  An interest in the equity of the business.

19  They're talking about the same thing.  It's the whole firm

20  and it's a meaningful participation.

21      Q.     And did you -- I see the reference to 10 percent.

22  That was consistent with the conversations?

23      A.     Yes.

24      Q.     It doesn't seem to have any time in it.  Was that a

25  concern to you?

1      A.     No.

2      Q.     Why not?

3      A.     Because I'd had the discussion with Tim and also

4    separately with Frank and confirmed that the intent was no

5    matter what they did it would relate back to the time I

6    started.  It would be effective economically for me as of the

7    time I started.

8      Q.     It also refers to the -- to the different forms

9    that interest could take.  You see that?

10     A.     Yes.

11     Q.     Were you concerned that that meant that they were

12   not going to give you some interest in the entire firm?

13     A.     No.

14     Q.     Why not?

15     A.     Well, because there are many ways of giving someone

16   ownership of equity in the whole firm.  And I had seen -- I

17   drafted plans that were a lot of those ways.  You could do it

18   through any one of those ways.  And, in addition, all of the

19   conversation I'd had with Tim was about paying cash for stock

20   and my impression -- Tim said when I said I can pay cash,

21   this isn't a problem for me, he said that's good or great or

22   something like that, and so my belief was they were going to

23   go with the stock purchase plan and I would be buying

24   10 percent for cash.

25     Q.     Had you pursued -- let me strike that.

1          Had you considered any other job opportunities

2    during this period of time that you were talking with

3    Landmark from January to May?

4          A.    Yes.

5          Q.    And what were the nature of the -- what was the

6    nature of the consideration that you'd given?

7          A.    Well, in that period of time I was still finishing

8    the Brownfield's capital thing I described before.  I got a

9    series of calls from executive recruiters said, hey, I hear

10   you're leaving Carlyle, are you interested in this or this or

11   this.  Returned those calls.  Mostly I got along quickly with

12   Landmark and decided on that option.  There were a couple I

13   pursued a little bit more than that.

14         MR. BUSH:  One second, your Honor?

15         THE COURT:  Yes.

16         Q.    Did you have any discussions with FBR?

17         A.    I did.

18         Q.    What was the nature of those discussions?

19         A.    FBR is an investment bank located in Washington,

20   D.C. area and they contacted me with a series of proposals

21   for me to become the Chief Executive Officer of an REIT or

22   Real Estate Investment Trust that they were looking to take

23   public.

24         Q.    Did you have more than one discussion with them?

25         A.    Yes.

1      Q.    Did you -- were you familiar with REIT's?

2      A.    Yes.

3      Q.    This was a public REIT?

4      A.    There was more than one, but yes.

5      Q.    And were you familiar --

6      A.    Excuse me.  They would be public, yes.

7      Q.    I understand.  Did you have any knowledge about

8   what the level of compensation would be for a senior

9   executive?

10      A.    I had a general sense, yes.

11      Q.    Please let me finish the question.  The court

12   reporter has a hard time taking it down if we're talking at

13   the same time.

14      A.    Sorry.

15      Q.    Did you have any understanding of what the senior

16   executive at a Real Estate Investment Trust compensation

17   would be?

18      A.    Yes.

19      Q.    And what is that?

20      A.    Current compensation would typically be in the

21   range, at that time, of a million to a million and a half

22   dollars of cash, plus stock options that would be, if the

23   REIT were successful, worth much more than that.

24           MR. BUSH:  One second, your Honor.

25           I'd like to show the witness what's been marked as

 1    Defendant's Exhibit 516.

 2         A.    Yes.

 3         Q.    First of all, what is this document?

 4         A.    This looks like either a copy or the original of a

 5    document sent from my home fax.

 6         Q.    Can you turn the page and tell us what you were

 7    sending?

 8         A.    I was transmitting my acceptance of the letter

 9    agreement back to Landmark.

10         Q.    And what's the date of the -- what's the date on

11    the fax cover sheet?

12         A.    May 19th, 2004.

13         Q.    I mean on the date where it says to fax number

14    from, you see date?

15         A.    Yes.

16         Q.    Can you highlight that?

17               So what's the cover sheet dated?

18         A.    May 21.

19         Q.    And I think you were referring to a date at the

20    top, the fax line --

21         A.    Yeah.

22         Q.    Gary, you really need to let me finish talking

23    before you answer.

24         A.    Sorry.

25         Q.    What's that date?

1    A.    That date is May 19th, 2004.

2    Q.    And do you know why those dates are different?

3    A.    Yes.

4    Q.    Why?

5    A.    Because the date stamp on my home fax machine

6    wasn't programmed properly.  It was off by a couple days.

7    Q.    And can you turn to the last page and highlight the

8    signature block, please, Jake?

9          Sorry, your Honor, we need a second.

10         MR. FIEBACH:  Your Honor, I have no objection to the

11   admission.

12         THE COURT:  It will be admitted full.

13         MR. BUSH:  I'm sorry.  I wasn't thinking of the jury

14   having seen it.  Can we publish it?  Is it available to the

15   jury?

16         THE COURT:  It is.  It's up on the screen.

17   Q.    And what's the date of your signature line?

18   A.    The date on that one says the 21st of May.

19   Q.    Is this the actual signed version that you returned

20   to Landmark so far as you know?

21   A.    As far as I know, yes.

22   Q.    When did you begin work at Landmark?

23   A.    June 1st of 2004.

24   Q.    And when did you leave?

25   A.    In early November 2008.

1    Q.    What were the, in general, the circumstances under

2    which you left?

3    A.    They terminated me.

4    Q.    Did Landmark put into place any economic

5    participation plan during the time that you were there?

6    A.    No.

7    Q.    Did you make any efforts between 2004 and 2008 to

8    try and get Landmark to put an economic participation plan

9    into effect?

10    A.    Yes.

11    Q.    What were the -- in general, what were the efforts

12    that you made?

13    A.    In general, there were discussions with Tim and/or

14    Frank saying this was a critical piece of my coming to the

15    firm.  What's going on with your efforts to finalize these

16    ownership restructure issues, to put a plan in place and give

17    me the benefit you promised me.

18    Q.    When did you have these conversations?

19    A.    They happened numerous times.  At a minimum, they

20    happened in conjunction with each of the annual reviews that

21    I had where we sat down and talked about how I was doing and

22    how I liked the firm.  And there were conversations beyond

23    that.

24    Q.    And during the annual reviews, how did you bring

25    the subject up?

1      A.    Well, it was typically, look, tell me about the

2  status of these economic participation plans, what's

3  happening.

4      Q.    What did Tim and Frank tell you when you brought the

5  subject up?

6      A.    In every case they said, look, we're struggling.

7  We are working on it.  We don't have anything for you yet,

8  but we recognize we owe it to you and we're going to give it

9  to you.

10     Q.    Is there any other time you can think of that you

11 raised it in a different context?

12     A.    Yes.

13     Q.    What was that?

14     A.    There are a couple, but one in particular was that

15 Jamie Sunday, who was working for me in the real estate

16 group, received an offer to leave Landmark and take a job

17 with a firm called Harborvest, and the subject came up in

18 connection with trying to keep Jamie on board.

19     Q.    And what was the name -- what was the discussion

20 that you had with Mr. Borges and Mr. Haviland when that

21 circumstance came up?

22     A.    Well, in the context of how do we keep Jamie, I

23 described Jamie's primary concerns about Landmark which

24 related to the same issues that I had with the economic

25 participation plan.

1    Q.    Did you have a meeting in June of 2008 where you

2    discussed economic participation?

3    A.    Yes.

4    Q.    And how did that meeting come about?

5    A.    I asked to meet with Frank and Tim.

6    Q.    And what was the purpose for the meeting?

7    A.    I felt that too much time had gone by, that I was

8    no longer willing to just hear these general assurances, and

9    before we raised another real estate fund and went out to the

10   public with it, I wanted to resolve the open issue about

11   economic participation in the whole firm.

12   Q.    And where did you meet?

13   A.    We met I think at -- we met in my office at

14   Landmark.

15   Q.    What did you say to them on the subject?

16   A.    I said, look, guys, I like you, I'm happy here.

17   And I'm upset about this, that we can't just keep going like

18   this where you keep promising me you're going to do something

19   in the future but nothing happens.  You really got to address

20   the issue.  I'm feeling like I made a big mistake coming here

21   and you need to address it.

22   Q.    What did they say, if anything?

23   A.    They said, you know, you're right.  We've

24   struggled, we've tried a lot of things.  We consulted with

25   this guy and that guy.  We've really worked on it, but you're

1 right, we have to resolve it.

2     Q.     And how did the meeting end?

3     A.     Pretty much that way.  Look, we want to keep you.

4 We think you're doing a good job.  We want to get out there

5 with this new fund that we're raising and we'll address it.

6     Q.     Was there a discussion at some time after this

7 meeting in June at which you addressed, you and Mr. Borges

8 and Mr. Haviland, addressed the progress on the economic

9 participation plan?

10     A.     Yeah, there were some casual conversations over the

11 summer, but the next big discussion happened in September.

12     Q.     And do you recall when it happened in September?

13     A.     I can't recall the exact dates.  I did -- excuse

14 me.  I prepared a memo ahead of the meeting to serve as an

15 agenda of the meeting, but I don't recall the exact date.

16     Q.     Let me ask the witness to take a look at Exhibit

17 59.  Let me know when you've had a chance to look at that.

18     A.     Sure.  Okay.

19     Q.     Is this the memo that you referred to?

20     A.     Yes.

21     Q.     When did you prepare it?

22     A.     I prepared it immediately before I sent it.  So I

23 prepared it on, I think, September 20th and 21st of 2008.

24     Q.     And did you provide it to Mr. Haviland and

25 Mr. Borges in advance of the meeting?

1      A.    Yes.

2      Q.    And did you have the meeting?

3      A.    Yes.

4            MR. BUSH:  I'd move that into evidence, your Honor.

5            MR. FIEBACH:  Hearsay, your Honor.

6            THE COURT:  Sustained.

7            MR. BUSH:  I think it is not being offered for that

8      purpose, your Honor.

9            THE COURT:  I sustained the objection.

10     Q.    I think you said you had the meeting.  What did you

11     discuss at the meeting?

12     A.    We discussed the topics that I described in this

13     agenda memo.

14     Q.    All right.  And can you tell me what you said about

15     you and Mr. Borges and Mr. Haviland discussed about your

16     commitment to Landmark?

17     A.    Yes.  Frank had recently asked me are you with us,

18     are you really committed to being with this firm.  And I was

19     responding to that in this part of the agenda memo and at the

20     meeting that happened that day.

21     Q.    And what did you say on that subject?

22     A.    I said, look, when we met last June, you guys

23     indicated, yet again, that you were going to do something.

24     Now three months have gone by, you still haven't done

25     anything.  That's a problem.  You have not honored the

1    provision of my employment agreement that we agreed on when I

2    started that was most important to me and that really

3    concerns me a great deal.  So if you're asking me am I with

4    you whether or not you would ever do what you said you would

5    do, the answer is no.  What kind of person you would want to

6    keep would agree to that?

7         Q.    And did they have any response to those comments?

8         A.    Yes.

9         Q.    What was the response?

10        A.    During the meeting they said you're right.  You

11   will soon receive a presentation from Tim about an economic

12   participation plan.

13        Q.    And did you receive something from Mr. Haviland?

14        A.    Yes.

15        Q.    Let me ask you to take a look at Plaintiff's

16   Exhibit 60 which, I believe, is in evidence.  Is that right?

17            THE COURT:   60's a full exhibit.

18        Q.    Is this what you received?

19        A.    Yes.

20        Q.    And what was your reaction when you received it?

21            THE COURT:   Can you put 60 on the screen so the

22   jurors can see it.

23            Go ahead, Mr. Bush.  I just wanted to make sure the

24   jurors could see it.

25        Q.    Do you have the hard copy of that up there?

1    A.    Not that I'm aware of, but I'll look.

2    Q.    Let me ask you to look through that and answer my

3    question, what was your reaction after you reviewed it?

4    A.    My first reaction was finally, but then as I read

5    it I was shocked.

6    Q.    And why were you shocked?

7    A.    Because I didn't see how they were outlining

8    something that was responsive to the commitment they made.

9    Q.    And in what respects was it not honoring the

10   commitment in your view?  Let's take a look at Bates page

11   197.

12   A.    On that page there are four points.  None of them

13   responded to, in my view, the original agreement.

14         The first one says this is a plan for partners and

15   principals.  Well, the plan that we were talking about in

16   2004, as you heard Tony describe it, was for the key leaders.

17   Tim had described them to me.  There are only four of them at

18   the time.  So partners and principals was a much, much

19   broader group.  So you want to have a plan that includes

20   them, I guess you can do that, but it's not -- seems unlikely

21   to me that you're actually going to offer the same kinds of

22   economics in the firm to all of these people that we were

23   talking about when we talked about the four people who were

24   already here, plus me, which is five, that you might later

25   expand to ten.  So that's number one.

1            Number two, the benefit of the plan didn't start

2    until calendar year 2009.  I got there in 2004.  So I didn't

3    see how a plan that benefited me starting in 2009 related to

4    something that would be effective for me economically as of

5    the time I started.

6            Third, the participants -- it talks about receiving

7    participation in an operating margin, I didn't know what that

8    was, of new line marked funds.  That's not participation in

9    the whole firm.  That's some operating margin concept that I

10   don't even know what you're talking about.  And that the

11   first funds would be Fund VX, that's private equity fund,

12   Real Estate V and P.E. Co-Investment.  Those were relatively

13   new funds.  I mean, Real Estate V hadn't even been raised

14   yet.  We hadn't even put the book on the street.

15   Q.    Let me ask you to turn to Bates page 198.  What was

16   your reaction to whether the terms on that page satisfied the

17   agreement.

18   A.     No, same points.  The first one is applied to a

19   much broader group and it's limited by its terms to

20   respective product lines.  It's not the whole firm.  Not only

21   is it -- it's only certain product times.  Participation

22   based on tenure and contribution.  That, per se, didn't

23   really bother me, because they assured me that whatever they

24   did would relate back to the time I started, but the

25   suggested range of participation had a maximum participation

1    for partners of 10 percent -- of 5 percent.  And the number

2    that we talked about, they presented in my terms and put in a

3    summary letter was 10 percent.

4        Q.    Was there anything else about the -- and you're

5    free to look through it -- anything else about the proposal

6    or the outline that you focussed on?

7        A.    Yes.

8        Q.    What was that?

9        A.    Well, I read through the other terms.  I had some

10   problems with most of them.  There was a term that I thought,

11   well, at least you're pointing in the right direction

12   there.

13       Q.    And what was that?

14       A.    Bates 200.

15       Q.    And why is that pointing in the right direction?

16       A.    Well, it's a recognition that even on a plan that's

17   called Equity Share Program that is sort of geared to an

18   operating margin concept which I guess is sort of a profit

19   plan, but it's a recognition that you're not really getting

20   economic participation in profits unless there's an equity

21   conversion feature that says, look, if you own part of that

22   revenue stream, but if we do something like bring in a new

23   investor or we sell a bunch of the company, that revenue

24   stream is no longer owned by the same guys so we've got to

25   convert the right to receive that revenue stream to an equity

1    stake, otherwise you're not getting the full economic

2    benefit.  At least it showed that.  They were acknowledging

3    that part of the -- of the original agreement.  So it was

4    sort of a profit sharing plan.  It had a lot of things that

5    didn't comply with the original agreement, but this part I

6    thought sort of did, because it recognized that when they

7    said economic participation in the whole enterprise, if they

8    did that by giving you ownership in the revenue streams or

9    the profit streams, they had to recognize that couldn't get

10   taken away from you just because they brought in a big new

11   investor.  So you'd get conversion to equity in that interest

12   so that you realize the value for the future.

13        Q.    Did you respond to Mr. Haviland?

14        A.    Yes.

15        Q.    How?

16        A.    Well, in multiple ways.  The initial response after

17   I reviewed it, I immediately called him.

18        Q.    What did you say to him?

19        A.    I don't remember exactly.  I know I took some

20   notes, but I don't remember.

21        Q.    Where were you at the time?

22        A.    I was in Chevy Chase when -- I think I was in Chevy

23   Chase when I received this.  I could have still been on the

24   road.  This was a Friday.  I traveled a huge amount during

25   September of 2008.  I was back and forth between the coasts a

1    couple times.  I don't remember if I was back from the trip

2    that week or not when I actually got this.

3        Q.    And what was the conversation that you had?  What

4    did you tell him when you got him on the phone?

5        A.    I said, Tim, I don't know what to say about this.

6    First of all, I have no idea what these operating margin

7    things are.  I don't know what you're talking about.  But

8    this isn't in the whole firm, Tim, this is in future funds.

9    That's really not what we meant.

10       Q.    What did he say?

11       A.    He basically shifted.  He didn't respond to that.

12   He shifted to this is a great program.  You're going to make

13   a lot of money on this program.  I've done some numbers and

14   I'll send them to you and, boy, this is fantastic.

15       Q.    Did you follow that phone call up with any other

16   communication?

17       A.    Yes.

18       Q.    Let me ask you to turn to Plaintiff's

19   Exhibit -- you don't have -- to Plaintiff's Exhibit 64.  Is

20   that a memorandum you wrote after receiving the proposal

21   that's Plaintiff's Exhibit 60?

22       A.    Yes.

23       Q.    And is that where you conveyed your reaction to the

24   proposal to Mr. Haviland and Mr. Borges?

25       A.    Yes.

1    Q.    And did you send it to them on or about September

2   28, 2008?

3    A.    Yes.

4          MR. BUSH:  I move it into evidence.

5          MR. FIEBACH:  No objection, your Honor.

6          THE COURT:  Grounds?

7          MR. FIEBACH:  No objection.

8          THE COURT:  No objection.  It can be admitted as a

9   full exhibit.  64 can be full.

10   Q.    There's a reference in the second paragraph as Tim

11  acknowledged.  Do you see that?

12   A.    Yes.

13   Q.    What did Mr. Haviland acknowledge -- first of all,

14  when did he make that acknowledgement?

15   A.    In the phone conversation that I had on the

16  previous Friday, the 26th.

17   Q.    And what did he acknowledge?

18   A.    He acknowledged that they did not prepare this plan

19  with a view towards satisfying my original commitment.

20   Q.    Did you have a meeting with Mr. Borges and

21  Mr. Haviland immediately following this email or a phone

22  call?

23   A.    Yes.  Some kind of -- might have been telephonic.

24  I really don't remember.

25   Q.    Let me show you what's been marked as Exhibit 65.

1      Show you what's been marked as Exhibit 65 and ask you to

2   turn to the second page.

3      A.   Yes.

4      Q.   Does that refresh your recollection when you had a

5   phone call with Mr. Haviland and Mr. Borges following your

6   memo?

7      A.   It does.

8      Q.   And can you describe for the jury what the -- what

9   happened in that phone call, what you said to them and they

10   said to you?

11         MR. FIEBACH:  Your Honor, I ask that he put his

12   notes down unless he needs them and unless there's a

13   foundation.

14         THE COURT:  Why don't we take the exhibit off the

15   screen.

16      Q.   Do you recall what you said?

17      A.   Yes.

18      Q.   And can you testify to what you said to Mr. Borges

19   and Mr. Haviland in the phone call?

20      A.   Yes.  It would be helpful so that I can refer to my

21   notes so I could get everything, but I can remember the

22   general gist of the conversation.

23         MR. FIEBACH:  Objection.

24      Q.   Give your best recollection and then I'll refresh

25   your recollection.  What's your best recollection?

1      A.      The first thing is Frank, I believe, said you're

2  right, we gave you commitments up front and we need to honor

3  them and we will honor them.  The next thing we talked about

4  was buying.  I said something like, look, we spent a very

5  long time in 2004 talking about my ability to buy into the

6  firm, and I really believed at that time that I was going to

7  buy in for cash if you would keep the stock purchase plan as

8  the form of the plan and that I would be buying stock and

9  that you would modify it to deal with the people who had

10  problems financing it.  What happened to that idea?  Why

11  didn't you implement that?

12      Q.      Did they respond?

13      A.      Yes.

14      Q.      What did they say?

15      A.      Either Tim -- I think Tim said, well, we didn't

16  adopt a stock purchase plan like the one we talked about

17  because we couldn't agree on valuation.

18      Q.      What was your reaction to that?

19      A.      Wait a minute.  You never talked with me during

20  this consideration.  I thought we did agree on valuation.

21  But, okay, you didn't talk to me about this.  What, you just

22  decided?

23      Q.      And did you have any discussion about the valuation

24  subject, further discussions about the valuation subject?

25      A.      Yeah.  I said, wait a second, wait a second, wait a

1    second.  You gave me specific numbers about the value of the

2    enterprise at 2004, and we talked about an equity multiple

3    and it was kind of a ten times in earnings was about the

4    value of the firm and, you know, there was probably some debt

5    attached to that.  But tell me this, you got to 20 million

6    dollar value, subtract the debt, and compare that number

7    which was sort of the value we were talking about my buying

8    into, with the comparable number today.  Apples to apples on

9    2008 basis.  Look at that number.  That's got to be huge.

10   That is going to be a huge number.  And this plan is a joke

11   compared to that.  It's just not talking about the same

12   thing.

13        Q.    And what was their reaction?  Did they have one?

14        A.    I think they were defensive, they were trying to

15   sell.  And then I said, well, look, I don't know the numbers

16   because you're not sharing them with me, but I think that

17   that two million dollar buy-in would now be worth more than

18   20 million dollars.  It's gone way way up for a whole lot of

19   reasons.

20        MR. FIEBACH:  Your Honor, I move to strike that,

21   this testimony, as being excluded by the Court's ruling.

22        THE COURT:  I'm going to overrule the objection.

23        A.    How can the value be zero --

24        MR. FIEBACH:  Your Honor, can we have a limiting

25   instruction.

1          THE COURT:  I'll give a limiting instruction.

2          MR. BUSH:  He's in the middle of the answer.

3          THE COURT:  He can finish the answer.

4     A.    How can the value be zero as of January 1, 2009,

5     which is what -- this plan to me, after almost five years, is

6     worth zero today.  And what we spent all the time talking

7     about would have been worth probably more than 20 million

8     dollars today.  How can that possibly be the same thing?

9          THE COURT:  All right, ladies and gentlemen.  Again,

10    you're hearing evidence along the lines we've heard before,

11    that the parties discussed at various times either giving

12    Mr. Stevens  an ownership in it or an ownership interest.  I

13    instruct you that the contract between the parties did not

14    require Landmark to give Mr. Stevens an ownership interest

15    and that you may, therefore, not consider this evidence as

16    proof either that Landmark breached the contract or that it

17    is liable for any negligent misrepresentation simply because

18    it failed to give Mr. Stevens an ownership interest.  The

19    Court's already ruled that Landmark was not required to do

20    that and you're not to speculate as to why.  Instead, you may

21    consider evidence about discussions of an ownership interest

22    only for the limited purpose of determining whether Landmark

23    promised to let Mr. Stevens participate in the economics of

24    the entire firm or just in specific funds managed by the

25    firm.  In other words, you may consider this evidence only in

1    deciding what the parties agreed to and whether Landmark is

2    liable for any negligent misrepresentation about the scope of

3    the program referred to in the May 20th, 2004 agreement.

4            All right, Mr. Bush.

5            MR. BUSH:  Thank you, your Honor.

6    Q.    You recall what your next -- actually withdrawn.

7            How did that telephone call end?  Was there any

8    agreement on next steps or anything like that?

9    A.    I'm sorry, I'm a little distracted by our new

10   guests here.  May I refer to my notes for this?  I've lost

11   track.

12   Q.    We were talking about the conversation you had with

13   Mr. Borges and Mr. Haviland concerning the Plaintiff's

14   Exhibit 60, and I think you related what that conversation

15   was and I have asked you now whether there was any agreement

16   at the end of the conversation about what the next steps

17   were?

18   A.    Yes.  We agreed to continue dialogue on this

19   subject.

20   Q.    Let me show you what's been marked, premarked as

21   Exhibit 66.  Is this email a follow-up from Mr. Borges to the

22   conversation that you just testified about?

23   A.    Yes.  I'm sorry -- no.

24   Q.    What is it a follow-up to or what is it?

25   A.    It's an email that he sent to me after I

1    sent -- wait a second.  I'm sorry.  I'm confused here.  It's

2    an email he sent after the memo I had on September 28th.

3    This is an email from Frank Borges dated Monday,

4    September 29th, about 3:15 or so.  And the meeting I had that

5    I just described to you was later in the afternoon.  It was

6    before.  I got this before the meeting I just described.

7        Q.    And what did you understand Mr. Borges to be saying

8    to you in this email?

9        A.    He was apologizing for the fact that it took so

10   long to come up with a plan and reiterated it wasn't because

11   we hadn't tried, it just took a very, very long time.  We

12   looked at everything and we've concluded that the best option

13   is to give a meaningful participation in current profits and

14   equity-like treatment on a liquidity event, the meaning of

15   sale -- liquidity, meaning something that creates cash.

16       Q.    And in the very large paragraph in the middle --

17   can you blow that up -- there's language addresses the intent

18   of the provision.  Do you see that?  Can you highlight that,

19   Jake.

20            I'm sorry, can we move this into evidence, your

21   Honor?

22            MR. FIEBACH:  No objection, your Honor.

23            THE COURT:  Document will be admitted full.

24            I think the jury has it now, Mr. Bush.

25       Q.    Did you agree with Mr. Borges that the proposal

1    that he had made addressed the intent of the provision?

2         A.    No.

3         Q.    Why not?

4         A.    Well, there were lots of reasons, but it just

5    wasn't responsive for the reasons I described before.  It

6    wasn't an interest in the whole firm.  It didn't -- it wasn't

7    effective to convey economic benefit as of my start date.  It

8    wasn't 10 percent of anything.  And it wasn't -- it just was

9    like a different topic, which I said, I told them I was

10   concerned we were talking about two different things.

11        Q.    Did you convey that to him in the phone call that

12   you've already testified about that occurred after this

13   email?

14        A.    Yeah.  That was my pretty consistent message all

15   the way through, through telephone conversations, in-person

16   meetings, and a series of emails.

17        Q.    Let me ask you to take a look at Plaintiff's

18   Exhibit 69 which I'll get for you.

19              One second, your Honor?

20              THE COURT:  Yes.

21        Q.    Is this an email that you wrote to Mr. Borges and

22   Mr. Haviland and sent to them on October 1st, 2004?

23        A.    That's one of the two emails that's on this page,

24   yes.

25        Q.    The one that's at the top?

1      A.    Yes.

2            MR. BUSH:  I move this into evidence.

3            MR. FIEBACH:  Objection, your Honor.

4            THE COURT:  Grounds?

5            MR. FIEBACH:  Grounds are hearsay and settlement.

6            THE COURT:  Well, with regard to the second

7      objection, it's overruled.  With regard to the first

8      objection, it's sustained as to the top portion of the

9      document.

10           MR. FIEBACH:  That's what the objection was to, the

11     top portion.

12     Q.    When you sent this email, were you communicating to

13     Mr. Haviland and Mr. Borges what your reaction was to their

14     positions on the share equity plan?

15     A.    Yes.

16     Q.    And what were your reactions?  What were your main

17     points?

18     A.    The main points were that the plan that they

19     presented to me did not -- was not a reasonable way of

20     satisfying the commitment they had had for three reasons that

21     were articulated here.

22           First, it didn't offer participation in the whole

23     enterprise.  It was limited to one narrow part of it, the

24     real estate part of it.

25           Secondly, the magnitude of what they were proposing

1    is so far off of what we were talking about when we made the

2    original agreement that it can't possibly be the same thing.

3           And, third, it didn't begin to build value until the

4    following year when I'd been working there since 2004, like

5    five years later.

6    Q.    And did Mr. Borges respond to you in writing?

7    A.    I believe that he did.

8    Q.    Let me ask you to take a look at Plaintiff's

9    Exhibit 72.  Is this Mr. Borges's response?

10   A.    I believe so.  There were lots of emails and phone

11   calls in this period.  I believe this is the next direct

12   response to the email you just asked me about.  So the email

13   you just asked me about was Wednesday, October 1.  This is

14   Thursday October 2.  I believe that's the first response to

15   that email.

16   Q.    Okay.  And in this email, did he, in your view,

17   make any statements about how -- withdrawn.  Did he make any

18   statements about how the plan was interpreted by him?

19   A.    Yes.

20   Q.    And what were those statements?

21         MR. FIEBACH:  Your Honor, I object on the grounds of

22   settlement.

23         THE COURT:  That's overruled.

24   Q.    So what were those statements?

25   A.    The statements that he was making to me were you

1    pointed out that the intent was to -- for you to participate

2    in all of LPI economics.  You're absolutely right, and the

3    plan we presented to you does not do that.

4        Q.    And did he say that they would do anything about

5    that?

6        A.    Yes.

7        Q.    What did he say?

8        A.    He said you will be a five percent participation in

9    the next private equity fund as well as a 10 percent

10   participation in the next real estate fund starting in

11   2009.

12       Q.    Did you reach any conclusion about whether that had

13   addressed one of your concerns?

14       A.    Yes.

15       Q.    And what was the conclusion?

16       A.    It didn't.  Well, it did in a conceptual way he was

17   admitting that what they actually offered didn't comply with

18   the agreement.  He admitted that.  It didn't address the

19   concern, because it was still five percent and it was only

20   specific funds instead of the whole firm.  So partially I

21   guess I would say.

22            MR. BUSH:  One second, your Honor.

23       Q.    Did Mr. Borges indicate to you that he thought that

24   what he had proposed did meet the spirit and intent of the

25   agreement?

1    A.    I don't recall it off the top of my head.  If you'd

2    like me to refer to this, I can probably figure that out.

3    Q.    Let me direct your attention to the last

4    line -- second to last line.  Excuse me.

5    A.    Yes.  He said this represents substantial economics

6    to me and he's taking the position that it met both the

7    spirit and intent of the original agreement.

8    Q.    Did you agree with that?

9    A.    No.

10    Q.    Did you tell him?

11    A.    Yes.

12    Q.    And do you recall how you told him, phone call or a

13    memo or what?

14    A.    Both were involved.  I may have sent him -- I sent

15    a memo or an email.  I don't recall specifically what the

16    next step was but, yes, I did respond.

17    Q.    Let me ask you to take a look at Plaintiff's

18    Exhibit 74.  Will Exhibit 74 refresh your recollection about

19    what the next step was?

20    A.    Yes.

21    Q.    And what was the next step?

22    A.    I sent an email responding to Frank's email.

23    Q.    Can you tell us what your response was?

24        MR. FIEBACH:  Your Honor, I object.  I believe that

25    we are now in settlement discussions.

1          THE COURT:  Let me be clear, the question was what

2     was his response?

3          MR. BUSH:  Yes.

4          THE COURT:  That's overruled.

5     A.     At first I expressed appreciation that I'd given

6     them three objections and that he was addressing one of the

7     three.

8     Q.     And what was that one?

9     A.     Well, he was admitting that the plan couldn't

10    possibly comply with the agreement because it only offered me

11    an interest in real estate.  So he was acknowledging that the

12    concept of the deal was, you're right, we weren't just

13    talking about real estate, we're talking about the whole

14    firm.  So he was conceding that.  So I said I appreciate the

15    fact that you're conceding that.

16    Q.     What was the rest of your response?

17    A.     Wait a second, I think you're arguing basically

18    that the minimum 10 percent participation and the relating

19    back to the time I started would only apply in the event that

20    you chose a stock purchase plan.  That makes no sense to me.

21    Because what that would mean is that if you didn't choose the

22    stock purchase option you, in your sole discretion, could

23    make the provision worthless.  And that's just not what we

24    meant.  Further, what that meant is the longer you delayed,

25    the more you got to see how much the value of the firm was

1   going up and retread the deal.  That makes no sense.  So

2   basically what you're saying is this wasn't actually a

3   commitment that you made to me.  This was a unilateral option

4   for you.

5       Q.    Did you have any conversation with Mr. Borges and

6   Mr. Haviland immediately following this email, that you

7   recall?

8       A.    By immediately, I don't remember if it was that

9   day, but we continued to have a series of regular

10  communications.

11      Q.    Did you communicate with them in the form of a memo

12  shortly after this?

13      A.    Yes.

14      Q.    Let me ask you to take a look at Exhibit 76,

15  Plaintiff's Exhibit 76.  And what is 76?

16      A.    It's an email that transmits a memo that I sent to

17  Frank and Tim on October 4th.

18      Q.    Let me ask you what the memo was intended to do,

19  what was its purpose?

20      A.    Well, it was first a response to Frank's most

21  recent communication, and then it was an attempt to outline

22  my overall feeling about the key provisions and articulate in

23  writing, as clearly as I could, why what they were offering,

24  even if they actually amended the proposal as the email

25  suggested, still didn't comply remotely to what they had

1     promised.

2          Q.     And did you indicate that, in your view, he had

3     responded to the second of your major objections?

4          A.     I indicated that just to say, look, you are now

5     acknowledging that we did have a discussion about the

6     economic benefit to me being effective as of the time I

7     started.  You're now admitting that.  But you're taking the

8     position that it only applies if you elect a stock purchase

9     plan and then implement it.  Otherwise, the effective date is

10    whenever you decide.

11         Q.     Did you disagree with that?

12         A.     Yeah.

13         Q.     And why?

14         A.     Because it made no sense.

15         Q.     Any other reason?

16         A.     It wasn't what they told me.  It wasn't what Tim

17    told me and it wasn't what Frank told me.

18         Q.     And why didn't it make any sense?

19         A.     Because it meant they had an option.  It meant that

20    they could just sit there, keep delaying year after year

21    after year.  Sit there, see what happens at the firm, make a

22    decision later, and basically give me zero economic benefit

23    instead of something that we had talked about that we both

24    understood to be very, very valuable as of 2004.

25         Q.     And why did it give them the ability to do that?

1    A.    Because he was basically taking the position that

2    this whole business about being effective for me and

3    resolving the problems that they talked about, that the

4    context -- that that only applied in the event of a stock

5    purchase plan, if they elected it.  Otherwise, if they made

6    any other election, then the effective date was whenever they

7    said.  Maybe three years, maybe five years, maybe never.  And

8    specific -- okay.

9    Q.    Did you say anything about the 10 percent term?

10   A.    Yes.

11   Q.    What did you communicate on that subject?

12   A.    I said, look, you're saying that the 10 percent

13   only applied in the event of a stock purchase plan.  Look at

14   the agreement.  It's a number.  The number's 10.  You're

15   offering me five in the private equity plan.  What's your

16   rationale for that?  This is not interpretation.  It's a

17   number.  The number's 10.

18         MR. BUSH:  One second, your Honor.

19         THE COURT:  Yes.

20         MR. BUSH:  I'm sorry, your Honor.

21   Q.    Mr. Stevens, I'd like you to take a look at

22   Exhibit -- Plaintiff's Exhibit 74, which you have up there,

23   and Plaintiff's Exhibit 60.

24   A.    I'm sorry, 74 and?

25   Q.    60.  Specifically, on 60 at 197, Bates page 197.

 1      A.    Just so I'm clear, 60 is the plan -- I see it.

 2   Okay.  Got it.  Okay.

 3      Q.    And 74, I want to direct your attention to the last

 4   paragraph on that page, about in the middle of it.  It says:

 5   You will be a 10 percent participant in the real estate plan

 6   beginning with LRF VI.  Do you is see that?

 7            THE COURT:  Excuse me, Mr. Bush.  Just from my

 8   notes, has 74 been offered or admitted?

 9            MR. BUSH:  It has neither been offered or admitted.

10            THE COURT:  All right.  Go ahead.

11      Q.    Did you see the reference to LRF Fund VI?

12      A.    Not yet.  But if Jake helps me out, I think I can

13   find it.

14      Q.    Lower.  Two lines down.  Right there.  Perfect.

15      A.    Got it.  Thank you.

16      Q.    And then in the plan overview it refers to REF V?

17      A.    Yes.

18      Q.    Was it your understanding that this plan was going

19   to apply to REF V?

20      A.    Yes.

21      Q.    And when was that REF V sold to the public or

22   sold?

23      A.    I may be getting confused on this number thing.

24            Five was the one I marketed -- can I think?  Right,

25   five was the one I marketed.  So that was already in

1    existence.

2        Q.    And which did you understand that the plan was

3    going to start with, V or VI?  Did you have an

4    understanding?

5        A.    I was confused about that, because Real Estate V

6    was already in existence, but the start date of the plan

7    wasn't until 2009.  So I didn't really have a view on how

8    that would work.  It looked inconsistent, but I didn't

9    understand it.

10       Q.    And Real Estate Fund VI, had that already been

11   raised?

12       A.    No.

13           MR. BUSH:  Your Honor, it might actually be a good

14   time if we could take a break now.  I'll wrap up and see what

15   loose ends I have.

16           THE COURT:  That's fine.

17           All right, ladies and gentlemen, we're going to take

18   our lunch break five minutes early.  Why don't we plan to

19   come back at ten after one, be in our seats then so we can

20   try to stay on schedule.

21           Once again, please do not discuss the case amongst

22   yourselves or with anyone else, and do not allow anyone to

23   discuss it with you.  Enjoy your lunch.

24           (Jury out at 12:25, p.m.)

25           THE COURT:  All right, Mr. Stevens, you can step

1   down.  Everyone else can be seated.

2          Mr. Bush, let me just get an estimate from you how

3   much longer you think you'll be on direct.

4          MR. BUSH:  I doubt very much it going for more than

5   15 minutes.

6          THE COURT:  15 minutes or so?

7          MR. BUSH:  That's my guess.  It might be shorter.

8          THE COURT:  Is there anything we should cover before

9   we come back for lunch?

10         No.  All right.

11         We'll be in recess until ten after.

12         MR. BUSH:  I take it you are going to take the

13  motions for directed verdict at the end of the plaintiff's

14  case which will happen right after lunch?

15         THE COURT:  Yes, I will.

16         (Luncheon Recess.)

17         THE COURT:  Please be seated.

18         And just to save time this afternoon, Mr. Fiebach,

19  when Mr. Bush is ready to rest, I'll just ask you if you have

20  a motion and then you can confirm that, and then I'll say

21  that we'll hear argument at the end of the trial day after

22  the jurors have left.

23         Anything to discuss before we bring the members of

24  the jury out?

25         MR. BUSH:  I don't think so, your Honor.

1            MR. FIEBACH:  You didn't give until ten after yet.

2            THE COURT:  I think they're ready.

3            (Jury in at 1:09, p.m.)

4            THE COURT:  All right, folks.  You can be seated.

5    We'll continue.

6            Mr. Bush, whenever you're ready.

7            MR. BUSH:  Thank you, your Honor.

8       Q.    Mr. Stevens, were you able to work out the

9    differences between you and Mr. Haviland and Mr. Borges?

10      A.    No.

11      Q.    And what was the result of that?

12      A.    They terminated me.  It was clear to me they

13   weren't going to comply with the provisions of the original

14   agreement and they terminated me.

15      Q.    Can I ask you to take a look at Exhibit 78.

16            Pop that up, Jake.

17            Handing you Exhibit 78.

18      A.    Yes.

19      Q.    What is that?

20      A.    That's the termination letter dated November 6,

21   2008.

22            MR. BUSH:  I move that into evidence, your Honor.

23            THE COURT:  No objection.

24            THE COURT:  It will be admitted as a full exhibit.

25      Q.    Let me ask you to take a look at Exhibit 100.  What

1   is Exhibit 100?

2       A.    This is a chart that I received from Landmark that

3   says its total compensation summary for the years, in my

4   case, 2004 through 2008.

5           MR. BUSH:  Jake, can you blow that up a little bit

6   until it's easier to read.  Try to get 2008 on the screen.  I

7   guess it's on enough.

8       Q.    And what's the row -- can you just go through this

9   and describe what is in the rows?  I'll bring you through it,

10  but what's the salary row?

11      A.    These are base salary amounts that I received for

12  2004, 5, 6 and 7, and the rate at which I was receiving base

13  salary during the part of 2008 that I was employed at

14  Landmark.

15          THE COURT:  Excuse me.  Mr. Bush, were you looking

16  to introduce this document into evidence?

17          MR. BUSH:  I'm sorry.  Thank you very much.  I would

18  like to introduce it into evidence.

19          MR. FIEBACH:  Your Honor, I just ask what the

20  purpose of the offer is, offer of proof?

21          THE COURT:  Didn't he testify that Landmark prepared

22  this?

23          MR. FIEBACH:  Yes.  But trying to get the relevancy,

24  what it's being offered for.

25          MR. BUSH:  The overall compensation which is

1    relevant to damages.

2              MR. FIEBACH:  Is this part of the damage

3    calculation?

4              THE COURT:  The exhibit will be admitted full.

5    Q.    What's in the bonus row?

6              The row that says bonus I think represents the

7    amounts of what Landmark called whatever category bonus that

8    was that were received in 2005, '06 and '07.  I don't have

9    any independent way of verifying that those are correct, but

10   that's what it purports to be.

11   Q.    And the special bonus line?

12   A.    Yes.  Indicates that I received a special bonus of

13   200,000 in 2005.

14   Q.    And the next line is called Cap Call Profits

15   Participation?

16   A.    Yes.

17   Q.    And what's reflected in that line?

18   A.    Amounts that were -- Landmark categorized the way

19   that I received in 2004, '05, '06 and '07.

20   Q.    And under that there's a subtitle, is that right?

21   A.    Yes.

22   Q.    Subtitle of what?

23   A.    I believe it's the sum of the items above that we

24   just discussed.

25   Q.    Can I ask you to look down at the carried interest

1   box or part of the chart.  Do you see that?

2       A.    Yes.

3       Q.    What's reflected in the carried interest part of

4   the chart?

5       A.    These are amounts that were projected by

6   Landmark -- I think they're projected amounts that tried to

7   capture the value that's projected to be received if the

8   funds are successful and carried interest in the future

9   years.

10      Q.    Are these amounts actually received by you?

11      A.    No.

12      Q.    Is there a place on the chart that reflects amounts

13  actually received by you with respect to carried interest?

14      A.    Yes.

15      Q.    Where is that?

16      A.    It's the second to last line with numbers on it

17  from the bottom, it says distributions.  Those are the actual

18  amounts received in carried interest in the years shown.

19      Q.    And the lines below that says capital calls.  What

20  is that?

21      A.    Those are the amounts that I contributed as my

22  share of the general partners capital requirement that Tim

23  described yesterday, my share of those cap call requirements,

24  that's what I contributed.

25           MR. BUSH:  Your Honor, one minute?

1          THE COURT:  Yes.

2          MR. BUSH:  I pass the witness.

3          THE COURT:  All right.  Mr. Fiebach.

4                  CROSS-EXAMINATION

5    BY MR. FIEBACH:

6     Q.    Good afternoon, Mr. Stevens.

7     A.    Good afternoon.

8     Q.    I want to start where Mr. Bush sort of left off,

9    toward the end of your tenure at Landmark.  Now, there's sort

10   of a gap between the dates that you mentioned about your

11   conversations with Mr. Borges and Mr. Haviland in an attempt

12   to resolve the differences between the two of you and the

13   date of the termination letter?

14    A.    Yes.

15    Q.    During that period of time, without getting into

16   the substance of it, you and Mr. Borges and Mr. Haviland were

17   engaged in discussions in an attempt to resolve your

18   differences?

19          MR. BUSH:  Objection, your Honor.

20          THE COURT:  I think he can answer that question yes

21   or no.

22    A.    If by resolving our differences means were we

23   attempting to resolve the dispute about the meaning of my

24   employment agreement that we've been discussing?

25    Q.    Yes.

1      A.      I would not characterize them that way, no.

2      Q.      You were having discussions, were you not?

3      A.      That's correct.

4      Q.      And eventually, as you testified, you were unable

5   to resolve those differences?

6      A.      By those differences, you're referring again to the

7   differences that we had --

8      Q.      I'm just asking.

9           THE COURT:  One second, one second.  Let Mr. Stevens

10   finish his answer.  Go ahead, Mr. Stevens.

11      A.      I'm sorry.  I got a little lost in thought there.

12   You, again, asked about resolving differences.  Assuming

13   you're talking about resolving differences over the meaning

14   of Landmark's commitment, is your question whether I

15   was -- we were continuing to try to resolve those during the

16   period after the -- prior to my termination?

17      Q.      Mr. Stevens, you didn't have a lot of trouble with

18   that when Mr. Bush asked you the question.  You testified

19   after lunch, just about three minutes ago, that you were

20   unable to work out the differences.

21      A.      Yes.

22      Q.      And that's all I asked you.

23      A.      I'm sorry.  I was unclear about the time period you

24   were asking, sir.

25      Q.      Well, the time period's not after lunch.  The time

1   period is at the end of your tenure at Landmark.

2      A.   Yes.

3      Q.   Okay.  And about six days after you received the

4   letter of termination you started this lawsuit?

5      A.   Yes.

6      Q.   And that lawsuit had been in the works even while

7   you were still employed at Landmark?

8      A.   No, I wouldn't say that.

9      Q.   When did you first engage Mr. Bush?

10      A.   I don't remember the exact date.  If you have

11   something that would refresh my recollection.  It

12   was -- there were -- there were documents being exchanged

13   between Landmark and me and at some point in -- I don't

14   recall whether it was late October or early -- I believe it

15   was early November I engaged -- well, engaged him -- I talked

16   with Graeme sometime immediately -- very shortly before I was

17   terminated.

18      Q.   During the sum period of the time that you were

19   attempting to work out the differences and unable to do so

20   ultimately, you had already engaged counsel?

21      A.   I would not say that's fair.  I think that I

22   engaged counsel at a point when I believed that we weren't

23   going to resolve things.

24      Q.   And that was before the termination?

25      A.   Yes.

1      Q.     Now, I just want to go back to some testimony you

2    gave earlier today about this REIT, FDR investment bank.  Do

3    you remember that testimony?

4      A.     Yes.

5      Q.     What is a REIT?

6      A.     Real Estate Investment Trust.

7      Q.     And it raises money, correct, has unit holders,

8    investors?

9      A.     Yeah.  They're normally called stockholders, but

10   yes.

11     Q.     Stockholders, unit holders.  And they put in money

12   into this entity called a Real Estate Investment Trust?

13     A.     Not necessarily.  Some of them buy their interest

14   on the public markets, the secondary markets.

15     Q.     What was FDR talking to you about?

16     A.     I'm assuming you're referring to FBR.

17     Q.     FBR.  What were they talking about?

18     A.     They were talking to me about several options to

19   become CEO of a REIT.

20     Q.     What was the REIT that they were talking about?

21     A.     I don't think it had a name.

22     Q.     Didn't have a name yet?

23     A.     No.  In that case it was --

24     Q.     Wait --

25            THE COURT:  I think my understanding was you

1    finished your answer.  Let Mr. Fiebach continue.

2        Q.    How were they planning to raise the money for the

3    REIT?

4        A.    In the case of the REIT that I -- they were

5    planning to have an initial public offering.

6        Q.    And they were going to go out to the public and

7    going to ask the public to buy shares in this Real Estate

8    Investment Trust at some price that some underwriter prices

9    it at, that's the process?

10       A.    Generally, yes.

11       Q.    And they had not yet done that?

12       A.    Correct.

13       Q.    The REIT had not yet been formed?

14       A.    Correct.

15       Q.    And how long had you been talking to them about

16   this potential opportunity?

17       A.    I'd focused on this particular opportunity, the

18   very specific REIT, three weeks or so prior to my receiving

19   an offer at Landmark.

20       Q.    And it had not gotten to the point where you had

21   been made an offer of a job?

22       A.    That's correct.

23            MR. FIEBACH:  Can we put Defendant's Exhibit 503 up,

24   please.  And that's in evidence.

25            I still don't have it here.  Does the jury have it?

 1            THE COURT:  They should have it, yes.

 2      Q.    Can we turn to what's page four, his professional

 3  experience.  Or actually page five.  Start with the last

 4  page.

 5            Mr. Stevens, you graduated from Cornell University

 6  Law School in 1976 with a juris doctorate in law?

 7      A.    Yes.

 8      Q.    And you were admitted to practice law?

 9      A.    Yes.

10      Q.    Where were you admitted?

11      A.    In the District of Columbia.

12      Q.    And I think you said that you -- this is not on

13  here, but for a short period of time you were employed by a

14  Washington, D.C. Law firm, Melrod, Redman & Gartlan?

15      A.    That's correct.

16      Q.    And you were there for about six months?

17      A.    Yes.

18      Q.    And you did transactional work?

19      A.    Yes.

20      Q.    And transactional, just so the jury understands, in

21  the law field is different than this which is called

22  litigation, right?

23      A.    Thankfully, yes.

24      Q.    And in connection with your work at the Melrod

25  firm, you were involved in contract matters?

1       A.      Yes.

2       Q.      Drafting contracts?

3       A.      Yes.

4       Q.      Reviewing contracts?

5       A.      Yes.

6       Q.      And then you became -- were you admitted initially

7   as a partner at Aronoff and David firm or were you an

8   associate and then became a partner?

9       A.      I was an associate and then became a partner.

10      Q.      And you did transactional work there?

11      A.      Yes.

12      Q.      And you drafted contracts?

13      A.      Yes.

14      Q.      Hundreds of contracts?

15      A.      I believe so, yeah.

16      Q.      And as such, you knew the importance, as a lawyer,

17  of including all of the essential terms of the contract into

18  the writing?

19      A.      In cases where the contract purported to have all

20  the terms in it, yes.

21      Q.      You prepared profit sharing plans?

22      A.      I did.

23      Q.      You knew there were a lot of different kinds of

24  profit sharing plans?

25      A.      Yes.

1    Q.    And you understood what a profit sharing plan

2    was?

3    A.    I understood what my clients meant when they asked

4    me to prepare them.

5    Q.    You also reviewed contracts that the litigation

6    lawyers were involved in in litigation and gave them your

7    views as to what those contracts provided?

8    A.    On occasion, yes.

9    Q.    In addition to drafting contracts and reviewing

10   contracts, you also negotiated contracts?

11   A.    That's right.

12   Q.    So you could negotiate them and then draft them and

13   make sure that what was negotiated was included into the

14   contract?

15   A.    Yes.

16   Q.    You reviewed drafts of contracts with clients?

17   A.    Yes.

18   Q.    You reviewed -- you evaluated contracts for what

19   they contained?

20   A.    Yes.

21   Q.    And it's true, is it not, Mr. Stevens, that by

22   2004, you had drafted or reviewed or been involved with

23   thousands of contracts?

24   A.    Yes.

25   Q.    And that you had advised clients on what you

1    described as a huge number of contracts?

2        A.    Yes.

3        Q.    By the way -- let me just turn the page over to the

4    business experience.  In any of your business experiences,

5    did you also, for any of these companies, did you also serve

6    as general counsel for the company?

7        A.    Yes.

8        Q.    Which companies?

9        A.    I was -- at a certain period of time with the

10   Artery Organization I was general counsel.  At J.E. Robert,

11   Joe Robert often referred to me as his general counsel.  I

12   honestly don't know whether I ever had that particular title

13   or not because most of the things I did were elsewhere in the

14   company.

15       Q.    So that was -- those were other areas where you got

16   some experience in dealing with contracts?

17       A.    Yes.

18       Q.    Now, I wasn't quite clear on your employment from

19   1991 to 1996 with the J.E. Robert Companies.  And I know you

20   testified at length about that.  You did leave there in 1996,

21   correct?

22       A.    Yes.

23       Q.    And I think you testified you left there because of

24   the opportunity at Carlyle?

25       A.    That's right.

1     Q.    Didn't you have a dispute over at the J.E. Robert

2  Company with respect to issues relating to whether they were

3  giving you what you thought you deserved?

4     A.    That was unconnected to my departure, but there was

5  a point in time during that five-year period where Joe and I

6  had a disagreement about the meaning of one piece of my

7  agreement, yes.

8     Q.    Just one piece?

9     A.    Yes.

10    Q.    What was that?

11    A.    It was -- in that case the agreement I had with Joe

12  about my participation in the economics of the J.E. Robert

13  Companies had a provision describing participation in future

14  bulk sale fund -- negotiations with bulk sale partners as to

15  how I would participate.

16    Q.    And?

17    A.    I read it as applying to a couple of instances; joe

18  read it a different way.

19    Q.    He didn't agree with his general counsel?

20    A.    It was -- it was a good relationship, a

21  good-hearted disagreement, and ultimately he made it up

22  somewhere else so it didn't matter.

23    Q.    It was a good-hearted disagreement?

24    A.    Yes.

25    Q.    Now, I just want to learn a little bit more about

1   Carlyle.  I think you described Carlyle as the largest

2   private equity firm in the United States?

3        A.    At various times, that's right.

4        Q.    And it had a lot of experience in making

5   investments?

6        A.    Yes.

7        Q.    And it had an excellent track record for making

8   investments?

9        A.    Generally, yes.

10       Q.    The resume, your resume that's attached to this

11   document, page four.  Was that prepared by you or was that

12   prepared by Mr. LoPinto?

13       A.    May I see the document you're referring to:

14       Q.    I'm sorry.  D-503.  Turn to the CV.  It's in

15   evidence.

16       A.    I see it here.  I got it.  It came up.  It did come

17   up that -- there's this cross thing in the middle.  Is it

18   possible to take that away.  It's blocking.

19       Q.    It's out.

20       A.    Thank you.

21       Q.    Did you prepare that?

22       A.    No.

23       Q.    So it was prepared by Mr. LoPinto?

24       A.    I assume so.  I don't actually know, but I assume

25   that's right.  It says Equinox Partners at the bottom.

1      Q.    Did you review it?

2      A.    No.

3      Q.    It isn't accurate, is it?

4      A.    I think it's generally accurate.  I'm looking at it

5  on a small screen here.  I didn't prepare the document.  I'm

6  sorry, I don't know.

7            THE COURT:  Can we give him 503?  It's 503,

8  Mr. Fiebach?

9            MR. FIEBACH:  Yes, your Honor.

10           (Clerk hands.)

11           THE COURT:  All right.  Mr. Fiebach, go ahead.

12     Q.    You have that in front of you now, Mr. Stevens?

13     A.    Yes.

14     Q.    The resume concerning your employment at Carlyle

15  Group is inaccurate, is it not?

16     A.    I wouldn't call it inaccurate, sir.

17     Q.    I'd ask you to -- let me have Exhibit 501, please.

18  Defendant's 501.

19           Mr. Stevens, I show you Defendant's Exhibit 501.

20  It says at the top Employment Resignation Agreement?

21     A.    Yes.

22     Q.    Can you tell me what this document is?

23     A.    This is a draft document that was prepared at

24  Carlyle in connection -- it was considered for use in

25  connection with my departure.

1        Q.      It's signed by the Carlyle Group, is it not?

2        A.      It looks like it is.

3        Q.      And isn't this your Employment Resignation

4   Agreement with Carlyle?

5        A.      No.

6        Q.      You're saying you didn't enter to this?

7        A.      Correct.

8        Q.      This agreement says that your employment terminates

9   effective as of February 28, 2004?

10       A.      Yes.

11       Q.      And this document was produced to us by Carlyle as

12   being your resignation agreement?

13              MR. BUSH:  Objection.  I don't think that's an

14   accurate characterization.

15              THE COURT:  Well, the witness knows the answer.  He

16   can testify to the answer to that question.  The objection's

17   overruled.

18       A.      I'm sorry, sir, could you repeat the question?

19       Q.      The question is, are you aware that this document

20   was produced to us by Carlyle Group as being a true and

21   correct copy of your Employment Resignation Agreement?

22       A.      No.  And I doubt that's the case.

23       Q.      This document states that your employment

24   terminated effective February 28, 2004.  Is that when your

25   employment terminated at Carlyle?

1      A.    Yes.

2      Q.    The document at 6-B says:  Gary Stevens employment

3   by Carlyle shall end on the resignation date.  However,

4   Carlyle will allow the use of Carlyle's voicemail and email,

5   without access to Carlyle's servers, through May 27, 2004 for

6   the sole purpose of obtaining subsequent employment.  And

7   Gary Stevens agrees not to use any of the foregoing for any

8   other purpose.

9           Was that your arrangement with Carlyle?

10     A.    No.

11     Q.    You're saying this document is not accurate?

12     A.    Correct.

13     Q.    Had you told Mr. LoPinto that your employment had

14  terminated?

15     A.    My employment -- I told him the facts of my leaving

16  Carlyle, but when I first talked to him I was still there.

17     Q.    Isn't it a fact, Mr. Stevens, that your employment

18  had been terminated at Carlyle, but you were still allowed to

19  make it look like you were still an employee so as to allow

20  prospective employers to think that you were still employed

21  at Carlyle?

22     A.    No, that's not true.

23     Q.    Let's go back and look at your CV again, Exhibit

24  503.  Starting with the first page, the first page of the CV,

25  the page four of the document.

1          So you started to work at Carlyle in 1996?

2     A.   Yes.

3     Q.   And through 2002, you were involved in the Real

4  Estate Group, right?

5     A.   Well, that's true, yes.

6     Q.   And then in 2002, you transitioned out of real

7  estate and got into I think some other initiatives which you

8  described on your direct, is that correct?

9     A.   Not exactly.

10    Q.   Well, then, tell me what it was.

11    A.   During the expire period from 1996 until I left, I

12 worked on matters related to the real estate funds and my

13 title was Managing Director in Real Estate.  It is true that

14 around 2002 I started working on the things that I described,

15 some of which were trying to find new investment areas for

16 Carlyle within real estate and some of which were things

17 outside of real estate that I had been asked to help out with

18 by the founder of the firm.

19    Q.   And in the time period around 2004, 2003 and

20 2004 --

21    A.   Yes.

22    Q.   -- Carlyle had three managing partners?

23    A.   I don't think they used that term, sir.  There were

24 three individuals who were generally understood to be running

25 the firm.

1      Q.     Mr. Stevens, do you remember you had your

2  deposition taken in this case?

3      A.     Yes.

4      Q.     And as a lawyer, you know and you understand you're

5  under oath?

6      A.     Yes.

7      Q.     You had as much obligation to tell the truth then

8  as you do now?

9      A.     Yes.

10     Q.     I want to read to you from page 47 of a deposition

11  that was taken of you in this case on November 4, 2008.

12     A.     Yes.

13     Q.     And I want to read from page 47, starting at line

14  2.

15         MR. BUSH:  Can you hold on a second?

16     Q.     Mr. Dell'Osa you remember was asking you some

17  questions, correct?

18     A.     I take your word for the date, sir, yes.

19     Q.     And Mr. Dell'Osa asked you:  How much -- how did

20  Carlyle determine how much your bonus would be?

21         And your answer was:  I think it was a subjective

22  judgment from the three managing partners.  They just said

23  here is your bonus.

24         Q    Who were the three managing partners?

25         A    David Rubenstein, William Conway, and Dan

1    Aeiollo (ph).

2            Who were the three managing partners?

3        A.    On that date I referred to them as managing

4    partners.  What I said to you earlier was I wasn't really

5    sure if they used that particular title.  Generally we called

6    them DBD, Dan, Bill and David.  That's how everybody referred

7    to them there.  They also referred to as the partners.

8    Everybody knew who they were.  In terms of their exact

9    titles, that's a fair -- managing partners is a fair title.

10    I think what I was trying to express before, whether they

11    used that title, I don't know.  For purposes of answering

12    questions to somebody who didn't know what DBD meant, I said

13    managing partners.  I think that's an accurate description.

14        Q.    Mr. Stevens, just answer my questions.

15        A.    I'm trying, sir.

16        Q.    That would be helpful.  And who was Rob Stuckey?

17        A.    Rob Stuckey was a Managing Director at Carlyle,

18    also in the Real Estate Group.

19        Q.    And he was brought in to head up the Real Estate

20    Department when you transitioned out?

21        A.    No, that's not accurate.

22        Q.    Let's talk about your decision to leave Carlyle.  I

23    think you testified you had an investment opportunity in

24    2003, correct?

25        A.    Yes.

1    Q.    And you had negotiated an agreement as to your

2    departure from Carlyle?

3    A.    Yes, that's fair to say.

4    Q.    And then I think you said in December of 2003 that

5    opportunity fell through?

6    A.    I'm sorry.  That referred to my agreement to leave

7    Carlyle?  I didn't follow.  I'm sorry.

8    Q.    The investment opportunity that you had in 2003.

9    A.    Yes.

10    Q.    That investment opportunity fell through in

11    December of 2003.  I think that was your testimony.

12    A.    Pretty close.  I'll explain, if you want.

13    Q.    And the agreement that you had reached was that you

14    were going to leave Carlyle effective February 28th, 2004?

15    A.    You're switching now back to my agreement to depart

16    from Carlyle?

17    Q.    Yes.

18    A.    Yes.  The answer is yes.

19    Q.    Let me be clear.  When you negotiated the agreement

20    because you were leaving for this investment opportunity, you

21    had negotiated an agreement that you would leave Carlyle

22    effective February 28, 2004?

23    A.    Not exactly.

24    Q.    Let me try your deposition again.  Page 48, line

25    17.

1          Q    Did you reach an agreement on a specific date

2    for your departure?

3          A    Yes.

4          Q    What was that date?

5          A    I think it was the end of February of 2004, but

6    I could be wrong about that.  That's my best recollection

7    right now.  It could have been the end of January.

8              Now, my question, sir, does that refresh your

9    recollection?

10         A.    My disagreement with the previous question had

11   nothing to do with what you just read.  I agree that that was

12   accurate.  I can explain why I answered no.

13         Q.    Let me ask the question.

14         A.    Okay.

15         Q.    The question is, when you were negotiating your

16   departure from Carlyle the first time when you had this

17   investment opportunity, you had agreed with Carlyle that you

18   would leave February -- the end of February, around February

19   28, 2004, is that correct?

20         A.    I don't understand what you mean by the first time

21   but, generally, the rest of your statement's correct.

22         Q.    Excuse me?

23         A.    I don't understand what you meant by the first

24   time.  However, what I think you're trying to ask, the

25   answer's yes.

1    Q.    If you don't understand, just tell me you don't

2    understand the question.  I'll rephrase it.

3    A.    Okay.

4    Q.    I don't want you to guess.  When you negotiated

5    your departure from Carlyle for purposes of leaving Carlyle

6    to take advantage of the opportunity, you agreed with Carlyle

7    that you would leave effective around the end of February

8    2004?

9    A.    The answer to that question needs to be no.  Would

10   you like me to explain why.

11   Q.    You'll always have the opportunity to explain.

12   A.    The predicate in the middle is I negotiated to

13   leave Carlyle because of the specific investment opportunity

14   that I was, in fact, pursuing which implied to me -- I'm

15   sorry if I misunderstood -- that you were connecting the

16   because part with the negotiation part and they were really

17   independent.  In other words, it wouldn't be fair to say that

18   one caused the other.  It is fair to say that I was pursuing

19   both, but they weren't linked in the way that I thought was

20   implied by your question.  I'm sorry if I misunderstood.

21   Q.    And then after you had reached that agreement with

22   them and the investment opportunity fell through, you

23   discussed with Carlyle the possibility of staying at Carlyle,

24   did you not?

25   A.    I'm sorry, I'm not following you.  That and them,

1    we're referring to whom?  You're talking about two different

2    agreements here and I'm really confused about which one

3    you're talking about.  I'm sorry.

4        Q.    When your investment opportunity fell through, you

5    had a discussion with the managing partners and Mr. Stuckey

6    concerning the possibility that you would possibly stay on at

7    Carlyle?

8        A.    No, that's incorrect.

9        Q.    Let me read you your deposition again, Mr. Stevens.

10   Mr. Dell'Osa asked you at page 52, line 13:

11            Q  I come back to the question I asked before, at

12   least I thought I asked, but now have a different

13   perspective.  They told you to go out and try to pursue your

14   opportunity and stay at Carlyle and see what happens.  You

15   went out.  You pursued the opportunity.  The opportunity fell

16   through.  Why don't you just stay at Carlyle and continue to

17   look for other opportunities like they told you to do?

18            A  Well, I think from their standpoint I had come up

19   with a series of strategic ideas for pursuing real estate

20   alternatives at Carlyle.  David said to me -- and that's

21   David who?

22       A.    I think you mean David Rubenstein, but I'm not -- I

23   don't know what you're looking at.  You told me what you're

24   looking at.  I'm not seeing it.  I believe it's David

25   Rubenstein, as far as I can follow you.

1          MR. FIEBACH:  It's not up on the screen.  We'll do

2     it the old fashioned way.

3          MR. DELL'OSA:  May I, your Honor?

4          THE COURT:  You may.

5          (Hands.)

6     Q.     Page 52, Mr. Stevens.  I just asked you --

7     A.     Is this depo page 52 or page 52 of the document?

8     Q.     Page 52 of the deposition.  I asked you who the

9     David was you're referring to in that answer.

10    A.     Okay.

11    Q.     Why don't you read your answer to that question,

12    page 52, starting at line 21, and I think your answer goes on

13    without interruption to the top of page 55, line 6.

14         MR. BUSH:  Objection, I don't think this is proper

15    impeachment.  I'm having a hard time figuring out what the

16    inconsistent statement in this is.

17         THE COURT:  I have to sustain that objection,

18    Mr. Fiebach.  I'm a little puzzled about that myself.

19    Q.     Didn't they tell you it was time to move on?

20    A.     They didn't say that.  No, that's not what -- they

21    didn't tell me that.  I think at the point I agreed to leave,

22    we both agreed that there were a bunch of options on the

23    table that we kicked around and based on what I wanted to do,

24    the best alternative for particularly for the real estate

25    group, the U.S. Real Estate Group and me was to move on.

1   That's certainly true.

2       Q.    And you said on page 54, line 10:  I think Rob felt

3   and I think Deanella (ph) felt it was just good for -- time

4   for me to move on.

5       A.    Yeah.  The problem is you're talking about a

6   confusing time frame here.  That did not happen after the

7   opportunity fell through with Brownfields Capital which is I

8   think what you asked me.  The timing's all wrong so it's

9   misleading.

10      Q.    I'm misleading?

11      A.    Yes.

12      Q.    Mr. Stevens --

13      A.    Yes, sir.

14      Q.    The question that Mr. Dell'Osa asked you was, I

15  come back to the question I asked before, at least I thought

16  I asked but now have a different perspective.  They told you

17  to go out and to try to pursue your opportunity and stay at

18  Carlyle and see what happens.  You went out.  You pursued the

19  opportunity.  The opportunity fell through.  Why don't you

20  just stay at Carlyle and continue to look for other

21  opportunities like they told to you to do?  That was the

22  question that was asked of you by Mr. Dell'Osa.

23      A.    It was.

24      Q.    That's what you were answering, true?

25      A.    I was answering as he said.  I came back to the

1  question he asked before.  The question he asked before was

2  not tied to the opportunity falling through.  These

3  discussions took place way before the opportunity fell

4  through.

5  Q.    So you're saying your answer, it wasn't responsive

6  to the question, it was something else?

7  A.    I'm saying --

8  Q.    Let me finish the question.  So you're saying your

9  answer was not in response to the question that was asked but

10  was something completely different?

11  A.    No, I'm not saying that.

12  Q.    Were you answering the question?

13  A.    I was doing the best I could to answer the question

14  I thought Rob was asking.  Like you, he had these long

15  predicates that required me to assume four different things

16  that was inconsistent and rather than arguing with him, like

17  we're doing here, I tried to answer the question as I

18  understood him to be asking.  He was referring back to a

19  series of conversations that are accurately described by my

20  answer.  I thought that's what he was asking about and that's

21  what I answered.

22       So rather than objecting to the opportunity fell

23  through part of the question, which was I think somewhat

24  misleading, I tried to answer what I believed he was

25  answering -- what he believed he was asking.

1    Q.    So it's your testimony then that you were still

2    employed after February 28th at Carlyle?

3    A.    No.  I didn't say that.

4    Q.    So you were unemployed?

5    A.    I'm sorry, I thought you said employed.

6    Q.    So you were no longer employed as of February

7    28th?

8    A.    That's correct.  That's correct, I'm sorry.  I

9    didn't hear you correct.

10   Q.    I think that's where we started, Mr. Stevens.  You

11   told me that you were still working there, you hadn't

12   resigned as of February 28th.  Now you're telling me you had

13   resigned?

14        MR. BUSH:  Objection.

15        THE COURT:  One second.  Mr. Bush, go ahead.

16        MR. BUSH:  I don't believe that is an accurate

17   characterization of the testimony.

18        THE COURT:  It will be the jury's recollection of

19   the testimony that matters.  Why don't we ask the next

20   question, Mr. Fiebach.

21   Q.    Just to be clear, you were unemployed from February

22   28th until you signed the agreement with Landmark in May?

23   A.    I was unemployed until I started working at

24   Landmark on June 1, yes.

25   Q.    You were unemployed as of February 28th?

1      A.     Certainly as of March 1st, yes.

2      Q.     In fact, your last day of employment was February

3  28th?

4      A.     Yes.

5             MR. FIEBACH:  Your Honor, 515 is our copy of the

6  contract.  It's already in evidence through a plaintiff

7  exhibit.  It's easier for me to use our exhibit number.

8             THE COURT:  Let me ask if Mr. Bush has any objection

9  to that.  Mr. Bush, do you have an objection?

10            MR. FIEBACH:  I'll use it.

11            THE COURT:  You're going to use 25?

12            MR. FIEBACH:  Yes, your Honor.

13            You have that, Mr. Stevens?

14            THE COURT:  It's also on the screen, sir, if that

15  will help you.

16            THE WITNESS:  I'm sorry, I had cataract surgery.

17  It's a little tough for me.  I think it's in this pile and I

18  will try to find it.  Yes.

19     Q.     I just want to go through a few things about this

20  contract with you at this point.  You went through some of

21  this with Mr. Bush, but there are a couple of things that you

22  maybe went over more quickly so I just want to cover them.

23            If you look at the last page on the document.

24            MR. BUSH:  I'm afraid that the witness may not

25  actually have the right exhibit.

1          THE WITNESS:  This is a different version.

2          THE COURT:  Let's make sure the witness has

3     Plaintiff's 25.  Here you go.

4          Thank you, Mr. Bush.

5     Q.    Look at the last page of the document.

6     A.    Yes.

7     Q.    It says Landmark is an at will employer, which

8     means that either you or Landmark may terminate your

9     employment at any time with or without notice or cause.  You

10    understood that at the time you signed this agreement?

11    A.    Yes.

12    Q.    And I think we saw that you had been given a draft

13    of this on May 17th by Mr. LoPinto and I think we all agree

14    there's no substantial difference between the drafts you saw

15    and the final document?

16    A.    I don't know if we all agree on that.  They're

17    different.  I didn't think there were substantial

18    differences.

19    Q.    Certainly, I agree with that.  So you had basically

20    five days to review the terms that were being proposed to you

21    by Landmark before you ultimately signed on?

22    A.    I had more than that.

23    Q.    Well, from the time you received a written offer

24    letter, May 17th, until May 21st when you signed it it, five

25    days?

1      A.    I had the summary.  I had the draft summary for

2  five days before I signed the final summary.

3      Q.    And you have no disagreement with anything in it?

4      A.    As I said, I thought that it was a fair summary of

5  the terms that we'd agreed upon.

6      Q.    It was completely consistent with what you had

7  discussed, was it not?

8      A.    Yes.

9      Q.    Completely consistent?

10      A.    Yes.  I think that's fair.

11      Q.    Now, one of the things that you talked about in

12  connection with your discussion with Mr. LoPinto was your

13  handwritten note, P-21.  That's in evidence.  Can we get

14  that?

15          THE COURT:  Mr. Stevens, do you have P-21?

16          THE WITNESS:  I do, yes.  Thank you.

17      Q.    If we look down on the first page, you have in your

18  handwritten note, ownership of Landmark PTR's equity.  That's

19  what you wrote, right?

20      A.    Yes.

21      Q.    And then you say dash TBD with a w/a new program,

22  to be determined with a new program?

23      A.    Yes.

24      Q.    Now, I'd like to go back now to Defendant's

25  Exhibit -- I'm sorry, Plaintiff's 25.  Looking at the second

1    page, participation in the economics of Landmark Partners,

2    Inc.

3         A.    Yes.

4         Q.    That didn't say in the portion of the document that

5    has the description of what the topic is, it didn't say

6    ownership of Landmark Partners' equity, did it?

7         A.    That's correct.

8         Q.    It said participation in the economics of Landmark

9    Partners, Inc.

10        A.    Yes.

11        Q.    And it further said that we have not determined

12   what form that will take, i.e., ownership in the management

13   company, options, profit sharing or some combination thereof.

14   That's what they told you in this contract, correct?

15        A.    That's the way they described that provision in the

16   summary, yes.

17        Q.    You knew that you might not get an ownership -- a

18   right to buy an ownership interest in Landmark when you

19   signed this contract, didn't you?

20        A.    I knew that I might not get the right to buy common

21   stock in Landmark, yes.

22        Q.    You knew that you might not get ownership in the

23   management company?

24        A.    Yes.

25        Q.    And you knew that you might get offered a profit

1    sharing plan?

2        A.    Yes.

3        Q.    I'm going to put a series of documents in front of

4    you, Mr. Stevens.  Defendant's Exhibit 520 is a letter dated

5    December 23, 2004 from Landmark Partners to you.  Defendant's

6    Exhibit 521, December 22, 2005, from Landmark Partners to

7    you.  522, December 18, 2006 from Landmark Partners to you.

8    And Defendant's Exhibit 523, a letter from Landmark Partners

9    to you.  You received all of these documents at or about the

10   time they were dated, correct?

11       A.    I believe so.  Sir, if you'd just give me a moment.

12   The number of documents you've given me is significantly more

13   than the number I described so I'm trying to figure out

14   what's what here.  If you'll bear with me, I think I can do

15   that.  It appears to me you've given me duplicates of each

16   document so I have twice as many documents.  I'm not certain,

17   because I didn't give it to myself.  That's what it looks

18   like to me.  You cited a number of documents.  I had twice as

19   many.  I was trying to figure out why.  I think the reason is

20   pretty simple.  I think you just gave me two copies of each

21   one.

22       Q.    You received each of these letters from Landmark

23   Partners at or about the time they were --

24       A.    Yes.

25             MR. FIEBACH:  Your Honor, I move Defendant's 520

1    through 523 into evidence.

2           MR. BUSH:  No objection.

3           THE COURT:  They may be marked as full, 520 through

4    523.

5    Q.    Now, let's look at 520.  That's a letter to you,

6    December 23, 2004.  Can we get it up, please.  I want to

7    focus in on the next to last paragraph of the letter on page

8    two.

9    A.    The screen's showing 523 and that only has one

10   page.  So I'm sorry, I'm not following you.

11   Q.    I'm sorry.  520.  Second page.  Let's focus in

12   where it says for 2004.

13          Mr. Haviland and Mr. Borges were informing you

14   there that for 2004 the company will pay a discretionary

15   profit participation bonus to key employees aimed at

16   rewarding them for contributing to Landmark's growth and

17   expansion.  Is that what they said to you in a letter?

18   A.    That's what this letter says, yes.

19   Q.    And it says, in this regard, you have been awarded

20   a bonus of $150,000 for 2004 payable January 5, 2005?

21   A.    That's what it says.

22   Q.    And you received that money, did you not?

23   A.    Yes.

24   Q.    And was this $150,000 required to be paid to you

25   under your agreement, letter agreement with Landmark?

```
 1        A.    I don't think so.

 2        Q.    This was something given to you over and above,

 3   right?

 4        A.    Yes.

 5        Q.    And then again in 521, please.  The rest of the

 6   letter is sort of a summary of the year and sort of wraps

 7   up --

 8        A.    It's a form letter, yes.

 9        Q.    Well, it's is summary of what happened during the

10   year?

11        A.    That went to all employees, yes.

12        Q.    Good things that happened to Landmark during that

13   year?

14        A.    Yeah.

15        Q.    Right?

16        A.    Yeah.  I think that's fair.

17        Q.    And Exhibit 521 is the similar kind of letter for

18   the following year?

19        A.    Exhibit 521 has two letters in it, but one of the

20   two is, yes.

21        Q.    Just talking about the first two pages.

22        A.    Got it.

23        Q.    And looking at the last -- the second page of that

24   document, the focus again on you have been awarded, the third

25   bullet point?
```

1      A.    Yes.

2      Q.    You have been awarded a profit participation bonus

3   for 2005 of $150,000 payable January 6, 2006?

4      A.    Yes.

5      Q.    And you were paid that?

6      A.    I believe so, yeah.

7      Q.    And you weren't required to be paid that under your

8   agreement with Landmark?

9      A.    That's correct.

10     Q.    Defendant's Exhibit 522, the letter of December

11   18th, 2006.  Again, focusing in on the third bullet point on

12   the second page.

13         Mr. Borges and Mr. Haviland informed you that you

14   were given a third profit participation bonus for 2006 of

15   $150,000?

16     A.    Yes.

17     Q.    And you received that as well?

18     A.    Yes.

19     Q.    And, again, that wasn't required by your

20   contract?

21     A.    That's correct.

22     Q.    And finally, in 2007, Exhibit 523, the third bullet

23   point.  Mr. Haviland and Mr. Borges awarded you a fourth

24   $150,000 profit participation bonus for the year 2007 payable

25   in 2008?

1     A.     Yeah.  That's capital call bonuses.

2     Q.     Excuse me?

3     A.     There was a discussion about the capital call bonus

4  and how it was discontinued and they called it profit

5  participation bonus.  As you can see it's -- now we call it a

6  profit participation bonus, but by the way if you have

7  outstanding capital --

8     Q.     Is that what the letter says?

9     A.     Yeah.

10     Q.     Where does it say that?

11     A.     Right under it.  It says, we're giving you a profit

12  participation bonus for 2007, same point.  If you have an

13  outstanding loan for capital calls, pay it off.

14     Q.     We recommend a portion of your bonus to pay down

15  the loan?

16     A.     Yes, we recommend it.

17     Q.     But you were rewarded a $150,000 profit

18  participation bonus for 2007?

19     A.     Yes, sir.

20     Q.     And you got that money?

21     A.     Yes, sir.

22     Q.     So that over the four years you were paid $600,000

23  in profit participation bonus that was not called for by your

24  contract?

25     A.     I think that's fair to say.

1     Q.     Now, you spent a lot of time earlier today talking

2   about the discussion of whether or not anything that they did

3   give you under the economics of Landmark was to be effective

4   or relate back to the beginning of your employment.  Do you

5   remember that discussion?

6     A.     I think I know what you're referring to, yes.

7     Q.     Now, in fact, the only discussion that you ever had

8   with Mr. Borges or Mr. Haviland concerning any earlier

9   effective date was when Mr. Borges said to you that if, if it

10  was a stock purchase plan, that we would value your

11  requirement to buy the stock at the value of the company when

12  you started.  That was the only discussion that you ever had

13  with Mr. Borges or Mr. Haviland?

14    A.     No, that's not true.

15    Q.     What is true?

16    A.     I think I testified to that.  During my

17  conversation with Tim Haviland, he indicated in a couple of

18  different ways that the -- it would be effective for me as of

19  2004, and effective for everybody who had participated by the

20  end of 2004.  And in my discussion with Frank Borges, his

21  representation was considerably broader than what you just

22  stated.

23    Q.     There's nothing in the contract, P-25, when we look

24  at participation in the economics of Landmark Partners, Inc.,

25  there's no discussion there about a start date or an

1  effective date?

2      A.     I think a date is in here.

3      Q.     An effective date?

4      A.     I'm sorry.

5      Q.     In the section under participation in the economics

6  of Landmark Partners, Inc., in Exhibit P-25, where it says

7  participation in the economics of Landmark Partners, second

8  page.  There is no language there that says in your agreement

9  with Landmark that whatever plan they put into effect, that

10 it will be effective for you as of the date of your

11 employment.  Doesn't say that, does it?

12     A.     This summary that you're asking about does not say

13 that, that's correct.

14     Q.     The document that you signed did not say that?

15     A.     I signed the summary document.  We're talking about

16 the same thing.

17     Q.     Is it your contention that you had a discussion

18 with Mr. Borges or Mr. Haviland that if they implemented a

19 profit sharing plan that the profit sharing plan would be

20 effective as of the start of your employment?

21     A.     I'm trying to be really responsive so I'm trying to

22 make sure I understand all parts of your question.

23     Q.     Why don't you just try to be truthful.

24     A.     I am doing that, sir.  I am under oath.  I

25 understand that.

1          Can you please restate it so I make sure I'm

2     following every piece?

3          Q.   My question is, is it your contention that you had

4     a discussion with Mr. Borges or Mr. Haviland that if the plan

5     that was implemented was a profit sharing plan that it will

6     be effective as to you as of the date of the commencement of

7     your employment?

8          A.   Not exactly.  I had a conversation with them that

9     saying whatever they did, it would be effective as of the

10    time I started.  But I didn't have any conversations about

11    what if we adopt a profit sharing plan.  And, in fact, my

12    belief at this time was that's not what they were going to do

13    for me.

14         Q.   So it's your contention today that whatever plan

15    was adopted would be related back to the commencement of your

16    employment?

17         A.   Yes.

18         Q.   I want you to look at your deposition.

19              MR. DELL'OSA:  May I, your Honor?

20              THE COURT:  You may.

21         Q.   And you agree that your deposition, your testimony

22    was -- should be as truthful as it is here today?

23         A.   Of course.

24         Q.   Would you look at page 431, starting at line 1.

25    You were asked this question.

 1              MR. BUSH:  Can you hold on just a second.  Okay.

 2              THE COURT:  Okay, Mr. Bush?

 3              MR. BUSH:  Yes.

 4         Q.    You were asked this question, Mr. Stevens.  He

 5    said, Let's look at the next exhibit, Exhibit 45.  Is Exhibit

 6    45 a memorandum that you prepared?  And your answer was yes.

 7    Correct?

 8         A.    That's what it says here, yes.

 9         Q.    And then -- and you said to Frank Borges and Tim

10    Haviland on October 8, 2008?

11              MR. BUSH:  Objection, your Honor.  I believe this is

12    referring to an exhibit that's barred by the settlement

13    ruling.

14              THE COURT:  Are you trying to impeach this statement

15    about -- that he made before you gave him the deposition,

16    right?  You're doing this for impeachment purposes, right?

17              MR. FIEBACH:  Yes.

18              THE COURT:  Are we going to get to the impeaching

19    statement?

20              MR. FIEBACH:  Yes, your Honor.

21              THE COURT:  Why don't we get there.

22              MR. BUSH:  But, your Honor, I do have an objection

23    that it's related to a document.

24              THE COURT:  Why don't we come up to side-bar.

25               (Whereupon, the following conference was held at

1    side-bar.)

2         THE COURT:  For the record, he just handed me the

3    transcript because I asked him to.  I'm trying to understand

4    Exhibit 45, the document.

5         MR. BUSH:  It's one of the documents.

6         THE COURT:  That's covered by the ruling?

7         MR. BUSH:  Exactly.

8         MR. FIEBACH:  I'm not using it for that, because at

9    the end he says sitting here today he still agrees with that

10   so.  Sitting here today he still agrees with it and he says

11   yes.  And that's the impeachment.

12        MR. BUSH:  My objection stands because this -- it's

13   exactly the reason you're not supposed to use -- you're not

14   supposed to use settlement documents for their admissions and

15   they come into evidence, and if you've done this in the

16   courtroom right today you would have been able to ask that

17   question.

18        MR. FIEBACH:  Your Honor, the impeachment here

19   today, that sitting here today in his deposition he still

20   agrees with that.  He doesn't say that was something I said

21   per settlement or anything else and that's been -- you've

22   allowed testimony on this and he's saying the complete

23   opposite in his deposition, and I think I should be able to

24   impeach him.

25        THE COURT:  The problem is, Mr. Fiebach, it appears

1    that the question he's quoting from is a document that was

2    kept out by my ruling.  And my recollection of the rule, the

3    language of the Rule 408(a) specifically includes

4    impeachment.  In other words, evidence of the following is

5    not admissible either to prove or disprove the validity or

6    amount of a disputed claim or to impeach by a prior

7    inconsistent statement or contradiction.  So based on that,

8    although the source is the deposition, the question is

9    effectively quoting from a document that is a settlement

10   document.

11          I think I need to sustain the objection.  I'll hear

12   you briefly.

13          MR. FIEBACH:  Your Honor, that's not what I'm -- the

14   impeaching part is that sitting here in his deposition he

15   still agrees with that, and he said that under oath.  And

16   otherwise, you're allowing him to testify completely

17   different than the way he testified in his deposition.

18          THE COURT:  And my understanding of the rule is that

19   for policy reasons that's what the drafters of the rule have

20   contemplated.

21          MR. FIEBACH:  No, your Honor, I don't think so.  I

22   think if the question just asked ended with that's what you

23   you said in that memorandum, I think that would be true.  But

24   the next question and answer is the impeaching part for this

25   purpose, which is, you still believe that to be true today,

1    and as of the date of the deposition.  And that's the

2    impeaching part.

3            THE COURT:  I'm going to sustain the objection.

4            (Side-bar concluded.)

5            THE COURT:  Okay, ladies and gentlemen, I've

6    sustained Mr. Bush's objection.

7    BY MR. FIEBACH:

8        Q.    Mr. Stevens, at Landmark there were several

9    categories of people at the higher end of the spectrum.  One

10   was partners and you were a partner, considered a partner,

11   correct?

12       A.    I'm not -- higher end of the spectrum?  There are

13   different ways of looking at that.  Partners were

14   certainly -- it's fair to say they were at the higher end of

15   the spectrum.  I'm not sure I understand.

16       Q.    There was a category of people?

17       A.    Yes.

18       Q.    And another category was principals?

19       A.    That's true.  That was another category of people

20   at Landmark, that's right.

21       Q.    Yes.  And when you got the plan that was proposed

22   to you in September of 2008, it was your testimony that you

23   thought that that plan was broader than it should have been

24   because it included principals, not just partners.  Wasn't

25   that your testimony?

1    A.    I think I described it as a draft outline of a plan

2    but, yes, I did talk about my reaction to that bullet

3    point.

4    Q.    Could you look at your agreement with Landmark

5    again, the participation in the economics of Landmark?

6    A.    Yes.

7          THE COURT:  I think we're looking at Exhibit 25.

8          MR. FIEBACH:  25.  P-25.  Highlight the

9    participation in the economics of Landmark.

10   Q.    In fact, your agreement said we are in the process

11   of examining various options for key principals.  You see

12   that?

13   A.    Yes.

14   Q.    So the plan that was ultimately given to you, at

15   least in that sense, was consistent with your contractual

16   obligation, was it not?

17   A.    I think the answer's yes.  I just want to make

18   sure.  Can I see the plan again?

19   Q.    As long as you think the answer's yes, we can leave

20   that issue.

21         Now, as long as we have that in front of us, you

22   were told when you signed this that Landmark had not

23   determined the form of what the program would be, correct?

24   A.    Yes.

25   Q.    And this was going to be a plan, as it says, for

1    key principals, not just for Gary Stevens?

2        A.    Right.

3        Q.    And it was to be a plan that was going to allow the

4    principals "to benefit from their contributions to the growth

5    of the firm," correct?  Correct?

6        A.    Yes, that's what it says.

7        Q.    And you were given -- the last sentence, you will

8    have a meaningful participation, initially 10 percent in the

9    program.  Is that what it says?

10       A.    It does.

11       Q.    It doesn't say in the company, does it?

12       A.    Depends on -- it doesn't use that word, that's

13   correct.

14       Q.    It uses the word program?

15       A.    That's correct.

16       Q.    You have Exhibit 560 -- I'm sorry, Plaintiff's

17   Exhibit 60 there.

18             Plaintiff's Exhibit 60, Mr. Stevens, is the outline

19   of the equity share program that was presented to you in

20   September 2008, correct?

21       A.    Got it, yes.

22       Q.    And you've told the jury all the reasons why you

23   thought that the plan didn't meet your expectations or what

24   you thought was required of Landmark.

25       A.    That's right.

1      Q.    And when you received Plaintiff's Exhibit 60, you

2   testified that after you had reviewed it you sent a

3   memorandum to Mr. Haviland and Mr. Borges?

4      A.    Yes.

5      Q.    And that memorandum, I think, has been admitted

6   into evidence as Plaintiff's Exhibit 64.  Can we get that up?

7            Now, let's go through this.  This is your immediate

8   response to the program that was outlined to you in September

9   2008.  This was your first response, correct?  I think that's

10  what you testified to earlier.

11     A.    I think my first response was to call Tim.

12     Q.    First written response?

13     A.    Yes, that's correct.

14     Q.    Okay.  Now, let's start first paragraph.

15           I reviewed the plan outline that Tim sent on Friday

16  and gave him some comments during a phone call Friday

17  afternoon.  And then you say, I'm really concerned, though,

18  and you wanted to clarify so you could move things along more

19  efficiently.

20           Let's move down to the second paragraph.  And I

21  think you testified to this.

22           Frank had asked you are you with us, and my

23  response emphasized my need to have you address an important

24  provision in my initial employment letter.

25           And you testified to that earlier, correct?

1    A.    Yes.

2    Q.    And I'm skipping down to the next paragraph.

3    Please take the time to read.  You then quoted the language

4    from your agreement with respect to participation in the

5    economics of Landmark Partners, Inc.  Correct?

6    A.    Almost correct.  There are some minor differences.

7    I actually only had an electronic version of the draft so

8    what I quote here is the draft.  It is slightly different

9    from the final.  But, yes, substantially that's correct.

10   Q.    And then in the next paragraph you said, you

11   assured me that whatever the program and whenever it was

12   presented, my participation would relate back to Landmark's

13   financial condition and status as of the time of my original

14   employment, May 2004.  This was an essential part of why I

15   came to Landmark, and why I have worked for the last four and

16   a half years rebuilding Landmark's Real Estate Group, and you

17   have not honored this provision.  That's what you said to

18   Mr. Borges and to Mr. Haviland, correct?

19   A.    Yes.

20   Q.    And then the next paragraph says, I don't

21   understand how a plan for partners and principals to share up

22   to five percent of net revenues from specific funds only,

23   beginning in 2009, could possibly be construed as remotely

24   close to satisfying your obligation on the above commitment.

25   A.    Right.

1    Q.    So you raised specifically two points.  One, it

2    wasn't retroactive?

3    A.    I'm sorry.  Are you asking me what I was raising in

4    this communication or what I testified to earlier?

5    Q.    This communication, sir.

6    A.    Got it.

7    Q.    This is your first response to the plan?

8    A.    My first written response.

9    Q.    And the first thing you raised was that it wasn't

10   retroactive?

11   A.    Yes.

12   Q.    And the second thing you raise was that it was five

13   percent when you had been promised 10 percent?

14   A.    Yes.

15   Q.    You didn't put a word in this document that it

16   should be related to the entire firm's revenues and not just

17   the real estate.  There's nothing in this document on that,

18   right?

19   A.    Well, except for the fact that the provision says

20   the participation in the economics in Landmark Partners,

21   Inc., which we understood to be the entire firm.  But you're

22   correct, there's nothing other than that in this document.

23   Q.    After you quoted the language of the agreement and

24   then you had two paragraphs of your complaint about what had

25   been offered to you?

1        A.     Yes.

2        Q.     There isn't a word in there about the fact that it

3    didn't cover the entire revenues of Landmark Partners, that

4    it only related to the real estate funds?

5        A.     Right.  As I testified, I had a whole bunch of

6    problems with it, but these are the two that I mentioned in

7    this memo, that's correct.

8        Q.     So in your first response -- if you just would

9    answer my question and then we can move on -- it's true, is

10   it not, that you did not in this first response, written

11   response, raise the issue of the fact that the plan did not

12   give you a right to any income other than those related to

13   the real estate funds?

14       A.     I raised that in my telephone call, but in the

15   written response, that's true.

16       Q.     Written response you didn't mention it?

17       A.     In this written response, right.

18       Q.     And you didn't say that I was entitled to a hundred

19   percent of the income of the firm in this document?

20       A.     Lots of things I didn't say, correct.

21       Q.     Those are things you added later?

22       A.     I didn't add them later.  I communicated them

23   repeatedly later.

24            MR. FIEBACH:  Your Honor, I was going to ask if I

25   could have a five-minute break to review my notes and then I

1    think there's one or two areas I want to cover, buty I just

2    want to finish up.

3         THE COURT:  Why don't we let the jurors take a five

4    minute break.  Ladies and gentlemen, we're almost done for

5    the day, but Mr. Fiebach just has to review his notes, see if

6    he has any further questions.

7         Don't discuss the case, don't let any one discuss it

8    with you, and we'll come back in about five minutes.

9         (Jury out at 2:44, p.m.)

10        THE COURT:  We're going to go back on the record.

11        MR. FIEBACH:  I have one more area to cover with

12   Mr. Stevens.  It's an impeachment area and it would be

13   prejudicial if I didn't get to finish, start and finish it at

14   one time, and I don't think I can get it done in 10 or 15

15   minutes.  So I would request that we adjourn.

16        THE COURT:  Why don't we excuse the jury for the

17   day.  We'll deal with the motions.  You think you have, what,

18   another 20 minutes?

19        MR. FIEBACH:  Yes.

20        THE COURT:  You're going to have a little on

21   redirect.

22        Why don't we bring the jury in.

23        (Jury in.)

24        THE COURT:  Please be seated.  Ladies and gentlemen,

25   what I have to do with the lawyers is going to take a little

 1    bit longer than I anticipated.  The good part about that is

 2    we're going to excuse you early today.  I will just caution

 3    you again, sort of my broken record refrain, don't

 4    communicate with anyone about the case, including your family

 5    members, including your friends.  You certainly can tell them

 6    that you are a juror, but don't tell them anything else until

 7    you've been discharged by me, and don't let anyone speak to

 8    you about the case.  And we'll see you tomorrow morning at

 9    9:00.  Thank you for your attention today.

10              THE COURT:  You can be seated.  Mr. Stevens can step

11    down.

12              Let's just see where we are time wise.  Obviously,

13    we can't take up any motions just yet.

14              Mr. Fiebach, my understanding is you're going to be

15    another 20, 25 minutes on cross?

16              MR. FIEBACH:  That's what I expect, your Honor.

17              THE COURT:  And then, Mr. Bush, do you have an

18    estimate as on the redirect?

19              MR. BUSH:  It's more like a guesstimate, your Honor,

20    but my guesstimate would be 15, maybe 20.

21              THE COURT:  That's what I would expect.  At that

22    point is it still your expectation to rest?

23              MR. BUSH:  Yes, it is.

24              THE COURT:  So we'll deal with the motions tomorrow

25    in the manner I indicated earlier, namely, I'll just ask you

1    if you have a motion if the jury's here, we won't send them

2    out, and I'll let you put together your record at a break

3    when they're out.

4          And then is it your intention to call -- who do you

5    intend to call Mr. Fiebach?

6          MR. FIEBACH:  Your Honor, our witnesses tomorrow

7    will be Mr. Borges, Mr. Haviland and, if we get to him,

8    Mr. Glusman.  I assume we will based on the schedule.  We

9    then will rest our case.

10         THE COURT:  And I recognize there may or may not be

11   a request for some rebuttal, which I don't express any

12   opinion about now.  I'm just trying to think ahead to the

13   charge conference and when we're going to have that.  It

14   sounds like we'll certainly get to it at some point on

15   Thursday.  And so I would -- let me just say this.  Why don't

16   we, for the moment, plan to be prepared to have a charge

17   conference as early as Thursday morning.  Whether we actually

18   have it Thursday morning remains to be seen, but let's at

19   least be prepared to have a charge conference as early as

20   Thursday morning.

21         Is there anything else to discuss today?

22         MR. BUSH:  Your Honor, I think you had mentioned,

23   this may be several days ago, that you were planning on

24   circulating a verdict form.  Will you do that in advance of

25   the charge conference?

1          THE COURT:  Yes, I'll do it in advance of the charge

2     conference.  I also am going to have try to have a draft

3     charge for you at the charge conference which is why we may

4     not get to it Thursday morning, but I'm going to try.  What

5     we'll do is hear you both on the draft instruction and the

6     draft verdict form.

7          Anything else?

8          MR. BUSH:  That's it.  Thank you, your Honor.

9          THE COURT:  Very well.  We'll stand in recess.

10    We're adjourned.

11          (Court adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4   the foregoing pages are a complete and accurate transcription

5   of my original stenotype notes taken in the matter of Stevens

6   v. Landmark Partners, which was held before the Honorable

7   Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,

8   Connecticut, on April 23, 2013.

9

10

11

12                              _____
                                Martha C. Marshall, RMR,CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1

2                            I   N   D   E   X

3
      PLAINTIFF'S WITNESSES:
4
      GARY STEVENS
5     Direct Examination              220
      Cross-Examination               348
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25